## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUUL LABS, INC.,<br><br>     Plaintiff,<br><br>  v.<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:22-cv-02853<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

I, Michele Mital, declare as follows:

1.  I am the Deputy Director of the Center for Tobacco Products ("CTP"), in the Office of the Center Director ("OCD"), CTP, U.S. Food and Drug Administration ("FDA") in Silver Spring, Maryland. From April 10, 2022 to July 2, 2022, I was the Acting Center Director of CTP.  I submit this Declaration in support of Defendant's Motion for Summary Judgment in the above-captioned matter.

2.  CTP is the center within FDA responsible for regulating tobacco products. The Center Director is the head of CTP.  OCD has supervisory authority over all of the offices in CTP, including the Office of Science ("OS"), which conducts all scientific premarket review, including review of premarket tobacco product applications ("PMTAs").

3.  The statements made in this Declaration are based upon my personal knowledge and information made known to me in my official capacity and about which I have become knowledgeable.  In addition, I am personally familiar with CTP's handling of PMTAs generally and CTP's handling of the PMTAs submitted by Juul Labs, Inc. ("Plaintiff") specifically.

4.      The purpose of this declaration is to explain:  (a) CTP's general practice in conducting scientific review of PMTAs; (b) CTP's handling of Plaintiff's PMTAs; and (c) the anticipated harm that is reasonably likely to result from disclosure of the records at issue in this matter.

**CTP'S GENERAL PRACTICE IN CONDUCTING SCIENTIFIC REVIEW OF PMTAS**

5.      Section 910 of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 387j, provides the Secretary of Health and Human Services ("HHS") with premarket review authority regarding tobacco products.

6.      The Secretary of HHS has delegated this authority to the Commissioner of Food and Drugs ("Commissioner"), with authority to further redelegate it.  *See* FDA Staff Manual Guides ("SMG") 1410.10, at 1.A.1 (delegating to the Commissioner "[f]unctions vested in the Secretary under the Federal Food, Drug, and Cosmetic Act"), available at https://www.fda.gov/media/81983/download.  A true and correct copy of SMG 1410.10 is attached as **Exhibit 1**.

7.      The Commissioner has delegated to multiple CTP officials the authority "to issue orders to approve or deny applications under Section 910(c)(1)(A) of the [FDCA]," and "to deny applications and to provide information about the measures required to remove the application from deniable form under Sections 910(c)(2) and (c)(3) of the [FDCA]," including the Director and Deputy Director of CTP, and the Director of OS.  *See* SMG 1410.1103, at 1.F and 1.G, available at https://www.fda.gov/media/83160/download.  A true and correct copy of SMG 1410.1103 is attached as **Exhibit 2**.

8.      The Center Director and his/her office, OCD, is the head of CTP and has supervisory authority over all of the offices in CTP, including OS.  *See* CTP Organization Chart,

available at https://www.fda.gov/media/131220/download.  A true and correct copy of the CTP

Organization Chart is attached as **Exhibit 3**.

9.      OS conducts scientific review of PMTAs, and regularly consults with OCD in

making such decisions, including when a review raises novel and/or complex regulatory

questions, such as application of the statute's unique public health standard to a new category of

products.

10.     During OS's scientific review of PMTAs, reviewers in each applicable scientific

discipline draft a review memo (a "Discipline Review Memo") for each review cycle in which

they participate and place that memo in CTP's database (referred to as the "Image" database)

under the application's Submission Tracking Number ("STN").  Discipline Review Memos are

limited to the individual discipline reviewer's area of expertise and evaluate the available data

and information in accordance with the principles of that scientific discipline.  Discipline Review

Memos discuss how the available data and information informs and supports the reviewer's

opinion regarding the limitations and strength of the application with regard to that discipline,

including how the reviewer believes that the data and information should be interpreted (and

whether there are limitations to the conclusions that can be drawn from the data and information)

in light of the relevant statutory standard.  The OS staff-level scientists who draft the Discipline

Review Memos do not have delegated authority to make the agency decision on whether to grant

or deny marketing authorization.  *See supra* ¶ 7.

11.     OS further designates an experienced staff member as the Technical Project Lead

("TPL") for each application.  The TPL evaluates the application under the statutory standard

required for marketing authorization, i.e., whether permitting the marketing of the product would

be "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2)(A).  The TPL's

evaluation aggregates and assesses the contents of the Discipline Review Memos provided by the individual discipline reviewers.  The TPL makes recommendations to the Director of OS regarding the action the TPL believes FDA should take on the application.  TPLs' recommendation memos, containing these evaluations and recommendations, are called "TPL Review Memos."

12.     The Director of OS considers the TPL's evaluations and recommendations and often makes the FDA decision as to whether to grant or deny marketing authorization, with input as needed from the Office of the Center Director.  *See* supra, ¶ 7.   An FDA decision to approve a PMTA is known as a Marketing Granted Order (MGO), and a decision to deny is known as a Marketing Denial Order (MDO).

### CTP'S HANDLING OF PLAINTIFF'S PMTAS

13.     Plaintiff submitted a bundle of PMTAs for numerous electronic nicotine delivery systems (ENDS) products (colloquially known as e-cigarettes) in July 2020.

14.     In comportment with its supervisory role over OS, OCD advised OS that it "would review any conclusions reached by OS for this [application] bundle before those conclusions [become] a final agency decision."  *See* June 23, 2022 Memo to File at 1 ("OCD Memo"), a true and correct copy of which is attached as **Exhibit 4**.

15.     As it neared the end of its scientific review, OS proposed to OCD that a decision denying Plaintiff's application bundle should issue based solely on identified toxicological deficiencies.  Consistent with this approach, the OS staff scientist designated as the TPL prepared two separate TPL Review Memos – one focused only on the PMTAs' toxicology deficiencies and a second discussing the same PMTAs as viewed through the lenses of other scientific disciplines.   OS proposed to OCD that the decision denying Plaintiff's application

bundle should rest on the toxicological deficiencies (those described in the Toxicology TPL Review Memo) alone. *See id.* at 1 (The "TPL . . . advised OCD that an MDO should be issued because of toxicological deficiencies, which are described in the [Toxicology TPL Review Memo] and the relevant disciplinary reviews. The TPL has also advised OCD in a separate memo, [the Additional Disciplines TPL Review Memo], that OS has completed other (non-toxicology) discipline reviews.").

16.     OCD reviewed the Toxicology TPL Review Memo and concurred with this proposal. *See id.* ("OCD completed review of the [Toxicology TPL Review] and hereby concurs with its conclusions . . . OS and OCD agree that CTP should issue an MDO for the application bundle on the basis of the toxicological deficiencies alone").

17.     Because OCD concurred, for FDA to issue a decision, "it [was] not necessary for OCD to review and resolve (and thus CTP has not resolved) any other aspects of the applications." *Id.* Therefore, OCD stated that the additional Discipline Review Memos and related conclusions in the Additional Disciplines TPL Review Memo "have not been adopted by OCD and do not reflect complete agency consideration or a final agency decision." *Id.* at 1-2.

18.     Further, while the Additional Disciplines TPL Review Memo reflects that the Director of OS "concur[red] with [the] TPL['s] findings and conclusion," it expressly explains that "OCD advised OS that OCD would review any conclusions reached by OS for this bundle before those conclusions became a final agency decision," and that "OCD has not reviewed the findings and conclusions in this TPL Review (Additional Disciplines)."

19.     To prevent internal confusion regarding whether the Additional Disciplines TPL Review Memo provided any part of the basis of the agency's ultimate decision, CTP decided that

the record should not be stored in the Image database, but instead maintained with other working files.

20.     OCD explicitly contemplated the possibility that, if the agency proceeded to further consider additional disciplines in Plaintiff's PMTAs other than toxicology, "further deficiencies may be found" but that "would not change the current conclusion" that the products did not meet the statutory standard for authorization.  *Id.* at 2.

21.     OCD's decision not to review and resolve the non-toxicological aspects of the applications means that the records discussing those topics remain pre-decisional and deliberative in nature, and reflect only individual OS staff scientists' views in those reviewers' areas of expertise at an identified point in time.  The Additional Disciplines TPL Review Memo and its underlying Discipline Review Memos do not reflect agency conclusions.  These records contain recommendations from OS to OCD regarding how the agency might have proceeded if the agency had chosen to go beyond what was necessary to issue the MDO based only on the toxicology deficiencies.  The agency chose not to do that.

22.     The Director of OS signed and issued the agency decision, an MDO based solely on the applications' toxicological deficiencies as outlined in the Toxicology TPL Review Memo, on June 23, 2022.  A true and correct copy of the MDO (redacted for public release) is attached as **Exhibit 5**.  The MDO adopted the reasoning set forth in the Toxicology TPL Review Memo.

## ANTICIPATED HARM FROM DISCLOSURE

23.     If the records at issue in this matter are disclosed, it is reasonably foreseeable that the agency's current and future deliberations regarding the same data and information, as analyzed by scientists from various disciplines other than toxicology, would be adversely impacted.  A supervisory review process involving Plaintiff's MDO is currently underway.  This

review may entail active reconsideration of those very subjects, including deliberations by the same individuals who drafted the earlier review memos, or by different individuals exercising their own independent judgment and expertise.  The release of the agency's unfinished deliberations, including the opinions of individuals who could be involved in current or future deliberations on the exact same data and information, could adversely affect those current or future deliberations (including any that may be currently taking place).  For example, knowing that the applicant has seen an individual reviewer's earlier analysis could discourage that reviewer or others from appropriately refining or revising that analysis based on further discussion and deliberation.

24.     If these records are disclosed, it is also reasonably foreseeable that revealing the substance of unfinished staff scientist-level deliberations would cause confusion regarding the basis of FDA's MDO.  As explained, FDA's MDO was not based in any way upon the subjects discussed in the Additional Disciplines TPL Review Memo and the associated Discipline Review Memos.  However, because FDA typically releases TPL Review Memos and Discipline Review Memos that *do* provide the basis for its decisions, and because the records at issue here did not serve that purpose but otherwise appear very similar to the types of records FDA typically releases in such circumstances, these records are very likely to be misconstrued outside of the agency.  The public, and Plaintiff, might be led to believe that these records reflect CTP's position on topics for which it has not yet reached a conclusion, such as "the potential benefit to adults as compared to the risk to youth posed by [Juul's] tobacco or menthol products."  *See* Exh. 5 at 12.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

Executed on March 1, 2023.

Michele Mital -S

Digitally signed by Michele Mital -S
Date: 2023.03.01 22:37:49 -05'00'

MICHELE MITAL
Deputy Director
Center for Tobacco Products
Food and Drug Administration
U.S. Department of Health and Human Services

# <u>Exhibit 1</u>

SMG 1410.10

**FDA Staff Manual Guides, Volume II – Delegations of Authority**

**Regulatory – General**

**Delegations of Authority to the Commissioner of Food and Drugs**

Effective Date:  22 February 2023

**1.  Authority Delegated and To Whom Delegated.**

A.  The Secretary of Health and Human Services (the Secretary) has redelegated to the Commissioner of Food and Drugs (Commissioner), with authority to redelegate (except when specifically prohibited), all authority as follows:

(1)  Functions vested in the Secretary under the Federal Food, Drug, and Cosmetic Act (FFD&C) (21 U.S.C. 301 *et seq*.), as amended.

(2)  Functions vested in the Secretary under the Filled Milk Act (21 U.S.C. 61 – 63), and the Federal Import Milk Act (21 U.S.C. 141 *et seq*.).

(3)  Functions vested in the Secretary under the Federal Caustic Poison Act (44 Statute 1406); also, Public Law 86-613, section 19 (formerly section18).

(4)  Functions vested in the Secretary under The Fair Packaging and Labeling Act (15 U.S.C. 1451 *et seq*.).

(5)  Functions vested in the Secretary under section12 of Reorganization Plan No. IV and Reorganization Plan No. 1 of 1953, including authority to administer oaths vested in the Secretary of Agriculture by 7 U.S.C. 2217.

(6)  Functions vested in the Secretary under section 301 (Research and Investigations); section 307 (International Cooperation); and section 311 (Federal-State Cooperation) of the Public Health Service (PHS) Act (42 U.S.C. 241, 242l, 243), as amended, which relate to the functions of the Food and Drug Administration (FDA).

(7)  Functions vested in the Secretary under section 361 of the PHS Act (42 U.S.C. 264), as amended, which relate to the law enforcement functions of the FDA concerning the following products and activities: Biological (including blood and blood products); interstate travel sanitation (except interstate transportation of etiologic agents under 42 CFR Part 72); food (including milk and food service sanitation and shellfish sanitation); and drugs, devices, cosmetics, electronic products, tobacco products and other items or products regulated by the FDA.

(8)  Functions vested in the Secretary under sections 351 and 352 of Part F, Subpart 1 of the PHS Act (42 U.S.C. 262 and 263), as amended (Biological Products), insofar as they relate to the functions assigned to the FDA.

(9)   Functions vested in the Secretary under 302(a) of the PHS Act (42 U.S.C. 242(a)), as amended, which relate to the determination and reporting requirements with respect to the medicinal and scientific requirements of the United States for controlled substances.

(10)  Functions vested in the Secretary under section 303 of the PHS Act (42 U.S.C. 242a), as amended, which relate to the authorization of persons engaged in research on the use and effect of drugs to protect the identity of their research subjects with respect to drugs scheduled under Public Law 91-513 for which an investigational new drug application is filed with the FDA and with respect to all drugs not scheduled under Public Law 91-513.

(11)  Functions vested in the Secretary pertaining to section 4 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (Public Law 91-513, 84 Statute 1241) which relate to the determination of the safety and effectiveness of drugs or to approve new drugs to be used in the treatment of narcotic addicts.

(12)  Functions vested in the Secretary pertaining to section 303(f) of the Controlled Substances Act (21 U.S.C. 823(f)), which relate to the merits of the research protocol and to the determination of the qualifications and competency of practitioners wishing to conduct research with controlled substances listed in Schedule I of the Act.

(13)  Functions vested in the Secretary pertaining to provisions of the Controlled Substances Act (21 U.S.C. 801 *et seq*.), which relate to administration of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 *et seq*.).

(14)  Functions vested in the Secretary under section 409(b) of the Federal Meat Inspection Act (21 U.S.C. 679(b)), which relate to the detention of any carcass, part thereof, meat, or meat product of cattle, sheep, swine, goats, or equines.

(15)  Functions vested in the Secretary under section 24(b) of the Poultry Products Inspection Act (21 U.S.C. 467f(b)), which relate to the detention of any poultry carcass, part thereof, or poultry product.

(16)  Functions vested in the Secretary under the Egg Products Inspection Act (21 U.S.C. 1031 *et seq*.).

(17)  Functions vested in the Secretary by amendments to the foregoing statutes subsequent to Reorganization Plan No. 1 of 1953.

(18)  Function of issuing all regulations of the FDA, except as provided in this delegation section 2, Limitations.  The reservation of authority contained in Chapter 2-000 of the Department Organization Manual shall not apply.

(19)  Functions vested in the Secretary under section 1103 of Executive Order 11490, as amended by Executive Order 11921, which relate to emergency health functions as they pertain to the operations and functional responsibilities assigned to the FDA.  This authority shall be exercised in

accordance with section 102 and pertinent sections of Part 30 of Executive Order 11490 and guidelines issued by the Federal Preparedness Agency of the General Services Administration and the Office of the Secretary.

(20)   Function vested in the Secretary for authorizing and approving miscellaneous and emergency expenses of enforcement activities.

(21)   Functions vested in the Secretary under the Federal Advisory Committee Act (Public Law 92-463) to:

   a.   Renew recharter, amend and terminate established Federal Advisory Committees.

   b.   Authority to approve waivers to appoint committee members to established Federal Advisory Committees.

   c.   Authority to close review meetings following approval by the Office of the General Counsel based on a determination that the Advisory Committee meeting or a portion thereof may be closed to the public under the provisions of 5 U.S.C. 552b(c) and section10(d) of the Federal Advisory Committee Act.

These authorities are to be exercised in accordance with the requirements of the Federal Advisory Committee Act (Public Law 92-463) (5 U.S.C. 552b), Departmental regulations (45 CFR 11, superseded by 41 CFR 101-6); and any other applicable statutes and regulations.

(22)   Functions vested in the Secretary under the second sentence of section 310(a) and under section 310(b) (Health Conferences and Health Education Information) of the PHS Act (42 U.S.C. 242o), as amended, to call for a conference and invite as many health authorities and officials of State or local public or private agencies or organizations as deemed necessary or proper on subjects related to the functions of the FDA, and to issue information related to health for the use of the public and other pertinent health information for the use of persons and institutions concerned with health services when such information is related to the functions of the FDA.

(23)   Functions vested in the Secretary under section 2701 of the PHS Act (42 U.S.C. 238), as amended, to accept offers of gifts, excluding the acceptance of gifts of real property (only the authority to accept unconditional gifts of personal property valued at $5,000 or less may be redelegated).

(24)   Functions vested in the Secretary under section 362 of the PHS Act (42 U.S.C. 265), as amended, which relate to the prohibition of the introduction of foods, drugs, devices, cosmetics, electronic products, and other items or products regulated by the FDA into the United States when it is determined that it is required in the interest of public health when such functions relate to the law enforcement functions of the FDA.

(25) Functions vested in the Secretary under section 401(a) of the Lead-Based Paint Poisoning Prevention Act, as amended by Public Law 94-317 (42 U.S.C. 4831(a)), relating to the prohibition of the application of lead-based paint to cooking, drinking, or eating utensils.

(26) Functions vested in the Secretary for the health information and health promotion program under Title XVII of the PHS Act (42 U.S.C. 300u *et seq*.), as amended, insofar as the authorities pertain to functions assigned to the FDA.  The delegation includes, but is not limited to, the authorities under: sections 1702(a)(1) and (3) and sections 1704(1) and (2) of the PHS Act (42 U.S.C. 300u-1(a) and (3) and 300u-3(1) and (2)).  This delegation excludes the authority to select all Senior Executive Service, supergrade and equivalent, and Schedule C (GS-12 and above) positions; issue regulations; and submit reports to the President.

(27) To administer a Small Business Innovation Research Program under section 9 of the Small Business Act (15 U.S.C. 638), as amended.  The delegation excludes the authority to issue regulations, establish advisory councils and committees, appoint members to advisory councils and committees, and submit reports to Congress.

(28) Functions vested in the Secretary under sections 982 and 983 of the Consumer-Patient Radiation Health and Safety Act of 1981 (the Act) (42 U.S.C. 10007 and 10008), as amended.  The delegation excludes the authority to issue regulations and submit reports to Congress.  The authority delegated under section 983 of the Act may only be exercised as it relates to functions assigned to the FDA.

(29) Functions vested in the Secretary under 35 U.S.C. 156, as amended, which allows for the extension of patent terms for human drug products, medical devices, food additives, and color additives subject to the FFD&C Act.  These authorities may be redelegated, except the authority to make due-diligence determinations under section 156(d)(2)(B), which may not be redelegated to an organization below the Office of the Commissioner of Food and Drugs.

(30) Functions vested in the Secretary under the Stevenson-Wydler Technology Innovation Act of 1980 (the Act) (15 U.S.C. 3701 *et seq*.) as amended, and under Executive Order 12591 of 10 April 1987, as they pertain to the functions of the FDA.  This delegation excludes the authority to issue regulations and submit reports to Congress under section 11(a)(2) of the Act (15 U.S.C. 3710a(a)(2)) to approve agreements and contracts with invention management organizations; and under section 11(c)(3)(B) of the Act (15 U.S.C. 3710a(c)(3)(B)) to propose necessary statutory changes regarding conflict of interest.

   a. The authorities under section 11(c)(5) (A) and (B) of the Act (15 U.S.C. 3710a (c)(5) (A) and (B)) to disapprove or require the modification of cooperative research and development agreements and licensing agreements after the agreement is presented to the Commissioner by

the head of the laboratory concerned, and to transmit written explanation of such disapproval or modification to the head of the laboratory concerned, may be redelegated only to a senior official in the immediate Office of the Commissioner.

b.   The following authorities may not be redelegated:

i.   The authority under section 11(b)(3)(D) of the Act (15 U.S.C. 3710a(b)(3)(D)) to waive a right of ownership which the Federal Government may have to an invention made under a cooperative research and development agreement.

ii.   The authority under section 11(b)(3)(C) of the Act (15 U.S.C. 3710a(b)(3)(C)) to permit employees or former employees to participate in efforts to commercialize inventions they made while in the service of the United States.

iii.   The authority under section11(c)(3)(A) of the Act (15 U.S.C. 3710a(c)(3)(A)) to review employee standards of conduct for resolving potential conflicts of interest.

iv.   The authority under section 13(a)(1) of the Act (15 U.S.C. 3710c(a)(1)) to retain any royalties or other income, except as provided in section 13(a)(2) of the Act (15 U.S.C. 3710c(a)2)).

v.   The authority under section 13(a)(1)(A)(i) of the Act (15 U.S.C. 3710c(a)(1) (A)(i)) to pay royalties or other income the FDA receives on account of an invention to the inventor if the inventor was an employee of the FDA at the time the invention was made.

(31)   Functions vested in the Secretary under section 4702, 4703, and 4704 of the Pesticide Monitoring Improvements Act of 1988 (21 U.S.C. 1401-1403) that relate to pesticide monitoring and enforcement information, foreign pesticide information, and pesticide analytical methods.  The delegation excludes the authority to submit reports to Congress.

(32)   Functions vested in the Secretary under section 2312(a)(1) and (2)(B), (b), and (c) (Use of Investigational New Drugs with Respect to Acquired Immunodeficiency Syndrome); 2314(c) (Scientific and Ethical Guidelines for Certain Treatments); and 2317(d) and (e) (Information Services) of Title XXIII of the PHS Act (42 U.S.C. 300cc-12(a)(1) and (2)(B), (b) and (c), 300cc-14(c) and 300cc-17 (d) and (e)), as amended, insofar as these authorities pertain to the functions assigned to the FDA.  The delegation excludes the authority to issue regulations, submit reports to the Congress, establish advisory committees or national commissions, and appoint members to such committees or commissions.

(33)   Functions vested in the Secretary under section 2672(a)(1) (A) and (B) (Provisions Relating to Blood Banks) and section 2672(a)(2) (Information and Training Programs) of the PHS Act (42 U.S.C. 300ff-72(a)(1)(A) and (B) and (a)(2) *et seq*.), as amended, insofar as these authorities pertain to the functions assigned to the FDA.  The delegations exclude the authority

to issue regulations, submit reports to the Congress, establish advisory committees or national commissioners, and appoint members to such committees or commissions.

(34)   Functions vested in the Secretary under section 1322(b) and (c) of the Food, Agriculture, Conservation, and Trade Act of 1990 (the National Laboratory Accreditation Program) (7 U.S.C. 138a), as amended hereafter, which relate to setting standards for the National Laboratory Accreditation Program and approving State agencies or private, nonprofit entities as accrediting bodies to implement certification and quality assurance programs in accordance with the requirements of this section.  The delegation excludes the authority to submit reports to Congress.

(35)   Functions vested in the Secretary under Part C, Subtitle 2 of Title XXI of the PHS Act (42 U.S.C. 300aa-25 *et seq.*), as amended, and the National Childhood Vaccine Injury Act of 1986 (42 U.S.C. 300aa-1 note), as amended hereafter, as follows:

   a.   Section 2125 of the PHS Act (42 U.S.C. 300aa-25) – Recording and reporting of information.

   b.   Section 2127 of the PHS Act (42 U.S.C. 300aa-27) – Mandate for safer childhood vaccines.

   c.   Section 2128 of the PHS Act (42 U.S.C. 300aa-28) – Manufacturer recordkeeping and reporting.

   d.   Section 312 of the National Childhood Vaccine Injury Act of 1986 – Related studies (42 U.S.C. 300aa-1 note).

   e.   Section 313 of the National Childhood Vaccine Injury Act of 1986 – Study of other vaccine risks (42 U.S.C. 300aa-1 note).

   f.   Section 314 of the National Childhood Vaccine Injury Act of 1986 – Study Review of Warnings, Use Instructions, and Precautionary Information (42 U.S.C. 300aa-1 note).

This delegation excludes the authority to issue regulations and submit reports to Congress.

(36)   Functions vested in the Secretary under section 201(h)(4) of the Controlled Substances Act (Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended) (21 U.S.C. 811(h)(4)) to provide responses to the Drug Enforcement Administration's temporary scheduling notices.  The delegation excludes the authority to submit reports to Congress.

(37)   Functions vested in the Secretary under the Safe Medical Devices Act of 1990 (Pub. L. 101-629), as amended hereafter (e.g., 21 U.S.C. 360c note, 360i note, and 360j note).  The delegation excludes the authority to submit reports to Congress.

(38) Functions vested in the Secretary under section 601 of Public Law 104-180 (Effective Medication Guides of the Agriculture, Rural Development, FDA, and Related Agencies Appropriations Act of 1997), as amended hereafter. The delegation excludes the authority to issue reports to Congress.

(39) Authority to take final action on matters pertaining to section 203 of the Equal Access to Justice Act (5 U.S.C. 504), and to develop procedures and regulations where necessary to supplement the Department's regulations, 45 CFR Part 13.

(40) Authority to administer and make decisions regarding the invention and patent program as they pertain to the functions of the FDA and to make determinations of rights in inventions and patents in which the Department has an interest.  This delegation excludes the authority to submit reports to Congress and further, it excludes those authorities under the Stevenson-Wydler Technology Innovation Act of 1980, as amended by the Federal Technology Transfer Act of 1986 and the National Technology Transfer and Advancement Act of 1995, which are governed by a separate delegation (under this SMG A.26.). All authorities other than the authority under
35 U.S.C. 203 (March-In Rights) may be redelegated.

(41) Functions vested in the Secretary under Title III, section 354, of the PHS Act (42 U.S.C. 262 *et seq*.), as amended.  The authority pertains to the FDA's oversight of mammography facilities.

(42) Authority under 45 CFR 5b.8 regulations, to take final action upon an individual's appeal of a refusal to correct or amend the individual's record when the appeal has been made by the individual under Privacy Act regulations (Part 21 of this chapter and 45 CFR Part 5b).  The authority may not be redelegated.

(43) Authority under Public Law 107-108 (Best Pharmaceuticals for Children Act), as amended by section 3(b)(2) of Public Law 108-155 (Pediatric Research Equity Act of 2003), to charter, convene, consult, and appoint members to an advisory committee on pediatric therapeutics.

(44) Functions vested in the Secretary under section 353 of the Public Health Service Act (42 U.S.C. 263a), as amended, to implement Clinical Laboratory Improvements Amendments' (CLIA's) complexity categorization provisions as they apply to commercially available tests to the Commissioner of Food and Drugs.  This authority includes, but is not limited to the following:

  a.  Interpreting the CLIA provisions related to complexity categorization.

  b.  Holding public workshops and meetings on CLIA complexity categorization.

  c.  Developing and issuing implementing rules and guidance for CLIA complexity categorization.

The Administrator of the Centers for Medicare and Medicaid Services (CMS) will provide funding to implement CLIA's complexity categorization provisions as set forth in the Agency Agreement between the FDA and the CMS (CMS IA-04-01, FDA 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), as amended.  Except as provided above, the existing delegation of authority to the Administrator of CMS concerning CLIA is unaffected.  This delegation shall be exercised under the Department's existing delegation and policy on regulations.

(45)   Functions vested in the Secretary under Title III, section 317R of the Public Health Service Act (42 U.S.C. 247b-20), titled "Food Safety Grants," as amended, which is to award grants to States and Indian tribes (as defined in section 4(e) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b(e))), to expand participation in networks to enhance Federal, State, and local food safety efforts, including meeting the costs of establishing and maintaining the food safety surveillance, technical, and laboratory capacity needed for such participation.  This delegation shall be exercised under the Department's existing delegation and policy on regulations.  Limitation: This authority must be implemented with prior consultation of the Office of Public Health Emergency Preparedness, Office of the Secretary.

(46)   Functions vested in the Secretary under section 402(j)(5)(c)(ii) of the Public Health Service Act, 42 U.S.C. 282(j)(5)(C)(ii) to determine that any clinical trial information was not submitted as required under 42 U.S.C. 282(j) or was submitted but is false or misleading in any particular and to notify the responsible party and give such party an opportunity to remedy non-compliance by submitting required revised clinical trial information not later than 30 days after such notification.

(47)   Authorities under Public Law 111-31; 123 Statute 1776.

(48)   Authorities under section 105 of the Drug Quality and Security Act of 2013, Public Law 113-54.

(49)   Authorities under section 1002, 1003, 1004, 1005(f), 1006(b) and 1006(d) of the Food and Drug Administration Amendments Act (FDAAA) of 2007, Public Law 110-85.

(50)   Authorities under section 102(b)(2), (c); 103(b), (c), (d), (h); 104; 105(b); 106(b), (c); 113(b); 114(d); 115; 201(c); 202(b); 204; 205(b)(2), (c); 206(b); 207(b); 304(b); 305; 306(b); 308; and 309 of the FDA Food Safety Modernization Act of 2011 (FSMA), Public Law 111-353.

(51)   Authorities under section 5 of the Biomaterials Assurance Act of 1998, Public Law 105-230, (21 USC 1604).

(52)   Authorities under section 3 of the Accelerating Access to Critical Therapies for ALS Act, Public Law 117-79 (42 USC 280g-7b).

(53)   Authorities under section 3855 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law 116-136.

B. The Deputy Assistant Secretary for Health Management Operations, Public Health Service, has redelegated to the Commissioner of Food and Drugs, with authority to redelegate (except when specifically prohibited), all authority as follows:

   (1) To certify true copies of any books, records, or other documents on file within the FDA, or extracts from such.

   (2) To certify that true copies are true copies of the entire file of the Administration.

   (3) To certify the complete original record or to certify the nonexistence of records on file within the Administration.

   (4) To cause the Seal of the Department to be affixed to such certifications and to agreements, awards, citations, diplomas, and similar documents.

C. The Chief Counsel of the FDA is authorized to report apparent violations to the Department of Justice for the institution of criminal proceedings, under section 305 of the FFD&C Act (21 U.S.C. 335), section 4 of the Federal Import Milk Act (21 U.S.C. 144), and section 9(b) of the Federal Caustic Poison Act.

## 2. Limitations

A. Notwithstanding provisions of this SMG, paragraph 1 or any previous delegations of authority to the contrary, the Secretary reserves the authority to approve regulations of FDA, except regulations to which section 556 and 557 of Title 5 U.S.C. apply, which:

   (1) Establish procedural rules applicable to a general class of foods, drugs, cosmetics, medical devices, tobacco products, or other subjects of regulation; or

   (2) Present highly significant public issues involving the quality, availability, marketability, or cost of one or more foods, drugs, cosmetics, medical devices, or other subjects of regulation.

B. Nothing in this section precludes the Secretary from approving a regulation, or being notified in advance of an action, to which section 556 and 557 of Title 5 U.S.C. apply, which meets one of the criteria in paragraph A. of this Reservation of Authority.

C. This reservation of authority is intended only to improve the internal management of the Department of Health and Human Services, and it is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, the Department of Health and Human Services, the FDA, any Agency, officer, or employee of the United States, or any person. Regulations issued by FDA without the approval of the Secretary are to be conclusively viewed as falling outside the scope of this reservation of authority.

**3. Redelegation.**

   A.  These officials may not further redelegate these authorities except where specified.

**4. Effective Date.**

The Secretary of Health and Human Services approved this delegation, via memorandum, on 22 February 2023.

| Status | Date Approved | Location of Change History | Contact | Approving Official |
|---|---|---|---|---|
| Initial | 05/18/2005 | N/A | OC/ OA/ OM/ OMP | Mike Leavitt Secretary of Health and Human Services |
| Revision | 09/05/2012 | N/A | OO/ OBS | Kathleen Sebelius Secretary of Health and Human Services |
| Revision | 04/11/2014 | N/A | OO/ OHR/ MASS | Sylvia M. Burwell Secretary of Health and Human Services |
| Revision | 11/17/2015 | N/A | OO/ OHR/ MASS | Sylvia M. Burwell Secretary of Health and Human Services |
| Revision | 08/26/2016 | N/A | OO/ OHR/ MASS | Sylvia M. Burwell Secretary of Health and Human Services |
| Revision | 04/26/2019 | N/A | OO/ OHCM/ MASS | Alex M. Azar II Secretary of Health and Human Services |
| Revision | 11/29/2022 | N/A | OO/ OFBAP/ OPERM/ DPPAM | Xavier Becerra Secretary of Health and Human Services |
| Revision | 02/22/2023 | N/A | OO/ OFBAP/ OPERM/ DPPAM | Xavier Becerra Secretary of Health and Human Services |

# **Exhibit 2**

**SMG 1410.1103**

**FDA STAFF MANUAL GUIDES, VOLUME II – DELEGATIONS OF AUTHORITY**

**REGULATORY – TOBACCO**

**SUBSTANTIAL EQUIVALENCE AND PREMARKET REVIEW OF TOBACCO PRODUCTS**

Effective Date: April 27, 2017

## 1. AUTHORITY DELEGATED AND TO WHOM DELEGATED.

A. The following officials are authorized to grant, deny, or rescind an exemption from the requirement of demonstrating substantial equivalence for a tobacco product under Section 905(j)(3) of the Federal Food, Drug, and Cosmetic Act:

1) Director and Deputy Director, Center for Tobacco Products (CTP), Office of Medical Products and Tobacco (OMPT).

2) Director, Office of Science (OS), CTP, OMPT.

3) Deputy Director for Research, OS, CTP, OMPT.

4) Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

5) Director and Deputy Director, Division of Product Science (DPS), OS, CTP, OMPT.

B. The following officials are authorized to determine that premarket review is required under Section 910(a)(2)(A) of the Federal Food, Drug, and Cosmetic Act:

1) Director and Deputy Director, CTP, OMPT.

2) Director, OS, CTP, OMPT.

3) Deputy Director for Research, OS, CTP, OMPT.

4) Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

     5)  Director and Deputy Director, Division of Individual Health Sciences (DIHS), OS, CTP, OMPT.

C.  The following officials are authorized to issue orders establishing whether a tobacco product is substantially equivalent under Section 910(a)(3)(A) of the Federal Food, Drug, and Cosmetic Act:

     1)  Director and Deputy Director, CTP, OMPT.

     2)  Director, OS, CTP, OMPT.

     3)  Deputy Director for Research, OS, CTP, OMPT.

     4)  Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

     5)  Director and Deputy Director, DPS, OS, CTP, OMPT.

D.  The following officials are authorized to require that an application contain additional information and samples of tobacco product and components under Sections 910(b)(1)(E) and (b)(1)(G) of the Federal Food, Drug, and Cosmetic Act:

     1)  Director and Deputy Director, CTP, OMPT.

     2)  Director, OS, CTP, OMPT.

     3)  Deputy Director for Research, OS, CTP, OMPT.

     4)  Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

     5)  Director and Deputy Director, DIHS, OS, CTP, OMPT.

E.  The following officials are authorized to refer an application to the Tobacco Products Scientific Advisory Committee under Section 910(b)(2) of the Federal Food, Drug, and Cosmetic Act:

     1)  Director and Deputy Director, CTP, OMPT.

     2)  Director, OS, CTP, OMPT.

     3)  Deputy Director for Research, OS, CTP, OMPT.

     4)  Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

     5)  Director and Deputy Director, DIHS, OS, CTP, OMPT.

F.  The following officials are authorized to issue orders to approve or deny applications under Section 910(c)(1)(A) of the Federal Food, Drug, and Cosmetic Act:

     1)  Director and Deputy Director, CTP, OMPT.

     2)  Director, OS, CTP, OMPT.

     3)  Deputy Director for Research, OS, CTP, OMPT.

     4)  Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

     5)  Director and Deputy Director, DIHS, OS, CTP, OMPT.

G.  The following officials are authorized to deny applications and to provide information about the measures required to remove the application from deniable form under Sections 910(c)(2) and (c)(3) of the Federal Food, Drug, and Cosmetic Act:

     1)  Director and Deputy Director, CTP, OMPT.

     2)  Director, OS, CTP, OMPT.

     3)  Deputy Director for Research, OS, CTP, OMPT.

     4)  Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

     5)  Director and Deputy Director, DIHS, OS, CTP, OMPT.

H.  The following officials are authorized under Section 910(c)(5)(B) of the Federal Food, Drug, and Cosmetic Act to make determinations that there exists valid scientific evidence (other than the evidence set forth in Section 910(c)(5)(A)) which is sufficient to evaluate the tobacco product and may authorize that determinations for the purposes of Section 910(c)(2)(A) be made on the basis of such evidence:

     1)  Director and Deputy Director, CTP, OMPT.

     2)  Director, OS, CTP, OMPT.

     3)  Deputy Director for Research, OS, CTP, OMPT.

4) Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

5) Director and Deputy Director, DIHS, OS, CTP, OMPT.

I. The following officials are authorized to propose to temporarily suspend and propose to withdraw orders issued under Section 910(c)(1)(A)(i) and under Section 910(d) of the Federal Food, Drug, and Cosmetic Act:

1) Director and Deputy Director, CTP, OMPT.

2) Director, OS, CTP, OMPT.

3) Deputy Director for Research, OS, CTP, OMPT.

4) Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

J. The following officials are authorized to designate the employees who will serve orders issued under Section 910 of the Federal Food, Drug, and Cosmetic Act:

1) Director and Deputy Director, CTP, OMPT.

2) Director, OS, CTP, OMPT.

3) Deputy Director for Research, OS, CTP, OMPT.

4) Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

5) Director and Deputy Director, DIHS, OS, CTP, OMPT.

K. The following officials are authorized to issue orders prescribing the records and reports to be established and maintained for tobacco products and that reports be made to CTP under Section 910(f)(1) of the Federal Food, Drug, and Cosmetic Act:

1) Director and Deputy Director, CTP, OMPT.

2) Director, OS, CTP, OMPT.

3) Deputy Director for Research, OS, CTP, OMPT.

4) Deputy Director for Regulatory Science and Management, OS, CTP, OMPT.

5) Director and Deputy Director, DIHS, OS, CTP, OMPT.

## 2.  REDELEGATION.

These officials may not further redelegate this authority.

## 3.  EFFECTIVE DATE.

The delegations become effective upon date of signature.

The Commissioner of Food and Drugs approved this delegation, via memorandum, on April 27, 2017.

| STATUS (I, R, C) | DATE APPROVED | LOCATION OF CHANGE HISTORY | CONTACT | APPROVING OFFICIAL |
|---|---|---|---|---|
| Initial | 02/29/2012 | N/a | OMPT/CTP/ OM | Margaret A. Hamburg, M.D., Commissioner of Food and Drugs |
| Revision | 10/09/2014 | N/a | OMPT/CTP/ OM | Margaret A. Hamburg, M.D., Commissioner of Food and Drugs |
| Revision | 04/27/2017 | N/a | OMPT/CTP/ OM | Stephen M. Ostroff, M.D. Acting Commissioner of Food and Drugs |

Back to Delegations of Authority, Volume II (1400)

# **<u>Exhibit 3</u>**

February 2023

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Tobacco Products**



# Exhibit 4



**FDA U.S. FOOD & DRUG**
ADMINISTRATION

---

# Memorandum

**From**:      Michele Mital
                    Acting Center Director
                    Office of the Center Director, Center for Tobacco Products

Michele Mital -S
Digitally signed by Michele Mital -S
Date: 2022.06.23 08:56:34 -04'00'

**To:**          File

**cc:**          Matt Holman
                    Director
                    Office of Science, Center for Tobacco Products

**Date:**       June 23, 2022

**Subject:**    Juul Review

---

The Office of Science (OS) regularly consults with the Office of the Center Director (OCD) in making regulatory decisions under the Tobacco Control Act, including when review raises novel and complex regulatory questions, such as application of the statute's unique public health standard to a new category of products. Consistent with this longstanding practice, during consultations related to the Juul application bundle [Submission tracking numbers PM0000864, PM0000872, PM0000874, PM0000876, PM0000878, PM0000879], OCD advised OS that OCD would review any conclusions reached by OS for this bundle before those conclusions became a final agency decision. This includes conclusions regarding the risks and the potential benefits of the products to the population as a whole, including users and non-users.

The Technical Project Lead (TPL) has finished reviewing the pending Juul application bundle and has advised OCD that an MDO should be issued because of toxicological deficiencies, which are described in the TPL Review (Toxicology) and the relevant disciplinary reviews. The TPL has also advised OCD in a separate memo, TPL Review (Additional Disciplines), that OS has completed other (non-toxicology) discipline reviews.

OCD initiated review of the conclusions reached by OS. OCD completed review of the TPL Review (Toxicology) and hereby concurs with its conclusions. Because OCD concurs that the toxicological issues are dispositive of the applications, it is not necessary for OCD to review and resolve (and thus CTP has not resolved) any other aspects of the applications.

OS and OCD agree that CTP should issue an MDO for the application bundle on the basis of the toxicological deficiencies alone. Therefore, the discipline reviews and related conclusions in the separate memo, TPL Review (Additional Disciplines), have not been adopted by OCD and do

not reflect complete agency consideration or a final agency decision. In addition, the MDO letter should indicate that the list of deficiencies supporting the denial is not necessarily exhaustive. Whether further deficiencies may be found would not change the current conclusion that the applicant has not demonstrated that marketing of these products is appropriate for the protection of the public health.

# **Exhibit 5**



U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

June 23, 2022

**DENIAL**

Juul Labs Inc.
Attention: Angela Ho-Chen, Director, Regulatory Affairs
1000 F Street NW, Suite 800
Washington, D.C. 20004

**FDA Submission Tracking Numbers (STNs):** Multiple STNs, see Appendix A

Dear Angela Ho-Chen:

We completed substantive scientific review of your PMTAs[1] and are denying issuance of marketing granted orders for the tobacco products identified in Appendix A. Refer to Appendix B for a list of amendments received in support of your applications.

**Based on our review of your PMTAs, we determined that the applications for the new tobacco products, as described in your applications and specified in Appendix A, lack sufficient evidence to demonstrate that permitting the marketing of the products subject to these applications is appropriate for the protection of the public health (APPH). You cannot introduce or deliver for introduction these products into interstate commerce in the United States. Doing so is a prohibited act under section 301(a) of the FD&C Act, the violation of which could result in enforcement action by FDA.**

Section 910 of the FD&C Act provides that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." Section 910(c)(2)(A). In assessing APPH, the statute requires FDA to consider the risks and benefits to the population as a whole, including both tobacco users and nonusers, and taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such products. Section 910(c)(4).

As the statutory text makes clear, it is the applicant's burden to make a "showing"—with sufficient supporting information—that permitting the marketing of a new tobacco product would have a net benefit to public health based upon the risks and benefits to the population as a whole. Before determining that permitting the marketing of a new tobacco product would result in a net benefit to public health, FDA must weigh all potential public health benefits against all potential public health harms—including but not limited to the likelihood that the product will affect patterns of initiation and cessation of tobacco use.  Concluding that there is a net benefit takes into account whether the

---

[1] Premarket Tobacco Product Applications (PMTAs) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act)

applicant has provided sufficient information regarding product design, chemistry, stability, manufacturing controls including process controls and quality assurance procedures, toxicology, abuse liability, and other factors that can affect the product's risks to individual users and nonusers, including relative to those of other tobacco products. In June 2019, we issued a Guidance for Industry, Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. Although not binding on FDA or the public, and an applicant can use an alternative approach if it satisfies the applicable legal requirements, the guidance gave FDA's current thinking on these applications. The guidance recommended "providing a full assessment of the toxicological and pharmacological profile associated with the new tobacco product." Guidance at 34.  It noted the importance of providing, among other things: "[t]oxicological endpoints such as cytotoxicity, genotoxicity, carcinogenicity, and respiratory, cardiac, reproductive, and developmental toxicity"; "[i]nformation concerning substances that may be solvent extractable from the container closure system or leachable into the e-liquid when the e-liquid is in contact with the container closure system (e.g., information on whether toxic substances present in the container closure system can potentially transfer into the e-liquid or aerosol)"; "a conclusion as to whether there is a toxicological concern with respect to the ingredients, constituents… that will be delivered in the aerosol from the use."  Guidance at 35. It noted that "where a thorough literature review does not address these points, these topics may need to be addressed in separate studies conducted by the applicant." Guidance at 35. Finally, the guidance recommended providing "an integrated summary discussing how permitting the marketing of the new tobacco product would be APPH from a toxicology perspective relative to any similar comparator tobacco products." Guidance at 37.

Without sufficient evidence of a product's toxicity risks, including in relation to the risks posed by other tobacco products, FDA cannot conduct a full evaluation of the overall risks and benefits of a new tobacco product. For example, FDA cannot adequately evaluate whether and to what extent relevant tobacco use behaviors would represent a public health benefit or a public health harm. Switching from one tobacco product to another tobacco product is not inherently beneficial or harmful. To illustrate, if a new tobacco product presents a greater level of risk than combustible cigarettes, switching from combustible cigarettes to the new product would represent a health harm to those who switch, not a health benefit. Only if FDA is able to conclude that a new tobacco product presents lower risk than combustible cigarettes can FDA consider that switching from combustible cigarettes to the new tobacco product represents a health benefit to those who switch.

In addition, FDA considers the risks of the new tobacco product in relation to other similar tobacco products (e.g., products in the same product category). For example, if an ENDS product poses lower risk than combustible cigarettes, but higher risk than other ENDS, the potential public health benefit from cigarette smokers switching could be offset by increased harm to users who choose the new tobacco product over less harmful ENDS products. These kinds of analyses, among other related considerations, would inform FDA's determination as to whether marketing of the product would have a net benefit to public health based upon the risks and benefits to the population as a whole. Other considerations could include how the product is actually used (e.g., nonuser initiation, dual use) and effects on nonusers (e.g., accidental or secondhand exposure).

As described in more detail in the deficiencies below, we found that you did not provide sufficient information for FDA to assess the toxicological risks posed by the new products, and the information that you provided raised concerns. Among other deficiencies, the evidence you provided was internally inconsistent; lacked key information; relied in significant part on methodological choices that, without adequate justification, ignored crucial indications of toxicity; and used a different methodology to assess the toxicity of the new products than it did for comparison products in key respects. As a result, FDA was

unable to make any meaningful determinations regarding the risks of the new products relative to their benefits and compared to the risks of other tobacco products, including combustible cigarettes and other ENDS, which is necessary for FDA to make a determination as to likely net public health impact. Without such information, FDA is not able to adequately evaluate whether and to what extent relevant tobacco use behaviors (e.g., initiation with the new products, switching from combustible cigarettes to the new products, switching from other ENDS products, dual use of the new products with other tobacco products) would represent a public health benefit or a public health harm. Without the ability to make any meaningful determinations regarding the toxicological risks presented by the new products, the public health impact of the initiation, switching, and cessation data in the applications cannot be evaluated under the APPH standard, regardless of what those data otherwise show. In light of these uncertainties, it is possible that marketing of the new products would have a neutral impact, result in net public health benefit, or result in net public health harm. Because we do not have adequate information to fully evaluate the products' toxicological profile, and the evidence you did submit raises substantial toxicity concerns, we cannot determine that these products have met the statutory standard. Therefore, you have not met your burden of "showing" that permitting the marketing of the new products would be APPH as required by Section 910(c)(2)(A).

In light of the unaddressed deficiencies regarding potential toxicological risks and in the interest of issuing a decision without the additional delay that further analysis would have required, FDA did not assess whether there might be additional deficiencies relating to initiation, switching, and cessation.

We provide the following bases for our determination:

1. **Identity of leachable constituents produced by the Juul System (PM0000864, PM0000872, PM0000874, PM0000876, PM0000878, PM0000879); mainstream aerosol yields of these leachable constituents in the Juul System; issues in the risk assessment provided to assess toxicity of these leachable constituents in the mainstream aerosol yield of the Juul System**

   You have not provided proper identification of leachable constituents (leachables) in the new products nor have you provided mainstream aerosol yield data for these leachables generated by the new products (PM0000864, PM0000872, PM0000874, and PM0000876) when used with PM0000878 and/or PM0000879. As a result, FDA cannot perform an accurate and complete risk assessment of the new products.

   In your original submission for these PMTAs, you submitted a toxicological evaluation of identified leachables from your new products PM0000864, PM0000872, PM0000874, PM0000876 when used with PM0000878 and/or PM0000879. The devices (PM0000878 and PM0000879) are responsible for aerosolizing and delivering the e-liquid to the user. HPHCs and mutagenic and genotoxic constituents from the JUULpods can be transferred into the mainstream aerosol via the devices. The device functional parameters (i.e., coil temperature, power delivery and maximum puff duration) control and mediate the transfer of these genotoxic leachables into the mainstream aerosol. In this toxicological evaluation, you identified the presence of two genotoxic leachables found to produce an excess cancer risk outside of generally accepted margins of "tolerable cancer risks." These leachables were identified by you as Ethyl-4-hydroxyquinoline-3-carboxylate (EHQC) and Propylpyridine,1H-pyrrole-1-hexanoic acid,2,5-dihydro-2,5-dioxo-related compound) (PHDC). Further, you declined to provide testing results of these leachables in the mainstream aerosol generated under intense and non-intense use of your new tobacco products. Nor did you provide a comparison with similar testing for

suitable comparison products.

In response to FDA's Deficiency letter, you revised the identity of the leachable EHQC to 1,8,9-trihydro-2-(3-carboxypropylamine-N-yl)-3-ethylcarboxylate-4-quinolone (TCEQ) and revised the identity of the leachable PHDC to Nornicotine, N-carboxyglycerol-5'-(methoxy-1-(p-hydroxybenzene-O4-yl-acetic acid)) (NNMA). The information you provided to support these revised identifications (revised chemical structures, chemical formulas and mass spectral data) is incompatible with chemical analysis and mass spectral data you previously submitted regarding the identification of these leachables. Additionally, information you provided elsewhere in the response to FDA's Deficiency letter identifies the revised leachable TCEQ as a different chemical, (4-((3-(ethoxycarbonyl)-4-oxo-1,4,6,7-tetrahydroquinolin-2-yl)amino)butanoic acid) (ETBA) (app-17-03-n-3-3-whole-pod-leach-tra-report.pdf; pages 105 and 306). This conflicting data further undermines your revised identification of EHQC as TCEQ. You continued to decline to provide testing results of these leachables in the mainstream aerosol.

In addition, in response to the Deficiency letter, you provided a new risk assessment indicating that these revised leachables are not present at levels of toxicological concern. However, there are two overarching concerns with this submitted risk assessment.  First, because you have not established the identity of these revised leachables, the risk assessment that you submitted evaluating these leachables cannot be used to determine the toxicity of the new products. Second, we find significant methodological issues that preclude our consideration of your findings.  The risk assessment you provided uses a less conservative approach (Carthew et al., 2009[2]) than what was used in the original risk assessment, (Escher et al., 2010[3].) When the original, more conservative, approach was used, these leachables were found to be present at a level of toxicological concern. In your original risk assessment, you stated that the more conservative risk assessment approach used in Escher et al., 2010 "would appear to be more representative for the extractables and leachables risk assessment" as this risk assessment evaluated industrial chemicals, whereas the risk assessment approach used in Carthew et al., 2009 is based on an evaluation of consumer products ingredients. We agree that the dataset used to develop the Escher et al., 2010 risk assessment approach included industrial chemicals that are likely more representative of the types and classes of chemicals encountered in an assessment of leachables akin to those present in the aerosol yield of the JUUL System. The risk assessment approach used in Carthew et al., 2009 is based on an evaluation of consumer products ingredients, which consists of chemicals intentionally added to products. As the leachable chemicals "leach" from the components of the JUULpods and are not added intentionally to the products as ingredients, the Escher et al., 2010 method is more appropriate than the Carthew et al., 2009 method which is geared towards the risk assessment of added ingredients. Because the Carthew et al., 2009 method specifically focuses on ingredients, it does not have the specificity needed to evaluate the types of leachable chemicals typically studied in a leachables assessment (for example, polymers and heavy metals). Additionally, the dataset used to derive the Carthew et al. 2009 approach and evaluate subsequent health risks does not include chemicals relevant to the assessment of leachables; it specifically excludes genotoxic carcinogens, in vivo mutagens, heavy metals and polymers from the risk assessment, "as they

---

[2] Carthew P, Clapp C, Gutsell S. Exposure based waiving: The application of the toxicological threshold of concern (TTC) to inhalation exposure for aerosol ingredients in consumer products. Food and Chemical Toxicology. 2009;47:1287-1295.

[3] Escher SE, Tluczkiewicz I, Batke M, et al. Evaluation of inhalation TTC values with the database RepDose. Regulatory Toxicology and Pharmacology. 2010;58:259-274.

were not considered representative of the ingredients that are, or could be used, in aerosols for consumer use." You demonstrated in the provided mainstream aerosol HPHC yield data for the new products that the aerosol generated using PM0000864, PM0000872, PM0000874, and PM0000876 with PM0000878 contains genotoxic constituents, in vivo mutagens and heavy metals. Therefore, Carthew et al., 2009's less conservative approach used in your revised risk assessment of these leachables is inappropriate for evaluation of the new products, as this approach does not accurately model the potential health risks associated with use of the new products.

You have not explained why the less conservative approach used in Carthew et al., 2009 is appropriate to perform a risk assessment of these revised leachables. Additionally, you did not provide an explanation for why the revised risk assessment was limited to assessing systemic toxicity and did not include local toxic effects, which have a lower threshold for occurrence. Overall, your additional risk assessment has not adequately addressed the toxicology concerns regarding these leachable constituents, and you did not provide an explanation for using a less conservative approach than the approach used in your initial risk assessment.

In order for FDA to perform a full toxicological evaluation of these leachable constituents, the correct identity of these leachables needs to be determined. Accordingly, you needed to have:

a) Provided consistent and non-conflicting information to support your identification of these leachable constituents. These data are needed to ensure that an accurate toxicological risk assessment is performed.

b) Provided a toxicological risk assessment of these identified leachable constituents that used an appropriate methodology consistent with your original approach. This is needed to ensure the health risks associated with use of the new products are accurately evaluated using a reasonably conservative risk assessment methodology.

c) Provided testing results of these two leachable constituents in the mainstream aerosol generated from appropriately aged new JUULpod products (PM0000864, PM0000872, PM0000874, and PM0000876) with the new JUUL devices (PM0000878 or PM0000879) under intense and non-intense use conditions, and a comparison with similar testing for suitable comparison products. These aged JUULpod products should undergo 1) accelerated aging for 22 weeks at 30°C and relative humidity of 65%, equivalent to 9 months ambient conditions and 2) accelerated aging for 22 weeks at 40°C and relative humidity of 75%, equivalent to 18 months ambient conditions. For example, the new products used to generate the aerosol should have been prepared in the same manner (i.e., the same parameters to simulate shelf aging) as previously done to evaluate leachable constituents. These data are needed to assess the toxicological risks associated with the presence of these leachable constituents in the mainstream aerosol generated from the new product and enable FDA to determine relevant health risks to consumers of the new products.

**2. Methodological issues impacting scientific validity of results provided from your in vitro micronucleus assay genotoxicity study comparing the genotoxic potential of the new products to other tobacco products**

You submitted in vitro toxicological studies to assess the genotoxic potential for the new products (PM0000864, PM0000872, PM0000874, PM0000876, PM0000878 and PM0000879) in comparison to other tobacco products. These in vitro studies utilized both the e-liquids and

aerosol condensates.  However, the methodology you used in the assays to evaluate in vitro genotoxicity (i.e., the in vitro micronucleus assay) raises concerns regarding the scientific validity of the assay results due to unjustified deviations from the guidelines that you selected in order to conduct the in vitro micronucleus assay. Specifically there was: (a) uneven application of acceptance criteria (including inconsistent cell counting) for the scoring and evaluation of positive and negative genotoxic responses and (b) use of different methodologies to evaluate the new products and the comparison products.

The devices (PM0000878 and PM0000879) are responsible for aerosolizing and delivering the e-liquid to the user. HPHCs, mutagenic and genotoxic constituents within the e-liquid can be transferred into the aerosol via the device. The device functional parameters mediate and control the delivery of these toxic constituents to the user and are a critical factor in assessing user exposure to genotoxic constituents. This means that the inability to perform a full and accurate toxicological evaluation of the new product e-liquids (PM0000864, PM0000872, PM0000874 and PM0000876) precludes the completion of a full and accurate toxicological evaluation of the JUUL devices (PM0000878 and PM0000879) as these devices play a critical role in the production and delivery of genotoxic constituents to the product user.

(a)  Uneven application of acceptance criteria (including inconsistent cell counting) for the scoring and evaluation of positive and negative genotoxic responses for the new products

In your study protocol, you stated that the in vitro micronucleus assay was performed according to Organization for Economic Cooperation and Development (OECD) guidelines as described in OECD Test Guideline 487 (TG 487) for the in vitro micronucleus assay. TG 487 describes the purpose and principles of the assay, the methodology used to conduct the in vitro micronucleus assay, acceptability criteria for the acceptance of assay results, and criteria for the evaluation and interpretation of assay results. The acceptability criteria in TG 487 sets standards needed for accepting the results of the assay. Within the acceptance criteria in TG 487, there is no requirement to verify a clearly positive or clearly negative response. You initially evaluated the new products for genotoxic potential using 2000 cells per concentration as required by TG 487, but diverged from this required cell count when there was a positive result for genotoxicity. Specifically, if a new product yielded a negative result, this negative result was accepted as final. However, if a positive result was produced for the new product, the assay result was rejected and the new product was re-evaluated using 4000 cells per concentration. Equivocal responses for the new products were further evaluated by counting an additional 2000 cells "to clarify the response" however, you did not provide a rationale or supporting statistical calculations to demonstrate why counting additional cells, in lieu of conducting a repeat or modified experiment, was appropriate and justified. This inconsistent methodology used to evaluate the genotoxic potential of the new products raises concerns as your select re-evaluation of new products yielding positive genotoxicity results caused assay results to be changed to lower risk categories (i.e., negative or equivocal for genotoxicity).

Furthermore, your inconsistent testing methodology and select application of more rigorous criteria for the evaluation of the new products that were found to be positive for genotoxicity is not supported by TG 487 or by your submitted study protocol. Based on these criteria, the positive genotoxicity responses identified for the new products should have been accepted and not subjected to an additional, more rigorous evaluation. We note that in response to this toxicological concern (raised by FDA in Cycle 1, Deficiency 19 of FDA's Deficiency letter), you

state that, in specific situations, the number of cells counted and scored for micronuclei formation was increased to establish the biological relevance of the results. However, assessing the biological relevance of the genotoxicity assay results does not require rejecting these valid results and you did not provide a justification or explanation for why these results were rejected. You rejected genotoxicity results for clearly positive responses that you subjectively deemed to be "very weak" or "very small", despite the fact that the responses met all assay acceptance criteria described in TG 487 and your provided study protocol. In lieu of rejecting clearly positive responses for assays conducted in line with the guidelines set out in your study protocol, you could have discussed toxicologically relevant factors (e.g., the presence of detoxification pathways in vivo that are absent within this in vitro model system) that may mitigate the occurrence of toxicity in vivo. However, you did not address such toxicologically relevant factors in your response, or explain how the counting (use) of additional cells and re-evaluation of the assay results is an appropriate method to assess the biological relevance of a positive genotoxicity response. The inconsistent use of assay acceptance criteria resulted in unequal treatment of test articles within the genotoxicity assay, which adversely affects the scientific validity of the assay, thereby preventing accurate and meaningful toxicological conclusions on the genotoxic potential of the new products from being made.

(b)  Use of a different methodology to evaluate the comparison products.

Additionally, the data you provided from the in vitro micronucleus assay shows that the new products were not evaluated using the same methodology as the comparison products. The new products, as described above, were evaluated using 2000 cells, or re-evaluated using 4000 cells if there was a equivocal or positive result. In contrast, all the comparison products were evaluated for genotoxic potential using a single assay at 4000 cells per concentration without appropriate justification. Furthermore, you did not count additional cells or further evaluate equivocal responses reported for the comparator products.

The differences in methodology created situations where there may be meaningful differences in statistical power between the genotoxicity assays. Statistical analysis of the assay results is a key component of evaluating the genotoxic potential of a test article, therefore differences in statistical power can directly affect the ability to correctly identify positive and negative genotoxic test articles. As you state in your response, "[s]coring 4,000 cells instead of 2,000 cells may provide greater statistical power to distinguish between a weak positive response and potentially false positive results." However, you did not provide statistical power calculations for your study. This information is needed to demonstrate that the increased counting of cells for select groups is appropriate for the statistical analyses being performed and to show that these modifications do not adversely impact the validity of assay. This is necessary information as the affected statistical analysis is a key deciding factor in determining whether or not the product being evaluated is identified as being positive or negative for genotoxicity. However, even if this additional information describing the statistical power of the analysis was provided, significant concerns regarding inconsistencies in the assay methodology and rejection of valid assay results remain.  You provided new data in response to Deficiency 19 of FDA's Deficiency Letter to show that the increased counting of cells, from 2000 to 4000 cells per concentration, identified a similar percentage of micronuclei formation, which indicate similar genotoxic responses. This suggests that sufficient sampling and statistical power were present at 2000 cells per concentration to accurately assess the genotoxic potential of the new and comparison products. Furthermore, you state that "[s]ince all the [in vitro micronucleus] studies were conducted

consistent with the OECD TG 487 guidelines, the differences in the number of cells scored for some of the test articles and comparison test samples do not impact the scientific validity of the assay and the ability to correctly identify genotoxic versus non-genotoxic test articles." In contrast to what you stated, there is a conflict with the OECD guidelines as OECD only states the minimum standards to evaluate and score a single test article. OECD guidelines emphasize that when multiple cell cultures are evaluated, the same number of cells from each culture must be scored. The methodology used to evaluate the genotoxic potential of a group of test articles needs to be comparable to generate reliable, valid results and is necessary when making relative comparisons of genotoxic potential between test articles. As demonstrated in your submitted data, your assessment of genotoxic potential for the new products varied significantly as additional cells were counted.

For scientific validity, it is necessary that the new and comparison products are evaluated for genotoxic potential using a consistent methodology to ensure that accurate comparisons are made between the products. For example, from the data you provided, it is unknown if any of the comparison products would have been positive for genotoxicity at 2000 cells per concentration and unknown if the new products that were found to be negative at 2000 cells per concentration would have produced a positive response at 4000 cells per concentration. You did not provide an adequate scientific justification or explanation for why the differences in methodology for the in vitro genotoxicity evaluation of the new products and the comparison products does not impact the scientific validity of the assay. The inability to adequately compare the in vitro genotoxicity assay results between the new and comparison products prevents a complete and accurate toxicological evaluation of the new products.

In summary, the unequal treatment of test articles is demonstrated in your data by the acceptance of negative genotoxicity responses for the new products without further investigation while positive genotoxicity responses were further evaluated using more rigorous criteria (i.e., rejecting "very weak" or "very small" responses). Additionally, the unequal treatment of new and comparison products within your in vitro genotoxicity assay and your rejection of valid assay results prevents FDA from performing a conclusive toxicological evaluation of the new products.

Accordingly, in order for FDA to evaluate the genotoxicity of the Juul System you needed to have:
   a) Specifically, addressed how the differences in assay methodology do not impact the scientific validity of the assay or cause differences in the ability to correctly identify genotoxic versus non-genotoxic test articles, or
   b) Provided data comparing the genotoxic potential of the new products and the comparison products using a consistent methodology.

This information is needed to ensure that an accurate and complete toxicological evaluation of the new products can be conducted, that the different cell counting and scoring methodologies you used did not prevent the identification of genotoxic compounds, and that scientifically valid comparisons are made between the new and comparison products.

**3.   Regarding the Genotoxic Potential of PM0000872 (Menthol 5%), PM0000874 (Virginia Tobacco 3%) and PM0000876 (Virginia Tobacco 5%) used with the devices PM0000878 and PM0000879:**

You submitted data from the in vitro micronucleus assay (n-3-1-2-micronuc-men-5-rpt-03420reva-report.pdf, n-3-1-2-micronuc-vt-3-rpt-03425reva.report.pdf, n-3-1-2-micronuc-vt-5-rpt-03399reva-report.pdf) to demonstrate that PM0000872 (Menthol 5%), PM0000874 (Virginia Tobacco 3%) and PM0000876 (Virginia Tobacco 5%) do not induce genotoxic responses, and that PM0000872 (Menthol 5%), PM0000874 (Virginia Tobacco 3%) and PM0000876 (Virginia Tobacco 5%) are relatively less genotoxic than a combustible cigarette comparison product. However, your data demonstrate that PM0000872 (Menthol 5%), PM0000874 (Virginia Tobacco 3%) and PM0000876 (Virginia Tobacco 5%)  induced clearly positive genotoxic responses under the initial conditions of analyzing 2000 cells per concentration used in this assay. You did not provide an adequate rationale or justification to address why these initial genotoxicity assay results from valid assays were rejected. The 3R4F combustible cigarette comparison product was found to be equivocal for genotoxicity. These results indicate that PM0000872 (Menthol 5%), PM0000874 (Virginia Tobacco 3%) and PM0000876 (Virginia Tobacco 5%) with PM0000878 and PM0000879 may be relatively more genotoxic than the combustible cigarette comparison product.

In an attempt to address this positive genotoxicity result for PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%), you provided data from an in vivo genotoxicity study. You did not provide additional information or in vivo study data to further evaluate the genotoxicity of PM0000876 (Virginia Tobacco 5%). The in vivo study evaluated the potential for PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) to induce DNA damage in vivo, assessed using the Comet assay, and to induce genotoxicity in vivo, assessed using the micronucleus assay. The data you provided in the DNA damage/Comet assay indicated that PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) had negative responses for both induction of DNA damage and genotoxicity in vivo. However, the results were highly variable and may not reliably indicate the occurrence of DNA damage.[418] Additionally, the in vivo study did not include a combustible cigarette comparison product; therefore, no comparisons of genotoxic potential between PM0000872 (Menthol 5%) or PM0000874 (Virginia Tobacco 3%) and a combustible cigarette can be made using your provided in vivo data. The inclusion of a combustible cigarette comparison product within the in vivo genotoxicity study is needed to perform a complete toxicological evaluation of PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%), as your in vitro genotoxicity study indicated PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) with PM0000878 and PM0000879 may be more genotoxic than the 3R4F combustible cigarette comparison product. The relative genotoxicity of PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) with PM0000878 and PM0000879 versus a combustible cigarette comparison product needs to be conclusively addressed in order to perform a complete toxicological evaluation of PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%).

It is not scientifically sufficient or adequate to accept the negative genotoxicity results from the in vivo genotoxicity study without an explanation or justification for why the positive in vitro

---

[18] While relatively large standard deviations are commonly observed in the DNA damage/Comet assays, the high variability of the data can compromise the statistical analysis and can limit the conclusions that can be drawn (Langie et al., 2015 ).

genotoxicity results should be considered biologically insignificant or irrelevant. Differences in the design and execution of in vitro and in vivo studies can cause changes in the concentrations of HPHCs and other health hazardous constituents within the test system (i.e., cell culture or animal model), which will affect dose-response relationships, tissue level exposure to hazardous constituents, toxicokinetics and toxicodynamics. Differences in the biological system used to evaluate genotoxicity in vitro and in vivo (i.e. availability of detoxification pathways, occurrence of bioactivation, contributions of gender and/or species-specific effects) may also contribute to producing conflicting results between in vitro and in vivo studies. You did not provide a justification or explanation addressing these toxicologically relevant factors and how they pertain to the conflicting genotoxicity results of PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) with PM0000878 and PM0000879 in your additional information. A comparison of the in vitro and in vivo studies using additional information or bridging data from scientific literature is needed to put the positive in vitro genotoxicity result for PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) with PM0000878 and PM0000879 in the context of the in vivo biological system.

Therefore, you needed to have:

a) Provided data from a repeated in vivo genotoxicity study using a relevant and justifiable exposure concentration of aerosol from PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) with PM0000878 and/or PM0000879 and smoke from the 3R4F combustible cigarette comparison product. Or,

b) Provided scientific data and a rationale to address the conflicting genotoxicity results for PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) from the in vitro and in vivo genotoxicity study data you provided. These data can include measurements of HPHCs and other chemical constituents from PM0000872 (Menthol 5%) and PM0000874 (Virginia Tobacco 3%) with PM0000878 and the 3R4F combustible cigarette comparison product to compare the cell and tissue levels of potentially hazardous constituents between the positive in vitro and negative in vivo genotoxicity studies, an assessment of relevant pharmacokinetic/toxicokinetic parameters, detoxification mechanisms, metabolic and bioactivation pathways, and/or an evaluation of dose-response relationships for relevant HPHCs and other health hazardous constituents that may be present within the in vitro and in vivo genotoxicity assays.

c) Provided scientific data and a rationale to address the positive in vitro genotoxicity score from the initial genotoxicity assay of PM0000876 (Virginia Tobacco 5%) using 2000 cells. This assay met the acceptance criteria listed in your study protocol, however, you rejected the positive genotoxicity result and re-evaluated PM0000876 (Virginia Tobacco 5%). You did not provide an adequate rationale or justification to address why these initial genotoxicity assay results from valid assays were rejected. You also did not provide an explanation as to why this rejection of valid assay results does not adversely impact the scientific validity of the assay.

This additional information is needed to evaluate the biological significance and relevance of the positive in vitro genotoxicity result for PM0000872 (Menthol 5%), PM0000874 (Virginia Tobacco 3%) and PM0000876 (Virginia Tobacco 5%) with PM0000878 and PM0000879. The devices (PM0000878 and PM0000879) are responsible for aerosolizing and delivering the e-liquid to the user. HPHCs, mutagenic and genotoxic constituents within the e-liquid can be transferred into the aerosol via the device. The device functional parameters mediate and control the delivery of these toxic constituents to the user and are a critical factor in evaluating the genotoxicity of the

new products. This information is also needed to assess the risk of genotoxicity associated with use of PM0000872 (Menthol 5%), PM0000874 (Virginia Tobacco 3%) and PM0000876 (Virginia Tobacco 5%) with PM0000878 and PM0000879, which received positive results for in vitro genotoxicity, relative to the 3R4F combustible cigarette comparison, which received an equivocal result for in vitro genotoxicity and was not included within the in vivo genotoxicity study.

4. **Regarding the Mutagenic Potential of PM0000872 (Menthol 5%) used with the devices PM0000878 and PM0000879:**

You submitted data from the in vitro bacterial reverse mutation assay (Ames assay; n-3-1-1-ames-men-5-rpt-03408-reva-report) to identify if a test article is able to induce DNA mutations. Your submitted data show that the aerosol condensate produced from PM0000872 (Menthol 5%) using the devices PM0000878 and PM0000879, using standard puffing parameters, induced a significant mutagenic response when compared to the historical vehicle control group. According to your study guidelines, the criteria for a positive mutagenic response include a three-fold increase in TA98 revertants seen in two or more successive concentrations, or a repeatable response at a single concentration. Your data submitted indicates that PM0000872 (Menthol 5%) used with the devices PM0000878 and PM0000879 induced a mutagenic response. The devices (PM0000878 and PM0000879) are responsible for aerosolizing and delivering the e-liquid to the user. HPHCs, mutagenic and genotoxic constituents within the e-liquid can be transferred into the aerosol via the device. The device functional parameters mediate and control the delivery of these toxic constituents to the user and are a critical factor in evaluating the mutagenicity and genotoxicity of the new products. Thus, the information set out below is needed to assess the risk of mutagenicity associated with use of PM0000872 (Menthol 5%), used with the devices PM0000878 and PM0000879.

You also needed to have:
   a) Provided additional data, information or a scientific rationale for PM0000872 as used with the JUUL devices PM0000878 and PM0000879 to demonstrate that these results from the in vitro bacterial reverse mutation assay are not biologically relevant or biologically significant. This could have included data and results from a repeated in vitro bacterial reverse mutation assay, a discussion of the mutations induced within the TA98 strain by test articles and their in vivo relevance, the anticipated mutagenic and detoxification responses that would occur in vivo following exposure to PM0000872 (Menthol 5%) and how the assay results from PM0000872 (Menthol 5%) can be interpreted in relation to suitable comparison products (i.e., combustible cigarettes). This additional information is needed to assess the risk of mutagenicity posed by PM0000872 (Menthol 5%) and will establish the in vivo relevance of this in vitro mutagenicity assay result.

If you choose to submit new applications for these tobacco products, you must fulfill all requirements set forth in section 910(b)(1). To do so, you may cross-reference information submitted in:

- The new tobacco product applications, PM0000864.PD1, PM0000872.PD1, PM0000874.PD1, PM0000876.PD1, PM0000878.PD1 and PM0000879.PD9 subject to this Denial. (see 21 C.F.R. 1114.17)

- A Tobacco Product Master File submission (see 21 CFR 1114.7(b)(2) or 1114.17(c)(2); and guidelines at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/tobacco-product-master-files)

Your new PMTAs should clearly identify the PMTA submission type as a resubmission and include all information necessary to respond to all deficiencies identified in this letter (see 21 CFR 1114.17(d)). Please note, however, that the list of deficiencies identified in this letter is not necessarily exhaustive. We found that the toxicological deficiencies identified above are dispositive of your applications because they preclude a finding that permitting the marketing of your new tobacco products is APPH. Accordingly, FDA has not reached a final agency decision on other aspects of your application, including for example, the potential benefit to adults as compared to the risk to youth posed by your tobacco or menthol products. If you decide to resubmit and cross-reference this PMTA, in addition to evaluating your response to the listed deficiencies, FDA will assess your submission to determine whether it meets the requirements of the FD&C Act and the PMTA rule[5] and whether the application as a whole supports a finding that the marketing of your product(s) is appropriate for the protection of the public health.

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[6,7] using eSubmitter.[8]  Alternatively, submissions may be mailed to:

> Food and Drug Administration
> Center for Tobacco Products
> Document Control Center (DCC)
> Building 71, Room G335
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[9]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day.  We are unable to accept regulatory submissions by e-mail.

---

[5] See 86 FR 55300, October 5, 2021.
[6] For more information about CTP Portal, see
https://www.fda.gov/tobacco-products/manufacturing/submit-documents-ctp-portal
[7] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[8] For more information about eSubmitter, see https://www.fda.gov/industry/fda-esubmitter
[9] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

If you have any questions, please contact Rodney Hammond, MPH, CHES, Regulatory Health Project Manager, at (240) 796 - 4667 or Rodney.Hammond@fda.hhs.gov.

Sincerely,

Digitally signed by Matthew R. Holman -S
Date: 2022.06.23 09:54:44 -04'00'

Matthew R. Holman, Ph.D.
Director
Office of Science
Center for Tobacco Products

Enclosures:
　　　Appendix A – New Tobacco Products Subject to This Letter
　　　Appendix B – Amendments Received for These Applications

**Appendix A[10,11]**
New Tobacco Products Subject to This Letter

| Common Attributes of PMTA | |
|---|---|
| **Date of Submission:** | July 29, 2020 |
| **Date of Receipt:** | July 29, 2020 |
| **Product Manufacturer:** | JUUL Labs Inc. |
| **Product Category:** | ENDS (VAPES) |
| **PM0000864.PD1: JUULpods (Menthol 3.0%)** | |
| **Product Sub-Category:** | Closed E-Liquid |
| **Package Type:** | Cartridge |
| **Package Quantity:** | 1 Cartridge |
| **Characterizing Flavor:** | Menthol |
| **E-liquid volume** | 0.7 mL |
| **Nicotine concentration:** | 3.0% |
| **PG/VG ratio:** | 30/70 |
| **Additional property:** | Blister Pack |
| **PM0000872.PD1: JUULpods (Menthol 5.0%)** | |
| **Product Sub-Category:** | Closed E-Liquid |
| **Package Type:** | Cartridge |
| **Package Quantity:** | 1 Cartridge |
| **Characterizing Flavor:** | Menthol |
| **E-liquid volume** | 0.7 mL |
| **Nicotine concentration:** | 5.0% |
| **PG/VG ratio:** | 30/70 |
| **Additional property:** | Blister Pack |
| **PM0000874.PD1: JUULpods (Virginia Tobacco 3.0%)** | |
| **Product Sub-Category:** | Closed E-Liquid |
| **Package Type:** | Cartridge |
| **Package Quantity:** | 1 Cartridge |
| **Characterizing Flavor:** | Tobacco |
| **E-liquid volume** | 0.7 mL |
| **Nicotine concentration:** | 3.0% |
| **PG/VG ratio:** | 30/70 |
| **Additional property:** | Blister Pack |
| **PM0000876.PD1: JUULpods (Virginia Tobacco 5.0%)** | |
| **Product Sub-Category:** | Closed E-Liquid |
| **Package Type:** | Cartridge |
| **Package Quantity:** | 1 Cartridge |
| **Characterizing Flavor:** | Tobacco |
| **E-liquid volume** | 0.7 mL |
| **Nicotine concentration:** | 5.0% |
| **PG/VG ratio:** | 30/70 |
| **Additional property:** | Blister Pack |

[10] We interpret package type to mean container closure system and package quantity to mean product quantity within the container closure system, unless otherwise identified.
[11] Brand/sub-brand or other commercial name used in commercial distribution.

| PM0000878.PD1: JUUL Device | |
|---|---|
| **Product Sub-Category:** | Closed E-Cigarette |
| **Package Type:** | Box |
| **Package Quantity:** | 1 ENDS Device |
| **Characterizing Flavor:** | None |
| **Length:** | (b) (4) |
| **Diameter:[12]** | N/A |
| **Wattage:** | (b) (4) |
| **Battery Capacity:** | 200 mAh |
| **E-liquid volume** | 0.7 mL |
| **Nicotine concentration:** | N/A |
| **PG/VG ratio:** | N/A |
| **Additional properties:** | Width: (b) (4) |
| | Depth: (b) (4) |
| | Color: Slate |
| | Universal Serial Bus (USB) Charging Dock |
| **PM0000879.PD9: JUUL Locked Device** | |
| **Product Sub-Category:** | Closed E-Cigarette |
| **Package Type:** | Box |
| **Package Quantity:** | 1 ENDS Device |
| **Characterizing Flavor:** | None |
| **Length:** | (b) (4) |
| **Diameter:[12]** | N/A |
| **Wattage:** | (b) (4) |
| **Battery Capacity:** | 256 mAh |
| **E-liquid volume** | 0.7 mL |
| **Nicotine Concentration:** | N/A |
| **PG/VG ratio:** | N/A |
| **Additional properties:** | Width: (b) (4) |
| | Depth: (b) (4) |
| | Color: Slate |
| | USB Charging Dock |

---

[12] Applicant provided depth as an alternative for diameter given the product proportions.

**Appendix B**
Amendments Received for These Applications

| Submission Date | Receipt Date | Applications being amended | Reviewed | Brief Description |
|---|---|---|---|---|
| November 30, 2020 | November 30, 2020 | All STNs | Yes | Response to November 9, 2020 FDA Information Request |
| June 22, 2021 | June 22, 2021 | All STNs | Yes | Response to March 26, 2021 Deficiency Letter |