**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JUUL LABS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 1:22-CV-02853-RDM |
| v. | ) |
| | ) |
| FOOD & DRUG ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF JUUL LABS, INC.'S COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANT FDA'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION.............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

    A.    The Tobacco Control Act And FDA Regulation Of ENDS Products. ................... 3

    B.    JLI's PMTAs AND FDA's Marketing Denial Order. ........................................... 5

    C.    JLI's FOIA Requests.............................................................................................. 8

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT .................................................................................................................. 10

I.    FDA HAS NOT IDENTIFIED ANY FORESEEABLE HARM THAT  WILL RESULT FROM DISCLOSURE. ........................................................................ 11

    A.    Disclosure Will Not Chill Future Deliberations Or Undermine FDA's Ongoing Supervisory Review Of JLI's Applications. ........................................... 13

    B.    Disclosure Will Not Cause "Public Confusion." .................................................. 18

    C.    *Vanda* And Other Decisions Have Rejected The Same Arguments In Similar Circumstances. .......................................................................................... 19

II.    THE WITHHELD DOCUMENTS ARE NOT PROTECTED BY THE DELIBERATIVE PROCESS PRIVILEGE IN THE FIRST PLACE...................... 22

    A.    The Second TPL Review Memo—And The Discipline Reviews It Incorporates—Are Not "Predecisional." .............................................................. 22

    B.    The Scientific Discipline Reviews Are Not "Deliberative." ............................... 25

III.    FDA HAS AT MINIMUM FAILED TO SHOW THAT IT CANNOT SEGREGATE PROTECTED AND UNPROTECTED INFORMATION IN THE WITHHELD DOCUMENTS. .......................................................................... 27

IV.    THE COURT SHOULD, IF IT DOES NOT ORDER IMMEDIATE DISCLOSURE, PERMIT DISCOVERY AND REVIEW THE DOCUMENTS *IN CAMERA* .................................................................................................... 29

CONCLUSION ............................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*100Reporters LLC v. U.S. Dept. of J.*,
   248 F. Supp. 3d 115 (D.D.C. 2017) ....................................................................30

*Afshar v. Dep't of State*,
   702 F.2d 1125 (D.C. Cir. 1983) .........................................................................22

*Al Khalifa Group v. FDA*,
   No. 21-71340, Dkt. 21-2 (9th Cir.) ....................................................................17

*Army Times Publishing Co. v. Dep't of Air Force*,
   998 F.2d 1067 (D.C. Cir. 1993) .........................................................................27

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
   473 F.3d 312 (D.C. Cir. 2006) ...........................................................................10

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...........................................................................................24

*Bidi Vapor LLC v. FDA*,
   No. 21-13340, Index ...........................................................................................17

*Bristol–Myers Co. v. FTC.*,
   424 F.2d 935 (D.C. Cir. 1970) ...........................................................................25

*Burka v. U.S. Dep't of Health and Human Servs.*,
   87 F.3d 508 (D.C. Cir. 1996) .......................................................................10, 21

*Buzzfeed, Inc. v. Dept. of Homeland Sec.*,
   2022 WL 3976099 (D.D.C. Sept. 1, 2022) ........................................................18

*Campaign Legal Ctr. v. U.S. Dep't of Justice*,
   34 F.4th 14 (D.C. Cir. 2022) ..............................................................................22

*Citizens for Resp. and Ethics in Washington v. U.S. Dept. of Justice*,
   2006 WL 1518964 (D.D.C. June 1, 2006) .........................................................29

*Citizens for Resp. and Ethics in Washington v. U.S. Dept. of State*,
   585 F. Supp. 3d 34 (D.D.C. 2022) ................................................................12, 24

*Cole v. Copan*,
   2021 WL 6049871 (D.D.C. Dec. 21, 2021) .......................................................29

*Ctr. for Biological Diversity v. U.S. EPA*,
    279 F. Supp. 3d 121 (D.D.C. 2017) ...................................................................25, 26, 27, 28

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
    436 F. Supp. 3d 90 (D.D.C. 2019) ......................................................................................27

*Ctr. for Pub. Integrity v. U.S. Dept. of Com.*,
    401 F. Supp. 3d 108 (D.D.C. 2019) ....................................................................................28

*Elec. Frontier Found. v. U.S. Dept. of J.*,
    826 F. Supp. 2d 157 (D.D.C. 2011) ....................................................................................27

*Evans v. Fed. Bureau of Prisons*,
    951 F.3d 578 (D.C. Cir. 2020) ............................................................................................10

*FBI v. Abramson*,
    456 U.S. 615 (1982) ......................................................................................................12, 24

*Fontem US, LLC v. FDA*,
    No. 22-1076, Doc. No. 19560007 (D.C. Cir. July 21, 2022) ..............................................14

*Fontem US, LLC v. FDA*,
    No. 23-1021 (D.C. Cir. Jan. 25, 2023) ................................................................................23

*Fumizer, LLC v. FDA*,
    No. 21-71315, Dkt. 12 (9th Cir.) ........................................................................................17

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
    198 F.R.D. 540 (W.D. Wash. Apr. 11, 2000) ......................................................................26

*Hall & Assocs. v. EPA*,
    956 F.3d 621 (D.C. Cir. 2020) ..............................................................................................9

*Jud. Watch, Inc. v. U.S. Dept. of Treas.*,
    796 F. Supp. 2d 13 (D.D.C. 2011) ......................................................................................27

*Judicial Watch, Inc. v. FDA*,
    449 F.3d 141 (D.C. Cir. 2006) ............................................................................................22

*Senate of Commonwealth of Puerto Rico ex rel. Judiciary Comm. v. DOJ*,
    823 F.2d 574 (D.C. Cir. 1987) ............................................................................................22

*Juul Labs, Inc. v. FDA*,
    D.C. Cir. No. 22-1123, Dkt. No. 1952074 (June 24, 2022) ..............................................2, 6

*Landmark Leg. Found. v. E.P.A.*,
    959 F. Supp. 2d 175 (D.D.C. 2013) ....................................................................................30

*Leopold v. U.S. Dep't of Just.*,
    2021 WL 3128866 (D.D.C. July 23, 2021)............................................................19

*Logic Technology L.L.C. v. FDA*,
    No. 22-3030, Dkt. No. 33 (3d Cir.)....................................................................14

*My Vape Order Inc. v. FDA*,
    No. 21-71302, Dkt. 21-1 (9th Cir.) ...................................................................17

*Nat'l Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002)............................................................................25

*New York Times Co. v. Dept. of Health & Human Services*,
    513 F. Supp. 3d 337 (S.D.N.Y. 2021)...............................................................16

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978)..........................................................................................10

*Parke, Davis & Co. v. Califano*,
    623 F.2d 1 (6th Cir. 1980) ................................................................................26

*Pavement Coatings Tech. Council v. U.S. Geological Survey*,
    995 F.3d 1014 (D.C. Cir. 2021) ..........................................................15, 21, 22

*Petroleum Info. Corp. v. U.S. Dep't of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992) ..............................................................9, 25, 26

*Pub. Employees for Envtl. Resp. v. Envtl. Protec. Agency*,
    288 F. Supp. 3d 15 (D.D.C. 2017).....................................................................30

*Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.*,
    575 F. Supp. 3d 34 (D.D.C. 2021).....................................................................19

*R.J. Reynolds Vapor Co. v. FDA*,
    Case No. 23-60037, Dkt. 121-1 (5th Cir. Mar. 23, 2023) (Slip Op.).................14

*Reps. Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021)\* .................................................................. *passim*

*SAI v. Transportation Sec. Admin.*,
    315 F. Supp. 3d 218 (D.D.C. 2018)...................................................................25

*Scudder v. C. Intel. Agency*,
    25 F. Supp. 3d 19 (D.D.C. 2014).......................................................................29

*Sierra Club v. U.S. Fish and Wildlife Serv.*,
    523 F. Supp. 3d 24 (D.D.C. 2021)...................................................23, 24, 28, 29

*Sterling Drug Inc. v. Harris,*
  488 F. Supp. 1019 (S.D.N.Y. 1980) ...................................................................26

*Trea Senior Citizens League v. U.S. Dep't of State,*
  994 F. Supp. 2d 23 (D.D.C. 2013) .....................................................................24

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,*
  141 S. Ct. 777 (2021) ...................................................................................22, 23

*Vanda Pharm., Inc., v. Food and Drug Admin.,*
  2023 WL 2645714 (D.D.C. Mar. 27, 2023)* ............................................. *passim*

**Statutes**

5 U.S.C. § 552(a)(8)(A)(i)(1) ....................................................................................12

5 U.S.C. § 552(b) ......................................................................................................27

5 U.S.C. § 552(b)(5) .................................................................................................11

21 U.S.C. § 355(s)(1) ...............................................................................................17

21 U.S.C. §§ 387j(a)(1)-(2) ........................................................................................4

21 U.S.C. § 387j(c)(1)(A) ...........................................................................................4

21 U.S.C. § 387j(c)(4) .................................................................................................4

21 U.S.C. §§ 387j(c)(4)-(5) .........................................................................................4

21 U.S.C. § 387r(b)(1) ................................................................................................4

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................9, 30

**Other Authorities**

21 C.F.R. § 10.75 ........................................................................................................6

21 C.F.R. § 14.20(b)(4)–(6) ......................................................................................17

21 C.F.R. § 1114.47 ..................................................................................................14

81 Fed. Reg. 28,793 ....................................................................................................4

S. Rep. No. 4, 114th Cong. 1st Sess. 2 (2015) ........................................................11

## INTRODUCTION

FDA's opposition to turning over almost 500 pages of agency documents is the latest example of its Kafkaesque treatment of e-cigarette manufacturers. For more than eight months, FDA gave the public impression that the Office of Science within FDA's Center for Tobacco Products ("CTP") led the review of Juul Labs ("JLI")'s applications and that the Director of that Office, Matthew Holman, made the final decision to deny JLI marketing authorization. That is not what happened. Bureaucrats at CTP with no scientific training told Dr. Holman what his decision should be after choosing between not one, but two different final decisions authored by the agency's scientists. FDA made available the final decision dictated by the CTP Director, but excluded the other decision from the agency's usual document repository ostensibly to "avoid confusion." The existence of a second decision was thus a secret for almost six months, and even FDA's own FOIA officers were unaware the memo existed when responding to JLI's FOIA requests. It is difficult to imagine a more arbitrary agency proceeding or one less deserving of secrecy under the deliberative process privilege.

FDA nonetheless refuses to make available its second, secret decision (known as a TPL Review memo) or the nineteen underlying scientific reviews discussed in that decision, despite JLI's urgent need for those materials. None of the withheld documents are protected by the deliberative process privilege. The withheld TPL Review memo is a document approved and signed by Dr. Holman under his delegated authority from the Secretary of Health and Human Services, just like the marketing denial order and the other TPL Review memo FDA concedes are final agency decisions. Officials with final decision-making authority do not sign pre-decisional drafts, and no memo from the CTP Director can strip away the finality of a signature by an agency official exercising authority delegated by the Secretary. The scientific discipline reviews, in turn,

are not deliberative policymaking documents, but are instead scientific documents rife with facts that the deliberative process privilege does not protect.

Even if the privilege applied, disclosing the withheld materials will not harm the agency's deliberative process—a separate and independent reason why FDA cannot withhold those documents.   In fact, the recent decision in *Vanda Pharmaceuticals, Inc. v. FDA* rejected remarkably similar deliberative process arguments and ordered FDA to produce its clinical and statistical reviews for a supplemental new drug application that the agency did not approve.  *See Vanda Pharm., Inc., v. Food and Drug Admin.,* 2023 WL 2645714, *1 (D.D.C. Mar. 27, 2023). Advancing the same arguments it presses here, FDA asserted turning over those reviews would "chill[] agency discourse" and "caus[e] consumer confusion."  *Id.* at *3.  Judge Cooper was "not convinced" because "FDA currently discloses clinical and scientific reviews to the public in a variety of circumstances" and its concerns about confusion were simply "conjecture."  *Id.* at *3-4.

The same is true here.  Turning over the second TPL Review memo will not chill agency discourse.  Dr. Holman signed that memo exercising his delegated authority and he was prepared to make it public.  As for the withheld scientific discipline reviews, FDA routinely makes all reviews available when it grants marketing authorization, and even when it denies authorization, FDA makes available the reviews the agency "considered," "reviewed," or "relied in part on" in reaching its decision. Ex. 1 at 2.  If FDA had based its decision on the second TPL Review memo, that would have included all nineteen discipline reviews the agency refuses to produce.  Ex. 2 at 7.  In these circumstances, disclosure will not chill agency deliberations.  Scientific reviewers should reasonably expect that their reviews will become public after FDA issues its decision.

There is also no merit to FDA's concern that releasing the reviews "could discourage the reviewer" from "refining or revising that analysis" as part of the agency's ongoing supervisory

review of the marketing denial order.  FDA Br. 20-21.  FDA already made available the first and second cycle discipline reviews for chemistry, toxicology, and environmental science, and the flaws in those reviews are a key issue in the supervisory review.  If the reviewers for those disciplines can be trusted to refine or revisit their now publicly available work product, there is no reason the authors of the other discipline reviews cannot.  Nor would releasing the withheld documents cause confusion.  The marketing denial order speaks for itself.

The Court cannot allow FDA to continue withholding these important, presumptively public agency records.  JLI has an administrative appeal of FDA's decision pending right now. The company deserves the opportunity to respond to all of FDA's concerns at the same time— even if those concerns are, as FDA claims, only preliminary—and to convince the agency it can perform the statutorily required balancing using the full set of scientific reviews FDA already conducted.  JLI cannot do that while FDA improperly withholds most of its scientific reviews. Meanwhile, the Minnesota Attorney General is using the marketing denial order to tell a jury in an ongoing trial that JLI's products are unsafe and have no public health benefits.  The prejudice caused by that one-sided presentation is extreme, and JLI needs the withheld documents to give the jury and the court a complete picture of what FDA scientists thought of its application, again even if, as the agency claims, those scientific conclusions are not FDA's final position.  The Court should grant summary judgment that FDA must produce the withheld materials, and it should do so as expeditiously as possible.

## BACKGROUND

### A.    The Tobacco Control Act And FDA Regulation Of ENDS Products.

JLI's FOIA requests arise out of its attempts to comply with FDA regulations.  In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA") to regulate tobacco products and encourage the development and introduction of alternatives to traditional

cigarettes that reduce tobacco-related death and disease.  *See* 21 U.S.C. § 387r(b)(1).  As originally enacted, the TCA applied only to "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco" products, not electronic cigarettes or electronic nicotine delivery system (ENDS) products.  *Id.* § 387a(b).  But Congress delegated to FDA discretion to "deem" other products subject to the statute.  *Id.*  FDA deemed ENDS products subject to the TCA in 2016.  *See* 81 Fed. Reg. 28,793.

Following this "Deeming Rule," all ENDS products were made subject to "premarket review" requirements, even though many ENDS products (including JUUL products) were already on the market.  Those requirements include obtaining FDA authorization. 21 U.S.C. §§ 387j(a)(1)-(2).  The pathway to authorization for virtually all ENDS products requires the manufacture to submit a premarket tobacco product application ("PMTA") that demonstrates the product "is appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(4).  Applying the "appropriate for the public health" standard requires a comprehensive, holistic analysis that balances the "risks and benefits to the population as a whole, … taking into account (A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products."  21 U.S.C. §§ 387j(c)(4)-(5).

The TCA assigns the Secretary of Health and Human Services premarket review authority for tobacco products. 21 U.S.C. § 387j(c)(1)(A).  The Secretary has delegated this authority to the Commissioner of Food and Drugs.  *See* FDA Staff Manual Guides 1410.10 at 1.A.1; Mital Decl. ¶ 6.  The Commissioner has, in turn, delegated to multiple officials within FDA's Center for Tobacco Products the authority "to issue orders to approve or deny applications" and "to deny applications and to provide information about the measures required to remove the application

from deniable form." FDA Staff Manual Guides 1410.1103, at 1.F, 1.G; Mital Decl. ¶ 7. Those officials include the CTP Director and Deputy Director, the Director of the Office of Science within CTP, and the Director of the Division of Individual Health Science within the Office of Science. *Id.*

FDA relies on its staff of scientists to review applications submitted by ENDS manufacturers. Mital Decl. ¶ 10. Reviewers in each relevant scientific discipline draft what are known as scientific discipline reviews that evaluate the information in the application based on the principles of that scientific discipline. Mital Decl. ¶ 10. A chemist would review the chemistry data in an application, for example, while an epidemiologist would look at other data and offer a different scientific perspective on the public health risk of a product. FDA also designates an experienced staff member as the Technical Project Lead for each application. Mital Decl. ¶ 11. The Technical Project Lead assesses the scientific discipline reviews and makes a recommendation about whether to grant or deny the application. *Id.* This assessment and recommendation is documented in a TPL Review memo. *Id.* An FDA official with delegated decision-making authority—usually the Director of the Office of Science—reviews the TPL Review memo and makes a "Signatory Decision" to either accept or reject the Technical Project Lead's recommendation. Mital Decl. ¶ 12; Ex. 3. A decision authorizing an application is called as a marketing granted order, and a decision denying an application is a marketing denial order. Mital Decl. ¶ 12.

**B.      JLI's PMTAs AND FDA's Marketing Denial Order.**

In July 2020, JLI submitted its PMTAs with over 125,000 pages of information, data, and analysis, seeking authorization to market two devices and four types of JUUL pods (Virginia Tobacco and Menthol flavors in 5.0% and 3.0% nicotine concentrations). Ex. 4 at 24. JLI conducted more than 75 nonclinical and 13 clinical studies to evaluate the potential health risks

among users of its JUUL products.  *Id.* at 25.  The research showed that among adult smokers who

started using JUUL products, over 50% completely switched from combustible cigarettes—a level

far higher than other ENDS products.  *Id.* at 5–6.

On June 22, 2022, almost two years after JLI's initial submission, JLI received word that

FDA was planning to deny its application and order all JUUL products off the U.S. market.  That

notice came from the press, not FDA.  Ex. 5.  Officials with knowledge of FDA's order apparently

leaked the decision to *The Wall Street Journal*, leaving the marketplace for JLI's products in

disarray.

FDA issued its formal order the next day through a letter addressed to JLI.  Ex. 6.  FDA

acknowledged that "exposure to carcinogens and other toxicants present in cigarette smoke were

greatly reduced with exclusive use of the new products compared to [cigarette] smoking."  Ex. 3

at 13.  FDA nevertheless focused on purported "toxicological" shortcomings in JLI's PMTAs and

asserted that "[w]ithout sufficient evidence of a product's toxicology risks," the agency "cannot

conduct a full evaluation of the overall risks and benefits of JLI's products."  Ex. 6 at 2.  After the

D.C. Circuit granted an emergency administrative stay of the marketing denial order, FDA took

the highly unusual step of staying its own order and announcing it would conduct a further internal

review of the decision to deny the PMTAs, a process known as "supervisory review."  Ex. 7; *Juul*

*Labs, Inc. v. FDA*, D.C. Cir. No. 22-1123, Dkt. No. 1952074 (June 24, 2022); *see also* 21 C.F.R.

§ 10.75.  This agency-initiated supervisory review was later combined with a separate supervisory

review proceeding stemming from an administrative appeal filed by JLI.  Ex. 4.  In its letter

announcing the stay, FDA acknowledged that, after "reviewing the briefing materials" JLI had

submitted to the D.C. Circuit, it found that "there are scientific issues unique to this application

that warrant additional review."  Ex. 7.

FDA arrived at its marketing denial order through a troubling administrative process.  The Technical Project Lead authored not one, but two TPL Review memos, *see* Mital Decl.  The first memo, the TPL Review (Toxicology), exclusively discusses the "toxicological risks posed by" JLI's products.  Ex. 3 at 4.  FDA labeled the other memo the "TPL Review (Additional Disciplines)", but it covers all relevant scientific disciplines including toxicology.  Ex. 2 at 7.  The fact that the Office of Science finalized and the Director of that Office signed a second TPL Review memo that surveys all the relevant disciplines raises serious questions about the accuracy of FDA's statement in the marketing denial order that the agency "cannot conduct a full evaluation of the overall risks and benefits of JLI's products."  Ex. 6 at 2.  Indeed, although the MDO asserts that "[i]n light of the unaddressed deficiencies regarding potential toxicological risks and in the interest of issuing a decision with the additional delay that further analysis would have required, FDA did not assess whether there might be additional deficiencies relating to initiation, switching, and cessation," *id.* at 3, it appears that FDA *did*, in fact, conduct extensive analysis of these issues— the agency just chose to keep that analysis secret from the public and JLI.

The CTP Director also exercised an unusual oversight over JLI's application.  At some point in the review process, the Office of the Center Director "advised" the Office of Science that the CTP Director "would review any conclusions reached by OS for" JLI's products "before those conclusions became a final agency decision."  Ex. 10 at 2.  The Office of Science sent the CTP Director both TPL Review memos, and the Director instructed the Office of Science to issue a marketing denial order based on the TPL Review (Toxicology).  *Id.*  Despite the CTP Director dictating the outcome for JLI's applications, the marketing denial order issued under the signature of Matthew Holman, the Director of the Office of Science.  Ex. 6 at 13.

Dr. Holman signed the marketing denial order, the TPL Review (Toxicology) and the TPL Review (Additional Disciplines) on June 23, 2022.  Ex. 6 at 13; Ex. 3 at 1; Ex. 2 at 7.  That same day, the Acting CTP Director at the time, Michele Mital, signed a memo to file documenting the Office of the Center Director's oversight and instructions.  Ex. 10.  As part of those instructions, CTP decided that the TPL Review (Additional Disciplines) "should not be stored in [CTP's] Image database" where CTP typically stores its TPL Review memos and scientific discipline reviews. Mital Decl. ¶ 19; German Decl. ¶ 11.

FDA took these unusual actions against a backdrop of immense political pressure. Members of Congress through letters and at hearings pressed FDA officials to commit that JUUL products would not be authorized.  Ex. 11.  After FDA's decision, Representative Krishnamoorthi boasted about the congressional pressure placed "on the FDA to deny JUUL's PMTA applications."  Ex. 12.  Senator Durbin for years pushed FDA to "finally do the right thing" and take "JUUL off the market."  Ex. 13; Ex. 14.  Commentators observed that JLI had been "singled out": there had been "so much opposition to Juul" from "legislators in state legislatures and Congress," that "FDA simply could not have authorized the sale of JUUL" without provoking a "fierce" backlash and jeopardizing its funding. Ex. 14.  It now appears those political considerations influenced how FDA approached JLI's applications.

### C.      JLI's FOIA Requests

The same day FDA issued its marketing denial order, JLI submitted two FOIA requests seeking "technical project lead review ('TPL') and any related documents" as well as "disciplinary review documents for" JLI's PMTAs.  Ex. 15; Ex. 16.  FDA responded to JLI's requests in two letters, dated July 8, 2022 and July 21, 2022.  On July 8, FDA provided a partial response that included the "Technical Project Lead Review (Toxicology)," as well as the "First and Second Cycle Toxicology Reviews," but not documents related to topics other than toxicology.  Ex. 17.

On July 21, FDA stated that, in addition to the toxicology documents it had provided earlier, it would also "releas[e] the First and Second Cycle Environmental Science and Chemistry Reviews" because the TPL Review (Toxicology) "considered" or "relied in part on" those reviews.  Ex. 1. FDA refused to make available nineteen other discipline reviews discussing JLI's applications. *Id.*; Ex. 2; German Decl. ¶ 14.

At the time, FDA's FOIA office did not know a second TPL Review memo—the TPL Review (Additional Disciplines)—existed.  German Decl. ¶ 15.  Nor did the FOIA office know that someone in CTP instructed agency officials not to store this second TPL Review memo in the typical repository.  *Id.* ¶¶ 11, 15.  The FOIA office "became aware" of this second memo only after JLI filed this FOIA action.  *Id.* ¶ 15.  JLI first learned FDA had authored a second, secret TPL Review Memo when FDA provided its *Vaughn* index on December 14, 2022.  Ex. 2 at 7.  FDA first revealed the existence of the Mital memo and offered a glimpse into its unusual decision-making process four months later, on March 2, 2023, when the agency filed its summary judgment motion.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Hall & Assocs. v. EPA*, 956 F.3d 621, 629 (D.C. Cir. 2020) (quoting Fed. R. Civ. P. 56(a)); *see also Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992).  "To carry its burden at summary judgment […] the government must demonstrate that (A) the materials at issue are covered by the deliberative process privilege, and (B) it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege."  *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021).  An agency may make such a demonstration at the summary-judgment stage on the basis of agency affidavits only if "they

contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020).  And although discovery in FOIA cases is "rare," it should be denied only when the Court is assured that "an agency's declarations are reasonably detailed, submitted in good faith[,] and the court is satisfied that no factual dispute remains."  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006).

## ARGUMENT

FDA fails to carry its burden to invoke the deliberative process privilege in this case, which features an extraordinary sequence of agency decision-making that cries out for transparency.  The agency authored not one, but two TPL Review memos, *see* Ex. 10—an unusual step even experienced FDA observers have never seen before, Ex. 14 ("[W]e have never seen FDA bifurcate and compartmentalize TPLs.").  FDA then successfully concealed the existence of one of those memos for months, still refuses to make that memo available to JLI, and is apparently attempting to pass off a political decision ultimately made by non-scientists as a decision by CTP's Office of Science under the signature of its chief scientist.  *See* Ex. 10.  Nothing about this process is consistent with reasoned decision-making or the transparency Congress expects from administrative agencies.

"The basic purpose of Freedom of Information Act […] is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The statute enacts a "strong presumption in favor of disclosure" of agency records.  *Burka v. U.S. Dep't of Health and Human Servs.*, 87 F.3d 508, 516 (D.C. Cir. 1996).  "[A]gencies may only withhold information that falls within one of the Act's nine enumerated exemptions," one of

which is "Exemption 5," which allows agencies to withhold internal records protected by the deliberative process privilege.  5 U.S.C. § 552(b)(5); *Reporters Comm. For Freedom of the Press v. FBI*, 3 F.4th 350, 371-72 (D.C. Cir. 2021).  But exemptions "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Id.* at 357.

FDA has the burden to show that the materials at issue "are covered by the deliberative process privilege" and that "it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege."  *Id.* at 361.  FDA cannot make either showing here, and making matters worse, the agency is abusing the privilege by invoking its protections selectively.  The agency has no issue discussing portions of its internal deliberative process that support its flawed, arbitrary decision to deny JLI marketing authorization, including a previously undisclosed internal memo purporting to document how bureaucrats chose between two different decisions by the agency's scientists, and even selectively quotes from the very documents—like the withheld TPL Review Memo—that it refuses to produce.  *See* Mital Memo ¶ 18.  The FOIA Improvement Act of 2016 was supposed to put an end to this type of abusive privilege assertion.  The Court should accordingly grant JLI's motion, deny FDA's motion, and order the requested materials disclosed to JLI as soon as possible.

## I.   FDA HAS NOT IDENTIFIED ANY FORESEEABLE HARM THAT WILL RESULT FROM DISCLOSURE.

As an initial matter, FDA cannot show any distinct foreseeable harm likely to arise from disclosing the second TPL memo and the nineteen withheld scientific discipline reviews to JLI.  *FBI*, 3 F.4th at 369.  In 2016, Congress "adopted the FOIA Improvement Act in part out of concerns that some agencies [were] overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure," with the "deliberative process privilege" being singled out for "particular[] concern" regarding "agency overuse and abuse."  *Id.* at 369(citing S.

Rep. No. 4, 114th Cong. 1st Sess. 2 (2015)); *see also Citizens for Resp. and Ethics in Washington v. U.S. Dept. of State*, 585 F. Supp. 3d 34, 40 (D.D.C. 2022).  The Act requires that agencies "withhold information … only if … disclosure would harm an interest protected by" a FOIA exemption.  5 U.S.C. § 552(a)(8)(A)(i)(1).  This "distinct foreseeable harm requirement" "impose[s] an independent and meaningful burden on agencies."  *FBI*, 3 F.4th at 369.  To meet it, agencies must "explain how disclosure 'would'—not 'could'—adversely impair internal deliberations."  *Id.* at 369–70.

FDA makes two arguments to resist disclosure: (1) that disclosure could "chill … [FDA's] supervisory review of Plaintiff's PMTAs," and (2) that disclosing "scientist-level deliberations would cause confusion regarding the basis of FDA's MDO."  FDA Br. 20–21.  Neither argument justifies the broad withholding at issue here.  The reviewers cannot reasonably expect confidentiality, especially where FDA itself has already disclosed aspects of its deliberative process, routinely made available similar records, and stepped right up to the edge of relying on these very documents in its marketing denial order.  Nor is there any evidence confusion would result from releasing the requested materials.  FDA instead worries about hypotheticals and ignores the tools at its disposal to mitigate that risk.

For largely the same reasons, the *Vanda* decision recently rejected virtually identical arguments by FDA and ordered the agency to release similar reviews to the public.  *Vanda,* 2023 WL 2645714 at *4.  This case is on all fours—involving the same agency, the same type of underlying dispute, the same purported privilege, and the same practice of regularly disclosing agency work product.  To the extent these cases are different, that is only because FDA's treatment of JLI's PMTA applications and FOIA requests is even more extraordinary—FDA is withholding

12

an unusual, second TPL memo signed on the same day as its marketing denial order, a circumstance that only accentuates the need for transparency here.

### A.      Disclosure Will Not Chill Future Deliberations Or Undermine FDA's Ongoing Supervisory Review Of JLI's Applications.

FDA's concerns about a chilling effect on staff communications is no reason to withhold the documents at issue.  Making the second TPL Review memo available would not harm FDA's deliberative process in any way.  The deliberative process was at an end within CTP's Office of Science.  Dr. Holman, the Office of Science's Director at the time, signed the memo to indicate his "concur[rence] with [the] TPL['s] findings and conclusion."  Mital Decl. ¶ 18.  Dr. Holman had final say within the Office of Science and authority to "make[] the FDA decision as to whether to grant or deny marketing authorization."  *Id.* ¶¶ 7, 12.  By signing the second TPL memo, Dr. Holman indicated he was prepared to make the second TPL a public part of FDA's decision and the TPL's findings the scientific basis for that decision.  In its motion, FDA relies heavily on the fact that the CTP Director "advised" the Office of Science that the Office of the Center Director "would review any conclusions reached by OS," Mital Memo at 1, but that is irrelevant to the harm inquiry.  The Mital memo already lays bare the deliberations within the Office of the Center Director about how to handle both TPL memos the Office of Science authored.  *See* Mital Memo. It would not serve any purpose underlying the deliberative process privilege to keep a document confidential where the agency has already disclosed the relevant internal deliberations surrounding the document and where the document's authors were comfortable sharing their conclusions publicly.

Disclosing the nineteen scientific discipline reviews FDA withheld likewise would not impair agency deliberations.  When the scientific reviewers wrote their discipline reviews, those reviewers knew that their work would likely be made public after FDA issued its decision.

13

FDA regularly makes its TPLs and disciplinary reviews available for authorized tobacco products.  21 C.F.R. § 1114.47; *see also* Ex. 19; Ex. 20; Ex. 21; Ex. 22.  Even for denied applications, FDA's decision to turn over to JLI the first and second cycle discipline reviews for chemistry, toxicology, and environmental science shows that the agency will make available reviewer notes and other materials FDA "considered," "reviewed," or "relied on" in its final decision.  *See* ECF 1, Ex. 2.  The administrative record in a recent D.C. Circuit appeal filed by another ENDS manufacturer challenging a Marketing Denial Order includes discipline reviews and other internal agency communications across a range of scientific disciplines.  Ex. 23 (*Fontem US, LLC v. FDA*, No. 22-1076, Doc. No. 19560007 (D.C. Cir. July 21, 2022)) at 2, 9-11.

In another case, FDA made available internal agency memos revealing that the CTP Director pressured the Office of Science not to issue marketing granted orders for a menthol-flavored ENDS product.  *See R.J. Reynolds Vapor Co. v. FDA*, Case No. 23-60037, Dkt. 121-1 at 10-11 (5th Cir. Mar. 23, 2023) (Slip Op.).  In the first memo, the Office of Science documented its original science-based conclusion that FDA should grant marketing authorization for the menthol-flavored product.  Ex. 24 at 2.  The same memo shows the CTP Director instructed the Office of Science to treat menthol-flavored products as a disfavored category, after which the Office of Science "reassessed" and reversed its recommendation.  *Id.* at 2-3.  A second memo confirms FDA's changing positions and documents staff concerns about the decision-making process.  Ex. 25 at 4.  Multiple TPL memos and the scientific discipline reviews underlying FDA's shifting positions are part of the administrative record in the manufacturer's appeal of the marketing denial order for its menthol-flavored product.  *See* Ex. 26 (Administrative Record in *Logic Technology L.L.C. v. FDA*, No. 22-3030, Dkt. No. 33, at 6–8, 21, 22, 27, 28, 31, 41, 47, 56, 62, 63, 69, 73, 76, (3d Cir.)).

Against this backdrop, making the requested materials available to JLI will not deter scientific reviewers from giving their honest assessment in the future.  The reviewers already know their work will be made public.  "Disclosure cannot chill deliberations if those deliberating do not reasonably expect their deliberations to remain private." *Vanda*, 2023 WL 2645714 at *4; *see also See Pavement Coatings Tech. Council v. U.S. Geological Survey*, 995 F.3d 1014, 1023 (D.C. Cir. 2021) (when typical practice often results in public disclosure, an agency "cannot meet its burden of justifying … categorical withholding").  If anything, the notion that the reviewers here did not know their work would likely become public is even weaker than usual.  The withheld TPL Review memo relies on each of those reviews, Ex. 2 at 7, and the CTP Director considered instructing Dr. Holman to make that memo the basis for FDA's marketing order, Ex. 10.

FDA's claim that disclosing the second TPL Review memo and the scientific discipline reviews "could discourage [a] reviewer" from "refining or revising that analysis" as part of the ongoing supervisory review is equally meritless.  Mital Decl. ¶ 23; German Decl. ¶¶ 28-30.  FDA and its declarants repeatedly speculate about what "*could*" happen rather than offer a "focused and concrete demonstration" of the harm that "*would*" actually result from disclosing the requested records.  *Reporters Committee*, 3 F.4th at 369–70 (emphasis added).  There is no evidence any FDA reviewer has skewed their analysis or refused to reconsider their past conclusions when confronted with new evidence because he or she "kn[ew] that the applicant had seen [the] individual reviewer's earlier analysis."  Mital Decl. ¶ 23; German Decl. ¶ 29.  Nor is there any evidence that there are any ongoing reviews right now involving the relevant scientific disciplines that might implicate FDA's purported concern.  FDA will only say such reviews "may be currently taking place."  Mital Decl. ¶ 23.  "'If the mere possibility that disclosure discourages a frank and open dialogue was enough for the exemption to apply, then Exemption 5 would apply whenever

the deliberative process privilege was invoked [...]"' *New York Times Co. v. Dept. of Health & Human Services*, 513 F. Supp. 3d 337, 353 (S.D.N.Y. 2021).  That is not the law, and FDA reviewers are career scientists who deserve a presumption that they will carry out any further discussion and deliberation fairly and objectively absent evidence to the contrary.

In any event, and even more fundamentally, FDA's supervisory-review argument makes little sense because FDA has already disclosed documents that are critical to that review.  It is undisputed that key documents forming the MDO's stated basis—the toxicology documents—have already been released.  *See* Mital Decl. Ex. 5; *see also* German Decl. Ex. 2 (Letter to JLI) ("On July 8, 2022, we sent you a partial response that included the Technical Project Lead Review (Toxicology) and the First and Second Cycle Toxicology Reviews ….").  Thus, there is no debate the MDO was (purportedly) based on toxicological concerns, that FDA's toxicology reviews will feature heavily in the supervisory review process, and—critically—that those documents have already been disclosed to JLI.  If disclosure truly would compromise the supervisory review or "discourage that reviewer or others from appropriately refining or revising that analysis based on further discussion and deliberation," FDA Br. 20, then such harms would have already occurred.

Yet FDA has never argued that its supervisory review is now a sham or that the agency is incapable of honestly performing the supervisory review process on account of the documents it has already released.  The agency must choose its position.  Either its reviewers are incapable of objectively re-reviewing their work once their reviews are released outside the agency, in which case supervisory review is almost always a biased and arbitrary process, or its reviewers are competent professionals who can re-evaluate their work even after the applicant has seen the reviewer's earlier analysis, in which case there is no harm in making available those earlier reviews.  FDA cannot have it both ways.

Accepting FDA's current position would cast doubt on far more than just the supervisory review of JLI's applications.  In at least a dozen cases over the past three years, FDA has voluntarily rescinded marketing denial orders or had those orders set aside by a federal court, with FDA placing the application back in scientific review.  *See* Ex. 27.  The administrative record on appeal in virtually all of those cases included the scientific discipline reviews and TPL memo supporting FDA's subsequently rescinded marketing denial order.  *See, e.g.*, Ex. 28 (*Al Khalifa Group v. FDA*, No. 21-71340, Dkt. 21-2 at 2–3 (9th Cir.)); Ex. 29 (*Bidi Vapor LLC v. FDA*, No. 21-13340, Index to Administrative Record, at 4 (11th Cir. Oct. 25, 2011)); Ex. 30 (*My Vape Order Inc. v. FDA*, No. 21-71302, Dkt. 21-1 at 1 (9th Cir.)); Ex. 31 (*Fumizer, LLC v. FDA*, No. 21-71315, Dkt. 12 at 4–5 (9th Cir.)).  FDA did not withhold those materials based on the deliberative process privilege.  FDA's position here, if taken seriously, would cast doubt on its ability to fairly re-review these applications as well as many other applications considered by the agency.  The fact FDA has never suggested, in any of these proceedings, that its reviewers cannot fairly reconsider their prior analysis in a fair way, even "knowing that the applicant has seen an individual reviewer's earlier analysis," Mital Decl. ¶ 23, further proves it is not a real concern.

The concern is also inconsistent with the public scrutiny FDA scientists accept and incorporate into their work in other contexts.  In the pharmaceutical context, for instance, FDA "shall … refer a drug or biological product to a[n] … advisory committee for review" if the active molecule has never been approved before.  *See* 21 U.S.C. § 355(s)(1).  "Advisory committees," in turn, hold proceedings that are almost always public.  *See* 21 C.F.R. § 14.20(b)(4)–(6).  There is no evidence FDA scientists are unwilling or unable to re-evaluate their work after these public meetings.  Quite the opposite.  For a recent birth control drug, FDA issued a highly critical report before the advisory committee meeting, finding it was not safer than current options and its

pregnancy-reduction rate was "unacceptable."  Ex. 32 at 10-11.  The Advisory Committee voted

14-1 to approve the drug anyway, *see* Ex. 33 at 6, and FDA then re-considered its thinking and

granted marketing authorization, Ex. 34.  There is no reason to believe FDA and its scientists

would be less open-minded here.

      **B.**      **Disclosure Will Not Cause "Public Confusion."**

      Releasing the second TPL Review memo and the withheld discipline reviews would not

"cause confusion regarding the basis of FDA's MDO."  FDA Br. 21 (quoting Mital Decl. ¶ 24).

The marketing denial order is publicly available, and the public can read for itself FDA's stated

basis for its decision.  Ex. 6 at 2.[1]  FDA also nowhere ties its concerns about confusion to specific

documents it withheld.  It is unclear, for example, how a "first cycle discipline review" about

"manufacturing, storage, and laboratory testing site[s]" authored by staff scientists will reasonably

confuse the public about the grounds for FDA's decision.  Ex. 2 at 2.  FDA's undifferentiated

invocation of "publication confusion" is instead the type of "mouthing the generic rationale for the

deliberative process privilege itself" that courts often reject.  *FBI*, 3 F.4th at 370 (rejecting public

confusion); *Buzzfeed, Inc. v. Dept. of Homeland Sec.*, 2022 WL 3976099, at *6 (D.D.C. Sept. 1,

2022) (same).

      FDA's own actions further undermine its purported concern for guarding against public

confusion.  Despite denying JLI's applications based on supposed toxicology issues, FDA's press

release announcing its decision prominently featured bold text blaming JLI for "play[ing] a

disproportionate role in the rise in youth vaping."  Ex. 35.  This statement, which gratuitously

blames JLI for youth vaping, appears in the release before FDA ever mentions the toxicology

---

[1]      The order is available at https://www.juullabsscience.com/wp-content/uploads/sites/8/2022/10/CourtesyCopy-JUUL-No-Marketing-Order-Letter-Redacted-FINAL-2022-08-08_Redacted.pdf (visited April 5, 2023).

concerns that are the actual basis for its decision. FDA's press release—which is still available on FDA's website—is far more likely to confuse the public than making available the requested materials.[2] If FDA is genuinely worried about confusion, it could combat that confusion by issuing another press release clarifying that interested parties should look to the marketing denial order— not the materials JLI seeks and not the prior press release—to understand the basis for the agency's decision. FDA could include a disclaimer as part of any package providing the materials JLI seeks to interested members of the public as well. But withholding the documents is not the answer.

The press release differentiates this case from those FDA relies on. In neither *Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.*, 575 F. Supp. 3d 34, 51 (D.D.C. 2021) nor *Leopold v. U.S. Dep't of Just.*, 2021 WL 3128866, *5 (D.D.C. July 23, 2021) did the agency issue public statements providing reasons for its decisions different from those provided in the official decision. Here, if the public is going to be confused about the stated reasons for FDA's marketing denial decision, it will be because of FDA's own press release—not because of hypothetical statements in a scientific reviewers' memo. FDA's contention otherwise is, at best, only speculation. Indeed, unlike in the cases FDA relies on, the agency merely speculates about what the public "*might* be led to believe" without any evidence to back up that conjecture. Mital Decl. ¶ 24 (emphasis added). Such "speculative or abstract fears" are not a reason to withhold the documents JLI requests here. *Reporters Committee*, 3 F.4th at 369.

### C.  *Vanda* And Other Decisions Have Rejected The Same Arguments In Similar Circumstances.

Another court in this district rejected FDA's virtually identical deliberative process arguments for exactly these reasons just weeks ago. In *Vanda*, a drug manufacturer asked FDA to

---

[2] The press release is available at https://www.fda.gov/news-events/press-announcements/fda-denies-authorization-market-juul-products. (last visited April 5, 2023).

grant a "supplemental New Drug Application" for a pharmaceutical intended to treat a circadian-rhythm disorder. *Vanda*, 2023 WL 2645714, at *1. FDA instead issued a "Complete Response Letter" ("CRL") amounting to a form of denial: the CRL required that the company either withdraw the application, "submit additional information … or appeal the decision through the FDA's formal dispute resolution process." *Id.* The company filed FOIA requests relating to the application, but FDA withheld key reviews "generated during the multidisciplinary assessment of the [drug]," asserting, just as in this case, that they were covered by the deliberative process privilege, and further asserting (again, just like this case) that FDA faced harm "because the agency may need to deliberate further on Vanda's sNDA." *Id.* at *3.

But the court rejected FDA's arguments and granted summary judgment to the company. It could "begin and end with Vanda's 'principal argument' that disclosure will not harm the agency's deliberative process," because FDA already "disclose[d] clinical and scientific reviews to the public in a variety of circumstances." *Id.* at *3. Specifically, and just as in the tobacco context, FDA would "publish underlying reviews whenever a [new drug application] is approved." *Id.* Likewise, "in at least one instance, the agency ha[d] also disclosed clinical reviews to defend its decision not to grant an evidentiary hearing for an NDA it declined to approve," and had also released reviews in additional circumstances, such as "for public health reasons." *Id.*

Thus, the court in *Vanda Pharmaceuticals* found itself "not convinced that disclosure of reviews related to pending sNDAs would lead to the chilling effect the agency fears." *Id.* As in this case, "the clinical reviewers do not know whether or not an application will be approved when the reviews are compiled," and "therefore, [are] unaware during the review process whether their work will be made public under any of the circumstances described above." *Id.* at *4. "Given that uncertainty, the agency has not established that reviewers currently expect written descriptions of

their views and deliberations to be shielded from public view … Absent any current expectation of confidentiality … the Court struggle[d] to see how requiring FOIA disclosure of statistical and clinical reviews associated with pending sNDAs would in any way chill the reviewers' frank and honest deliberations." *Id.* at *4.  Simply put, "[d]isclosure cannot chill deliberations if those deliberating do not reasonably expect their deliberations to remain private." *Id.* at *4.

The *Vanda* decision then brushed aside FDA's concerns about confusion.  FDA asserted Vanda "may misrepresent the opinions expressed in the reviews to mislead consumers and medical practitioners about the efficacy and safety of the drug under review." *Id.* at *5.  Judge Cooper found "this concern is insufficient to justify withholding the reviews." *Id.*  Rather than "concretely explain[] what harm would occur," Judge Cooper held FDA merely "speculates about harm that could happen" and overlooks "a number of factors that lessen the FDA's stated concern." *Id.*  Just as in this case, "[s]uch conjecture does not satisfy the agency's foreseeability requirement." *Id.*

*Vanda* follows in the footsteps of *Pavement Coatings*.  In that case, the D.C. Circuit rejected the United States' Geological Survey's attempt to invoke the deliberative process privilege, where (among other problems) there was unrebutted evidence that USGS scientists submitted their work to a scientific publication that "require[d] authors to 'make the materials, data, code, and associated protocols promptly available to readers without undue qualifications.'" *U.S. Geological Survey* 995 F.3d at 1023.  As the D.C. Circuit explained, because agency staff already lacked any guarantee of secrecy, "it [wa]s not obvious that disclosure would result in … harm to agency decision-making." *Id.*  Just as in *Vanda* and *Pavement Coatings*, FDA's purported justifications for withholding the responsive documents cannot overcome the strong presumption in favor of disclosure.  *Burka*, 87 F.3d at 516 (D.C. Cir. 1996).

## II.   THE WITHHELD DOCUMENTS ARE NOT PROTECTED BY THE DELIBERATIVE PROCESS PRIVILEGE IN THE FIRST PLACE.

Even if FDA could meet its burden to establish foreseeable harm, the agency cannot show the requested documents are protected by the deliberative process privilege in the first place.  To be protected by the deliberative process privilege, documents must be "both predecisional and deliberative." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006); *see also U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021).  Here, FDA "stumbles at both hurdles." *Pavement Coatings*, 995 F.3d at 1021.

### A.   The Second TPL Review Memo—And The Discipline Reviews It Incorporates—Are Not "Predecisional."

None of the withheld documents are predecisional.  The fundamental attribute of a predecisional document is that it must be created *before* the agency's decision.  "A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates." *Senate of Commonwealth of Puerto Rico ex rel. Judiciary Comm. v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987); *see also Afshar v. Dep't of State*, 702 F.2d 1125, 1139 (D.C. Cir. 1983) (the policies behind the privilege are "not served by protecting communications occurring after the decision has been reached").  "A paradigmatically predecisional document is" thus "one prepared to assist an agency decisionmaker in arriving at a decision, rather than to support a decision already made." *Campaign Legal Ctr. v. U.S. Dep't of Justice*, 34 F.4th 14, 23 (D.C. Cir. 2022).  The second TPL Review memo fails this simple test.

The evidence shows this withheld memo postdates FDA's decision and the end of its deliberative process.  Officials leaked FDA's decision to deny JLI's applications to *The Wall Street Journal* on June 22, 2023.  Ex. 5.  Dr. Holman did not finalize and sign the second TPL Review memo until the next day, June 23.  Ex. 2 at 7.  JLI identified this timing issue in its January 13 pre-summary judgment notice, D.I. 13 at 4-5, but FDA offers no response in its motion.  It does not

even address whether the second TPL Review memo was finalized before or after the marketing denial order Dr. Holman signed shortly before 10 am on June 23. *See* Ex. 6 at 13. That is a significant problem for the agency, because the date of the second TPL Review memo by itself establishes that the memo is not a predecisional document protected by the deliberative process privilege.

But the memo is not a predecisional document for a second, equally important reason. A document is a decisional document for purposes of FOIA—as opposed to a predecisional document—if it reflected the agency's "settled position" and "final view" on an issue. *United States Fish and Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786-87 (2021). The second TPL Review memo fits that description. The memo is signed by Dr. Holman, an agency official with authority "to approve or deny applications" and "to deny applications and to provide information about the measures required to remove the application from deniable form." *See* FDA Staff Manual Guides § 1410.1103 at 1.F, 1.G; Mital Decl. ¶ 7. Dr. Holman's signature reflects his "concur[rence] with [the] TPL['s] findings and conclusion" as one of the FDA decisionmakers imbued with final decision-making authority. Mital Decl. ¶ 18. There would have been no reason for Dr. Holman to sign or give his final concurrence if the document were only a draft, subject to further deliberation about whether a holistic review of the analysis performed by all the relevant scientific disciplines—not just toxicology—supported granting or denying JLI's applications. Agency officials do not sign working drafts. For that reason, as FDA recently told the D.C. Circuit, a signed TPL Review memo is "properly considered as part of the agency's decision." Oral Arg. at 44:59-45:03, *Fontem US, LLC v. FDA*, No. 23-1021 (D.C. Cir. Jan. 25, 2023). By "signing" the second TPL memo, Dr. Holman thus rendered that document "sufficiently 'final'" for deliberative-

process purposes. *Trea Senior Citizens League v. U.S. Dep't of State*, 994 F. Supp. 2d 23, 35-36 (D.D.C. 2013).

It makes no difference that the withheld TPL Review memo apparently states, "OCD has not reviewed the findings and conclusions in this TPL Review" or that CTP apparently instructed the Office of Science that "OCD would review any conclusions … before those conclusions became a final agency decision." Mital Decl. ¶ 18; Mital Memo. Dr. Holman did not need approval from the Office of the Center Director to take action. *See* FDA Staff Manual Guides § 1410.1103 at 1.F, 1.G. And FDA cites no authority for the head-scratching proposition that a memo from the Center Director can strip away the "direct and appreciable legal consequences" of a signature by an agency official exercising authority delegated by the Secretary. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The CTP Director at the time may, as a practical matter, have had the power to tell Dr. Holman to seek her input before signing any TPL Review memos. But the Director has no power to nullify the signature itself.

Because the second TPL Review memo is not a predecisional document, neither are the withheld scientific discipline reviews. Each of those reviews—along with the chemistry, toxicology, and environmental science reviews FDA previously provided—is identified in tables listing "Disciplines Reviewed" and "Consultations" by the agency as part of the decision memorialized in the second TPL Review memo. Ex. 2 at 7. Even a seemingly predecisional document, like the discipline reviews, "cannot be characterized as predecisional if it is" incorporated into or "adopted, formally or informally," in a final decision like the second TPL Review memo. *Citizens for Responsibility & Ethics*, 358 F. Supp. 3d at 53; *FBI v. Abramson*, 456 U.S. 615, 618, 630 (1982) ("incorporated into").

**B.      The Scientific Discipline Reviews Are Not "Deliberative."**

The scientific discipline reviews are also not "deliberative."  Those reviews are scientific reports, not policymaking documents.  "[P]urely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only 'those internal working papers in which opinions are expressed and policies formulated and recommended.'"  *Ctr. for Biological Diversity v. U.S. EPA*, 279 F. Supp. 3d 121, 150 (D.D.C. 2017) (quoting *Bristol–Myers Co. v. FTC.*, 424 F.2d 935, 939 (D.C. Cir. 1970)).  The D.C. Circuit has thus long "drawn a distinction between factual information, which generally must be disclosed, and materials embodying officials' opinions, which are ordinarily exempt."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002); *see also SAI v. Transportation Sec. Admin.*, 315 F. Supp. 3d 218, 257 (D.D.C. 2018).  That distinction makes sense, given that the deliberative process privilege "is designed to protect agency policy-oriented judgments and the processes by which policies are formulated, rather than 'purely factual, investigative matters.'"  *Nat'l Ass'n of Home Builders*, 309 F.3d at 39 (quoting *Petroleum Info. Corp.*, 876 F.2d at 1435).  Factual information is unlikely to reflect "preliminary positions or ruminations about how to exercise *discretion* on some *policy* matter" and therefore "could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment."  *Petroleum Info. Corp.*, 876 F.2d at 1435.

The discipline reviews fall on the wrong side of the fact/opinion dividing line.  FDA's *Vaughn* index shows that the reviewers analyzed JLI's products "from a microbiology perspective," "from a social science perspective," "from a medical perspective," and "from an epidemiology perspective."  Ex. 2 at 3-6.  This is consistent with Ms. Mital's description of what the "reviewers in each applicable scientific discipline" are supposed to do: "Discipline Review Memos are limited to the individual discipline reviewer's area of expertise and evaluate the

available data and information in accordance with the principles of that scientific discipline." Mital Decl. ¶ 10.  Discipline reviews embodying that analysis reflect the fact-based conclusions of FDA's scientific reviewers, not discretionary policy-making judgments.  Those fact-based conclusions are not privileged.

Courts have consistently rejected similar attempts to shield an agency's scientific work from public scrutiny.  In *Sterling Drug*, for example, the court ordered disclosure of "reviews performed by pharmacologists, physicians and statisticians" for a new drug, where "[t]hey are investigative, scientific reports which depend on the observation and expertise of the author," not "the deliberative process of decision or policy-making." *Sterling Drug Inc. v. Harris*, 488 F. Supp. 1019, 1022 (S.D.N.Y. 1980).  *Petroleum Information* similarly found the deliberative process privilege did not apply where the requested information was "technical and facilitative," rather than policy-decision related.  976 F.2d at 1436; *see also Parke, Davis & Co. v. Califano*, 623 F.2d 1, 6 (6th Cir. 1980) ("The documents in dispute here do contain opinions of medically and scientifically trained persons.  However, unless the opinion of an expert somehow reflects the deliberative process of decision or policy making, the opinion as such does not come within the exemption.").

FDA emphasizes that the discipline reviews reveal "each individual scientist's views of the data and information that scientist reviewed," German Decl. ¶25, but that is beside the point. Simply because "'scientific expertise is brought to bear' in the production of the documents in question, that fact 'does not transform interpretations of facts into communications protected by the deliberative process privilege.'" *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 151 (quoting *Greenpeace v. Nat'l Marine Fisheries Serv.*, 198 F.R.D. 540, 544 (W.D. Wash. Apr. 11, 2000)). Rather, because "expert opinion must relate to an exercise of discretionary policy-making

judgment," *id.*, the burden falls on FDA to explain with "specificity and [in] detail," *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 103 (D.D.C. 2019), how the reviews' fact-bound analyses reflect *policy-making judgments* concerning the agency's ultimate "decision on whether to authorize marketing of [JLI's] products," German Decl. ¶ 24. FDA's conclusory assertions attempting to transform the reviewers' scientific decisions into policy-making judgments simply do not suffice.

## III.   FDA HAS AT MINIMUM FAILED TO SHOW THAT IT CANNOT SEGREGATE PROTECTED AND UNPROTECTED INFORMATION IN THE WITHHELD DOCUMENTS.

FDA should make available the withheld documents in full.  If the Court determines some portions of those documents are protected by the deliberative process privilege, however, FDA must at least provide JLI with redacted versions that do not withhold "any purely factual, non-exempt information the document contains."  *Army Times Publishing Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993); 5 U.S.C. § 552(b).  A "district court *must* make specific findings of segregability regarding the documents to be withheld," with the agency "bear[ing] the burden of showing that no such segregable information exists."  *Elec. Frontier Found. v. U.S. Dept. of J.*, 826 F. Supp. 2d 157, 173 (D.D.C. 2011) (emphasis in original).  "To demonstrate that it has disclosed all reasonably segregable material, "the withholding agency must supply a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply."  *Jud. Watch, Inc. v. U.S. Dept. of Treas.*, 796 F. Supp. 2d 13, 29–30 (D.D.C. 2011); *see also Ctr. for Biological Diversity*, 279 F. Supp. 3d at 152 ("EPA must provide a particularized explanation for non-segregability for *each* document.").

FDA has not come close to making that showing here.  FDA simply asserts that it conducted a "line-by-line review" of the withheld materials, and that for all withheld records, "the

factual data and information are inextricably intertwined with the analysis of the staff scientists who drafted the reviews," such that "it is not possible to segregate and release only factual portions."  German Decl. ¶¶ 12, 32.  But even where an agency claims to have undertaken a "line-by-line" analysis, "[a] blanket declaration that all facts are so intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of non-segregability."  *Ctr. for Pub. Integrity v. U.S. Dept. of Com.*, 401 F. Supp. 3d 108, 117 (D.D.C. 2019); *see also Sierra Club v. U.S. Fish and Wildlife Serv.*, 523 F. Supp. 3d 24, 39 (D.D.C. 2021) (rejecting "conclusory assertions" of a line-by-line review).  FDA should have, but did not, provide a document-by-document explanation for why segregable facts have not been disclosed.  *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 152.

The material FDA has made available casts serious doubt on the claim that factual material is as "intertwined" as FDA asserts.  The toxicology TPL memo provides two pages of "Background," *see* Ex. 3 at 7–8, as well as extended discussion of the factual data submitted with JLI's PMTAs.  For example, in discussing the "leachable constituents" in JUUL products, the memo states:

> In their original submission for these PMTAs, the applicant submitted a toxicological evaluation of identified leachable constituents (leachables) from their new products (PM0000864, PM0000872, PM0000874, PM0000876). These new products were subjected to accelerated aging under two conditions: 1) accelerated aging for 22 weeks at 30°C and relative humidity of 65%, equivalent to 9 months ambient conditions and 2) accelerated aging for 22 weeks at 40°C and relative humidity of 75%, equivalent to 18 months ambient conditions. In this toxicological evaluation, as noted above, the applicant identified the presence of two genotoxic leachables found to produce an excess cancer risk outside of generally accepted margins of "tolerable cancer risks." These leachables were identified by the applicant as Ethyl-4-hydroxyquinoline-3-carboxylate (EHQC) and Propylpyridine,1H-pyrrole-1-hexanoic acid,2,5-dihydro-2,5-dioxo-related compound (PHDC). The applicant supported the identification of these leachables using analytical chemistry data and mass spectrometry analysis. The applicant stated in their provided toxicological risk assessment that these leachables were

> individually "considered a candidate target compound to monitor and evaluate in
> future analyses of the aerosol from the [applicant's] device."

*See* Ex. 3 at 14.

This is purely factual information, and none of it appears to bear on FDA's policy decision-making. It is a summary of what JLI submitted, albeit an incomplete summary that overlooks the 6,000 pages of aerosol data JLI provided that proves users are not exposed to these leachables. Ex. 4 at 8. Even portions of the memo that conceivably rely on the author's own expertise do so from a scientific rather than a policy perspective. *See* Ex. 3 at 24. Discussions of the "assay conditions" used to assess the "genotoxic potential" of JLI's products and the reviewer's "genotoxicity" conclusions do not unduly impinge on the deliberations of the agency. *Id.* Similar scientific discussions in the withheld documents would not interfere with agency deliberations either. It is well-established that a court should order an agency to re-review and disclose segregable material where, as here, a FOIA plaintiff "highlight[s] … red flags undermining the presumption that Defendant has disclosed all reasonably segregable material." *U.S. Fish and Wildlife Serv.*, 523 F. Supp. 3d at 39.

## IV. THE COURT SHOULD, IF IT DOES NOT ORDER IMMEDIATE DISCLOSURE, PERMIT DISCOVERY AND REVIEW THE DOCUMENTS *IN CAMERA*

Finally, if it does not order immediate disclosure, the Court should, at a minimum, permit reasonable discovery and review the documents *in camera*. Although rare in FOIA cases, discovery is appropriate where a plaintiff "has raised a sufficient question as to the agency's good faith, or when a factual dispute exists and the plaintiff has called the affidavits submitted by the government into question," *Cole v. Copan*, 2021 WL 6049871, at *6 (D.D.C. Dec. 21, 2021) (granting discovery); *Citizens for Resp. and Ethics in Washington v. U.S. Dept. of Justice*, 2006 WL 1518964, at *4 (D.D.C. June 1, 2006) (similar), or simply when "agency affidavits "contain discrepancies or are incomplete," *Scudder v. C. Intel. Agency*, 25 F. Supp. 3d 19, 50 (D.D.C. 2014);

*Landmark Leg. Found. v. E.P.A.*, 959 F. Supp. 2d 175, 184 (D.D.C. 2013) (permitting discovery in light of affiant's "inconsistencies and reversals").  As in all cases, the need for discovery flows from Federal Rule of Civil Procedure 56, which permits summary judgment only if "there is no genuine dispute as to any material fact."  Fed. R. Civ. Proc. 56(a).

FDA's highly unusual decision-making process raises a number of unanswered factual questions.  Those questions include when FDA decided to deny JLI's applications, whether it made that decision before or after Dr. Lindsey drafted the second TPL Review memo, and why Dr. Holman signed that memo.  The Court cannot hold the second TPL Review memo is predecisional without answers to those questions—questions FDA's incomplete affidavits do not address—but can grant summary judgment for JLI without that information.  Other questions raised by FDA's evidence include when the Office of the Center Director "advised" the Office of Science that it "would review any conclusions" the Office of Science reached and whether the Office of Science had already reached firm conclusions about JLI's applications before receiving that instruction.  Those answers are again necessary to rule in FDA's favor, but not to grant JLI's motion.  The Court cannot simply accept FDA's incomplete and procedurally questionable version of events.

If the Court does not simply grant JLI's motion for summary judgment, it should also review the withheld documents *in camera* and order non-privileged information produced.  *See*, *e.g.*, *Pub. Employees for Envtl. Resp. v. Envtl. Protec. Agency*, 288 F. Supp. 3d 15, 27 (D.D.C. 2017).  Courts have "broad discretion" to review documents *in camera* in FOIA cases, including "'when agency affidavits are insufficiently detailed to permit meaningful review of exemption claims."  *100Reporters LLC v. U.S. Dept. of J.*, 248 F. Supp. 3d 115, 166–67 (D.D.C. 2017); *see also Envtl. Protec. Agency*, 288 F. Supp. 3d at 25 (ordering several documents disclosed following in camera review).  Here, FDA's *Vaughn* index and declarations make little attempt to connect its

alleged harms to specific documents or provide a document-by-document discussion of why the extensive factual information in those documents cannot be reasonably disclosed.  The Court should not credit FDA's conclusory assertions on these topics at all, but it certainly should not credit those assertions without first reviewing the documents for itself.

## CONCLUSION

For the foregoing reasons, the Court should grant JLI's summary judgment motion, deny FDA's motion, and order disclosure of the requested materials.

Dated:  April 12, 2023                            Respectfully submitted,

By:   */s/ Jason M. Wilcox*
      Peter A. Farrell (DC Bar No. 53608) Jason
      M. Wilcox (DC Bar No. 1011415)
      KIRKLAND & ELLIS LLP
      1301 Pennsylvania Ave, NW Washington,
      D.C. 20004
      (202) 389-5000

      Steven J. Lindsay (DC Bar No. 1708507)
      KIRKLAND & ELLIS LLP
      300 N LaSalle
      Chicago, IL 60654
      (312) 862-2000

      *Attorneys for Plaintiff Juul Labs, Inc.*