IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JUUL LABS, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>FOOD & DRUG ADMINISTRATION,<br><br>        Defendant. | Civil Action No. 1:22-CV-2853 |

### **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACT**

Pursuant to Local Civil Rule 7(h)(1), Plaintiff Juul Labs, Inc. (JLI) respectfully submits the following statement of material facts as to which there is no genuine dispute.

1. The Tobacco Control Act assigns the Secretary of Health and Human Services ("Secretary") premarket review authority for tobacco products.  21 U.S.C. § 387j(c)(1)(A).

2. The Secretary has delegated this authority to the Commissioner of Food and Drugs ("Commissioner").  *See* FDA Staff Manual Guides 1410.10 at 1.A.1; Mital Decl. ¶ 6.

3. The Commissioner has delegated to multiple officials within the Food and Drug Administration's ("FDA's") Center for Tobacco Products (CTP) the authority "to issue orders to approve or deny applications" and "to deny [premarket tobacco product] applications and to provide information about the measures required to remove the application from deniable form." FDA Staff Manual Guides 1410.1103 at 1.F, 1.G; Mital Decl. ¶ 7.

4. Those officials authorized to approve or deny such applications include the CTP Director and Deputy Director, the Director of the Office of Science within CTP, and the Director of the Division of Individual Health Science within the Office of Science.  *Id.*

5. FDA relies on its staff of scientists to review applications submitted by ENDS manufacturers. Mital Decl. ¶ 10.

6. Reviewers in each relevant scientific discipline draft what are known as scientific discipline reviews that evaluate the information in the application based on the principles of that scientific discipline. Mital Decl. ¶ 10.

7. FDA also designates an experienced staff member as the Technical Project Lead for each application. Mital Decl. ¶ 11.

8. The Technical Project Lead assesses the scientific discipline reviews and makes a recommendation about whether to grant or deny the application. *Id.*

9. This assessment and recommendation is documented in a TPL Review memo. *Id.*

10. An FDA official with delegated decision-making authority—usually the Director of the Office of Science—reviews the TPL Review memo and makes a "Signatory Decision" to either accept or reject the Technical Project Lead's recommendation. Mital Decl. ¶ 12; Ex. 3 (Toxicology TPL).

11. A decision approving an application is called a marketing granted order, and a decision denying an application is a marketing denial order. Mital Decl. ¶ 12.

12. In July 2020, JLI submitted its PMTAs with over 125,000 pages of information, data, and analysis, seeking authorization to market two devices and four types of JUULpods (Virginia Tobacco and Menthol flavors in 5.0% and 3.0% nicotine concentrations). Ex. 4.

13. JLI conducted more than 75 nonclinical and 13 clinical studies to evaluate the potential health risks among users of its JUUL products. Ex. 4.

14. The research showed that among adult smokers who started using JUUL products, over 50% completely switched from combustible cigarettes—a level far higher than other ENDS products. Ex. 4.

15. On or before June 22, 2022, officials with knowledge of FDA's decision to deny JLI's applications and order all JUUL products off the U.S. market leaked the decision to *The Wall Street Journal*. *See* Ex. 5.

16. The *Wall Street Journal* published an article revealing FDA's decision on June 22, 2022. Ex. 5.

17. FDA issued its formal order the next day through a letter addressed to JLI. Ex. 6.

18. FDA acknowledged that "exposure to carcinogens and other toxicants present in cigarette smoke were greatly reduced with exclusive use of the new products compared to [cigarette] smoking." Ex. 3 (TPL).

19. FDA focused on purported "toxicological" shortcomings in JLI's PMTAs and asserted that "[w]ithout sufficient evidence of a product's toxicology risks," the agency "cannot conduct a full evaluation of the overall risks and benefits of JLI's products." Ex. 6 (MDO).

20. FDA issued a press release announcing its decision prominently featuring bold text stating that JLI "played a disproportionate role in the rise in youth vaping." Ex. 35 (6/23/22 FDA Press Release). This statement comes before FDA first mentions "the toxicological profile of the products" or FDA's purported concerns about that profile.

21. In the June 23, 2022 press release, FDA stated that "[t]o date, the FDA has not received clinical information to suggest an immediate hazard associated with the use of the JUUL device or JUULpods." Ex. 35 (6/23/22 FDA Press Release).

3

22. After the D.C. Circuit granted an emergency administrative stay of the marketing denial order, FDA stayed its own decision to conduct a further internal review, known as "supervisory review." Ex. 7 (July 5, 2022 FDA letter); *Juul Labs, Inc. v. FDA*, D.C. Cir. No. 22-1123, Dkt. No. 1952074 (June 24, 2022); *see also* 21 C.F.R. § 10.75.

23. In its letter announcing the stay, FDA acknowledged that, after "reviewing the briefing materials" JLI had submitted to the D.C. Circuit, it found that "there are scientific issues unique to this application that warrant additional review." Ex. 7 (July 5, 2022 FDA letter).

24. This agency-initiated supervisory review was combined with a separate supervisory review proceeding stemming from an administrative appeal filed by JLI. Ex. 4.

25. FDA arrived at its marketing denial order through an administrative process in which the Technical Project Lead authored not one, but two, TPL Review memos. *See* Ex. 10 (Mital Memo).

26. Outside observers stated that "[w]e have never seen FDA bifurcate and compartmentalize TPLs" in this way before. *See* Ex. 18.

27. The first memo, the TPL Review (Toxicology), discusses the "toxicological risks posed by" JLI's products. Ex. 3 (TPL) at 4.

28. FDA labeled the other memo the "TPL Review (Additional Disciplines)", but it covers all relevant scientific disciplines including toxicology. Ex. 2 (*Vaughn* Index) at 7.

29. The Office of Science sent the CTP Director both TPL Review memos, and the Director instructed the Office of Science to issue a marketing denial order based on the TPL Review (Toxicology). *Id.*

30. The marketing denial order issued under the signature of Matthew Holman, the Director of the Office of Science. Ex. 6 (MDO).

31. Dr. Holman also signed two TPL Review memos. Ex. 3 (TPL); Ex. 2 (*Vaughn* Index) at 7.

32. Dr. Holman signed the marketing denial order and the TPL Review (Toxicology) on June 23, 2022. Ex. 6 (MDO); Ex. 3 (TPL); Ex. 2 (*Vaughn* Index) at 7.

33. Dr. Holman signed the TPL Review (Additional Disciplines) on that same day, June 23, 2022. Ex. 2 (*Vaughn* Index) at 7.

34. Dr. Holman's signature on the TPL Review (Additional Disciplines) reflected his "concur[rence] with [the] TPL['s] findings and conclusion" as one of the agency decisionmakers imbued with final decision-making authority. Mital Decl. ¶ 18.

35. Dr. Holman has been delegated authority "to issue orders to approve or deny applications" and "to deny applications and to provide information about the measures required to remove the application from deniable form." FDA Staff Manual Guides 1410.1103 at 1.F, 1.G; Mital Decl. ¶ 7.

36. On June 23, 2022, the Acting CTP Director at the time, Michele Mital, signed a memo to file documenting the Office of the Center Director's oversight and instructions. Ex. 10 (Mital Memo).

37. As part of those instructions, CTP decided that the TPL Review (Additional Disciplines) "should not be stored in [CTP's] Image database" where CTP typically stores its TPL Review memos and scientific discipline reviews. Mital Decl. ¶ 19; German Decl. ¶ 11.

38. Before FDA issued its MDO, Members of Congress, through letters and at hearings, pressed FDA officials to commit that JUUL products would not be authorized. Ex. 11.

39. After FDA's decision, Representative Raja Krishnamoorthi boasted about the congressional pressure placed "on the FDA to deny JUUL's PMTA applications." Ex. 12.

40. Senator Dick Durbin for years pushed FDA to "finally do the right thing" and take "JUUL off the market." Ex. 13.

41. Commentators observed that JLI had been "singled out", there had been "so much opposition to Juul" from "legislators in state legislatures and Congress," that "FDA simply could not have authorized the sale of JUUL" without provoking a "fierce" backlash and jeopardizing its funding. Ex. 14.

42. The same day FDA issued its marketing denial order, JLI submitted two FOIA requests seeking "technical project lead review ('TPL') and any related documents" as well as "disciplinary review documents for" JLI's PMTAs. Ex. 15; Ex. 16.

43. FDA responded to JLI's requests in two letters, dated July 8, 2022 and July 21, 2022.

44. On July 8, FDA provided a partial response that included the "Technical Project Lead Review (Toxicology)," as well as the "First and Second Cycle Toxicology Reviews," but not documents related to topics other than toxicology. Ex. 17.

45. On July 21, FDA stated that, in addition to the toxicology documents it had provided earlier, it would also "release[e] the First and Second Cycle Environmental Science and Chemistry Reviews" because the TPL Review (Toxicology) "considered" or "relied in part on" those reviews. Ex. 1.

46. FDA refused to make available nineteen other discipline reviews discussing JLI's applications. *Id.*; Ex. 2 (*Vaughn* Index); German Decl. ¶ 14.

47. At that time, FDA's FOIA office did not know a second TPL Review memo—the TPL Review (Additional Disciplines)—existed. German Decl. ¶ 15.

48. Nor did the FOIA office know that the Office of the Center Director instructed agency officials not to store this second TPL Review memo in the typical repository. *Id.* ¶¶ 11, 15.

49. The FOIA office "became aware" of this second memo only after JLI filed this FOIA action. *Id.* ¶ 15.

50. JLI first learned FDA had authored a second TPL Review Memo when FDA provided its *Vaughn* index on December 14, 2022. Ex. 2 (*Vaughn* Index) at 7.

51. The withheld TPL Review memo relies on each of the discipline reviews (including the nineteen withheld reviews). Ex. 2 (*Vaughn* Index) at 7.

52. The CTP Director considered instructing Dr. Holman to make that memo the basis for FDA's marketing order. Ex. 10 (Mital Memo).

53. FDA routinely makes all reviews available when it grants marketing authorization. 21 C.F.R. § 1114.47; *see also* Ex. 19 (FDA Premarket Tobacco Product Marketing Granted Orders); Ex. 20 (Vuse Solo Power Unit TPL); Ex. 21 (Logic Regular Cartridge/Capsule Package TPL); Ex. 22 (NJOY ACE POD Rich Tobacco 5% TPL).

54. FDA also makes available the reviews the agency "considered," "reviewed," or "relied in part on" in reaching its decision. Ex. 1 (July 21, 2022 Final Response) at 2.

55. The administrative record in a recent D.C. Circuit appeal filed by another ENDS manufacturer challenging a marketing denial order includes discipline reviews, TPL, and other internal agency communications across a range of scientific disciplines. Ex. 23 (*Fontem US, LLC v. FDA*, No. 22-1076, Doc. No. 19560007 (D.C. Cir. July 21, 2022)) at 2, 9–11.

56. In another case, FDA made available internal agency memos revealing that the CTP Director pressured the Office of Science not to issue marketing granted orders for a menthol-

7

flavored ENDS product manufactured by Logic. *See R.J. Reynolds Vapor Co. v. FDA*, Case No. 23-60037, Dkt. 121-1 at 10–11 (5th Cir. Mar. 23, 2023) (Slip Op.).

57. In the first memo, the Office of Science documented its original science-based conclusion that FDA should grant marketing authorization for Logic's menthol-flavored product. Ex. 24 (10/25/2022 Cecil Memo) at 2.

58. The same memo shows the CTP Director instructed the Office of Science to treat menthol-flavored products as a disfavored category, after which the Office of Science "reassessed" and reversed its recommendation. *Id.* at 2–3.

59. A second memo confirms FDA's changing positions and documents staff concerns about the decision-making process. Ex. 25 (10/25/2022 King Memo) at 4.

60. Multiple TPL memos and the scientific discipline reviews underlying FDA's shifting positions are part of the administrative record in Logic's appeal of the marketing denial order for its menthol-flavored product. *See* Ex. 26 (Administrative Record in *Logic Technology L.L.C. v. FDA*, No. 22-3030, Dkt. No. 33 (3d Cir.)).

61. In at least a dozen cases over the past three years, FDA has voluntarily rescinded marketing denial orders or had those orders set aside by a federal court, with FDA placing the application back in scientific review. *See* Ex. 27 (FDA MDO List).

62. In *Al Khalifa Group v. FDA*, No. 21-71340 (9th Cir.), the administrative record includes the scientific discipline reviews and TPL memo supporting FDA's subsequently rescinded marketing denial order. FDA did not withhold those materials based on the deliberative process privilege. *See* Ex. 28 (Administrative Record in *Al Khalifa Group v. FDA*, No. 21-71340 (9th Cir.)).

63. In *Bidi Vapor LLC v. FDA*, No. 21-13340 (11th Cir.), the administrative record includes the scientific discipline reviews and TPL memo supporting FDA's subsequently rescinded marketing denial order. FDA did not withhold those materials based on the deliberative process privilege. *See* Ex. 29 (Administrative Record in *Bidi Vapor LLC v. FDA*, No. 21-13340 (11th Cir.)).

64. In *My Vape Order Inc. v. FDA*, No. 21-71302 (9th Cir.), the administrative record includes the scientific discipline reviews and TPL memo supporting FDA's subsequently rescinded marketing denial order. FDA did not withhold those materials based on the deliberative process privilege. *See* Ex. 30 (Administrative Record in *My Vape Order Inc. v. FDA*, No. 21-71302 (9th Cir.)).

65. In *Fumizer, LLC v. FDA*, No. 21-71315 (9th Cir.), the administrative record includes the scientific discipline reviews and TPL memo supporting FDA's subsequently rescinded marketing denial order. FDA did not withhold those materials based on the deliberative process privilege. *See* Ex. 31 (Administrative Record in *Fumizer, LLC v. FDA*, No. 21-71315 (9th Cir.)).

66. In the pharmaceuticals context, FDA "shall … refer a drug or biological product to a[n] … advisory committee for review" if the active molecule has never been approved before. *See* 21 U.S.C. § 355(s)(1).

67. "Advisory committees," in turn, hold proceedings that are public unless they are expressly closed, 21 C.F.R. § 14.20(b) (4–6), with the presumption being that proceedings on a drug application "ordinarily may not be closed," 21 C.F.R. § 14.27(b)(4).

68. For a recent application for a birth-control drug FDA held a public advisory committee meeting, where FDA staff knowingly provided participants with a "briefing document"

9

containing "assessments and/or conclusions and recommendations written by individual FDA reviewers." *See* Ex. 32 (October 30, 2019 Advisory Committee Meeting Briefing Document).

69. The briefing document criticized the drug, stating that "FDA does not believe that the data show a safety advantage," and that its pregnancy-reduction rate was "unacceptable." *Id.* at 10–11.

70. The Advisory Committee voted 14-1 to approve the drug anyway, *see* Ex. 33 (Meeting Minutes) at 6, and FDA in fact granted marketing authorization to the drug thereafter, *see* Ex. 19.

71. "On July 19, 2022, the U.S. Food and Drug Commissioner Robert Califf requested that the Reagan-Udall Foundation," a nonprofit organization created by Congress, "convene an Independent Expert Panel … to conduct an evaluation of the FDA Center for Tobacco Products (CTP) with the aim of addressing immediate issues and providing recommendations for greater success in the future." *See* Ex. 40 ("Operational Evaluation of Certain Components of FDA's Tobacco Program," Reagan-Udall Foundation) ("Reagan-Udall Report") at 5.

72. The resulting report wrote that "[t]he lack of clarity about CTP's direction, its priorities, and its near-term and longer-term goals and objectives, hinders CTP's ability to effectively carry out its mission," and that "[a] primary concern was the lack of clarity regarding how [FDA] is applying the [appropriate for the protection of public health] standard." *See id.* at 13, 16.

73. The report recommended "[p]roviding more details in public summaries of Marketing Granted Orders, and providing summaries at regular intervals of deidentified reasons why Marketing Denial Orders were issued to provide applicants more insight into CTP's regulatory decision-making process." *Id.* at 19.

74. The report further explained: "CTP must do a better job of explaining how and why it weighs the evidence, explicitly quantifying the trade-offs it is willing to accept, and distinguishing policy judgments from scientific information and determinations." *Id.* at 15; *see also id.* at 5 (recommending that CTP "do a better job explaining" its decisions to industry).

75. The marketing denial order is publicly available such that the public can read for itself FDA's stated basis for its decision. Ex. 6 (MDO) at 2; *see also* https://www.juullabsscience.com/wp-content/uploads/sites/8/2022/10/CourtesyCopy-JUUL-No-Marketing-Order-Letter-Redacted-FINAL-2022-08-08_Redacted.pdf (visited April 5, 2023).

Dated:  April 12, 2023                                    Respectfully submitted,

                                                          */s/ Jason M. Wilcox*
                                                          Peter A. Farrell (DC Bar No. 53608)
                                                          Jason M. Wilcox (DC Bar No. 1011415)
                                                          KIRKLAND & ELLIS LLP
                                                          1301 Pennsylvania Ave, NW
                                                          Washington, D.C. 20004
                                                          (202) 389-5000

                                                          Steven J. Lindsay (DC Bar No. 1708507)
                                                          KIRKLAND & ELLIS LLP
                                                          300 N LaSalle
                                                          Chicago, IL 60654
                                                          (312) 862-2000

                                                          *Attorneys for Plaintiff Juul Labs, Inc.*