```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3      JUUL LABS, INC.,                 )  Civil Action
                                        )  No. 1:22-cv-2853
4                  Plaintiff,           )
                                        )  SCHEDULING CONFERENCE
5      vs.                              )
                                        )  Washington, DC
6      FOOD & DRUG ADMINISTRATION,      )  April 19, 2023
                                        )  Time:  4:08 P.M.
7                  Defendant.           )
       _____
8
                    TRANSCRIPT OF SCHEDULING CONFERENCE
9                            HELD BEFORE
               THE HONORABLE JUDGE RANDOLPH D. MOSS
10                    UNITED STATES DISTRICT JUDGE
       _____
11
                      A P P E A R A N C E S
12

13     For Plaintiff:          DONALD B. VERRILLI, JR.
                               Munger, Tolles & Olson, LLP
14                             1155 F Street, NW, 7th Floor
                               Washington, DC 20004
15
                               JASON M. WILCOX
16                             Kirkland & Ellis, LLP
                               1301 Pennsylvania Avenue, NW
17                             Washington, DC 20004

18     For Defendant:          ANTONIA M. KONKOLY
                               U.S. Department of Justice
19                             1100 L Street, NW
                               Washington, DC 20005

20

21     _____

22     Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                               Official Court Reporter
23                             United States Courthouse, Room 6714
                               333 Constitution Avenue, NW
24                             Washington, DC  20001
                               202-354-3246
25
```

1          DEPUTY CLERK:  This is Civil Case 22-2853, Juul Labs,

2     Inc., vs. Food & Drug Administration.

3          Would counsel approach the podium, state your name

4     for the record starting with plaintiff's counsel.

5          MR. VERRILLI:  Good afternoon, your Honor.  Don

6     Verrilli from Munger, Tolles & Olson, for plaintiff, Juul Labs.

7          THE COURT:  Okay.  And everyone is welcome to take

8     their masks off when they're speaking if you'd like.  I'd ask

9     the audience to keep them on, but when you're speaking, you're

10    welcome to take them off.

11         Just for the record, I've known Mr. Verrilli for many

12    years.  We've worked together in the past, past lives and

13    things.  I don't think it presents an issue at all.  I want to

14    make clear that we've known each other a long time.

15         MR. WILCOX:  Good afternoon, your Honor.  Jason

16    Wilcox from Kirkland & Ellis, also on behalf of Juul Labs.

17         THE COURT:  Okay.  Good afternoon.

18         MS. KONKOLY:  Good afternoon, your Honor.  Antonia

19    Konkoly from the United States Department of Justice on behalf

20    of the FDA.  With me at counsel table is Marcia Berman, also

21    from the Department of Justice, and Julie Lovas from the

22    Food & Drug Administration.

23         THE COURT:  I have the plaintiff's motion here.  Why

24    don't I hear from them first.  Obviously, not on the substance.

25    This is really just a scheduling issue at this point.

1    MR. VERRILLI:  Thank you, your Honor.  So our ask

2    here this afternoon is that the FDA provide the Court with the

3    second technical project lead review memorandum.  And, if the

4    FDA is not amenable to doing that voluntarily, that the Court

5    order that it be produced for in camera inspection.

6    And we make that ask because we believe that that

7    second TPL very likely is a decision by FDA's Office of Science

8    that, based on the full range of factors that the statute calls

9    for consideration of, that the Office of Science believe that

10   Juul's applications should have been granted.  We know that's a

11   serious thing to say.  We've given it a great deal of

12   consideration.

13   We believe, though, based on the facts that we do

14   know, that that suspicion is warranted.  And if we're right

15   about that, then we believe that there really is an urgent need

16   for that document to become public immediately.

17   THE COURT:  Does the Office of Science have final

18   decision-making authority?

19   MR. VERRILLI:  It can exercise final decision-making

20   authority, yes.  It has delegated authority to exercise final

21   decision-making authority on these applications.  And in the

22   overwhelming majority of applications, it does, in fact,

23   exercise the final decision-making authority for FDA.

24   Now, it's the case that they are subject to

25   supervision by OCD and that -- and OCD also has that delegating

1    authority.  But part of what is the cause for great concern

2    here -- I know you want to talk about scheduling, but --

3            THE COURT:  Right, yes.

4            MR. VERRILLI:  -- I do think it helps to understand

5    why we think there's a real urgency here.

6            That the -- that this is, to our knowledge, the only

7    time ever that the Office of Science has issued two final

8    signed decision memos.  TPL, once signed by the director of the

9    Offices of Science, is a final decision of the Office of

10   Science.  We know from paragraph 18 of the Mital declaration

11   submitted in support of FDA summary judgment motion that the

12   second secret TPL was signed, so it was a final decision of

13   OCL (sic).

14           Here's why we think -- here's what we think is

15   the critical point.  If one looks at the basis that FDA

16   articulated for its decision to deny Juul's applications, it

17   was that -- and I believe the language is that the application

18   cannot be considered under the statute in the absence of a

19   fuller record on the toxicology issue.

20           Now, if the Office of Science, as we -- we don't

21   know for sure, of course, because we haven't seen it.  But if,

22   as we surmise, the Office of Science, in fact, reached the

23   conclusion that the application could be granted on the basis

24   of a holistic consideration of all factors, then that's a

25   pretextual rationale for the decision by OCD.  Because it isn't

1    the case -- and at the very least, the very least, the basic

2    requirements of reasoned decision-making under the APA would

3    require OCD to grapple with the fact that its Office of Science

4    reached a contrary conclusion.

5            So we think that the document is -- if our -- if

6    our belief about what that document says is correct, it's of

7    enormous pressing importance that it be made public.

8         THE COURT:  Well, the enormous pressing importance

9    may be that it does get us to the scheduling issue.

10        MR. VERRILLI:  Yes.

11        THE COURT:  My understanding was, when the

12   application was first made to expedite things, that the -- I

13   can't remember if it was the first or the second, but the

14   technical project lead report that was made public was -- I

15   guess it was just the MDL was used in litigation in Minnesota

16   and that this was necessary to rebut a false impression that

17   may be left with the jury in that case or the fact finder in

18   that case.  My understanding, that case is now settled.

19        I know in your reply brief, you now say, well,

20   there's another case in California.  I don't quite know what

21   the actual urgency is here in resolving this issue and whether

22   the urgency is a new urgency because the FDA comes back and

23   says they were aware of -- this was in the Vaughn index months

24   ago.  Now that our -- our opposition brief is due, they took

25   six weeks or whatever it was to file their opposition brief and

1   cross-motion and now that ours is due, they're saying you got

2   to do this; our hair is on fire.

3        MR. VERRILLI:  Well, let me address both of those

4   things.

5        THE COURT:  Yeah, please.

6        MR. VERRILLI:  First, yes, the case in Minnesota

7   settled, but it wasn't just in our reply.  Our opening papers

8   identified several reasons why we thought there was an urgent

9   need for immediate disclosure.

10       First reason that we identified was there is an

11  ongoing administrative review process in the FDA.

12       THE COURT:  Right.

13       MR. VERRILLI:  Now --

14       THE COURT:  And I don't know quite what the schedule

15  is on that one.

16       MR. VERRILLI:  Well, it's been going on for months

17  and months.  I think the key point there is that we're --

18  basically, if this TPL says what we think it says and we're

19  deprived of the ability to use it in that proceeding here and

20  now, that's an ongoing immediate injury to us.

21       THE COURT:  What is the schedule -- is there some

22  brief that is due imminently in that or it's all been briefed

23  and you're just waiting on a decision at this point?

24       MR. VERRILLI:  I don't think so.  But basically, we

25  have not been able to advocate for reversal in the

1    administrative process on the basis of this document if it says

2    what we think it says.

3              THE COURT:  How has that changed in the past three

4    months?

5              MR. VERRILLI:  Well, I think what's key -- I think

6    the two questions you asked are blending together here and

7    maybe I should address them.

8              THE COURT:  Okay.

9              MR. VERRILLI:  I think the key point to think about

10   in terms of timing is not the Vaughn index.  It is the

11   March 2nd filing of the government's summary judgment papers

12   which contains the Mital declaration.  It is for the first time

13   in that declaration that we've learned that this was a final

14   signed memo, the first time we learned that the memo conducted

15   a holistic analysis of all of the factors under the statute.

16   It's the first time we -- and there wasn't -- if one looked at

17   paragraph 15 of the memo, I think you can see pretty clearly

18   there is an explanation for why there were two memos, which is

19   really no explanation at all.

20              So March 2nd was the date that really set off the

21   alarm bells.  I think it would be helpful to the Court if I

22   just walked through what happened after March 2nd.

23              After March 2nd the company was concerned.

24   That's when they retained me to take an independent look at

25   this thing.  And I did.  I came away quite troubled by these

1    circumstances.

2         So at that point I contacted the leadership of the

3    civil division and asked to meet with them to discuss whether

4    there can be a consensual resolution of that.  I made that

5    request on March 16th.  The civil division offered -- the first

6    date they offered for a meeting was April 3rd.

7         We had the meeting on April 3rd.  They took this

8    under advisement on April 3rd and told me they'd give me an

9    answer on April 7th.  On April 6th I informed them about the

10   Minnesota situation which had just arisen on that date.  On the

11   evening of April 7th, they asked for until the close of

12   business on April 12th to give us an answer.

13        On the close of business of April 12th, they gave us

14   an answer saying we're not going to voluntarily disclose this

15   document.  We filed the motion on April 13th.

16        THE COURT:  Okay.

17        MR. VERRILLI:  So really what was going on in that

18   time frame, really March is the date that matters here,

19   March 2nd.  And what was going on in that time frame was an

20   effort to resolve this consensually.  Nobody was sitting on

21   their hands at all, at all.

22        THE COURT:  What about the California litigation?

23   What is the schedule there?

24        MR. VERRILLI:  So that trial is imminent.  Just to be

25   clear, Juul is not a defendant in that case.  Altria is a

1  defendant in that case.  But the State wants to use the MDL in

2  exactly the same way there that it was used in -- against us in

3  Minnesota.

4          THE COURT:  Would your client have any injury in that

5  case?

6          MR. VERRILLI:  No.  But there is a public injury

7  here, in that if, indeed, the -- the same risk of misleading

8  use of that document that affected us could affect them

9  imminently.  And that's -- this is a FOIA situation.  That's a

10  real harm that should be considered.

11          Then, of course -- well, there is less urgency with

12  respect to the following, I admit.  It's not like that

13  Minnesota lawsuit is the last lawsuit we're going to face.

14  There are other pending suits, there are going to be lots more.

15  Now that this play has been run in Minnesota, it's going to be

16  run everywhere.  So there is that urgency.

17          And then in addition, if I could, just two more

18  things.  While the D.C. Circuit appeal is not moving forward

19  now, we do think that, you know, it's going to move forward at

20  some point, and we think that basically, one of the key facts

21  about this document that gives rise to suspicion in our view is

22  that the OCD instructed the Office of Science not to put it in

23  the database that contains the record materials relevant to

24  this -- relevant to the consideration of the issue.  We think

25  that was most likely in order to try to keep it out of the

1    administrative record.  That's present.

2         And the fourth and final thing, when the FDA issued

3    this denial, they issued a press release.  That press release,

4    which is still on the FDA's website, blames Juul for the

5    increase in teen vaping and then says:  And we've denied their

6    application.  That's still on the website.

7         If, indeed, it's the case that the Office of

8    Science thought that on balance the public health would be

9    advanced by granting these applications, we ought to be able to

10   tell the public that in response to that statement on their

11   website now.

12        So all of those considerations seem to me to bear

13   directly on not just the ultimate question of whether it should

14   be disclosed but when.

15        THE COURT:  Right.  Well, I take all that and those

16   all strike me as good reasons to move as promptly as we can.

17        Without the Minnesota litigation, I'm a little less

18   sure whether that means we need a resolution of this in the

19   next several days or couple of weeks, and in a minute I'll tell

20   you from the Court's perspective -- I mean, I was in hearings

21   the past two days on a terrorism trial that I have starting

22   May 8th, and I've got many more hearings, arguments in that

23   trial -- for that trial that's coming up.  I have motions,

24   including a motion for preliminary injunction, pending.

25        So the question is whether both from the government's

1    perspective, this is a case in which they should be required to

2    respond more quickly than the agreed-upon period of time and

3    also whether there's the urgency from the Court's perspective

4    that I should push this ahead of preliminary injunctions and

5    cases in which people are facing potential life sentences in

6    prison to decide this ahead of other things.

7            I understand the urgency and importance of it, but I

8    guess the question is, what is the real urgency here and is

9    there something that's going to happen next week or the week

10   after that where this just has to get decided and there's going

11   to be a manifest injustice if it's not decided in the next two

12   weeks, or is it more, this is really important and we want to

13   get it decided as quickly as we can.

14           MR. VERRILLI:  We certainly understand your Honor's

15   need to prioritize, of course, of course.  But I think the ask

16   that we're making here is designed to facilitate that.

17           All we're asking for now is that this document be

18   produced for in camera inspection.  If the Court looks at it

19   and we're barking up the wrong tree, fine, keep it on the same

20   schedule.  But if we're right, then we do think whatever

21   expedition that the Court believes is warranted and consistent

22   with the Court's schedule is what we would ask for.

23           So that's the gist of our -- that's why what we're

24   asking for today is just submission of this document in camera

25   so we can figure out whether we're barking up the wrong tree or

1    not.

2            THE COURT:  You've also asked -- maybe you're not

3    asking for that today, but you've also asked that the

4    government file its response tomorrow to the cross-motion for

5    summary judgment.

6            MR. VERRILLI:  Right.  Yes, we have asked for

7    expedition.

8            But in view of the fact that Minnesota has in such

9    time resolved, I think what we're asking for now is this

10   two-step process, submission for in camera review and then the

11   Court should set a schedule that the Court thinks is

12   appropriate.  The Court can look at the document and say, well,

13   the current schedule is fine.  We think expedition is still

14   warranted given the considerations I raised before.

15           But I think the Court will have information that it

16   needs to make a full consideration of what the timetable ought

17   to be if the Court is able to look at the document in camera.

18           THE COURT:  I guess the other question I have, and I

19   obviously have not had the opportunity to roll up my sleeves on

20   the now partially briefed motions for summary judgment.  But

21   even if your premise is right and even if there is an internal

22   FDA memo that concludes that there could be public health

23   benefits to the products at issue, I guess I don't know whether

24   that actually is still deliberative if it wasn't the final

25   agency decision and the agency said yes, we see that memo,

1    we've considered that memo, we are not persuaded by it, and

2    we're going to make a contrary decision.

3           And part of the deliberative process is to allow

4    agencies to do that and to say, yes, we got the recommendation

5    from our Office of Science, and we think it's bunk, and we're

6    going to do something different and we don't have to explain it

7    all internally because we want to encourage the Office of

8    Science to tell us what they think and not be worried that it's

9    going to end up on the website when they tell us what they

10   think if it's not the final agency decision.

11          MR. VERRILLI:  So I will address that.  I think those

12   are important questions.  But I think the answer is -- the

13   first answer is, of course, the fact that it's deliberative or

14   pre-decisional isn't the end of analysis.  They have to

15   demonstrate harm from disclosure.

16          And I would bring to the Court's attention

17   Judge Cooper's recent decision in the Vanda case, in which he

18   found no harmful disclosure for very similar documents and we

19   think that answers the question, and let me explain why.  In

20   almost every case -- we're aware of only one other case with

21   respect to these applications in which the TPL from the Office

22   of Science wasn't the final decision.  In the overwhelming

23   majority of instances, it's the final decision.

24          So when the scientists are writing it, they're not

25   giving advice to their superiors at OCD about what they think

1    the science is.  They're engaged in the exercise of a process

2    that results in a final decision which they know will be

3    disclosed in the overwhelming majority of instances.

4           So the risk of chill, it seems to me, it's not a

5    serious argument given that.  They should and do anticipate in

6    virtually all circumstances that this work is going to be

7    disclosed.  So -- and that is very parallel to the analysis

8    that Judge Cooper relied on with respect to the FDA documents

9    at issue there.

10          Then the other concern they raised was the risk

11   of public confusion, but that's completely speculative.  And,

12   if anything, if we're right about what this document says, the

13   public is being confused now by its nondisclosure.  And so even

14   if one were to grant that -- we have made arguments in our

15   papers that we think are sound arguments that this is not

16   covered by the deliberative process of privilege.  Even if one

17   were to disagree or think it was arguable on the question of

18   harm, they have not made a case.

19          THE COURT:  It just may be a little bit difficult for

20   me to look at the document in camera and say -- I mean, I guess

21   I could look at the document in camera and say, yes, there's no

22   need for expedition.  It may be difficult for me to look at the

23   document in camera and say, aha, Juul is right and the document

24   should be released because there are all these other factors.

25          MR. VERRILLI:  Right.  There definitely needs to be

1    an adjudication.  We don't disagree with that.  Whatever

2    further briefing the Court thinks is appropriate would be

3    appropriate.

4           If we're right and these harms are real and concrete

5    and happening now, we'd ask, consistent with the Court's

6    priorities, that it be given expedited treatment.

7           THE COURT:  All right.  Let me hear from Ms. Konkoly

8    and I'll give you a chance to reply.

9           MR. VERRILLI:  Thank you.

10          MS. KONKOLY:  Thank you, your Honor.  First, let me

11   just represent to the Court absolutely, unqualifiably that the

12   additional disciplines, TPL does not recommend authorization of

13   plaintiff's PMTAs.  In fact, it recommends that they be denied.

14          THE COURT:  So let me just turn to Mr. Verrilli.  If

15   I verify that, does that -- and concur that that representation

16   is a correct representation, does that obviate the need at

17   least for expedition?

18          MR. VERRILLI:  No, your Honor.  I don't think it

19   would necessarily because if the -- if that memo -- because of

20   the context of that memo, with respect to all of the other

21   scientific disciplines being considered, the judgment is in

22   favor of granting the application.  That is information that

23   bears directly on the regulatory process, regulatory review

24   process.

25          It's information that we think we ought to be

1    entitled to use to defend our reputation in public.  We think

2    that's information that the jury in the California case and

3    other places should know.

4              THE COURT:  Okay.

5              MS. KONKOLY:  Let me proceed with a few other points

6    in response to Mr. Verrilli's argument.

7              THE COURT:  Please.

8              MS. KONKOLY:  To clarify, the decisional document

9    here, the final agency decision is encompassed by the MDO.  The

10   TPLs are not final agency decisions.  The MDO here did adopt

11   the toxicology TPL as setting forth the basis for the agency

12   decision, but it expressly declined to adopt the analysis in

13   the additional disciplines TPO.

14             The fact that Dr. Holman signed both documents does

15   not convert them into final agency actions.  When he's acting

16   in his capacity and his delegated authority to make that final

17   agency decision by signing the MDO, then his signature carries

18   that legal authority.

19             But in other capacities, adding his signature simply

20   conveys his personal views or concurrence with the document.

21   These are not the final documents.  They do not represent the

22   final agency decision.

23             THE COURT:  So are they usually made public or not?

24             MS. KONKOLY:  They are typically or often made

25   public.

1          THE COURT:  So why, if they're deliberative, why

2     would they be made public typically, or if they're not the

3     final agency decision, why would they be made public?

4          MS. KONKOLY:  That would be the adoption doctrine.

5     The agency would typically adopt the TPL in issuing the MDO.

6          THE COURT:  I see.  Okay.

7          MS. KONKOLY:  Here, the document at issue was

8     expressly not adopted.  That's set forth very clearly in the

9     memo to file that we attached, as well as the Mital declaration

10    in our briefing.

11          Also, on the harm points, which I think fold into

12    this a little bit, the point that Juul is making that they need

13    these documents to defend their reputation in a related state

14    court litigation in our view actually underscores the confusion

15    point that we made in our initial brief and intend to flesh out

16    further in our reply that Juul is intending to use the document

17    to attribute views to the FDA that are not the agency's views.

18          These are preliminary discussions that did not reach

19    an end point that were expressly not adopted in the final

20    agency decision.  They're simply not fully baked.  They do not

21    represent the agency's end point.

22          Relatably, the other harm that we discussed to the

23    ongoing review that's ongoing in the further administrative

24    process before the agency, we have no disagreement certainly,

25    but where the document forms the basis of a final agency

1    decision, such as when a TPL is adopted in an MDO, then the

2    agency would need to address any changes if it revisits and

3    deliberates further on that decision in some form or another.

4    Here, that's simply not the case because the additional

5    disciplines TPL was never adopted.  It was expressly not relied

6    on in the decision that the agency reached which relied

7    strictly on the four toxicological deficiencies identified in

8    the toxicology TPL.

9         THE COURT:  What about Mr. Verrilli's argument that,

10   to the extent the TPLs are often released, one, that there is

11   not a great risk of chilling in the deliberative process and,

12   two, since the FOIA Reform Act or -- I'm not going to remember

13   the name of the update to the Act -- but now the agency has to

14   make a showing that there would, in fact, be some injury

15   through release of the document, and under those circumstances,

16   why is there a risk here?

17        MS. KONKOLY:  Again, the risk here is that this was

18   not the final decision.  It did not represent the basis for the

19   TPL that was -- for the MDO that was issued, and the memo to

20   file expressly notes that had OCD, which has supervisory

21   authority over OS, and they would know that there's nothing

22   unusual about their exercise of that supervisory authority and

23   this brand-new regulatory regime that's getting set up and

24   implemented for the first time -- I'm sorry, I lost my train of

25   thought there.

1          THE COURT:  Let me interrupt you with another

2     question which will help you with the train of thought.

3          The government is currently scheduled to file its

4     response to the cross-motion on the 11th.

5          MS. KONKOLY:  Correct.

6          THE COURT:  Can you file it before then, and if so,

7     when would be a reasonable period of time for the Court to give

8     you to file that?

9          MS. KONKOLY:  If I may, your Honor, first just make a

10    brief point that we disclosed all of the key material facts

11    about the agency process that Juul is now very belatedly

12    claiming, indicates some form of impropriety here, and requires

13    expedition and a curtailing of the agreed-upon period that the

14    parties allowed for the DOJ's briefing.

15         We don't think there's any need to prejudice the

16    government by cutting short the time that we had negotiated to

17    prepare a full reply.

18         THE COURT:  So you disagree, then, with the

19    proposition that it wasn't until the government filed on

20    March 2nd that it became apparent that there was this

21    alternative report that may have reached alternative or

22    different conclusions?

23         MS. KONKOLY:  We do disagree.  We think that is fully

24    disclosed in our January 6th pre-motion filing.  We describe in

25    detail there; it certainly was a six-page filing.  So we flesh

1     it out further in our motion for summary judgment and we

2     attached the OCD memo to that.  But all of the key material

3     facts, that there were two memos and that the OCD director --

4     that the OS proposed to the OCD director -- or to OCD, I should

5     say, that the TPLs be bifurcated because the applications could

6     and should be denied on the basis of the toxicological

7     deficiencies alone; that they were dispositive; that there was

8     nothing in the rest of the applications, no matter what OS's

9     views on those were, that could overcome the deficiencies in

10    the toxicological aspect of the application.

11         So it was disclosed that that was OS's proposal, that

12    OCD reviewed those two memos and agreed that the toxicological

13    deficiencies were dispositive and concurred in that

14    recommendation, and then OS followed up on its proposal that it

15    issued the MDO on the basis of the toxicological deficiencies

16    alone.

17         All of those facts were disclosed in our January 6th

18    filing.  So Juul has been on notice for quite some time that

19    that was the process that was followed.  If they thought that

20    revealed any improprieties, they --

21         THE COURT:  Was there anything that was revealed with

22    your March 2nd filing that went into greater detail with

23    respect to the substance of the second TPL?

24         MS. KONKOLY:  Mr. Verrilli cited paragraph 18 of the

25    Mital declaration.

1          THE COURT:  Yes.

2          MS. KONKOLY:  I can just read it into the record.

3   (Reading) Further, while the additional disciplines TPL review

4   memo reflects that the director --

5          THE COURT:  You need to slow down.

6          MS. KONKOLY:  Absolutely.  I'll start over.

7          (Reading) Further, while the additional disciplines

8   TPL review memo, the withheld one, reflects that the director

9   of OS concurred with the TPL's finding and conclusion, it

10  expressly explains that OCD advised OS that OCD would review

11  any conclusion reached by OS for this bundle before those

12  conclusions became a final agency decision and that OCD had not

13  reviewed the findings and conclusions in this TPL, the

14  additional disciplines one.

15          Your Honor, I'm 99 percent sure that that is

16  fully disclosed in our January 6th filing.

17          THE COURT:  Okay.  I can take a look at that.

18          All right.  So putting that aside -- and I'm not

19  ruling at this point.  But if I were to conclude that some

20  expedition were merited, what would be a reasonable amount of

21  time for you to finish it?  You're already familiar with the

22  issues.  You're not coming to this new at this point.

23          MS. KONKOLY:  Thank you, your Honor.  I would

24  appreciate a minimum of two weeks.  In part, I was out of the

25  office last week, so I didn't actually have a chance to get my

1    hands around this brief until Monday and have been tied up

2    preparing for this hearing in the interim.  I'd appreciate two

3    weeks from today at an absolute minimum.

4              I'd again reiterate that on the agency's view,

5    there's no need to expedite at all given that Juul has been on

6    notice of the key facts for quite some time, and also in light

7    of the representation I have now made to the Court to clarify

8    that this memo does not recommend authorization of these PMTAs.

9              THE COURT:  Any objection to providing the Court a

10   copy of the memo in camera, ex parte?

11             MS. KONKOLY:  Your Honor, I think our position would

12   be the ex parte review is disfavored in FOIA cases and that the

13   presumption of regularity should apply to our declarations

14   here.

15             Generally, when courts do invoke their discretion to

16   require an in camera submission, that happens at the conclusion

17   of briefing.  We don't see any reason for a departure from

18   those normal procedures, and we don't think the presumption has

19   been overcome, certainly not before briefing has even

20   concluded.

21             That said, it's certainly within the Court's

22   discretion to order that.  If you would like to see it at any

23   point, we will, of course, comply with that order.

24             THE COURT:  I'm not insulted by your position that

25   you're resistant to providing it to the Court.  I just wanted

1    to know what your view was on the question.

2              Anything else you wanted to add?

3              MS. KONKOLY:  I just wanted to clarify.  I'll clarify

4    one other point, which is, because the agency found that the

5    toxicological differences -- deficiencies, I should say, were

6    dispositive, it's simply not the case that there could be

7    anything in the withheld memorandum that could overcome that.

8              FDA cannot -- if it finds that deficiencies are

9    dispositive, dispositive means dispositive, it means it can't

10   be outweighed even if everything else in all of the other

11   disciplines came out as positively as it could for Juul, that's

12   not the way that the standard works.

13             THE COURT:  I was going to ask about that.  When the

14   toxicological TPL concludes that there's a deficiency, is that

15   the end of the matter?

16             MS. KONKOLY:  In this case it was.

17             THE COURT:  The product -- but in general, as a

18   matter of law, if it's negative, or is it sometimes overcome by

19   other considerations?

20             MS. KONKOLY:  In this case, your Honor, the

21   toxicological deficiencies that the Court identified -- there's

22   four specific ones that are laid out in some detail, both in

23   the toxicology TPL that had been disclosed and in the MDO,

24   which is the final agency decision, they are -- my

25   understanding, they're all broadly related to carcinogenic

1    risks.

2            There's two pretty technical words you'll see in the

3    docs.  Let me find the page of my notes.  Genotoxicity and

4    mutagenicity.  I won't -- for the purposes of today's hearing,

5    I won't try to exceed my expertise on precisely what those

6    terms mean.  But they mean, broadly speaking, harms of

7    carcinogenic risk.

8            The Court identified four specific deficiencies

9    related to those topics.  And what the toxicology TPL concluded

10   in the assessment that the MDO ultimately adopted and rested on

11   is that there was insufficient and conflicting data which

12   precluded a conclusive assessment of the toxicological risks.

13           In light of those risks, there really isn't

14   anything -- without a conclusive assessment of the risks, the

15   MDO further explains that it could not make an overall

16   determination of whether the standard for approval, which is

17   appropriate for the protection of public health, had been met.

18           You know, for example, even if the application showed

19   that the rate of existing cigarette users switching over to

20   their products exceeded the rate of youth introduction to

21   tobacco use through these products, the value of those

22   tradeoffs just can't be assessed without a conclusive

23   assessment of the toxicological risks that are laid out in some

24   great detail both in the toxicological TPL and the underlying

25   TPL.

1          THE COURT:  Reading the parties' papers just relating

2     to scheduling issues, it appeared to me that the second TPL may

3     have included toxicological risk as well as other risks in

4     there.  I suppose if that addressed the toxicological issues

5     that were left unaddressed in the first TPL, that might support

6     the --

7          MS. KONKOLY:  I can also very affirmatively represent

8     that the additional disciplines TPL does not analyze

9     toxicological risk.  It does make cross-reference to the

10    findings and conclusions and analysis in the toxicology TPL

11    which explains some of the language that I think plaintiffs are

12    misconstruing in the Vaughn index.  There is no additional or

13    new analysis pertaining to toxicology in the additional

14    disciplines TPL.

15         THE COURT:  Anything else you want to add?

16         MS. KONKOLY:  No, your Honor, unless you have any

17    further questions.

18         THE COURT:  No.  Mr. Verrilli.

19         MR. VERRILLI:  Thank you, your Honor.  A few points.

20    The direct answer to your Honor's question about whether a

21    deficiency in toxicology submission is the end of the matter is

22    no.  There are several other instances, and I provided them to

23    the department's leadership in my discussions with them, in

24    which applications were granted even when the Office of Science

25    found the deficiency in the toxicological data.  So the answer

1    to your Honor's question is no, it's not the end of the matter,

2    which is critical because the whole point is that the statute

3    requires a holistic analysis.

4              To say in a situation in which, if it is the

5    case, as we have surmised that it is, that the other factors

6    analyzed point in the direction of grant, they've got to

7    explain why the deficiency is insufficient or else it's just a

8    pretext to say what they're saying.  That's why it's so

9    critical here.  So that's the story with respect to that.

10              With respect to paragraph 18 of the Mital declaration

11   which my friend read into the record, they seem to think it

12   helps them.  But here's what's new about it and here's what's

13   problematic about it.

14              First, it says that the -- first of all, as I

15   understand it, I believe, it's actually quoting the document

16   that -- the sentence is from the document that they're

17   withholding here.  One of the quoted sentences is that the

18   director of the Office of Science concurred with the TPL

19   findings and conclusions.  Okay.  It's not advice.  This is the

20   conclusion of the Office of Science.

21              Now, it is subject to supervision by OCD.  We

22   don't disagree with that.  But this was not advice about the

23   overall disciplines.  This was the conclusion --

24              THE COURT:  You know, I think that as a matter of

25   FOIA law, I'm not sure it's right to draw that sort of fine

1   distinction.  I'm familiar, for example, with some of the FOIA

2   law that deals with the Office of Legal Counsel where the Court

3   of Appeals has said you can have a final OLC opinion and

4   sometimes it's deliberative and sometimes it's not.  It's

5   not -- it's final, it's saying these are our views on the

6   issues, and it depends on how that information is then going to

7   be used.  And I think the same thing would presumably apply

8   here.

9          You could have, here's the final view of the office

10  of -- making sure that all of the pieces of paper that are

11  supposed to be filed were filed.  And our final view is yes,

12  they were all filed, or no, there was something that's missing.

13  It's not final agency action.  Maybe it's deliberate, maybe

14  it's not.  That may not be a great example because there's not

15  a deliberative element to it.

16         You could easily modify the hypothetical to come up

17  with a hundred decisions that are made before the FDA makes a

18  final decision about what to do once something -- that involve

19  all sorts of deliberative input where there are all sorts of

20  scientists who are saying, here's my final view.  I've done the

21  chronographic study or whatever it might be of the chemicals

22  and I've concluded that they fall here on the scale, and that

23  is my final report.  I've signed my name on it and I've

24  submitted it to the next person in the chain for their review,

25  and it's my opinion that this chemical is similar to another

1    chemical.  That's my step in the FDA process and I've done

2    that.

3           That's not -- that is still, at least arguably,

4    deliberative even though that's that person's or even that

5    office's final view, but then it goes into a process before

6    the -- where the agency decides what to do with all that input.

7           MR. VERRILLI:  Well, it certainly goes directly to

8    harm here, your Honor.  Because in the vast majority of

9    instances, when the director of the Office of Science signs

10   that TPL, it is the final decision by the agency.

11          THE COURT:  Well, I was going to ask you about that.

12   Is there any case that you know of where the FDA -- where the

13   MDO denies approval of the product or is a negative MDL where

14   the agency -- well, let me phrase it differently.

15          Is there any case you can think of where there's a

16   difference between the TPL and the MDO in which the agency

17   releases the TPL?  I understand why, as Ms. Konkoly indicated,

18   there is the adoption doctrine and, you know, you might have,

19   working in the government, written a memorandum to the

20   President.  Well, that's a little bit unique.  You might have

21   written a memo to the Attorney General recommending some course

22   of action, and the Attorney General checked it, yes, I want to

23   do that and signs it, and that becomes the final agency action.

24   I get that.

25          But are there cases where the memo submitted -- or

1    the TPL was submitted and the agency says no, we don't agree

2    with that assessment, but we're going to release it anyway?

3                MR. VERRILLI:  I believe the answer is yes.  I'll be

4    happy to supplement.

5                THE COURT:  I mean, I know we're getting into the

6    merits now.

7                MR. VERRILLI:  I'd be happy to supplement it.  I

8    believe the answer is yes.

9                The other point about paragraph 18 I want to make or

10   the other sentence that my friend quoted, that OCD advised OS

11   that OCD would review any conclusions reached OS, et cetera,

12   and that OCD has not reviewed the findings and conclusions in

13   this TPL review.

14               That's the problem from our perspective with respect

15   to the decision-making process.  That if, indeed, the Office of

16   Science said that these other factors point in favor of

17   granting the application as a holistic analysis, you can't

18   blind yourself to that.  That's the problem.  And that's why

19   this document is so critical in the overall --

20               THE COURT:  I understand the -- why this is an

21   important document in different respects.  It may be that the

22   interests or the analysis is different.

23               There may be lots of times where there are internal

24   deliberative documents in an agency that differ from what the

25   agency ultimately decides to do, where the regulated party

1    would very much like to have the views of the internal

2    recommendations because they're consistent with what the

3    regulated party thinks the world should look like but not what

4    the final decision-maker looks like.  They say, look, they've

5    got up on their website saying that product Y is dangerous.

6    There was an internal memo from someone in the agency who

7    reached a different view, and we want that out there.

8          As a matter of FOIA law, I'm not sure that's

9    necessarily a basis to say that it needs to come out.  I think

10   it would be a weighing process to decide that under FOIA.

11         Your interests may be very different with respect to

12   the administrative proceeding where, if there are documents

13   that were part of the administrative record, that the agency

14   has excluded from the administrative record that they have

15   failed to explain and that that may well violate the APA

16   because they've failed to explain why they didn't rely on the

17   second TPL or explain -- they didn't give any explanation with

18   respect to their analysis as to -- that could be problematic.

19         But the remedy in that context is usually to require

20   that they supplement the administrative record once you get to

21   court on that issue and not under FOIA to say that they need

22   release it.

23         MR. VERRILLI:  I understand that, your Honor, but we

24   are operating under the FOIA Improvements Act.  They have to

25   show harm here.

 1          THE COURT:  Thank you for reminding me of the name.

 2          MR. VERRILLI:  The harm they claimed is that the

 3    scientists will be chilled.  The fact is an overwhelming

 4    majority of instances preparing these exact documents they are

 5    disclosed and the scientists know it.

 6          So it seems to me the chill argument is

 7    insubstantial, and that's why this is relevant.

 8          THE COURT:  Although, that's where I think maybe my

 9    question is important as to whether they do release those

10    documents typically, even where the ultimate decision-maker

11    disagrees with the TPL.

12          I could see why there could be a chill if you thought

13    that your frank advice, which disagrees with your boss, would

14    be released.  But where it's adopted, there's not a chill

15    because my boss adopted my views on this and that's not a

16    problem.

17          MR. VERRILLI:  Couple things about that.

18          THE COURT:  Yes.

19          MR. VERRILLI:  I apologize for repeating myself, but

20    I do think it's relevant.  In the overwhelming majority of

21    instances, this is the final agency decision.

22          THE COURT:  Right.  But the question really, is it

23    the final agency decision because in the ordinary -- in the

24    overwhelming number of cases it is by the ultimate

25    decision-maker adopted --

1          MR. VERRILLI:  I'm sorry.

2          THE COURT:  Go ahead.

3          MR. VERRILLI:  In the overwhelming majority of cases,

4   they are the ultimate decision-maker in the Office of Science

5   exercising their delegated authority.

6          In addition to this case, there's only one other

7   instance that we're aware of in which OCD has ever taken the

8   decision away from them.  It's a case about menthol devices.

9   It's on appeal in the Fifth Circuit right now being challenged

10  on this ground.

11          So the overwhelming majority of the time, they are

12  exercising the agency's authority through their delegated

13  powers.  That's why the risk of chill seems to be nonexistent

14  here.

15          THE COURT:  I am getting way ahead of myself into the

16  merits on something where I haven't read the briefs.  I mean,

17  you haven't even finished writing the briefs on them.  It is

18  helpful for me in just thinking about the urgency of this to

19  understand what the arguments are at least.

20          I'm happy to hear anything else anyone wants to

21  offer.  I want to go back and look at the papers, and I'll

22  issue a prompt minute order just letting you know what I want

23  to do, whether I want to see the document in camera and also

24  about potentially adjusting the schedule.

25          I guess I should ask you, Mr. Verrilli, if I were to

1      give the government two weeks to file its response to the

2      cross-motion, how much time would you want for your final

3      brief?

4                      MR. VERRILLI:  Check with my colleague?  Seven days?

5                      THE COURT:  Okay.

6                      MR. VERRILLI:  Thank you.  I will say, your Honor,

7      that we do think in terms of an approach here, we continue to

8      think that in camera submission is the thing that makes the

9      most sense under the circumstances.  That two-week schedule is

10     fine with us.

11                     THE COURT:  The only problem I have is that I think

12     that it's going to be very hard for me without having the

13     briefs just to look at the document and know whether -- for the

14     reasons we've discussed whether there is enhanced urgency.

15                     If I requested the document and I got it in the next

16     day or two and I looked at it, I'd have to go back, I guess,

17     and look at the briefs and figure out how -- what I think of

18     the arguments in the briefs that have been filed thus far and

19     then set a schedule and give the government some time to

20     respond.  I suspect by the time I look at that and reach a

21     conclusion about whether how important I think the document is

22     and then give the government at least at that point a week to

23     respond, we may be at the two weeks anyway.

24                     It's going to be very hard for me to assess the

25     document without having the parties' legal briefing on the

1   issue.  I realize some of that has taken place already.  I'll

2   be in a much better position to assess the importance.

3          Quite frankly, I mean, this is helpful for me because

4   even if I conclude that the ex parte submission is not

5   necessary at this point, I might conclude that it's necessary

6   later.  This is, obviously, on my later now as a more pressing

7   matter and it's something where I can make sure that I turn my

8   attention to the case as quickly as I can once the briefing is

9   done.

10          MR. VERRILLI:  I'd very much appreciate that.  I

11   don't want to press, but just two things.

12          First, the reason we're pressing for ex parte review

13   is because of what we see as the extremely unusual character of

14   what went on here.  This is the first time we think ever that

15   there were two separate TPLs.  There's not been an explanation

16   for why that is.  So they were issued on the same day, signed

17   by the same person and, again, without any explanation.

18          The second TPL was excluded from the database

19   without any plausible explanation.  So there's a series of

20   circumstances that lead us to think that there's an unusual

21   situation here that justifies needing an in camera review.

22          But that said, perhaps one way to approach this, your

23   Honor, is that when the government files its papers, maybe the

24   Court could make a decision then about whether to ask for ex

25   parte review because at that point the Court will have

1   basically what it needs.

2          THE COURT:  That's a fair point.  I'll consider that

3   as well.

4          I do think that, based on the representations that

5   Ms. Konkoly has made that I, granted, assumed that -- I have no

6   reason to doubt that she's making accurate representations

7   about what's in the document.  I don't think I'm going to be

8   able to just look at the document and say, you know, aha

9   lightning has struck, there's a huge problem here and without

10  further briefing, I need to take further action, or I need

11  briefs tomorrow or the next day because there's such an urgent

12  crisis here.  I think that there are substantial arguments I'm

13  going to have to consider.

14         So I take your point.  I may think about requesting

15  the government, with its briefing, file the document, which may

16  help me in promptly resolving the motion.  I think filing it

17  now with me, it's just -- I'm just not sure what I'm going to

18  do at that point.

19         MR. VERRILLI:  I appreciate that, your Honor.  I

20  guess our point with respect to that is the sooner the Court

21  sees it, the sooner this gets cleared up.

22         THE COURT:  Okay.  Fair enough.  Anything else you

23  wanted to add?

24         MR. VERRILLI:  That's all.  Thank you, your Honor.

25         THE COURT:  Mrs. Konkoly, I'll give you the last

1    word.

2          MS. KONKOLY:  Briefly.  I apologize.  I inadvertently

3    left my mask at the podium.

4          THE COURT:  That's okay.  I'm slowly weaning myself.

5          MS. KONKOLY:  Two points.  One, I just wanted to

6    again return to paragraph 18 of the Mital declaration to

7    clarify the language that Mr. Verrilli again addressed.

8          Insofar as that paragraph reflects that the director

9    of OS concurred with the TPL's findings and conclusions, I want

10   to connect that to the representation I made earlier today that

11   the TPL recommended denial in the additional disciplines memo.

12   That is the concurrence there.

13          And relatably, OCD did not take the decision away

14   from OS.  OS made the proposal to approach the decision this

15   way to OCD, which then concurred with that approach.

16          And then secondly, the second half of paragraph 18

17   which talks about the additional discipline's TPL memo,

18   expressly explaining that OCD advised OS that OCD would review

19   any conclusions before they became final, that was fully

20   disclosed on January 16th, which takes me to my last point

21   about whether expedition is necessary.  Again, plaintiff has

22   been on notice of these facts since January.

23          Our current deadline is three weeks from tomorrow.

24   If they're able to file a reply brief in a week, this will be

25   fully briefed in one month.  And the government does

1    respectfully take the position that, in light of the procedural

2    history and the disclosures we've made today, there is no need

3    for expedition.

4           THE COURT:  Thank you.  Thank you all.  I'll get you

5    a minute order promptly.

6           (Whereupon, the hearing adjourned at 5:00 p.m.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4    above and foregoing constitutes a true and accurate transcript

5    of my stenographic notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7          Dated this 23rd day of April, 2023.

8

9

10                        /s/ Tamara M. Sefranek_____
                         Tamara M. Sefranek, RMR, CRR, CRC
11                       Official Court Reporter
                         Room 6714
12                       333 Constitution Avenue, NW
                         Washington, D.C.  20001

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 38:10

## 1

**1100** [1] - 1:18
**1155** [1] - 1:13
**11th** [1] - 19:4
**12th** [2] - 8:12, 8:13
**1301** [1] - 1:16
**13th** [1] - 8:15
**15** [1] - 7:17
**16th** [2] - 8:5, 36:20
**18** [6] - 4:10, 20:24, 26:10, 29:9, 36:6, 36:16
**19** [1] - 1:6
**1:22-cv-2853** [1] - 1:3

## 2

**20001** [2] - 1:24, 38:12
**20004** [2] - 1:14, 1:16
**20005** [1] - 1:19
**202-354-3246** [1] - 1:24
**2023** [2] - 1:6, 38:7
**22-2853** [1] - 2:1
**23rd** [1] - 38:7
**2nd** [7] - 7:11, 7:20, 7:22, 7:23, 8:19, 19:20, 20:22

## 3

**333** [2] - 1:23, 38:12
**3rd** [3] - 8:6, 8:7, 8:8

## 4

**4:08** [1] - 1:6

## 5

**5:00** [1] - 37:6

## 6

**6714** [2] - 1:23, 38:11
**6th** [4] - 8:9, 19:24, 20:17, 21:16

## 7

**7th** [3] - 1:13, 8:9, 8:11

## 8

**8th** [1] - 10:22

## 9

**99** [1] - 21:15

## A

**ability** [2] - 6:19, 38:6
**able** [5] - 6:25, 10:9, 12:17, 35:8, 36:24
**absence** [1] - 4:18
**absolute** [1] - 22:3
**absolutely** [2] - 15:11, 21:6
**accurate** [2] - 35:6, 38:4
**Act** [3] - 18:12, 18:13, 30:24
**acting** [1] - 16:15
**Action** [1] - 1:3
**action** [4] - 27:13, 28:22, 28:23, 35:10
**actions** [1] - 16:15
**actual** [1] - 5:21
**add** [3] - 23:2, 25:15, 35:23
**adding** [1] - 16:19
**addition** [2] - 9:17, 32:6
**additional** [11] - 15:12, 16:13, 18:4, 21:3, 21:7, 21:14, 25:8, 25:12, 25:13, 36:11, 36:17
**address** [4] - 6:3, 7:7, 13:11, 18:2
**addressed** [2] - 25:4, 36:7
**adjourned** [1] - 37:6
**adjudication** [1] - 15:1
**adjusting** [1] - 32:24
**Administration** [2] - 2:2, 2:22
**ADMINISTRATION** [1] - 1:6
**administrative** [8] - 6:11, 7:1, 10:1, 17:23, 30:12, 30:13, 30:14, 30:20
**admit** [1] - 9:12
**adopt** [3] - 16:10, 16:12, 17:5
**adopted** [2] - 17:8, 17:19, 18:1, 18:5, 24:10, 31:14, 31:15, 31:25
**adoption** [2] - 17:4, 28:18
**advanced** [1] - 10:9
**advice** [4] - 13:25, 26:19, 26:22, 31:13

**advised** [3] - 21:10, 29:10, 36:18
**advisement** [1] - 8:8
**advocate** [1] - 6:25
**affect** [1] - 9:8
**affected** [1] - 9:8
**affirmatively** [1] - 25:7
**afternoon** [5] - 2:5, 2:15, 2:17, 2:18, 3:2
**agencies** [1] - 13:4
**agency** [34] - 12:25, 13:10, 16:9, 16:10, 16:11, 16:15, 16:17, 16:22, 17:3, 17:5, 17:20, 17:24, 17:25, 18:2, 18:6, 18:13, 19:11, 21:12, 23:4, 23:24, 27:13, 28:6, 28:10, 28:14, 28:16, 28:23, 29:1, 29:24, 29:25, 30:6, 30:13, 31:21, 31:23
**agency's** [4] - 17:17, 17:21, 22:4, 32:12
**ago** [1] - 5:24
**agree** [1] - 29:1
**agreed** [3] - 11:2, 19:13, 20:12
**agreed-upon** [2] - 11:2, 19:13
**aha** [2] - 14:23, 35:8
**ahead** [4] - 11:4, 11:6, 32:2, 32:15
**alarm** [1] - 7:21
**allow** [1] - 13:3
**allowed** [1] - 19:14
**almost** [1] - 13:20
**alone** [2] - 20:7, 20:16
**alternative** [2] - 19:21
**Altria** [1] - 8:25
**amenable** [1] - 3:4
**amount** [1] - 21:20
**analysis** [10] - 7:15, 13:14, 14:7, 16:12, 25:10, 25:13, 26:3, 29:17, 29:22, 30:18
**analyze** [1] - 25:8
**analyzed** [1] - 26:6
**answer** [9] - 8:9, 8:12, 8:14, 13:12, 13:13, 25:20, 25:25, 29:3, 29:8
**answers** [1] - 13:19
**anticipate** [1] - 14:5
**Antonia** [1] - 2:18
**ANTONIA** [1] - 1:7
**anyway** [2] - 29:2, 33:23
**APA** [2] - 5:2, 30:15
**apologize** [2] - 31:19,

36:2
**apparent** [1] - 19:20
**appeal** [2] - 9:18, 32:9
**Appeals** [1] - 27:3
**appeared** [1] - 25:2
**application** [8] - 4:17, 4:23, 5:12, 10:6, 15:22, 20:10, 24:18, 29:17
**applications** [9] - 3:10, 3:21, 3:22, 4:16, 10:9, 13:21, 20:5, 20:8, 25:24
**apply** [2] - 22:13, 27:7
**appreciate** [4] - 21:24, 22:2, 34:10, 35:19
**approach** [5] - 2:3, 33:7, 34:22, 36:14, 36:15
**appropriate** [4] - 12:12, 15:2, 15:3, 24:17
**approval** [2] - 24:16, 28:13
**April** [11] - 1:6, 8:6, 8:7, 8:8, 8:9, 8:11, 8:12, 8:13, 8:15, 38:7
**arguable** [1] - 14:17
**arguably** [1] - 28:3
**argument** [4] - 14:5, 16:6, 18:9, 31:6
**arguments** [6] - 10:22, 14:14, 14:15, 32:19, 33:18, 35:12
**arisen** [1] - 8:10
**articulated** [1] - 4:16
**aside** [1] - 21:18
**aspect** [1] - 20:10
**assess** [2] - 33:24, 34:2
**assessed** [1] - 24:22
**assessment** [5] - 24:10, 24:12, 24:14, 24:23, 29:2
**assumed** [1] - 35:5
**attached** [2] - 17:9, 20:2
**attention** [2] - 13:16, 34:8
**Attorney** [1] - 28:21
**attorney** [1] - 28:22
**attribute** [1] - 17:17
**audience** [1] - 2:9
**authority** [12] - 3:18, 3:20, 3:21, 3:23, 4:1, 16:16, 16:18, 18:21, 18:22, 32:5, 32:12
**authorization** [2] - 15:12, 22:8

36:2
**apparent** [1] - 19:20
**Avenue** [3] - 1:16, 1:23, 38:12
**aware** [3] - 5:23, 13:20, 32:7

## B

**baked** [1] - 17:20
**balance** [1] - 10:8
**barking** [1] - 11:19, 11:25
**based** [3] - 3:8, 3:13, 35:4
**basic** [1] - 5:1
**basis** [9] - 4:15, 4:23, 7:1, 16:11, 17:25, 18:18, 20:6, 20:15, 30:9
**bear** [1] - 10:12
**bears** [1] - 15:23
**became** [3] - 19:20, 21:12, 36:19
**become** [1] - 3:16
**becomes** [1] - 28:23
**BEFORE** [1] - 1:9
**behalf** [2] - 2:16, 2:19
**belatedly** [1] - 19:11
**belief** [1] - 5:6
**believes** [1] - 11:21
**bells** [1] - 7:21
**benefits** [1] - 12:23
**Berman** [1] - 2:20
**best** [1] - 38:6
**better** [1] - 34:2
**between** [1] - 28:16
**bifurcated** [1] - 20:5
**bit** [3] - 14:19, 17:12, 28:20
**blames** [1] - 10:4
**blending** [1] - 7:6
**blind** [1] - 29:18
**boss** [2] - 31:13, 31:15
**brand** [1] - 18:23
**brand-new** [1] - 18:23
**brief** [9] - 5:19, 5:24, 5:25, 6:22, 17:15, 19:10, 22:1, 33:3, 36:24
**briefed** [3] - 6:22, 12:20, 36:25
**briefing** [9] - 15:2, 17:10, 19:14, 22:17, 22:19, 33:25, 34:8, 35:10, 35:15
**briefly** [1] - 36:2
**briefs** [6] - 32:16, 32:17, 33:13, 33:17, 33:18, 35:11
**bring** [1] - 13:16
**broadly** [2] - 23:25,

24:6
**bundle** [1] - 21:11
**bunk** [1] - 13:5
**business** [2] - 8:12, 8:13

## C

**California** [3] - 5:20, 8:22, 16:2
**camera** [13] - 3:5, 11:18, 11:24, 12:10, 12:17, 14:20, 14:21, 14:23, 22:10, 22:16, 32:23, 33:8, 34:21
**cannot** [2] - 4:18, 23:8
**capacities** [1] - 16:19
**capacity** [1] - 16:16
**carcinogenic** [2] - 23:25, 24:7
**carries** [1] - 16:17
**Case** [1] - 2:1
**case** [27] - 3:24, 5:1, 5:17, 5:18, 5:20, 6:6, 8:25, 9:1, 9:5, 10:7, 11:1, 13:17, 13:20, 14:18, 16:2, 18:4, 23:6, 23:16, 23:20, 26:5, 28:12, 28:15, 32:6, 32:8, 34:8
**cases** [5] - 11:5, 22:12, 28:25, 31:24, 32:3
**certainly** [6] - 11:14, 17:24, 19:25, 22:19, 22:21, 28:7
**CERTIFICATE** [1] - 38:1
**certify** [1] - 38:3
**cetera** [1] - 29:11
**chain** [1] - 27:24
**challenged** [1] - 32:9
**chance** [2] - 15:8, 21:25
**changed** [1] - 7:3
**changes** [1] - 18:2
**character** [1] - 34:13
**check** [1] - 33:4
**checked** [1] - 28:22
**chemical** [2] - 27:25, 28:1
**chemicals** [1] - 27:21
**chill** [5] - 14:4, 31:6, 31:12, 31:14, 32:13
**chilled** [1] - 31:3
**chilling** [1] - 18:11
**chronographic** [1] - 27:21
**cigarette** [1] - 24:19
**Circuit** [2] - 9:18, 32:9

**circumstances** [5] - 8:1, 14:6, 18:15, 33:9, 34:20
**cited** [1] - 20:24
**Civil** [1] - 1:3, 2:1
**civil** [2] - 8:3, 8:5
**claimed** [1] - 31:2
**claiming** [1] - 19:12
**clarify** [5] - 16:8, 22:7, 23:3, 36:7
**clear** [2] - 2:14, 8:25
**cleared** [1] - 35:21
**clearly** [2] - 7:17, 17:8
**CLERK** [1] - 2:1
**client** [1] - 9:4
**close** [2] - 8:11, 8:13
**colleague** [1] - 33:4
**COLUMBIA** [1] - 1:1
**coming** [2] - 10:23, 21:22
**company** [1] - 7:23
**complete** [1] - 38:5
**completely** [1] - 14:11
**comply** [1] - 22:23
**concern** [2] - 4:1, 14:10
**concerned** [1] - 7:23
**conclude** [3] - 21:19, 34:4, 34:5
**concluded** [3] - 22:20, 24:9, 27:22
**concludes** [2] - 12:22, 23:14
**conclusion** [8] - 4:23, 5:4, 21:9, 21:11, 22:16, 26:20, 26:23, 33:21
**conclusions** [9] - 19:22, 21:12, 21:13, 25:10, 26:19, 29:11, 29:12, 36:9, 36:19
**conclusive** [3] - 24:12, 24:14, 24:22
**concrete** [1] - 15:4
**concur** [1] - 15:15
**concurred** [2] - 20:13, 21:9, 26:18, 36:9, 36:15
**concurrence** [2] - 16:20, 36:12
**conducted** [1] - 7:14
**CONFERENCE** [2] - 1:4, 1:8
**conflicting** [1] - 24:11
**confused** [1] - 14:13
**confusion** [2] - 14:11, 17:14
**connect** [1] - 36:10
**consensual** [1] - 8:4
**consensually** [1] -

8:20
**consider** [2] - 35:2, 35:13
**consideration** [5] - 3:9, 3:12, 4:24, 9:24, 12:16
**considerations** [3] - 10:12, 12:14, 23:19
**considered** [4] - 4:18, 9:10, 13:1, 15:21
**consistent** [3] - 11:21, 15:5, 30:2
**constitutes** [1] - 38:4
**Constitution** [2] - 1:23, 38:12
**contacted** [1] - 8:2
**contains** [2] - 7:12, 9:23
**context** [2] - 15:20, 30:19
**continue** [1] - 33:7
**contrary** [2] - 5:4, 13:2
**convert** [1] - 16:15
**conveys** [1] - 16:20
**Cooper** [1] - 14:8
**Cooper's** [1] - 13:17
**copy** [1] - 22:10
**correct** [3] - 5:6, 15:16, 19:5
**Counsel** [1] - 27:2
**counsel** [3] - 2:3, 2:4, 2:20
**couple** [2] - 10:19, 31:17
**course** [7] - 4:21, 9:11, 11:15, 11:15, 13:13, 22:23, 28:21
**Court** [25] - 1:22, 1:22, 3:2, 3:4, 7:21, 11:18, 11:21, 12:11, 12:12, 12:15, 12:17, 15:2, 15:11, 19:7, 22:7, 22:9, 22:25, 23:21, 24:8, 27:2, 34:24, 34:25, 35:20, 38:11
**court** [2] - 17:14, 30:21
**COURT** [61] - 1:1, 2:7, 2:17, 2:23, 3:17, 4:3, 5:8, 5:11, 6:5, 6:12, 6:14, 6:21, 7:3, 7:8, 8:16, 8:22, 9:4, 10:15, 12:2, 12:18, 14:19, 15:7, 15:14, 16:4, 16:7, 16:23, 17:1, 17:6, 18:9, 19:1, 19:6, 19:18, 20:21, 21:1, 21:5, 21:17, 22:9, 22:24, 23:13, 23:17, 25:1,

25:15, 25:18, 26:24, 28:11, 29:5, 29:20, 31:1, 31:8, 31:18, 31:22, 32:2, 32:15, 33:5, 33:11, 35:2, 35:22, 35:25, 36:4, 37:4, 38:1
**Court's** [6] - 10:20, 11:3, 11:22, 13:16, 15:5, 22:21
**Courthouse** [1] - 1:23
**courts** [1] - 22:15
**covered** [1] - 14:5
**CRC** [2] - 1:22, 38:10
**crisis** [1] - 35:12
**critical** [4] - 4:15, 26:2, 26:9, 29:19
**cross** [5] - 6:1, 12:4, 19:4, 25:9, 33:2
**cross-motion** [4] - 6:1, 12:4, 19:4, 33:2
**cross-reference** [1] - 25:9
**CRR** [2] - 1:22, 38:10
**current** [2] - 12:13, 36:23
**curtailing** [1] - 19:13
**cutting** [1] - 19:16

## D

**D.C** [2] - 9:18, 38:12
**dangerous** [1] - 30:5
**data** [2] - 24:11, 25:25
**database** [2] - 9:23, 34:18
**date** [4] - 7:20, 8:6, 8:10, 8:18
**Dated** [1] - 38:7
**days** [3] - 10:19, 10:21, 33:4
**DC** [5] - 1:5, 1:14, 1:16, 1:19, 1:24
**deadline** [1] - 36:23
**deal** [1] - 3:11
**deals** [1] - 27:2
**decide** [2] - 11:6, 30:10
**decided** [3] - 11:10, 11:11, 11:13
**decides** [2] - 28:6, 29:25
**decision** [44] - 3:7, 3:18, 3:19, 3:21, 3:23, 4:8, 4:9, 4:12, 4:16, 4:25, 5:2, 6:23, 12:25, 13:2, 13:10, 13:17, 13:22, 13:23, 14:2, 16:9, 16:12, 16:17, 16:22, 17:3,

17:20, 18:1, 18:3, 18:6, 18:18, 21:12, 23:24, 27:18, 28:10, 29:15, 30:4, 31:10, 31:21, 31:23, 31:25, 32:4, 32:8, 34:24, 36:13, 36:14
**decision-maker** [4] - 30:4, 31:10, 31:25, 32:4
**decision-making** [6] - 3:18, 3:19, 3:21, 3:23, 5:2, 29:15
**decisional** [2] - 13:14, 16:8
**decisions** [2] - 16:10, 27:17
**declaration** [7] - 4:10, 7:12, 7:13, 17:9, 20:25, 26:10, 36:6
**declarations** [1] - 22:13
**declined** [1] - 16:12
**defend** [2] - 16:1, 17:13
**Defendant** [2] - 1:7, 1:17
**defendant** [2] - 8:25, 9:1
**deficiencies** [9] - 18:7, 20:7, 20:9, 20:13, 20:15, 23:5, 23:8, 23:21, 24:8
**deficiency** [4] - 23:14, 25:21, 25:25, 26:7
**definitely** [1] - 14:25
**delegated** [4] - 3:20, 16:16, 32:5, 32:12
**delegating** [1] - 3:25
**deliberate** [1] - 27:13
**deliberates** [1] - 18:3
**deliberative** [11] - 12:24, 13:3, 13:13, 14:16, 17:1, 18:11, 27:4, 27:15, 27:19, 28:4, 29:24
**demonstrate** [1] - 13:15
**denial** [2] - 10:3, 36:11
**denied** [3] - 10:5, 15:13, 20:6
**denies** [1] - 28:13
**deny** [1] - 4:16
**Department** [3] - 1:18, 2:19, 2:21
**department's** [1] - 25:23
**departure** [1] - 22:17
**deprived** [1] - 6:19
**DEPUTY** [1] - 2:1

**describe** [1] - 19:24
**designed** [1] - 11:16
**detail** [4] - 19:25, 20:22, 23:22, 24:24
**determination** [1] - 24:16
**devices** [1] - 32:8
**differ** [1] - 29:24
**difference** [1] - 28:16
**differences** [1] - 23:5
**different** [6] - 13:6, 19:22, 29:21, 29:22, 30:7, 30:11
**differently** [1] - 28:14
**difficult** [2] - 14:19, 14:22
**direct** [1] - 25:20
**direction** [1] - 26:6
**directly** [3] - 10:13, 15:23, 28:7
**director** [8] - 4:8, 20:3, 20:4, 21:4, 21:8, 26:18, 28:9, 36:8
**disagree** [5] - 14:17, 15:1, 19:18, 19:23, 26:22
**disagreement** [1] - 17:24
**disagrees** [2] - 31:11, 31:13
**discipline's** [1] - 36:17
**disciplines** [12] - 15:12, 15:21, 16:13, 18:5, 21:3, 21:7, 21:14, 23:11, 25:8, 25:14, 26:23, 36:11
**disclose** [1] - 8:14
**disclosed** [11] - 10:14, 14:3, 14:7, 19:10, 19:24, 20:11, 20:17, 21:16, 23:23, 31:5, 36:20
**disclosure** [3] - 6:9, 13:15, 13:18
**disclosures** [1] - 37:2
**discretion** [2] - 22:15, 22:22
**discuss** [1] - 8:3
**discussed** [2] - 17:22, 33:14
**discussions** [2] - 17:18, 25:23
**disfavored** [1] - 22:12
**dispositive** [6] - 20:7, 20:13, 23:6, 23:9
**distinction** [1] - 27:1
**DISTRICT** [3] - 1:1, 1:1, 1:10
**division** [2] - 8:3, 8:5
**docs** [1] - 24:3

**doctrine** [2] - 17:4, 28:18
**document** [34] - 3:16, 5:5, 5:6, 7:1, 8:15, 9:8, 9:21, 11:17, 11:24, 12:12, 12:17, 14:12, 14:20, 14:21, 14:23, 16:8, 16:20, 17:7, 17:16, 17:25, 18:15, 26:15, 26:16, 29:19, 29:21, 32:23, 33:13, 33:15, 33:21, 33:25, 35:7, 35:8, 35:15
**documents** [9] - 13:18, 14:8, 16:14, 16:21, 17:13, 29:24, 30:12, 31:4, 31:10
**DOJ's** [1] - 19:14
**Don** [1] - 2:5
**DONALD** [1] - 1:12
**done** [3] - 27:20, 28:1, 34:9
**doubt** [1] - 35:6
**down** [1] - 21:5
**Dr** [1] - 16:14
**draw** [1] - 26:25
**DRUG** [1] - 1:6
**Drug** [2] - 2:2, 2:22
**due** [3] - 5:24, 6:1, 6:22

**E**

**easily** [1] - 27:16
**effort** [1] - 8:20
**element** [1] - 27:15
**Ellis** [2] - 1:15, 2:16
**encompassed** [1] - 16:9
**encourage** [1] - 13:7
**end** [7] - 13:9, 13:14, 17:19, 17:21, 23:15, 25:21, 26:1
**engaged** [1] - 14:1
**enhanced** [1] - 33:14
**enormous** [2] - 5:7, 5:8
**entitled** [1] - 16:1
**et** [1] - 29:11
**evening** [1] - 8:11
**everywhere** [1] - 9:16
**ex** [5] - 22:10, 22:12, 34:4, 34:12, 34:24
**exact** [1] - 31:4
**exactly** [1] - 9:2
**example** [3] - 24:18, 27:1, 27:14
**exceed** [1] - 24:5
**exceeded** [1] - 24:20

**excluded** [2] - 30:14, 34:18
**exercise** [5] - 3:19, 3:20, 3:23, 14:1, 18:22
**exercising** [2] - 32:5, 32:12
**existing** [1] - 24:19
**expedite** [2] - 5:12, 22:5
**expedited** [1] - 15:6
**expedition** [9] - 11:21, 12:7, 12:13, 14:22, 15:17, 19:13, 21:20, 36:21, 37:3
**expertise** [1] - 24:5
**explain** [6] - 13:6, 13:19, 26:7, 30:15, 30:16, 30:17
**explaining** [1] - 36:18
**explains** [2] - 21:10, 24:15, 25:11
**explanation** [6] - 7:18, 7:19, 30:17, 34:15, 34:17, 34:19
**expressly** [7] - 16:12, 17:8, 17:19, 18:5, 18:20, 21:10, 36:18
**extent** [1] - 18:10
**extremely** [1] - 34:13

**F**

**face** [1] - 9:13
**facilitate** [1] - 11:16
**facing** [1] - 11:5
**fact** [10] - 3:22, 4:22, 5:3, 5:17, 12:8, 13:13, 15:13, 16:14, 18:14, 31:3
**factors** [6] - 3:8, 4:24, 7:15, 14:24, 26:5, 29:16
**facts** [7] - 3:13, 9:20, 19:10, 20:3, 20:17, 22:6, 36:22
**failed** [2] - 30:15, 30:16
**fair** [2] - 35:2, 35:22
**fall** [1] - 27:22
**false** [1] - 5:16
**familiar** [2] - 21:21, 27:1
**far** [1] - 33:18
**favor** [2] - 15:22, 29:16
**FDA** [16] - 2:20, 3:2, 3:4, 3:23, 4:11, 4:15, 5:22, 6:11, 10:2, 12:22, 14:8, 17:17,

23:8, 27:17, 28:1, 28:12
**FDA's** [2] - 3:7, 10:4
**few** [1] - 16:5, 25:19
**Fifth** [1] - 32:9
**figure** [1] - 11:25, 33:17
**file** [10] - 5:25, 12:4, 17:9, 18:20, 19:3, 19:6, 19:8, 33:1, 35:15, 36:24
**filed** [6] - 8:15, 19:19, 27:11, 27:12, 33:18
**files** [1] - 34:23
**filing** [7] - 7:11, 19:24, 19:25, 20:18, 20:22, 21:16, 35:16
**final** [42] - 3:17, 3:19, 3:20, 3:23, 4:7, 4:9, 4:12, 7:13, 10:2, 12:24, 13:10, 13:22, 13:23, 14:2, 16:9, 16:10, 16:15, 16:16, 16:21, 16:22, 17:3, 17:19, 17:25, 18:18, 21:12, 23:24, 27:3, 27:5, 27:9, 27:11, 27:13, 27:18, 27:20, 27:23, 28:5, 28:10, 28:23, 30:4, 31:21, 31:23, 33:2, 36:19
**finder** [1] - 5:17
**findings** [4] - 11:23, 25:10, 26:19, 29:12, 36:9
**fine** [4] - 11:19, 12:13, 26:25, 33:10
**finish** [1] - 21:21
**finished** [1] - 32:17
**fire** [1] - 6:2
**first** [18] - 2:24, 5:12, 5:13, 6:6, 6:10, 7:12, 7:14, 7:16, 8:5, 13:13, 15:10, 18:24, 19:9, 25:5, 26:14, 34:12, 34:14
**flesh** [2] - 17:15, 19:25
**Floor** [1] - 1:13
**FOIA** [9] - 9:9, 18:12, 22:12, 26:25, 27:1, 30:8, 30:10, 30:21, 30:24
**fold** [1] - 17:11
**followed** [2] - 20:14, 20:19
**following** [1] - 9:12
**Food** [2] - 2:2, 2:22
**FOOD** [1] - 1:6
**FOR** [1] - 1:1
**foregoing** [1] - 38:4

**form** [2] - 18:3, 19:12
**forms** [1] - 17:25
**forth** [2] - 16:11, 17:8
**forward** [2] - 9:18, 9:19
**four** [3] - 18:7, 23:22, 24:8
**fourth** [1] - 10:2
**frame** [2] - 8:18, 8:19
**frank** [1] - 31:13
**frankly** [1] - 34:3
**friend** [2] - 26:11, 29:10
**full** [4] - 3:8, 12:16, 19:17, 38:5
**fuller** [1] - 4:19
**fully** [5] - 17:20, 19:23, 21:16, 36:19, 36:25

**G**

**General** [1] - 28:21
**general** [2] - 23:17, 28:22
**generally** [1] - 22:15
**genotoxicity** [1] - 24:3
**gist** [1] - 11:23
**given** [5] - 3:11, 12:14, 14:5, 15:6, 22:5
**government** [11] - 12:4, 19:3, 19:16, 19:19, 28:19, 33:1, 33:19, 33:22, 34:23, 35:15, 36:25
**government's** [2] - 7:11, 10:25
**grant** [2] - 14:14, 26:6
**granted** [4] - 3:10, 4:23, 25:24, 35:5
**granting** [3] - 10:9, 15:22, 29:17
**grapple** [1] - 5:3
**great** [5] - 3:11, 4:1, 18:11, 24:24, 27:14
**greater** [1] - 20:22
**ground** [2] - 32:10
**guess** [8] - 5:15, 11:8, 12:18, 12:23, 14:20, 32:25, 33:16, 35:20

**H**

**hair** [1] - 6:2
**half** [1] - 36:16
**hands** [2] - 8:21, 22:1
**happy** [3] - 29:4, 29:7, 32:20
**hard** [2] - 33:12, 33:24
**harm** [8] - 9:10, 13:15, 14:18, 17:11, 17:22,

28:8, 30:25, 31:2
**harmful** [1] - 13:18
**harms** [2] - 15:4, 24:6
**health** [3] - 10:8, 12:22, 24:17
**hear** [3] - 2:24, 15:7, 32:20
**hearing** [3] - 22:2, 24:4, 37:6
**hearings** [2] - 10:20, 10:22
**HELD** [1] - 1:9
**help** [2] - 19:2, 35:16
**helpful** [3] - 7:21, 32:18, 34:3
**helps** [2] - 4:4, 26:12
**hereby** [1] - 38:3
**history** [1] - 37:2
**holistic** [4] - 4:24, 7:15, 26:3, 29:17
**Holman** [1] - 16:14
**Honor** [19] - 2:5, 2:15, 2:18, 3:1, 15:10, 15:18, 19:9, 21:15, 21:23, 22:11, 23:20, 25:16, 25:19, 28:8, 30:23, 33:6, 34:23, 35:19, 35:24
**Honor's** [3] - 11:14, 25:20, 26:1
**HONORABLE** [1] - 1:9
**huge** [1] - 35:9
**hundred** [1] - 27:17
**hypothetical** [1] - 27:16

## I

**identified** [5] - 6:8, 6:10, 18:7, 23:21, 24:8
**immediate** [2] - 6:9, 6:20
**immediately** [1] - 3:16
**imminent** [1] - 8:24
**imminently** [2] - 6:22, 9:9
**implemented** [1] - 18:24
**importance** [4] - 5:7, 5:8, 11:7, 34:2
**important** [5] - 11:12, 13:12, 29:21, 31:9, 33:21
**impression** [1] - 5:16
**improprieties** [1] - 20:20
**impropriety** [1] - 19:12
**Improvements** [1] -

30:24
**IN** [1] - 1:1
**inadvertently** [1] - 36:2
**Inc** [1] - 2:2
**INC** [1] - 1:3
**included** [1] - 25:3
**including** [1] - 10:24
**increase** [1] - 10:5
**indeed** [3] - 9:7, 10:7, 29:15
**independent** [1] - 7:24
**index** [3] - 5:23, 7:10, 25:12
**indicated** [1] - 28:17
**indicates** [1] - 19:12
**information** [5] - 12:15, 15:22, 15:25, 16:2, 27:6
**informed** [1] - 8:9
**initial** [1] - 17:15
**injunction** [1] - 10:24
**injunctions** [1] - 11:4
**injury** [4] - 6:20, 9:4, 9:6, 18:14
**injustice** [1] - 11:11
**input** [2] - 27:19, 28:6
**insofar** [1] - 36:8
**inspection** [2] - 3:5, 11:18
**instance** [1] - 32:7
**instances** [6] - 13:23, 14:3, 25:22, 28:9, 31:4, 31:21
**instructed** [1] - 9:22
**insubstantial** [1] - 31:7
**insufficient** [2] - 24:11, 26:7
**insulted** [1] - 22:24
**intend** [1] - 17:15
**intending** [1] - 17:16
**interests** [2] - 29:22, 30:11
**interim** [1] - 22:2
**internal** [4] - 12:21, 29:23, 30:1, 30:6
**internally** [1] - 13:7
**interrupt** [1] - 19:1
**introduction** [1] - 24:20
**invoke** [1] - 22:15
**involve** [1] - 27:18
**issue** [12] - 2:13, 2:25, 4:19, 5:9, 5:21, 9:24, 12:23, 14:9, 17:7, 30:21, 32:22, 34:1
**issued** [6] - 4:7, 10:2, 10:3, 18:19, 20:15, 34:16

**issues** [4] - 21:22, 25:2, 25:4, 27:6
**issuing** [1] - 17:5

## J

**January** [5] - 19:24, 20:17, 21:16, 36:20, 36:22
**Jason** [1] - 2:15
**JASON** [1] - 1:15
**JR** [1] - 1:12
**Judge** [2] - 13:17, 14:8
**JUDGE** [2] - 1:9, 1:10
**judgment** [6] - 4:11, 7:11, 12:5, 12:20, 15:21, 20:1
**Julie** [1] - 2:21
**jury** [2] - 5:17, 16:2
**Justice** [3] - 1:18, 2:19, 2:21
**justifies** [1] - 34:21
**JUUL** [1] - 1:3
**Juul** [12] - 2:1, 2:6, 2:16, 8:25, 10:4, 14:23, 17:12, 17:16, 19:11, 20:18, 22:5, 23:11
**Juul's** [2] - 3:10, 4:16

## K

**keep** [3] - 2:9, 9:25, 11:19
**key** [7] - 6:17, 7:5, 7:9, 9:20, 19:10, 20:2, 22:6
**Kirkland** [1] - 2:16
**kirkland** [1] - 1:15
**knowledge** [1] - 4:6
**known** [2] - 2:11, 2:14
**KONKOLY** [24] - 1:17, 2:18, 15:10, 16:5, 16:8, 16:24, 17:4, 17:7, 18:17, 19:5, 19:9, 19:23, 20:24, 21:2, 21:6, 21:23, 22:11, 23:3, 23:16, 23:20, 25:7, 25:16, 36:2, 36:5
**Konkoly** [5] - 2:19, 15:7, 28:17, 35:5, 35:25

## L

**LABS** [1] - 1:3
**Labs** [3] - 2:1, 2:6, 2:16

**laid** [2] - 23:22, 24:23
**language** [3] - 4:17, 25:11, 36:7
**last** [4] - 9:13, 21:25, 35:25, 36:20
**law** [4] - 23:18, 26:25, 27:2, 30:8
**lawsuit** [2] - 9:13
**lead** [3] - 3:3, 5:14, 34:20
**leadership** [2] - 8:2, 25:23
**learned** [2] - 7:13, 7:14
**least** [6] - 5:1, 15:17, 28:3, 32:19, 33:22
**left** [3] - 5:17, 25:5, 36:3
**legal** [2] - 16:18, 33:25
**Legal** [1] - 27:2
**less** [2] - 9:11, 10:17
**letting** [1] - 32:22
**life** [1] - 11:5
**light** [3] - 22:6, 24:13, 37:1
**lightning** [1] - 35:9
**likely** [2] - 3:7, 9:25
**litigation** [4] - 5:15, 8:22, 10:17, 17:14
**lives** [1] - 2:12
**LLP** [2] - 1:13, 1:15
**look** [14] - 7:24, 12:12, 12:17, 14:20, 14:21, 14:22, 21:17, 30:3, 30:4, 32:21, 33:13, 33:17, 33:20, 35:8
**looked** [2] - 7:16, 33:16
**looks** [3] - 4:15, 11:18, 30:4
**lost** [1] - 18:24
**Lovas** [1] - 2:21

## M

**majority** [8] - 3:22, 13:23, 14:3, 28:8, 31:4, 31:20, 32:3, 32:11
**maker** [4] - 30:4, 31:10, 31:25, 32:4
**manifest** [1] - 11:11
**March** [9] - 7:11, 7:20, 7:22, 7:23, 8:5, 8:18, 8:19, 19:20, 20:22
**Marcia** [1] - 2:20
**mask** [1] - 36:3
**masks** [1] - 2:8
**material** [2] - 19:10, 20:2

**materials** [1] - 9:23
**matter** [8] - 20:8, 23:15, 23:18, 25:21, 26:1, 26:24, 30:8, 34:7
**matters** [1] - 8:18
**MDL** [3] - 5:15, 9:1, 28:13
**MDO** [12] - 16:9, 16:10, 16:17, 17:5, 18:1, 18:19, 20:15, 23:23, 24:10, 24:15, 28:13, 28:16
**mean** [7] - 10:20, 14:20, 24:6, 29:5, 32:16, 34:3
**means** [3] - 10:18, 23:9
**meet** [1] - 8:3
**meeting** [2] - 8:6, 8:7
**memo** [20] - 7:14, 7:17, 12:22, 12:25, 13:1, 15:19, 15:20, 17:9, 18:19, 20:2, 21:4, 21:8, 22:8, 22:10, 28:21, 28:25, 30:6, 36:11, 36:17
**memorandum** [2] - 3:3, 23:7, 28:19
**memos** [4] - 4:8, 7:18, 20:3, 20:12
**menthol** [1] - 32:8
**merited** [1] - 21:20
**merits** [2] - 29:6, 32:16
**met** [1] - 24:17
**might** [5] - 25:5, 27:21, 28:18, 28:20, 34:5
**minimum** [2] - 21:24, 22:3
**Minnesota** [8] - 5:15, 6:6, 8:10, 9:3, 9:13, 9:15, 10:17, 12:8
**minute** [3] - 10:19, 32:22, 37:5
**misconstruing** [1] - 25:12
**misleading** [1] - 9:7
**missing** [1] - 27:12
**Mital** [6] - 4:10, 7:12, 17:9, 20:25, 26:10, 36:6
**modify** [1] - 27:16
**Monday** [1] - 22:1
**month** [1] - 36:25
**months** [4] - 5:23, 6:16, 6:17, 7:4
**MOSS** [1] - 1:9
**most** [2] - 9:25, 33:9

**motion** [1] - 2:23,
4:11, 6:1, 8:15,
10:24, 12:4, 19:4,
19:24, 20:1, 33:2,
35:16
**motions** [2] - 10:23,
12:20
**move** [2] - 9:19, 10:16
**moving** [1] - 9:18
**MR** [37] - 2:5, 2:15,
3:1, 3:19, 4:4, 5:10,
6:3, 6:6, 6:13, 6:16,
6:24, 7:5, 7:9, 8:17,
8:24, 9:6, 11:14,
12:6, 13:11, 14:25,
15:9, 15:18, 25:19,
28:7, 29:3, 29:7,
30:23, 31:2, 31:17,
31:19, 32:1, 32:3,
33:4, 33:6, 34:10,
35:19, 35:24
**MS** [23] - 2:18, 15:10,
16:5, 16:8, 16:24,
17:4, 17:7, 18:17,
19:5, 19:9, 19:23,
20:24, 21:2, 21:6,
21:23, 22:11, 23:3,
23:16, 23:20, 25:7,
25:16, 36:2, 36:5
**munger** [1] - 1:13
**Munger** [1] - 2:6
**mutagenicity** [1] -
24:4

## N

**name** [4] - 2:3, 18:13,
27:23, 31:1
**necessarily** [2] -
15:19, 30:9
**necessary** [4] - 5:16,
34:5, 36:21
**need** [15] - 3:15, 6:9,
10:18, 11:15, 14:22,
15:16, 17:12, 18:2,
19:15, 21:5, 22:5,
30:21, 35:10, 37:2
**needing** [1] - 34:21
**needs** [4] - 12:16,
14:25, 30:9, 35:1
**negative** [2] - 23:18,
28:13
**negotiated** [1] - 19:16
**never** [1] - 18:5
**new** [5] - 5:22, 18:23,
21:22, 25:13, 26:12
**next** [6] - 10:19, 11:9,
11:11, 27:24, 33:15,
35:11
**nobody** [1] - 8:20

**nondisclosure** [1] -
14:13
**nonexistent** [1] -
32:13
**normal** [1] - 22:18
**notes** [3] - 18:20,
24:3, 38:5
**nothing** [2] - 18:21,
20:8
**notice** [3] - 20:18,
22:6, 36:22
**number** [1] - 31:24
**NW** [5] - 1:13, 1:16,
1:18, 1:23, 38:12

## O

**objection** [1] - 22:9
**obviate** [1] - 15:16
**obviously** [3] - 2:24,
12:19, 34:6
**OCD** [24] - 3:25, 4:25,
5:3, 9:22, 13:25,
18:20, 20:2, 20:3,
20:4, 20:12, 21:10,
21:12, 26:21, 29:10,
29:11, 29:12, 32:7,
36:13, 36:15, 36:18
**OCL** [1] - 4:13
**OF** [3] - 1:1, 1:8, 38:1
**offer** [1] - 32:21
**offered** [2] - 8:5, 8:6
**office** [2] - 21:25, 27:9
**Office** [20] - 3:7, 3:9,
3:17, 4:7, 4:9, 4:20,
4:22, 5:3, 9:22, 10:7,
13:5, 13:7, 13:21,
25:24, 26:18, 26:20,
27:2, 28:9, 29:15,
32:4
**office's** [1] - 28:5
**Offices** [1] - 4:9
**Official** [2] - 1:22,
38:11
**OFFICIAL** [1] - 38:1
**often** [2] - 16:24,
18:10
**OLC** [1] - 27:3
**Olson** [2] - 1:13, 2:6
**once** [4] - 4:8, 27:18,
30:20, 34:8
**one** [16] - 4:15, 6:15,
7:16, 9:20, 13:20,
14:14, 14:16, 18:10,
21:8, 21:14, 23:4,
26:17, 32:6, 34:22,
36:5, 36:25
**ones** [1] - 23:22
**ongoing** [4] - 6:11,
6:20, 17:23

**opening** [1] - 6:7
**operating** [1] - 30:24
**opinion** [2] - 27:3,
27:25
**opportunity** [1] -
12:19
**opposition** [2] - 5:24,
5:25
**order** [6] - 3:5, 9:25,
22:22, 22:23, 32:22,
37:5
**ordinary** [1] - 31:23
**OS** [12] - 18:21, 20:4,
20:14, 21:9, 21:10,
21:11, 29:10, 29:11,
36:9, 36:14, 36:18
**OS's** [2] - 20:8, 20:11
**ought** [3] - 10:9,
12:16, 15:25
**outweighed** [1] -
23:10
**overall** [3] - 24:15,
26:23, 29:19
**overcome** [4] - 20:9,
22:19, 23:7, 23:18
**overwhelming** [8] -
3:22, 13:22, 14:3,
31:3, 31:20, 31:24,
32:3, 32:11

## P

**p.m** [1] - 37:6
**P.M** [1] - 1:6
**page** [2] - 19:25, 24:3
**paper** [1] - 27:10
**papers** [6] - 6:7, 7:11,
14:15, 25:1, 32:21,
34:23
**paragraph** [8] - 4:10,
7:17, 20:24, 26:10,
29:9, 36:6, 36:8,
36:16
**parallel** [1] - 14:7
**part** [4] - 4:1, 13:3,
21:24, 30:13
**parte** [5] - 22:10,
22:12, 34:4, 34:12,
34:25
**partially** [1] - 12:20
**parties** [1] - 19:14
**parties'** [2] - 25:1,
33:25
**party** [2] - 29:25, 30:3
**past** [4] - 2:12, 7:3,
10:21
**pending** [2] - 9:14,
10:24
**Pennsylvania** [1] -
1:16

**people** [1] - 11:5
**percent** [1] - 21:15
**perhaps** [1] - 34:22
**period** [3] - 11:2, 19:7,
19:13
**person** [2] - 27:24,
34:17
**person's** [1] - 28:4
**personal** [1] - 16:20
**perspective** [4] -
10:20, 11:1, 11:3,
29:14
**persuaded** [1] - 13:1
**pertaining** [1] - 25:13
**phrase** [1] - 28:14
**pieces** [1] - 27:10
**place** [1] - 34:1
**places** [1] - 16:3
**plaintiff** [2] - 2:6,
36:21
**Plaintiff** [2] - 1:4, 1:12
**plaintiff's** [3] - 2:4,
2:23, 15:13
**plaintiffs** [1] - 25:11
**plausible** [1] - 34:19
**play** [1] - 9:15
**PMTAs** [2] - 15:13,
22:8
**podium** [2] - 2:3, 36:3
**point** [28] - 2:25, 4:15,
6:17, 6:23, 7:9, 8:2,
9:20, 17:12, 17:15,
17:19, 17:21, 19:10,
21:19, 21:22, 22:23,
23:4, 26:2, 26:6,
29:9, 29:16, 33:22,
34:5, 34:25, 35:2,
35:14, 35:18, 35:20,
36:20
**points** [4] - 16:5,
17:11, 25:19, 36:5
**position** [4] - 22:11,
22:24, 34:2, 37:1
**positively** [1] - 23:11
**potential** [1] - 11:5
**potentially** [1] - 32:24
**powers** [1] - 32:13
**pre** [2] - 13:14, 19:24
**pre-decisional** [1] -
13:14
**pre-motion** [1] - 19:24
**precisely** [1] - 24:5
**precluded** [1] - 24:12
**prejudice** [1] - 19:15
**preliminary** [3] -
10:24, 11:4, 17:18
**premise** [1] - 12:21
**prepare** [1] - 19:17
**preparing** [2] - 22:2,
31:4

**present** [1] - 10:1
**presents** [1] - 2:13
**President** [1] - 28:20
**press** [3] - 10:3, 34:11
**pressing** [4] - 5:7, 5:8,
34:6, 34:12
**presumably** [1] - 27:7
**presumption** [2] -
22:13, 22:18
**pretext** [1] - 26:8
**pretextual** [1] - 4:25
**pretty** [2] - 7:17, 24:2
**priorities** [1] - 15:6
**prioritize** [1] - 11:15
**prison** [1] - 11:6
**privilege** [1] - 14:16
**problem** [5] - 29:14,
29:18, 31:16, 33:11,
35:9
**problematic** [2] -
26:13, 30:18
**procedural** [1] - 37:1
**procedures** [1] - 22:18
**proceed** [1] - 16:5
**proceeding** [2] - 6:19,
30:12
**proceedings** [1] - 38:6
**process** [16] - 6:11,
7:1, 12:10, 13:3,
14:1, 14:16, 15:23,
15:24, 17:24, 18:11,
19:11, 20:19, 28:1,
28:5, 29:15, 30:10
**produced** [2] - 3:5,
11:18
**product** [3] - 23:17,
28:13, 30:5
**products** [3] - 12:23,
24:20, 24:21
**project** [2] - 3:3, 5:14
**prompt** [1] - 32:22
**promptly** [3] - 10:16,
35:16, 37:5
**proposal** [3] - 20:11,
20:14, 36:14
**proposed** [1] - 20:4
**proposition** [1] -
19:19
**protection** [1] - 24:17
**provide** [1] - 3:2
**provided** [1] - 25:22
**providing** [2] - 22:9,
22:25
**public** [15] - 3:16, 5:7,
5:14, 9:6, 10:8,
10:10, 12:22, 14:11,
14:13, 16:1, 16:23,
16:25, 17:2, 17:3,
24:17
**purposes** [1] - 24:4

**push** [1] - 11:4
**put** [1] - 9:22
**putting** [1] - 21:18

## Q

**questions** [3] - 7:6,
13:12, 25:17
**quickly** [3] - 11:2,
11:13, 34:8
**quite** [6] - 5:20, 6:14,
7:25, 20:18, 22:6,
34:3
**quoted** [2] - 26:17,
29:10
**quoting** [1] - 26:15

## R

**raised** [2] - 12:14,
14:10
**RANDOLPH** [1] - 1:9
**range** [1] - 3:8
**rate** [2] - 24:19, 24:20
**rationale** [1] - 4:25
**reach** [2] - 17:18,
33:20
**reached** [7] - 4:22,
5:4, 18:6, 19:21,
21:11, 29:11, 30:7
**read** [3] - 21:2, 26:11,
32:16
**reading** [1] - 25:1
**Reading** [2] - 21:3,
21:7
**real** [4] - 4:5, 9:10,
11:8, 15:4
**realize** [1] - 34:1
**really** [9] - 2:25, 3:15,
7:19, 7:20, 8:17,
8:18, 11:12, 24:13,
31:22
**reason** [4] - 6:10,
22:17, 34:12, 35:6
**reasonable** [2] - 19:7,
21:20
**reasoned** [1] - 5:2
**reasons** [3] - 6:8,
10:16, 33:14
**rebut** [1] - 5:16
**recent** [1] - 13:17
**recommend** [2] -
15:12, 22:8
**recommendation** [2] -
13:4, 20:14
**recommendations** [1]
- 30:2
**recommended** [1] -
36:11
**recommending** [1] -

28:21
**recommends** [1] -
15:13
**record** [10] - 2:4, 2:11,
4:19, 9:23, 10:1,
21:2, 26:11, 30:13,
30:14, 30:20
**reference** [1] - 25:9
**reflects** [3] - 21:4,
21:8, 36:8
**Reform** [1] - 18:12
**regime** [1] - 18:23
**regularity** [1] - 22:13
**regulated** [2] - 29:25,
30:3
**regulatory** [3] - 15:23,
18:23
**reiterate** [1] - 22:4
**relatably** [2] - 17:22,
36:13
**related** [3] - 17:13,
23:25, 24:9
**relating** [1] - 25:1
**release** [6] - 10:3,
18:15, 29:2, 30:22,
31:9
**released** [3] - 14:24,
18:10, 31:14
**releases** [1] - 28:17
**relevant** [4] - 9:23,
9:24, 31:7, 31:20
**relied** [3] - 14:8, 18:5,
18:6
**rely** [1] - 30:16
**remedy** [1] - 30:19
**remember** [2] - 5:13,
18:12
**reminding** [1] - 31:1
**repeating** [1] - 31:19
**reply** [6] - 5:19, 6:7,
15:8, 17:16, 19:17,
36:24
**report** [3] - 5:14,
19:21, 27:23
**REPORTER** [1] - 38:1
**Reporter** [3] - 1:22,
1:22, 38:11
**represent** [5] - 15:11,
16:21, 17:21, 18:18,
25:7
**representation** [4] -
15:15, 15:16, 22:7,
36:10
**representations** [2] -
35:4, 35:6
**reputation** [2] - 16:1,
17:13
**request** [1] - 8:5
**requested** [1] - 33:15
**requesting** [1] - 35:14

**require** [3] - 5:3,
22:16, 30:19
**required** [1] - 11:1
**requirements** [1] - 5:2
**requires** [2] - 19:12,
26:3
**resistant** [1] - 22:25
**resolution** [2] - 8:4,
10:18
**resolve** [1] - 8:20
**resolved** [1] - 12:9
**resolving** [5] - 5:21,
35:16
**respect** [11] - 9:12,
13:21, 14:8, 15:20,
20:23, 26:9, 26:10,
29:14, 30:11, 30:18,
35:20
**respectfully** [1] - 37:1
**respects** [1] - 29:21
**respond** [5] - 11:2,
33:20, 33:23
**response** [5] - 10:10,
12:4, 16:6, 19:4,
33:1
**rest** [1] - 20:8
**rested** [1] - 24:10
**results** [1] - 14:2
**retained** [1] - 7:24
**return** [1] - 36:6
**revealed** [2] - 20:20,
20:21
**reversal** [1] - 6:25
**review** [16] - 3:3, 6:11,
12:10, 15:23, 17:23,
21:3, 21:8, 21:10,
22:12, 27:24, 29:11,
29:13, 34:12, 34:21,
34:25, 36:18
**reviewed** [3] - 20:12,
21:13, 29:12
**revisits** [1] - 18:2
**rise** [1] - 9:21
**risk** [10] - 9:7, 14:4,
14:10, 18:11, 18:16,
18:17, 24:7, 25:3,
25:9, 32:13
**risks** [6] - 24:1, 24:12,
24:13, 24:14, 24:23,
25:3
**RMR** [2] - 1:22, 38:10
**roll** [1] - 12:19
**Room** [2] - 1:23, 38:11
**ruling** [1] - 21:19
**run** [2] - 9:15, 9:16

## S

**scale** [1] - 27:22
**schedule** [10] - 6:14,

6:21, 8:23, 11:20,
11:22, 12:11, 12:13,
32:24, 33:9, 33:19
**scheduled** [1] - 19:3
**SCHEDULING** [2] -
1:4, 1:8
**scheduling** [4] - 2:25,
4:2, 5:9, 25:2
**science** [1] - 14:1
**Science** [20] - 3:7, 3:9,
3:17, 4:7, 4:9, 4:10,
4:20, 4:22, 5:3, 9:22,
10:8, 13:5, 13:8,
13:22, 25:24, 26:18,
26:20, 28:9, 29:16,
32:4
**scientific** [1] - 15:21
**scientists** [4] - 13:24,
27:20, 31:3, 31:5
**second** [9] - 3:3, 3:7,
4:12, 5:13, 20:23,
25:2, 30:17, 34:18,
36:16
**secondly** [1] - 36:16
**secret** [1] - 4:12
**see** [9] - 7:17, 12:25,
17:6, 22:17, 22:22,
24:2, 31:12, 32:23,
34:13
**seem** [2] - 10:12,
26:11
**sees** [1] - 35:21
**Sefranek** [3] - 1:22,
38:10, 38:10
**SEFRANEK** [1] - 38:3
**sense** [1] - 33:9
**sentence** [2] - 26:16,
29:10
**sentences** [2] - 11:5,
26:17
**separate** [1] - 34:15
**series** [1] - 34:19
**serious** [2] - 3:11,
14:5
**set** [5] - 7:20, 12:11,
17:8, 18:23, 33:19
**setting** [1] - 16:11
**settled** [2] - 5:18, 6:7
**seven** [1] - 33:4
**several** [3] - 6:8,
10:19, 25:22
**short** [1] - 19:16
**show** [1] - 30:25
**showed** [1] - 24:18
**showing** [1] - 18:14
**sic** [1] - 4:13
**signature** [2] - 16:17,
16:19
**signed** [7] - 4:8, 4:12,
7:14, 16:14, 27:23,

34:16
**signing** [1] - 16:17
**signs** [2] - 28:9, 28:23
**similar** [2] - 13:18,
27:25
**simply** [4] - 16:19,
17:20, 18:4, 23:6
**sitting** [1] - 8:20
**situation** [4] - 8:10,
9:9, 26:4, 34:21
**six** [2] - 5:25, 19:25
**six-page** [1] - 19:25
**sleeves** [1] - 12:19
**slow** [1] - 21:5
**slowly** [1] - 36:4
**someone** [1] - 30:6
**sometimes** [3] -
23:18, 27:4
**sooner** [2] - 35:20,
35:21
**sorry** [2] - 18:24, 32:1
**sort** [1] - 26:25
**sorts** [2] - 27:19
**sound** [1] - 14:15
**speaking** [3] - 2:8,
2:9, 24:6
**specific** [2] - 23:22,
24:8
**speculative** [1] - 14:11
**standard** [2] - 23:12,
24:16
**start** [1] - 21:6
**starting** [2] - 2:4,
10:21
**State** [1] - 9:1
**state** [2] - 2:3, 17:13
**statement** [1] - 10:10
**States** [2] - 1:23, 2:19
**STATES** [2] - 1:1, 1:10
**statute** [4] - 3:8, 4:18,
7:15, 26:2
**stenographic** [1] -
38:5
**step** [2] - 12:10, 28:1
**still** [5] - 10:4, 10:6,
12:13, 12:24, 28:3
**story** [1] - 26:9
**Street** [2] - 1:13, 1:18
**strictly** [1] - 18:7
**strike** [1] - 10:16
**struck** [1] - 35:9
**study** [1] - 27:21
**subject** [2] - 3:24,
26:21
**submission** [6] -
11:24, 12:10, 22:16,
25:21, 33:8, 34:4
**submitted** [4] - 4:11,
27:24, 28:25, 29:1

**substance** [2] - 2:24, 20:23
**substantial** [1] - 35:12
**suits** [1] - 9:14
**summary** [5] - 4:11, 7:11, 12:5, 12:20, 20:1
**superiors** [1] - 13:25
**supervision** [2] - 3:25, 26:21
**supervisory** [2] - 18:20, 18:22
**supplement** [1] - 29:4, 29:7, 30:20
**support** [2] - 4:11, 25:5
**suppose** [1] - 25:4
**supposed** [1] - 27:11
**surmise** [1] - 4:22
**surmised** [1] - 26:5
**suspect** [1] - 33:20
**suspicion** [2] - 3:14, 9:21
**switching** [1] - 24:19

**T**

**table** [1] - 2:20
**talks** [1] - 36:17
**Tamara** [3] - 1:22, 38:10, 38:10
**TAMARA** [1] - 38:3
**technical** [3] - 3:3, 5:14, 24:2
**teen** [1] - 10:5
**terms** [3] - 7:10, 24:6, 33:7
**terrorism** [1] - 10:21
**THE** [62] - 1:1, 1:1, 1:9, 2:7, 2:17, 2:23, 3:17, 4:3, 5:8, 5:11, 6:5, 6:12, 6:14, 6:21, 7:3, 7:8, 8:16, 8:22, 9:4, 10:15, 12:2, 12:18, 14:19, 15:7, 15:14, 16:4, 16:7, 16:23, 17:1, 17:6, 18:9, 19:1, 19:6, 19:18, 20:21, 21:1, 21:5, 21:17, 22:9, 22:24, 23:13, 23:17, 25:1, 25:15, 25:18, 26:24, 28:11, 29:5, 29:20, 31:1, 31:8, 31:18, 31:22, 32:2, 32:15, 33:5, 33:11, 35:2, 35:22, 35:25, 36:4, 37:4
**they've** [3] - 26:6, 30:4, 30:16

**thinking** [1] - 32:18
**thinks** [3] - 12:11, 15:2, 30:3
**three** [2] - 7:3, 36:23
**tied** [1] - 22:1
**timetable** [1] - 12:16
**timing** [1] - 7:10
**tobacco** [1] - 24:21
**today** [5] - 11:24, 12:3, 22:3, 36:10, 37:2
**today's** [1] - 24:4
**together** [2] - 2:12, 7:6
**Tolles** [1] - 1:13, 2:6
**tomorrow** [3] - 12:4, 35:11, 36:23
**took** [2] - 5:24, 8:7
**topics** [1] - 24:9
**toxicological** [15] - 18:7, 20:6, 20:10, 20:12, 20:15, 23:5, 23:14, 23:21, 24:12, 24:23, 24:24, 25:3, 25:4, 25:9, 25:25
**toxicology** [8] - 4:19, 16:11, 18:8, 23:23, 24:9, 25:10, 25:13, 25:21
**TPL** [37] - 3:7, 4:8, 4:12, 6:18, 13:21, 15:12, 16:11, 17:5, 18:1, 18:5, 18:8, 18:19, 20:23, 21:3, 21:8, 21:13, 23:14, 23:23, 24:9, 24:24, 24:25, 25:2, 25:5, 25:8, 25:10, 25:14, 26:18, 28:10, 28:16, 28:17, 29:1, 29:13, 30:17, 31:11, 34:18, 36:11, 36:17
**TPL's** [2] - 21:9, 36:9
**TPLs** [4] - 16:10, 18:10, 20:5, 34:15
**TPO** [1] - 16:13
**tradeoffs** [1] - 24:22
**train** [2] - 18:24, 19:2
**TRANSCRIPT** [1] - 1:8
**transcript** [2] - 38:4, 38:6
**treatment** [1] - 15:6
**tree** [2] - 11:19, 11:25
**trial** [4] - 8:24, 10:21, 10:23
**troubled** [1] - 7:25
**true** [2] - 38:4, 38:5
**try** [2] - 9:25, 24:5
**turn** [2] - 15:14, 34:7
**two** [20] - 4:7, 7:6, 7:18, 9:17, 10:21, 11:11, 12:10, 18:12,

20:3, 20:12, 21:24, 22:2, 24:2, 33:1, 33:9, 33:16, 33:23, 34:11, 34:15, 36:5
**two-step** [1] - 12:10
**two-week** [1] - 33:9
**typically** [4] - 16:24, 17:2, 17:5, 31:10

**U**

**U.S** [1] - 1:18
**ultimate** [4] - 10:13, 31:10, 31:24, 32:4
**ultimately** [1] - 24:10, 29:25
**unaddressed** [1] - 25:5
**under** [9] - 4:18, 5:2, 7:15, 8:8, 18:15, 30:10, 30:21, 30:24, 33:9
**underlying** [1] - 24:24
**underscores** [1] - 17:14
**unique** [1] - 28:20
**UNITED** [2] - 1:1, 1:10
**United** [2] - 1:23, 2:19
**unless** [1] - 25:16
**unqualifiably** [1] - 15:11
**unusual** [3] - 18:22, 34:13, 34:20
**up** [11] - 10:23, 11:19, 11:25, 12:19, 13:9, 18:23, 20:14, 22:1, 27:16, 30:5, 35:21
**update** [1] - 18:13
**urgency** [11] - 4:5, 5:21, 5:22, 9:11, 9:16, 11:3, 11:7, 11:8, 32:18, 33:14
**urgent** [3] - 3:15, 6:8, 35:11
**users** [1] - 24:19

**V**

**value** [1] - 24:21
**Vanda** [1] - 13:17
**vaping** [1] - 10:5
**vast** [1] - 28:8
**Vaughn** [3] - 5:23, 7:10, 25:12
**verify** [1] - 15:15
**VERRILLI** [37] - 1:12, 2:5, 3:1, 3:19, 4:4, 5:10, 6:3, 6:6, 6:13, 6:16, 6:24, 7:5, 7:9, 8:17, 8:24, 9:6,

11:14, 12:6, 13:11, 14:25, 15:9, 15:18, 25:19, 28:7, 29:3, 29:7, 30:23, 31:2, 31:17, 31:19, 32:1, 32:3, 33:4, 33:6, 34:10, 35:19, 35:24
**Verrilli** [7] - 2:6, 2:11, 15:14, 20:24, 25:18, 32:25, 36:7
**Verrilli's** [2] - 16:6, 18:9
**view** [10] - 9:21, 12:8, 17:14, 22:4, 23:1, 27:9, 27:11, 27:20, 28:5, 30:7
**views** [7] - 16:20, 17:17, 20:9, 27:5, 30:1, 31:15
**violate** [1] - 30:15
**virtually** [1] - 14:6
**voluntarily** [2] - 3:4, 8:14
**vs** [2] - 1:5, 2:2

**W**

**waiting** [1] - 6:23
**walked** [1] - 7:22
**wants** [2] - 9:1, 32:20
**warranted** [3] - 3:14, 11:21, 12:14
**Washington** [6] - 1:5, 1:14, 1:16, 1:19, 1:24, 38:12
**weaning** [1] - 36:4
**website** [5] - 10:4, 10:6, 10:11, 13:9, 30:5
**week** [6] - 11:9, 21:25, 33:9, 33:22, 36:24
**weeks** [8] - 5:25, 10:19, 11:12, 21:24, 22:3, 33:1, 33:23, 36:23
**weighing** [1] - 30:10
**welcome** [2] - 2:7, 2:10
**whole** [1] - 26:2
**WILCOX** [2] - 1:15, 2:15
**Wilcox** [1] - 2:16
**withheld** [2] - 21:8, 23:7
**withholding** [1] - 26:17
**word** [1] - 36:1
**words** [1] - 24:2
**works** [1] - 23:12
**world** [1] - 30:3

**worried** [1] - 13:8
**writing** [2] - 13:24, 32:17
**written** [2] - 28:19, 28:21

**Y**

**years** [1] - 2:12
**yourself** [1] - 29:18
**youth** [1] - 24:20