```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3      JUUL LABS, INC.,                ) Civil Action
                                       ) No. 1:22-cv-2853
4                     Plaintiff,       )
                                       ) MOTION HEARING
5      vs.                             )
                                       )
6      FOOD & DRUG ADMINISTRATION,     ) Washington, D.C.
                                       ) December 1, 2023
7                     Defendant.       ) Time:  1:40 P.M.
       _____
8
             TRANSCRIPT OF MOTION HEARING HELD BEFORE
9            THE HONORABLE JUDGE RANDOLPH D. MOSS
                  UNITED STATES DISTRICT JUDGE
10     _____

11
                       A P P E A R A N C E S
12

13     For Plaintiff:           JASON M. WILCOX
                                 Kirkland & Ellis, LLP
14                               1301 Pennsylvania Avenue, NW
                                 Washington, DC 20004
15

16     For Defendant:           ANTONIA M. KONKOLY
                                 MARCIA BERMAN
17                               U.S. Department of Justice
                                 1100 L Street, NW
18                               Washington, DC 20005

19     _____

20

21
       Court Reporter:          Tamara M. Sefranek, RMR, CRR, CRC
22                               Official Court Reporter
                                 United States Courthouse, Room 6714
23                               333 Constitution Avenue, NW
                                 Washington, DC  20001
24                               202-354-3246

25
```

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Civil Case 22-2853, Juul Labs,

3    Inc. v. Food & Drug Administration.

4              Would counsel please approach the podium, state your

5    name for the record, starting with plaintiff's counsel.

6              MR. WILCOX:  Good afternoon, Your Honor.  Jason

7    Wilcox from Kirkland & Ellis on behalf of Juul Labs.  I'm

8    joined today by my colleague, Joseph Schroeder.

9              THE COURT:  Okay.  Good afternoon.

10             MS. KONKOLY:  Good afternoon, Your Honor.  Antonia

11   Konkoly from the Department of Justice on behalf of the U.S.

12   Food & Drug Administration.

13             With me, I have Marcia Berman, also from the

14   Department of Justice; and Will Thanhauser from the FDA.

15             THE COURT:  All right.  Thank you for being here as

16   well.  So we're here on cross-motions for summary judgment.

17             And I believe that it's the FDA that filed the first

18   motion, so why don't you lead things off.

19             MS. KONKOLY:  Thank you, Your Honor.  I'd like to

20   begin this afternoon by emphasizing what is a very basic but

21   also a very, very crucial point for purposes of this case,

22   which is that the decisional document in the context of the

23   specific regulatory process that is at issue here, in other

24   words, the FDA's assessment of premarket tobacco applications,

25   is either a marketing granted order, an MGO, or a marketing

1    denial order, the MDO.

2              I'm starting here because there has been -- the

3    plaintiff has made a number of efforts to characterize the

4    underlying TPL review memo that is often adopted by the actual

5    decisional document as itself the decisional document.

6              THE COURT:  I noticed that.

7              MS. KONKOLY:  That is not the case.  The MDO or the

8    MGO is the decisional document.

9              The TPL is where an experienced staff scientist in

10   the Office of Science assesses all the underlying disciplined

11   review memos, puts them together, and makes an aggregate

12   recommendation to the decision-maker as to how the PMT in

13   question should be assessed.

14             But the TPL memos themselves are always necessarily

15   predecisional and deliberative documents by their very nature

16   in the way they are drafted.  Now, typically, the MDO or the

17   MGO will adopt the reasoning proposed by the TPL memo.  And

18   when that happens, the underlying TPL, pursuant to the adoption

19   doctrine, loses its protected status under the privilege.

20             So here, the decisional document is the June 23rd,

21   2022, MDO.  And prior to the issuance of that MDO, the process

22   that was followed was that the Office of Science determined to

23   propose to OCD, which is the office within CTP that has

24   supervisory authority over the entire -- over the entirety of

25   CTP and can exercise supervisory authority and weigh in on any

1    PTMA that it chooses to.

2         OS determined to propose to OCD that they deny Juul's

3    PMTAs on the basis of four identified toxicological

4    deficiencies which they assessed to be dispositive of the

5    entire application, meaning that there was nothing in the

6    remainder of the application that could suffice to outweigh

7    those toxicological deficiencies no matter how the rest of the

8    application was assessed.

9         So in furtherance of that proposal, OS -- the TPL in

10   the Office of Science authored two TPL memos.  The first was

11   the toxicology TPL, which has been released, which sets forth

12   that proposal in some detail as to what those four

13   toxicological deficiencies were and why they assessed them to

14   be dispositive.  Separately, she authored an additional

15   disciplines TPL, which assessed all of the other disciplines

16   and all of the other information contained within the

17   application.

18        Consistent with the MDO and the toxicological TPL,

19   the additional disciplines TPL also recommended that the

20   application should be denied.  Now, whether the TPL identified

21   additional reasons beyond those identified within the

22   toxicological TPL itself is not the final assessment of the

23   agency and what is protected -- it's part of what is protected

24   here by the deliberative process privilege.  But it did concur

25   in the recommendation that the applications be denied.

1          So as reflected by the record and specifically by the

2     OCD memorandum that we put in, OS sent both of those TPL

3     memorandums up to OCD, which, as I noted, had invoked its

4     supervisory authority here over these applications and informed

5     OS that it was going to weigh in on any proposed conclusions

6     before those were made final.

7          OS reviewed the toxicological TPL and agreed that the

8     toxicological deficiencies that were identified there were

9     dispositive, and so it expressly did not reach the -- the

10    assessments of the remaining disciplines found in that

11    additional TPL memo.

12         After OCD provided its concurrence, OS issued the MDO

13    that adopted the toxicological TPL, and that TPL only.  Thus,

14    both of the TPLs were predecisional, but only one was adopted.

15    And that is the one that's been disclosed here.

16         I would note, with respect to the adoption doctrine,

17    that Juul carries the burden to demonstrate that the agency has

18    adopted the decisions that they're seeking if their position is

19    that those documents are final because they have been adopted;

20    and there is simply no evidence in the record that would

21    contravene the FDA's evidence that it has not been adopted.

22         THE COURT:  But the FDA bears the burden with respect

23    to foreseeable harm.

24         MS. KONKOLY:  Sure.

25         THE COURT:  And I think there's a version of the same

1    argument that Juul is making with respect to foreseeable harm.

2    That is an issue that I wanted your help with today.

3              MS. KONKOLY:  The harm?

4              THE COURT:  Well, foreseeable harm; and, in

5    particular, there seems to be a disagreement among the parties

6    about how often and under what circumstances the FDA releases

7    the -- I've got to get the phrasing right here -- releases the

8    discipline review memos, and I guess the extent to which Judge

9    Cooper's decision in the *Vanda Pharmaceuticals* case is on

10   point.

11             I was just noticing, I think in the second German

12   declaration, what it says is that the agency has released such

13   memos that were considered, reviewed, or relied on in the

14   aforementioned TPL review memos in response to FOIA requests

15   with appropriate redactions.

16             So what I want to make sure I understand is whether

17   the discipline review memos are typically released only when

18   the reasoning and analysis in those memos is adopted or whether

19   they're released where it's not adopted but where the agency

20   says in the TPL review memo, we've read this and considered the

21   discipline review memo, but here's why we think it's wrong for

22   three reasons.  Would you release those memos -- does the

23   agency release the memos then or maybe it doesn't get down to

24   that -- maybe there's not that sort of expression of

25   disagreement that occurs when it happens?

1          What I'm trying to get my head around is whether --

2     if you're an FDA scientist and you're preparing a discipline

3     review memo, whether you say to yourself, this is only going to

4     be made public if the agency ultimately agrees with my

5     recommendation and my analysis, or whether you say to yourself,

6     you know, look, I'm a scientist, and I'm a grownup, and

7     sometimes they agree and sometimes they disagree, and that's

8     fine, and they're going to release it either way.  When I

9     prepare it, I'm aware of that.

10          MS. KONKOLY:  So, Your Honor, we identified two

11     harms --

12          THE COURT:  Right.

13          MS. KONKOLY:  -- that we believe would follow from

14     disclosure here.

15          THE COURT:  Right.

16          MS. KONKOLY:  The first is public confusion.  But I

17     believe the one that your question goes to is the second one,

18     the chilling.

19          THE COURT:  Which I think actually the order was.  I

20     think you made the chilling one first.

21          MS. KONKOLY:  That might be the case.

22          THE COURT:  I think you wisely rely on that

23     predominantly because that really is the one that goes most

24     directly to the purposes of the deliberative privilege.  And to

25     the extent that the foreseeable harm has to go to the purposes

```
1   of the privilege, I do think that's the predominant rationale

2   at least.

3              MS. KONKOLY:  Okay.  I would like an opportunity to

4   address confusion too.

5              THE COURT:  Of course.

6              MS. KONKOLY:  I'll start with the chilling harm.

7              THE COURT:  Yes.

8              MS. KONKOLY:  First, a point of clarification, the

9   harm that we articulate in our declarations and I believe

10  specifically in the first Mital declaration is where it's set

11  out, is a chilling harm to the ongoing supervisory review that

12  is happening now.

13             THE COURT:  Right.

14             MS. KONKOLY:  So, in other words, it's not -- the

15  articulation there is not a chilling of the scientists who are

16  authoring the discipline review memos, but to the personnel who

17  are conducting the presently ongoing further supervisory

18  review.

19             THE COURT:  And I noted that.  Am I correct to assume

20  that that review includes within its scope all of the

21  discipline review memos of both of the TPLs, not to ask you to

22  disclose what the agency is focusing in on today, because

23  that's the whole point in saying, well, here's the one that we

24  think is dispositive or not dispositive?

25             But I just want to clarify that they all fall within
```

1    the scope of the ongoing review.

2         MS. KONKOLY:  Your Honor, what I think I can say to

3    that is potentially.

4         THE COURT:  Yes.

5         MS. KONKOLY:  I'm not in a position to confirm that

6    necessarily, but potentially, my understanding is that that

7    ongoing review could sweep that far.

8         THE COURT:  That's the reason that I framed the

9    question the way I did.  I understand you may not want to

10   disclose -- and you're not required to disclose -- what the

11   agency is thinking at this particular moment or what it's

12   focused on.

13        But I think you may be using the word potentially in

14   the way I'm using just the word scope in that it is something

15   that they might consider -- it's there, and it is available to

16   them to consider, and their best scientific judgment is they're

17   going forward.

18        MS. KONKOLY:  Right.  So to be clear, again, the

19   personnel who we have articulated the harm, the chilling harm,

20   would fall upon would be those agencies at that level who are

21   conducting the supervisory review.  And the harm would follow

22   from the disclosure of any of these underlying documents that

23   are withheld at the moment.

24        Because they were not part of any TPL that was

25   adopted, none of them were considered in the process that led

1    up to and was encompassed by the final agency decision that

2    was, in fact, issued by the agency.

3            So that distinguishes those documents from the

4    discipline review memos that were considered in the toxicology

5    TPL and then were adopted because, once the agency has issued

6    its decision, to the extent that the further supervisory review

7    may evolve in its thinking or change something, then, of

8    course, the agency has an obligation to explain any change in

9    its thinking in that further review.

10           But as to all the memos that are withheld, they never

11   were considered within the scope of anything that became a

12   final agency decision.  So disclosing any of the withheld TRMs,

13   or especially the additional disciplines TPL, would give Juul a

14   peek behind the curtain into unfinished deliberations.

15           THE COURT:  Yes.  And my understanding of your

16   argument was even a step beyond that, and that it could

17   actually affect the decision-making process.  And so, for

18   example, if you're a supervisor and you disagree in the margin

19   with -- at the margin with the view of a very well-respected

20   and experienced scientist, if it's public, you might be more

21   inclined to simply say, I agree.  But if it's not public, it's

22   a little easier to say, well, I actually do have some slight

23   disagreement.

24           And that's -- that's how I understood your argument.

25   Is that accurate?

```
1          MS. KONKOLY:  I think that's a fair summary, Your

2     Honor.

3          THE COURT:  It did -- it brought to my mind when I

4     was reading the argument that when the Dobbs decision was

5     leaked, there was a lot of discussion in the public about

6     whether the leaking of the decision could have any effect on

7     the Supreme Court's deliberations.

8          I don't have any reason to think that it did in that

9     case, but I -- it sounded a familiar note for that reason.

10    Because I do think that you're right in that showing what

11    recommendations or deliberations are ongoing publicly, when

12    there's an ongoing deliberation, can, potentially at least,

13    have an effect on what the decision-maker does.

14          But just to get back to the core point here, I

15    understand that's the argument you're making here.  Are you not

16    making the other argument that I was spitting out with respect

17    to the -- instead of top-down/bottom-up argument, and if you

18    are making it, what is the --

19          MS. KONKOLY:  So we would distinguish Vanda, because

20    Vanda is bottom-up, and we're making a top-down argument.

21          THE COURT:  Right.

22          MS. KONKOLY:  However, there is one limited sense in

23    which we think Vanda -- if the Court were to find it

24    persuasive, I would note that FDA disagrees with that decision,

25    and it's not binding on this Court here.
```

```
 1                    THE COURT:  Right.

 2                    MS. KONKOLY:  But insofar as the Court found the

 3      reasoning there which found the key fact to be, did the authors

 4      of these review memos at the time they were authoring those

 5      memos have an expectation that their work would remain

 6      confidential.  That same fact pattern, to the extent the Court

 7      finds Vanda persuasive, does apply to one document here, which

 8      is the additional disciplines TPL because I think, as reflected

 9      by the record, by the very nature of the proposal, the proposal

10      was -- we think you can deny this application in full based on

11      these dispositive toxicological deficiencies, and we're going

12      to go ahead and say what we think and propose about everything

13      else over here.  But if you accept our proposal as to the

14      toxicological deficiencies, then you don't need to reach

15      anything in this additional memo in order to resolve the

16      application.

17                    OCD did concur with that application, and so we think

18      there was an expectation, you know -- a reasonable expectation

19      of likely confidentiality when that proposal was made and when

20      those two -- when the decision was made to bifurcate the

21      analysis into those two memorandums.

22                    THE COURT:  Did you say that OCD concurred with the

23      view that the second TPL recommendation was correct or --

24                    MS. KONKOLY:  They didn't reach it.

25                    THE COURT:  I thought what happened is that it was --
```

1    Dr. Holman signed a concurrence, not necessarily an approval,

2    in the same way that he would have with respect to adopting the

3    reasoning, but that he -- I guess, as a reviewer, he signed off

4    on it.

5         But the understanding at the time was that OCD had

6    indicated that it was retaining final decision-making

7    authority.  Therefore, he was not the final decision-maker.

8    And so that was a review decision rather than a final decision.

9         MS. KONKOLY:  A slight clarification, Your Honor,

10   just to be very precise.

11        THE COURT:  That's what I want.

12        MS. KONKOLY:  So what OS -- I'm sorry.  What CTD

13   informed OS is that they were invoking their supervisory

14   authority, and they wanted to review any proposed findings from

15   the Office of Science before any of those findings became

16   final.

17        So OS made its proposal, and this is in -- most

18   clearly in the OCD memo.  It's in both memorandums up to OCD,

19   and they read the toxicological one, and they agreed with the

20   proposal there.  And so then, after they expressed that

21   concurrence, then Dr. Holman was the person who exercised his

22   delegated authority to sign that TPL and also the MDO that

23   adopted the reasoning of just the toxicological TPL.

24        THE COURT:  I appreciate the refinement, but I get

25   that.  Thank you.

```
 1              MS. KONKOLY:  So I'm sorry, I confess I lost track of
 2       the question you had right before that.
 3              THE COURT:  I think I was just -- well, I think maybe
 4       it was with respect to other than the second TPL and with
 5       respect to the discipline review memos.
 6              As to those, do you think that's distinguishable from
 7       Vanda because they are not -- there's not an expectation those
 8       will be made public unless there's a concurrence or an
 9       adoption?
10              MS. KONKOLY:  Your Honor, with respect to the
11       discipline review memos and the bottom-up Vanda argument, we do
12       have a clarification that we narrow our argument at this point
13       in time.  We would only take the position that the Vanda
14       analysis, if the Court finds it persuasive, it applies to the
15       additional disciplines TPL, but we are not taking the position
16       that the authors of the disciplined review memos have an
17       expectation of confidentiality at the time they make -- they
18       author those decisions.
19              That said, the top-down harm that we have articulated
20       sweeps in everything because disclosure of that would affect
21       the ongoing process and chill the decision-maker who has an
22       active decision to make.
23              THE COURT:  Okay.  Is there any public statement with
24       respect to the timing of this additional review process?
25              MS. KONKOLY:  Your Honor, no.  I don't have anything
```

1    to report on that.  I am aware that Juul just submitted, I

2    believe, a large swath of new information for consideration in

3    that further ongoing review.

4           Perhaps, plaintiff's counsel can tell you more about

5    that.  I do know that the proceedings are still stayed and the

6    ongoing review is still actively ongoing.

7           THE COURT:  Okay.  Thanks.

8           MS. KONKOLY:  If I could address the confusion harm

9    while we're on the subject of harm as well?

10          THE COURT:  Yes.

11          MS. KONKOLY:  So for the reasons I addressed at least

12   in part, if possible, I think there are a few things I'd like

13   to go back and hit on the underlying deliberative process

14   privilege before I'm done.  We certainly take the very strong

15   position that none of the withheld documents are final.

16          However, both the additional disciplines TPL and the

17   discipline review memos look a lot like other TPLs that have

18   been adopted.  They look a lot like DRMs that are assessed by

19   TPLs that have been adopted.

20          And we think, should they be released, they have a

21   very substantial likelihood that they would cause public

22   confusion that they are, in fact, the agency's final views on

23   the subjects that they address, when they are not by virtue of

24   the process that the FDA followed here.

25          THE COURT:  The foreseeable harm requirement is a

1    relatively new one.  And the law is still, I think, under

2    development with respect to that.

3              But my recollection and understanding is that it has

4    to be a foreseeable harm that relates to the purpose of the

5    particular privilege or reason for -- or exemption at issue.

6    And so the foreseeable harm with respect to Exemption 6 might

7    be the harm to people's privacy and that they could be subject

8    to harassment.

9              And with the respect to the deliberative process

10   privilege, at least it's been my understanding -- but I'm open

11   to being persuaded otherwise -- is that it does need to be

12   related to the purposes of the privilege itself.  It may be

13   there's a way to tie it back here and perhaps multiple ways to

14   do so with respect to confusion.

15             For example, I can imagine a world in which -- again,

16   FDA scientists and officials might be reluctant to put things

17   on paper if they thought it was going to cause -- be released

18   and cause public confusion and, therefore, they might be -- it

19   might affect how they write things.  I certainly think you

20   might, if you're doing a draft or a TPL in the future, and you

21   know -- like in a case like this, which I take it is somewhat

22   unusual -- where there are two TPLs and one might not get

23   released, the one you're not so sure about getting released,

24   you might throughout the document put in bold, our preliminary

25   tentative possible view is the following, but it's not our

1     final view, and we haven't reached final conclusions on it.  So

2     it could affect what you're doing.

3          I suppose my question for you is, am I right in

4     thinking that it does -- the foreseeable harm has to be tied to

5     the purposes of the deliberative process privilege, and, if so,

6     what's your argument as to how that's done here?

7          MS. KONKOLY:  Your Honor, I agree this is a

8     developing area of law, and there are cases that emphasize that

9     that nexus needs to be drawn.

10         I don't think that it is necessarily consistent with

11    what the case law says in this area at this time.  But insofar

12    as Your Honor is looking for a nexus, I think, with respect to

13    public confusion, it would be that the deliberative process

14    privilege, you know, exists so that, among other purposes, it

15    stands for the principle that an agency should be judged based

16    on what it decided, not what it considered.

17         So the harm to FDA would be that the public is

18    confused and is judging the agency based on preliminary

19    findings that did not become a final decision on the part of

20    the agency.

21         There is quite a lot of public interest in the FDA's

22    new regulatory authorities in this tobacco space, as you can

23    imagine.  And that would be the harm insofar as it ties back to

24    the deliberative process privilege itself.

25         We did go beyond that and articulate the confusions

1    that could -- we're down to public health in this space.

2    Potentially, if members of the public were to see these initial

3    assessments and understand them to be the FDA's final

4    pronouncements and make decisions for themselves about the

5    safety of, you know, using or consuming electronic e-cigarette

6    products --

7            THE COURT:  Is there anything in the declarations or

8    Vaughn Index that ties foreseeable harm back to purposes of the

9    exemption?

10           MS. KONKOLY:  I think the clearest articulation is in

11   paragraph 24 of the first Mital declaration.  It's Docket

12   No. 16-2.

13           THE COURT:  Paragraph what?

14           MS. KONKOLY:  24.  So it explains that the FDA has

15   not yet reached a conclusion as to the potential benefit to

16   adults as compared to the risk to youth posed by tobacco or

17   menthol products.

18           That's a restatement of the "appropriate for the

19   public health" approval standard in the TCA, which,

20   essentially, requires the FDA to make a net -- it's a net

21   balancing test to make a finding of a net benefit to public

22   health; you know, considering the risks to nonusers of adoption

23   and to become a tobacco user weighed against the benefits that

24   they may have to sustain combustible tobacco users to quit

25   smoking.  And that's the ultimate assessment that the FDA needs

1    to make in order to approve any ENDS product.

2             While we're on the subject of confusion, Your Honor,

3    I would like to emphasize that Juul itself made a number of

4    representations the last time we were here in April and in some

5    of its filings as to what it intends to do with the documents

6    to use them in other judicial tribunals.

7             Obviously, in the context of FOIA, there are no

8    protective orders, there's no strings attached to any release

9    that would be made.  So they would be free to do with these

10   documents as they like.

11            They have certainly indicated an intention to present

12   the FDA's findings in the deliberative documents as the

13   agency's final word, which they are not.  Again, we see a very

14   straight line from that -- from those representations to a

15   reasonable conclusion that disclosure would cause public

16   confusion here.

17            I would also note that in their reply brief, they --

18            THE COURT:  With respect to the -- I'm perhaps

19   sounding a little bit like a broken record on this.

20            I'm convinced you're right about public confusion,

21   but I can't step into the role of the FDA and add to what's in

22   its declarations or Vaughn Index, and I do think that there's

23   substantial precedent -- just the language and history of the

24   foreseeable harm requirement ties it back to the purposes of

25   the exemption.

1           And so I'm -- the only issue I'm really struggling

2     with on the confusion issue is whether there's enough here in

3     the record for me to say that the FDA has made a determination

4     that that type of confusion would have an effect on

5     deliberations.

6           MS. KONKOLY:  Well, Your Honor, we have put in the

7     rationale that we have in the record currently.  If you would

8     like a little more specificity, I think the agency could submit

9     a supplemental declaration that breaks it down a little bit

10    further.  We would certainly welcome that opportunity to do so.

11          THE COURT:  Okay.

12          MS. KONKOLY:  One case I would point you to on the

13    confusion harm that didn't -- it found a public harm from -- it

14    found that the agency had articulated a harm that would flow

15    from disclosure in the form of public confusion.  It wasn't

16    tied back strictly to the privilege itself.

17          This was the Public Employees for Environmental

18    Responsibility case that we cited in our reply brief.  It was

19    from this court in 2021.  And it involved a strategic national

20    risk assessment that DHS issued, and the court agreed that the

21    agency had articulated that premature disclosure of this

22    nonfinal assessment of risks may result in members of the

23    public taking action on potential threats and hazards where no

24    action is warranted.  And that that kind of public confusion,

25    the just, sort of, you know, commonsense harms that could flow

1    from that kind of confusion suffice to meet the agency's

2    burden.

3              THE COURT:  It may be that what's going on in some of

4    these cases is that judges are filling in what the, I think,

5    not terribly controversial step is; and, particularly, when

6    you're dealing with a public health agency like the FDA, that

7    if they think their -- disclosure of their internal

8    deliberations could affect the public health, that -- through

9    confusion, that that would affect their deliberations.

10             I'm just really raising a question more of crossing

11   the T's and dotting the I's because there is D.C. Circuit

12   precedent, but also I think it's even the language of the

13   foreseeable harm provision itself talks about the harm to the

14   interests related to the exemption.

15             MS. KONKOLY:  I would also note that *Vanda* had a

16   public confusion analysis, and there *Vanda* did reject the FDA's

17   public confusion assertion.  But in doing so, it noted a number

18   of safeguards in the realm of public health that simply have no

19   analogy there.

20             Those included the fact that the -- in *Vanda*, there

21   was a drug that was already approved for sleep disorders, and

22   the drug company was applying for a new use for it to treat jet

23   lag.  And Judge Cooper noted that if there were any public

24   confusion about whether this drug was safe for that use, any

25   interested member of the public would need to go through a

1    licensed physician to obtain a prescription to obtain the drug.

2    So that was a safeguard.

3           He also noted that it had previously been approved

4    for other uses by the FDA, and the agency had not found any

5    known adverse side effects.  So he specifically relied on a

6    number of specific guardrails there that have no analogy here.

7    So I did want to point that out about *Vanda*.

8           THE COURT:  I appreciate that.  Thank you.

9           MS. KONKOLY:  The last thing I wanted to point out on

10   public confusion and Juul's statements on those facts is in

11   their reply brief, they -- they said we certainly don't intend

12   to present these documents as final.  We understand that they

13   are simply the recommendations of the staff scientists here.

14          There are some quotes, I believe on pages 7 and 9, to

15   the effect where they outright say that we understand these

16   documents are not final.  They do turn around a few pages later

17   and insist that these documents must necessarily represent the

18   agency's final view.  But notwithstanding that they made that

19   disclaimer in the context of trying to walk away from the

20   public confusion harm, we do think those are concessions that

21   are quite overt and that they should be held to.

22          Your Honor, I also wanted to just touch down briefly

23   on a few things for clarity that --

24          THE COURT:  I just have the language in front of me

25   finally on the exemption --

1          MS. KONKOLY:  I can find it, too, if you give me just

2     a second.

3          THE COURT:  I have it here.  It's the agency shall

4     withhold information under this section only if the agency

5     reasonably foresees that disclosure would harm an interest

6     protected by an exemption described in subsection B or the

7     disclosures prohibited by law.

8          So that's the reason I keep coming back to this

9     notion of saying it has to have some nexus to the exemption

10    rather than just some public harm.

11         MS. KONKOLY:  Okay.  Well, Your Honor, again, we

12    certainly think that that goes to the interest protected by the

13    deliberative process privilege, that the agency should be

14    judged by what it decides as a matter of its final judgment,

15    not by what it has considered along the way.

16         I think we take the position that we articulated on

17    the record here.  But if the Court would like a little more

18    specificity, we would certainly appreciate an opportunity to

19    submit a short supplemental declaration on that.

20         THE COURT:  All right.  Thank you.  Are you done with

21    the foreseeable harm?

22         MS. KONKOLY:  I was done with everything I had to say

23    on harm.

24         THE COURT:  Okay.  You want to turn, then, to the

25    applicability of the privilege and, in particular, do you want

1    to address Juul's arguments with respect to purely factual

2    material set forth in the documents at issue?

3         MS. KONKOLY:  Yes, Your Honor.  There again, the

4    deliberative process privilege doctrine is clear that factual

5    material can itself also be protected by the privilege; that

6    is, when it goes to the nature of the agency's decision-making

7    process itself.

8         The test there is, essentially, when the selection of

9    facts for inclusion in the documents at issue are revelatory of

10   the agency's prioritization of which facts are important within

11   the context of the decision-making process at issue.

12        We -- the German -- the first German declaration goes

13   into some detail about how the DRMs operate.  They assess the

14   strengths and weaknesses of the study submitted by Juul, they

15   talk about other evidence that could have been submitted that

16   were not.  They draw comparisons.  There's an interwoven

17   analysis running through the selection of the facts in those

18   documents as attested to by the German declaration.

19        So we think -- to be clear, we're asserting that both

20   on the basis of the selection of facts and insofar as it shows

21   the prioritization that the agency gives certain facts and then

22   also the inextricably intertwined nature of the analysis

23   interwoven with the selection of the facts.

24        THE COURT:  Would the FDA have any objection to

25   submitting all or perhaps a sample of the records at issue to

1    the Court for in camera inspection just so I can confirm that

2    there is the type of intertwining or selection that you're

3    talking about, and it's not just -- I mean, by way of example.

4          If it said -- the Juul application says the

5    following -- big block quote from the Juul application and the

6    entire relevant section, so it's not a matter of picking and

7    choosing.  It would be kind of hard to look at that and say

8    that that's revealing anything about the internal

9    deliberations.

10         I have been assigned to review the science relating

11   to Topic X.  Here's everything that Juul says in its

12   application on that topic; that type of thing.

13         I'm not questioning the good faith of the agency

14   here, but would there be any problem, as far as you're

15   concerned, with submitting the documents -- there's not a lot

16   of them -- to the Court just for in camera review just so that

17   I can confirm that the facts can't be readily separated?

18         MS. KONKOLY:  Your Honor, I will say to you the exact

19   same thing I said when I was in here in April, which is there's

20   a standard under FOIA that that's generally an exception to the

21   rule, in camera review.  It generally occurs when the Court

22   finds that it can't decide the issue on the basis of the record

23   and declarations in front of it.

24         We do think the declarations here suffice for a

25   decision on the papers, but we recognize that that is a

1    determination that is within the Court's discretion.  And,

2    certainly, if you assess that you would like to see them, we

3    will submit them.

4              THE COURT:  Right.  I'm really just thinking of this

5    as a matter of the most efficient way to handle the case.  It's

6    not a lot of documents.  As I said, I'm not doubting the good

7    faith.

8              But people can look at things differently as to

9    whether they think that they're segregable.  I won't direct it

10   now, but I'll think about that.  If I decide it would be

11   helpful to me, I'll enter an order.

12             MS. KONKOLY:  Certainly.

13             If I could address preemptively also Juul's arguments

14   regarding the effect of Dr. Holman's signature on the

15   additional disciplines TPL.

16             THE COURT:  Yes.

17             MS. KONKOLY:  The essence of their argument there is

18   that, because he holds delegated authority, OCD can't take that

19   away from him, and so there -- ipso facto, his signature on

20   that document turns it into a final decisional document for the

21   FDA.

22             One thing I would note, a particular detail that I

23   don't think actually made it into our briefs, is that the

24   scientist assigned as the TPL to this matter, Dr. Lindsey, she

25   actually also holds delegated authority under the same

1    concurrent delegation that he has.

2            She's the director of the Division of Individual

3    Health Sciences, I believe, DIHS.  That delegation is Exhibit 2

4    to the first Mital declaration.  I believe Sections F and G,

5    you'll see that office listed there.  If you compare that

6    office to her signature, she is that individual.

7            Juul is not contending that the fact that the TPL who

8    authored these documents in the first place and made the

9    initial recommendations was making a final decision for the

10   agency simply because she held the concurrent delegation; nor

11   would that argument pass the smell test where she was clearly

12   acting in a different capacity as TPL.  She wasn't exercising

13   that delegated authority.

14           She was acting as the TPL whose role is to make the

15   first-line recommendations in that document.

16           THE COURT:  Was the delegation adopted by notice and

17   comment rulemaking?

18           MS. KONKOLY:  I believe the delegation -- there are

19   two delegations.  Exhibit 1 to Mital is the delegation from HHS

20   to the commissioner of the Food & Drug Administration, and then

21   the additional document has the delegations from FDA to a

22   number of officials within the agency.

23           I don't believe it was through notice and comment.  I

24   think it was simply a matter of the commissioner redelegating

25   the authority that had been delegated to him.

1          THE COURT:  The reason I ask that is that I'm not

2     sure -- this may be more of a question for Juul's counsel than

3     for you.  But I'm not aware of any principle that says that if

4     you have the authority to make a delegation, and it's not in a

5     rule that would require a rulemaking to rescind, why you can't

6     in any way, shape, or form partially rescind it.

7          You know, I was the assistant attorney general for

8     the Office of Legal Counsel at the Justice Department and had a

9     delegation from the Attorney General to issue opinions on

10    behalf of the Attorney General regarding the law.

11         And if the Attorney General called me up and said, I

12    don't want you doing that, I'm doing it, I would have thought

13    that was sufficient, and that I then didn't have the authority

14    to issue the opinion on that topic because the Attorney General

15    had decided to retain it for herself on that.

16         It may be a different matter if it was notice and

17    comment.  But, usually, I don't think that internal agency

18    rules relating to authorities and responsibilities are,

19    typically, done by notice and comment rulemaking, in which case

20    I'm not sure why you couldn't simply just tell somebody who is

21    a delegee [sic] that I'm keeping this one.

22         MS. KONKOLY:  Yes, Your Honor.  We agree with that.

23    One point of clarification to make sure that I'm articulating

24    the agency's position on that.

25         We are not taking the position that there was any

1    formal rescission of the delegation, but certainly OS did

2    inform OCD that it was invoking its supervisory authority over

3    this set of applications.

4            THE COURT:  Yeah.  I'm not -- I understand the

5    subtlety of the argument you're making because of Mr. --

6    Dr. Holman was the one who then signed and was authorized to

7    actually sign the MDO, is that --

8            MS. KONKOLY:  MDO.

9            THE COURT:  But the point still stands, I think, in

10   the same way that any portion of any delegation, whether it's

11   formally done or informally done, I don't know why the

12   decision-maker couldn't do it.

13           There are lots of presidential authorities that are

14   delegated by executive order, and I don't think any cabinet

15   official would have a -- pause for a second if the President

16   called up and said, you know, there's this executive order that

17   says you're supposed to do this, but I'm going to do this one

18   or this portion of that one.

19           MS. KONKOLY:  That's exactly right.  So when OCD

20   invoked that supervisory authority, you know, as a practical

21   matter, certainly, Dr. Holman would be expected in the course

22   of a representative of government to comply with what his

23   supervisors within the agency are telling him about their

24   invocation of that authority.

25           I would also just further note that even if, as a

1    technical matter, since the delegation was not formally

2    revoked, he technically still had the legal authority to

3    perhaps, for lack of a better word, be insubordinate and go

4    ahead and issue a final decision that went further than OCD

5    wanted him to.

6              That's not what the record shows here.  The record

7    clearly shows that he signed an MDO that adopted only the

8    toxicological TPL.  As a matter of fact, that is what happened

9    here.

10             THE COURT:  Okay.

11             MS. KONKOLY:  In closing, Your Honor, unless you have

12   further questions, I want to touch on this very briefly on two

13   points that are not relevant to the Court's assessment of the

14   deliberative process privilege here; the first being Juul's

15   reasons for seeking the documents.

16             If I can just quickly quote from the *Williams &*

17   *Connolly* D.C. Circuit decision.  It's 662 F.3d 1240.  It's also

18   cited in our response to Juul's Notice of Supplemental

19   Authority regarding the *Fontem* decision that are the most

20   recent filings on this docket.

21             THE COURT:  Did you say 1240?

22             MS. KONKOLY:  I said 662 F.3d 1240.  This is a

23   verbatim quote.

24             It does not matter why the requester seeks the

25   information, what the requester plans to do with it or what

1    harm the requester might suffer from not getting the

2    information.  That's the end of the quote.

3         But the upshot of that is whether Exemption 5 applies

4    is a judgment to be made as is, again, a quote without regard

5    to the particular requester's identity.  So Juul certainly has

6    its reasons for wanting these documents, and it's made those

7    very clear.

8         With respect to FOIA and the decision before the

9    Court, they stand equally with your prototypical man on the

10   street who might be taking some kind of personal interest in

11   this.

12        Lastly, the other point I just wanted to emphasize

13   does not have relevance to this FOIA suit is whether FDA's

14   issuance of the MDO based solely on the toxicological

15   deficiencies complied with the standards of the Tobacco Control

16   Act.

17        I think there are a number of times when Juul has

18   tried to bring some of those merits issues that will,

19   ultimately, be decided by the D.C. Circuit into some of the

20   arguments here.

21        THE COURT:  All right.  Thank you.  I'll give you a

22   chance to reply.

23        MS. KONKOLY:  Okay.  Thank you.

24        THE COURT:  Mr. Wilcox.

25        MR. WILCOX:  Thank you, Your Honor.  Let me start by

1    making a couple responses to confusion because it seemed like

2    Your Honor thought that the FDA's arguments on that issue may

3    be persuasive.

4         THE COURT:  Well, I actually, I thought, was

5    indicating that I think there may be a missing piece on that,

6    but go ahead.

7         MR. WILCOX:  Let me start with that missing piece

8    part.  You're right that 5 U.S.C. 552 requires there to be that

9    nexus that you were referring to.  And that the agency can only

10   withhold it if they reasonably foresee that the disclosure

11   "would harm an interest protected by an exemption."

12        So they have to tie it back to the deliberative

13   process privilege.  The D.C. Circuit has made that same point

14   in the Reporters Committee decision that we cite in our brief;

15   that is 3 F.4th at 357 to 358.

16        So -- and I don't think the general confusion about

17   the public potentially being misled about the reasons for the

18   FDA's decision ties to a harm related to the deliberative

19   process privilege.  Now --

20        THE COURT:  Why wouldn't it if -- would it not if the

21   FDA were to just draw the missing link or the step in the

22   process, which is we're a public health agency, we care deeply

23   about people understanding what our views are on public health

24   issues.  That's why we exist.

25        And if people are confused about what the FDA's

1   position is with respect to public health issues, that is a

2   major problem.  And if we thought that our internal preliminary

3   analyses of issues were to be made public, we would write them

4   differently because we would want to avoid any possible risk

5   that the public might be misled about what we think.  We would

6   be much more cautious about what we say.

7            MR. WILCOX:  Well, I think it would have to be very

8   specific and concrete in how it would change the agency's

9   deliberations.  It would have to show -- as it would chill

10   honest and frank conversations.

11            So your example of what we'd say in big block

12   letters, this isn't our final decision, this is just our

13   preliminary views, writing that in doesn't chill honest and

14   frank discussion.  That just clarifies there's no confusion for

15   the public.

16            THE COURT:  We're a little bit ahead of the game

17   because I'd have to decide whether I want to provide an

18   opportunity for the agency to say more, and we're speculating

19   about what they might say.

20            But you can imagine a world in which you might say,

21   I'm a scientist, this is not my preliminary view.  This is, in

22   my view, fact.  I think this is 100 percent correct.  If I have

23   to say in this thing that it's my preliminary view and we're

24   still uncertain about that, that does affect the conversation.

25            I pick up a telephone and say, I know I have that big

1    caption in there, but you ought to know that I didn't really

2    mean it, and I'm pretty certain about my results here.  When

3    they say they're preliminary, they're not preliminary.  I

4    really think -- you can imagine a world in which it really

5    would affect the discussions and deliberations if they thought

6    they had to add lots of cautionary language that they didn't

7    necessarily internally -- at least the person who was writing

8    it may not internally believe, but they might be concerned that

9    their supervisor might be unsure.

10            MR. WILCOX:  As you said, in some ways we're getting

11   ahead of ourselves a little bit responding to what the FDA may

12   or may not say.

13            THE COURT:  Correct.

14            MR. WILCOX:  A couple points.  One, the FDA made the

15   same argument in *Vanda*.  It's at page 4 of the *Vanda* decision

16   where Judge Cooper addresses that, and he found these arguments

17   about confusion unpersuasive.

18            So we think that *Vanda*, again, is squarely on point

19   for addressing the confusion concern.

20            I also think that the FDA has tools at its disposal,

21   if it's concerned about confusion, to both not water down its

22   deliberations, but also make it clear to the public what is

23   happening.  For example, when it turns over this material as

24   part of a FOIA request, it could include in any letter it

25   submitted, you should know these are preliminary views, they do

1   not reflect the final views of the agency.  If you want to see

2   the agency's final views, go look at the publicly available

3   marketing denial order.

4          THE COURT:  Right.  But what happens then when Juul

5   or any other company receives that filing, they promptly take

6   the cover letter, and they roll it up and they toss it in the

7   bin, and then they post on their website, here's an FDA

8   document that talks about how wonderful our product is, and

9   it's actually not an FDA final view on it.

10          And it's posted -- I'm not saying Juul would do that,

11   but you can easily imagine a company doing something like that.

12          MR. WILCOX:  To be clear, Juul has no interest in

13   doing that, Your Honor.  I know you weren't suggesting that,

14   but just so it's clear on the record.

15          THE COURT:  No.  I think I know what Juul's interest

16   principally is here, which gets to the second rationale, which

17   is the top-down point.

18          You actually say in your brief that there are ongoing

19   deliberations, and we want this information so that we can

20   respond to the actual concerns in the agency, and you're candid

21   about that, and I appreciate that.

22          But doesn't that really step right into the problem

23   with respect to the top-down deliberative process.  They're

24   still thinking about these things, they're considering --

25   agencies are entirely free -- just like me as a judge, I can

1    come out here on the bench and tell you, you know, my

2    inclination in the case is to come out the following way, I'd

3    like to get your reactions to it; and agencies are free to do

4    that if they think it's helpful.

5              But I'm also free to keep it to myself and say, you

6    know, I'm not really ready to share what my preliminary

7    thoughts are here, and I want to hear what you think, and I'll

8    decide from there.  You know, you've made your submission, you

9    filed your application.  And it's not clear to me why there is

10   some right that an applicant to an agency has to say, I filed

11   my application, but I want to be able to respond to your actual

12   concerns, and, therefore, I want to know what your internal

13   deliberative documents -- predecisional documents say because

14   that's going to help me convince you that I'm right.

15             I understand why you want to do that, but I'm not

16   sure that there's any right to do it.  I do understand how that

17   could chill what the agency is doing or affect the agency's

18   deliberations if they thought the material was turned over,

19   because it makes it easier for you to do your job but it may

20   make it harder for them to do theirs.

21             MR. WILCOX:  I want to respond directly to that, Your

22   Honor, but before I do, if I can just make one final point on

23   confusion.

24             THE COURT:  Sure.

25             MR. WILCOX:  To your point about throwing it

1    immediately in the trash can, the FDA could, just like it does

2    all the time, issue a press release that says the same thing.

3    I suggested it in the letter.  And then it would be out there,

4    and I can't throw it in the trash can.

5         I think when you have FOIA where the purpose is --

6    the predominant purpose is disclosure, not keeping things

7    secret, we should be taking those prophylactic measures

8    seriously when we're thinking about this harm of confusion,

9    which is already fairly tangential to what the deliberative

10   process is really about.

11        But to turn to your question about chilling effect --

12        THE COURT:  Right.

13        MR. WILCOX:  -- I mean, you're right, FOIA, as

14   counsel for the FDA said, doesn't really concern itself for why

15   we want the documents.  We're not saying we're entitled to the

16   documents because this is the reason we want them, although we

17   are articulating why we want them to the Court to explain why I

18   think it's important to get them promptly.

19        But for a chilling effect, the agency needs to show

20   that there would be an actual chilling effect on agency

21   deliberations.  I think that some good proof that there isn't a

22   chilling effect here is, number one, the key focus of that

23   ongoing review is the toxicological concerns that the agency

24   already raised and were part of the MDO.

25        Those documents are out there in the public.  Anyone

1    can look at them.  Anyone can request them via FOIA.  And the

2    agency hasn't been willing to say in a declaration that we

3    think there's a chilling effect on our ongoing review of that

4    material because it's publicly available.

5              We also have more than a dozen examples that we cite

6    in our brief of agency proceedings where there were challenges

7    to a marketing denial order, the administrative record was made

8    available in the Court of Appeals, including the underlying

9    decisional documents, and then the FDA rescinded its marketing

10   denial order and went back into scientific review where it's

11   going to re-review that work.  And the agency hasn't come

12   forward with a single concrete example of where there's been a

13   chilling effect in any of those deliberations.

14             So where the standard is that there would, not just

15   could, be a chilling effect, as the Reporters Committee

16   decision says, I think the agency has a tough uphill battle

17   given those examples.

18             THE COURT:  I think your argument, perhaps, proves

19   too much.  What your argument suggests is, because there is a

20   great deal of APA litigation out there in which the

21   administrative record is made available in lots of cases -- and

22   some of those cases result in remands to the agency to further

23   consider the issue -- that means by the logic of your argument

24   that no internal deliberative documents of the agency really

25   should -- there's no foreseeable harm ever for the disclosure

1    of any internal deliberations because I can point to cases in

2    which there were appeals, there was an administrative record,

3    the agency had to go back and look at it again.  And everyone

4    in the world knew what the preexisting administrative record

5    was at that point in time, and no one has ever written a book

6    or a law review article saying that availability of that

7    information has prevented the agencies from doing their jobs

8    properly.

9         MR. WILCOX:  So I think that I may have not been

10   clear about exactly what we're saying.  It's not just there are

11   administrative records out there and there's some documents

12   that are in those records; it's the exact type of documents

13   that are at issue here.  It's the --

14        THE COURT:  But take any regulatory regime in the

15   world, and I can just say, those exact documents, there is a

16   huge EPA case in the D.C. Circuit with a record that is a

17   million pages long, and the D.C. Circuit remands the case back

18   to the EPA.  And the EPA then engages in further analysis,

19   there are internal memos that are written on it, and someone

20   submits a FOIA request and says I want those internal memos,

21   and the agency says, no, that would chill internal

22   deliberations.  We think we satisfy foreseeable harm.

23        And you come in and you say, what are you talking

24   about.  There already were a million pages in this EPA review

25   that were made available to the public that we already know

1    about.  How can these additional dinky little memos that you're

2    looking at now make any difference?

3           MR. WILCOX:  Again, Your Honor, it's the exact

4    documents that are making the exact type of scientific

5    conclusions that they're saying there will now be a top-down

6    chilling effect are the type that are routinely made available.

7    And then the agency goes back and reconsiders its decision, and

8    there's not a single example the agency can cite of there being

9    this top-down chilling concern effect.

10          And I'm also not aware of a single FOIA case adopting

11   this top-down theory of future ongoing deliberations, and

12   supervisors may not be willing to reconsider their

13   subordinates' work as candidly where that has been accepted.

14          So I think if the agency wants to make that

15   argument -- which it didn't make -- it would certainly, at the

16   least, have to submit additional declarations.

17          THE COURT:  I thought that actually was the focus of

18   their declarations.  My concern was they don't say a whole lot

19   about the public confusion, but I think they say quite a bit

20   about this issue.

21          MR. WILCOX:  Well, they do.  They generally

22   articulate this top-down concern.

23          What they don't explain is why that concern doesn't

24   apply equally to the documents that are already available, like

25   the toxicology TPL that exists in this case.

1          THE COURT:  Well, it might, but they just have to

2     live with that.  If it's publicly available, it's publicly

3     available.  There's nothing they can do about it.

4          MR. WILCOX:  It still seems like they should be able

5     to offer you some concrete evidence of how there has been a

6     chilling effect.

7          What the D.C. Circuit requires is concrete evidence

8     that it will actually impede agency deliberations.  That's what

9     the Reporters Committee decision says.  Reporters Committee

10    also says they need to articulate how it would, not could.  We

11    have two years --

12         THE COURT:  I understand the standard is would rather

13    than could.

14         I have to say, in all the FOIA cases that I've seen,

15    I've never seen a single FOIA case where an agency has

16    attempted to do what you're talking about and offer -- come in

17    with concrete evidence and saying I can point you to an

18    example.

19         See, Ms. Berman who probably has handled hundreds of

20    post-foreseeable harm cases is nodding her head in agreement.

21    I've never seen a single case or heard of a single case in

22    which an agency comes in and says, there's foreseeable harm

23    here -- and the typical cases, there's foreseeable harm here

24    because it's an internal deliberative document and it will

25    chill internal deliberations if it's disclosed, and it is on a

1    sensitive topic where people may disagree and -- you know, a

2    couple more sentences of that nature.

3            Then they'll come in and they say, here are three

4    examples of cases in which internal deliberative documents were

5    disclosed, for example, because there was a prior

6    administrative appeal and, guess what, that chilled us in the

7    future.  I've never seen that in a single case.  I've never

8    heard of it in a single case.

9            And I doubt you could find me a single case where

10   that's ever been done or required.

11           MR. WILCOX:  What I would say, Your Honor, is I think

12   the reason it normally doesn't come up is because the typical

13   chilling effect argument is what we've referred to as the

14   bottom-up argument today, which the agency isn't relying on.

15   And you can understand why in that case you wouldn't need to

16   talk about how it's going to chill future ongoing deliberations

17   about the same subject.  It's about just chilling future

18   ongoing deliberations, period.

19           THE COURT:  In *Nixon v. United States*, the Supreme

20   Court, when it first recognized the executive privilege,

21   didn't -- they didn't have any studies or analyses or evidence

22   in front of the -- the Court relied on common sense and said,

23   it's just common sense that people will be chilled in their

24   internal deliberations if the following happens.

25           And it does seem to me that it is common sense

1    that -- particularly for an agency like the FDA where you're

2    dealing with experienced scientists that more senior officials

3    may be reluctant to push back and to reach different

4    conclusions, where, one, it might not reflect terribly well on

5    the decision-maker.

6            I can imagine you, frankly -- this is probably one of

7    the things you would love to be able to do -- come in and say

8    that bureaucrat, to borrow your words, overruled that scientist

9    on that issue.  And that shows that this is all improper

10   because somebody who doesn't have a Ph.D. on this came to a

11   different decision than the Ph.D. came to on it.  That's one

12   mode of it.

13           The other mode of common sense is that people

14   typically like to get along with the people they work with and

15   not make them look bad in public.  And if you're going to --

16   you want to have a good, compelling reason to disagree with

17   them.

18           I'm not saying that an FDA scientist or a senior

19   official at FDA would reach what they felt was the wrong

20   decision for this reason, but it could color their decision, I

21   would imagine.  I really don't want to embarrass -- the person

22   has been in the agency 20 years, is the top scientist in his

23   field, and I don't want to say that person is wrong, even about

24   something small; they missed something.  That could be

25   embarrassing to that person.

 1              This is all common sense.  That's what I think, in

 2      recognizing executive privilege and other privileges, the

 3      courts have done for decades now.

 4              MR. WILCOX:  I'm not sure that I agree with your

 5      commonsense reasoning.  But I think that, regardless of whether

 6      you can rely on common sense to reach that type of decision,

 7      Your Honor -- and maybe it was entirely appropriate in *Nixon v.*

 8      *United States* where you didn't have this long, ongoing body of

 9      the agency or the Office of the President making this material

10      publicly available and not having examples of a chilling

11      effect.

12              But here, where you do have dozens of examples of

13      there being no chilling effect in the record, I think at the

14      very least on summary judgment, where you're supposed to draw

15      all inferences in my client's favor, you can't grant summary

16      judgment in the agency's favor.  We think that we should be

17      granted summary judgment, obviously.  We think those examples

18      show that there isn't a chilling effect.

19              But where you have all these examples of there being

20      these documents publicly available and there being no harm to

21      the ongoing deliberations that's at least evident to anyone and

22      then you have the agency deliberations, at the very least you

23      have a factual dispute between the parties the Court would need

24      to resolve at some proceeding other than summary judgment.

25              THE COURT:  Although you may have a factual issue,

1    but the -- and I understand the summary judgment standard well.

2    But the flip side of that is that the FOIA cases also recognize

3    a presumption of good faith where an agency makes a

4    representation to the Court, and the agency has represented to

5    me that if the records at issue in this matter are disclosed,

6    it's reasonably foreseeable that the agency's current and

7    future deliberations regarding the same -- I'm sorry.  I'm

8    going to read this again.

9          MR. WILCOX:  Normally that's my problem.

10         THE COURT:  When everyone reads, it happens.

11         If the records at issue in this matter are disclosed,

12   it is reasonably foreseeable that the agency's current and

13   future deliberations regarding the same data and information as

14   analyzed by scientists from various disciplines other than

15   toxicology would be adversely impacted, a supervisory review

16   process involving plaintiff's MDO is currently underway.  And

17   then it goes on from there.

18         Why wouldn't I just accord that the usual presumption

19   of good faith that I do in FOIA cases, typically?

20         MR. WILCOX:  So I agree that the presumption of good

21   faith exists, but that presumption exists unless there is

22   conflicting factual evidence offered by the other side.  And

23   then the presumption goes away, and it's just like any other

24   circumstance where you have competing evidence, and summary

25   judgment isn't appropriate.

```
 1            THE COURT:  Fair enough.  But what conflicting
 2     evidence do you have?  You indicate that there have been -- the
 3     same information has been disclosed, but you're just guessing
 4     when you say it hasn't affected their deliberations.  You don't
 5     have any basis for that.  You don't have any evidence on that.
 6            You just simply say there are other cases in which
 7     this information has been disclosed and they have reached
 8     decisions.  You don't say, and here I interviewed a former FDA
 9     scientist who said it didn't affect anything I ever did.
10            MR. WILCOX:  I mean, if you would like to offer me
11     the opportunity for discovery, Your Honor, in this FOIA case --
12     I know that's not what you're suggesting.  That's how I would
13     have to come forward with that type of evidence.
14            The evidence I have are all the administrative
15     records and the TPL in this case where it's come out, and we
16     have the dog that didn't bark, where there's no evidence that
17     it's ever happened before.  Especially where you're supposed to
18     draw all inferences -- reasonable inferences in favor of my
19     client, I think the reasonable inference to draw from that is
20     that there is no harm occurring to the agency's deliberations
21     from having these documents out there even when the agency has
22     ongoing further scientific review.
23            THE COURT:  Okay.
24            MR. WILCOX:  So while the agency has largely
25     abandoned what we'll call the bottom-up approach, it sounds
```

1    like it is maintaining it for the second TPL review memo.  My

2    understanding was that --

3              THE COURT:  No, I don't think so.

4              MR. WILCOX:  Maybe I misunderstood.

5              THE COURT:  We can ask Ms. Konkoly.  Are you making

6    the top-up argument with respect to the second TPL or not?  I

7    thought you were not.

8              MS. KONKOLY:  Your Honor, I'm sorry if I didn't state

9    that clearly earlier, Your Honor.

10             I was trying to explain that the key basis for the

11   *Vanda* decision, in other words, did the author of the document

12   have a reasonable expectation that his work would remain

13   confidential at the time the document was authored, that fact

14   pattern does apply to the additional disciplines TPL due to the

15   nature of the joint proposal that was made --

16             THE COURT:  I see.

17             MS. KONKOLY:  -- where OS proposed that it be

18   resolved based on the deficiencies identified in the toxicology

19   TPL and then set forth the rest of its analysis in a separate

20   document that was to the side of the analysis that it proposed

21   be the basis of the decision.

22             THE COURT:  Okay.

23             MS. KONKOLY:  So by the very nature of the structure

24   of that, we do think that that bottom-up rationale does apply,

25   but only to the additional disciplines TPL.  And I was

1    attempting to clarify that we -- narrowing our assertion, we're

2    taking the discipline review memos out of that.  We're not

3    asserting that rationale applies to those documents.

4              THE COURT:  All right.  I appreciate that

5    clarification.  Thank you.

6              MR. WILCOX:  So, Your Honor, just to then explain --

7              THE COURT:  Go ahead.

8              MR. WILCOX:  -- that clarification why we think that

9    rationale doesn't work even for the second TPL review memo.

10             When that memo was authored, both of them were

11   presented to Ms. Mital to make the decision about which one am

12   I going to concur with.  While there was a recommendation from

13   the TPL authors about which one they thought Ms. Mital should

14   concur with, they didn't know at the time which one she would;

15   just like the reviewers in *Vanda* have presented recommendations

16   about what they thought FDA should ultimately do.  But the

17   reviewers didn't know.

18             Certainly, we've presented evidence here at Exhibits

19   24 and 25 of other instances where the OCD has overruled the

20   Office of Science, has seen their recommendations and has said,

21   we disagree, and we're going to go in a different direction.

22   There it was for how to handle menthol products and what

23   standard you would hold menthol products to and, therefore,

24   whether you should grant a different manufacturer's menthol

25   product.

1          But given that background of knowing that it's going

2     to your supervisor for them to decide thumbs-up or thumbs-down

3     and you presenting both options to them, there was no

4     reasonable expectation that the supervisor would necessarily

5     agree and would only issue the toxicology one rather than

6     saying, you know what, I think it makes sense; I've read the

7     statute; I think it's holistic circumstances; we should just

8     put it all out there.  I don't think that the top-down works

9     even for the second TPL review memo.

10          THE COURT:  Okay.

11          MR. WILCOX:  And then just briefly on predecisional?

12          THE COURT:  Yes.

13          MR. WILCOX:  So our primary argument on predecisional

14     is just the timing and the chronology of events, which is that

15     the FDA's final decision was announced publicly through the

16     *Wall Street Journal* a day before the second TPL review memo --

17          THE COURT:  I think that's not fair, perhaps, to say

18     it was announced through the *Wall Street Journal*.  I don't

19     think the agency announced it.  I don't have any -- I know

20     there was a *Wall Street Journal* story on it.  I don't know

21     where that came from.

22          I don't know what -- frankly, whether it was accurate

23     or not.  There was a *Wall Street Journal* story, I'll give you

24     that.

25          MR. WILCOX:  I wasn't trying to suggest that the FDA

1    put out the equivalent of a press release in the *Wall Street*

2    *Journal*.  So if you had that impression, I apologize.

3           The decision -- the ultimate FDA decision became

4    known through this *Wall Street Journal* article a day before the

5    TPL review memo was actually signed.  So just on the temporal

6    sequencing, it doesn't fit as predecisional.

7           THE COURT:  But even if you put that all aside,

8    there's an ongoing proceeding right now, and the FDA has said

9    that all of this could be within the scope of that ongoing

10   proceeding.

11          So why does any of that timing matter if there's an

12   ongoing FDA proceeding in which this might be subject to

13   consideration by the agency?

14          MR. WILCOX:  Well, because the question is, what

15   decision does it relate to?  And the FDA has to specifically

16   articulate what decision does the second TPL review memo relate

17   to.  The one that they have articulated is the marketing denial

18   order which already issued.

19          THE COURT:  I don't think that's accurate.

20          MR. WILCOX:  They haven't said that the second TPL

21   review memo will be part of the ongoing scientific review that

22   is happening right now.

23          THE COURT:  But I think that the second TPL memo,

24   almost by definition, did not go to the first -- go to the MDO

25   decision.  The decision was made to put that aside.

1          And I think you might then say, well, why did you

2     feel a need to do anything if you were putting that aside?  I

3     think the fair inference is, because this is information that

4     could be of value to the agency in the future, and we wanted to

5     memorialize our work.

6          Because otherwise, you would just throw it in the

7     trash, right?  Because they made a decision not to rely on it

8     at that stage.

9          MR. WILCOX:  I think you could say that for every

10    document the agency creates, Your Honor.  If my sequence of

11    events is correct, that it was signed after the MDO decision,

12    even if they wanted to memorialize it, they weren't doing it

13    for the purposes of the MDO decision.

14         At that time they didn't know there was going to be

15    this ongoing scientific review because they didn't decide to do

16    that until weeks later.  And there wasn't even a request to do

17    that ongoing scientific review until later.  So I don't think

18    it quite fits.

19         But I don't want to belabor the point.  I think we

20    can win this case on harm and that our strongest arguments are

21    on harm.

22         THE COURT:  Let me ask you one more question on the

23    timing issue.  Even accepting your view and that this goes to

24    the MDO decision that you say was announced in the *Wall Street*

25    *Journal*, I think that the agency makes a pretty good argument

1    that a decision isn't a decision until it's made.

2         But putting that aside, isn't the relevant factor

3    when the memo was prepared and whether those who were actually

4    preparing and writing the memo would have been chilled if they

5    thought it was going to be public in some way?

6         Because, as I understand it, when Dr. Holman signed

7    it, he signed it as a reviewer.  Quite frankly, assume

8    Dr. Holman didn't sign it at that point at all and tomorrow

9    afternoon he signs it, says, yeah, I've reviewed this thing

10   and -- I've reviewed it now.

11        So I'm not sure why the date that he signed it as a

12   reviewer is dispositive.

13        MR. WILCOX:  So the date he signed it as a reviewer I

14   don't think goes to chill or to harm, but I think it goes to

15   whether it's predecisional.  If today Dr. Holman decided to

16   read the memo and go, hey, this looks pretty good to me and

17   signed it, then it wouldn't be a predecisional document in

18   reference to the MDO decision by the FDA.

19        THE COURT:  I'm sorry.  Maybe that goes to the

20   question of what his signature means on it.  If he's simply

21   saying that I've reviewed this and I believe that this is sound

22   analysis in here, it's not a decisional document because it's

23   not a decision.

24        So I'm just not quite sure what that adds or changes

25   to it, the fact that he has signed it.

1          MR. WILCOX:  Well, I guess the other thing I would

2     say is we don't actually know what happened on the 23rd.  What

3     we know is the final date of the document on the Vaughn Index

4     is the day after the *Wall Street Journal* article.  We don't

5     know -- we know that Dr. Holman, because of representations by

6     the FDA, signed it that day.

7          We don't know if there were other changes made to the

8     document that day, which would then look like other cases where

9     agencies have modified documents after a decision.  Well, if

10    you modified it after a decision, it's no longer predecisional.

11    We don't know that one way or the other.

12         THE COURT:  I guess my point is I'm just not sure

13    what the significance of his signature is on it.  Someone wrote

14    the document earlier, and he signed it saying I reviewed this.

15         So I guess what I'm struggling with is if it's not an

16    approval, it's not a final decision, how does his saying I've

17    reviewed it and I agree with the analysis in here take

18    something that would have been predecisional at the time it was

19    written and mean that it's no longer predecisional because he

20    now says I've reviewed it and I agree?

21         MR. WILCOX:  If the only thing that happened on the

22    23rd was he signed it, I agree, your argument seems sound, Your

23    Honor.  The problem is all that we know from the Vaughn Index

24    is that this document is dated June 23rd and it was signed by

25    Dr. Holman.

 1              We don't know if there were any edits made to the
 2      document that day or not.  So I don't think we can draw
 3      inferences one way or the other.  Certainly, we can't draw them
 4      in the government's favor that no edits were made on the 23rd.
 5      All we know, it's a document dated June 23rd.
 6              I think it's reasonable to assume that they didn't
 7      start writing it that morning.  I'm sure it existed beforehand,
 8      but whether there were edits made or not, we simply don't know.
 9              THE COURT:  How long are these documents?  I just
10      have the toxicology one, which looks lengthy.  I assume that a
11      document of this nature for all other disciplines, presumably,
12      would be a pretty long document?
13              MR. WILCOX:  They're fairly lengthy, Your Honor.
14      There's actually a couple more that are in the record.  They're
15      also Exhibits 20 to 22 to our brief or some other ones that
16      have been made public, which I think might be relevant when we
17      talk about segregability.
18              But if I can just say a word about deliberative
19      before we get to segregability.
20              THE COURT:  Sure.
21              MR. WILCOX:  On deliberative, there's a long line of
22      cases, whether it's the *Greenpeace* case that we cite in our
23      brief; whether it's the *Parke-Davis* case, which involved the
24      FDA and approval of a drug; whether it's the *Sterling* drug
25      case -- again, approval of a drug -- that says when scientists

1    are sitting down and doing scientific work, generally those

2    look like not deliberative documents because they're not going

3    to the agency's policymaking judgment.

4          Now, I'll concede that the second TPL memo, I think

5    we have a hard argument, and I'm not arguing that that is a

6    nondeliberative document.  Our argument for that document is

7    just predecisional and harm.

8          But for the scientific review memos, the underlying

9    discipline reviews, those are just scientists doing their

10   scientific work and coming to the agency and saying, based on

11   our scientific work, here is what we think are the

12   toxicological strengths and weaknesses of this product, for

13   example, or the pharmacological strengths and weaknesses.

14         THE COURT:  Isn't that just the sort of type of thing

15   that is protected by the deliberative process privilege?

16         I get your point if it's an analysis that says that

17   the molecular weight of a molecule is X, that's probably not

18   deliberative.  But if it is the molecular weight of a molecule

19   is the following and the molecular weight is the following and

20   we -- and in my view, because of that, this raises concerns,

21   that is deliberative.

22         MR. WILCOX:  Well, I think that at least the

23   *Greenpeace* case that we cite in our brief says it's -- that was

24   a case about whether something should be listed as privilege --

25   sorry -- should be listed as endangered for purposes of the

1     Endangered Species Act and was ultimately the scientific

2     analysis that was underlying, what does the science look like

3     for this species without making the ultimate recommendation.

4     The Court found that was a factual document that wasn't

5     protected.

6              THE COURT:  What court decided that case?

7              MR. WILCOX:  That one was Western District of

8     Washington.  We also have the *Sterling* drug case from SDNY; we

9     have the *Parke-Davis* case from the 6th Circuit; and we have the

10    *SAI v. Transportation Security Administration* case from this

11    district that all draw similar distinctions.

12             Now, the TSA case is, obviously, not about endangered

13    species; it was about various analyses the Security

14    Administration was doing.  And the other two cases were both

15    Food & Drug Administration cases where the ultimate

16    deliberative decision was do I approve this product or do I

17    allow this product to stay on the market.

18             And, nonetheless, the underlying scientific analysis

19    was deemed by those courts not to be protected by the

20    deliberative process privilege.  The cases where it has been

21    found to be protected, like some of the examples the government

22    cites, tend to be -- after doing that scientific analysis, the

23    agency reviewer goes on and does the next step, which is, and

24    here's how it meets the actual balancing under the statute.

25             THE COURT:  I've got to tell you, though, if you were

1    right about this, I imagine the entire regulatory process would

2    be fundamentally different.  Because anyone who submits to the

3    FDA a new drug application, an ANDA application, anything else

4    with the FDA, anyone who submits to any other agency a

5    licensing application, anything else like that, that they

6    submit it and there's usually a couple of years that go by

7    while scientists are doing it, and there's usually

8    back-and-forth.

9         And you're going to be just filing a series of FOIA

10   requests saying, okay, I want the notes of the FDA scientist

11   who did the chromographic analysis of this isotope or whatever

12   it is.  I know that's probably gobbledygook for anyone who

13   actually understands science.

14        But it would -- it's hard for me to think of

15   something that would be a bigger problem for the deliberative

16   process to have agencies constantly under a barrage as they're

17   trying to consider whether to approve applications on technical

18   matters to be disclosing at each stage what their internal

19   analysis is by their scientists at every step in the process.

20   I mean, it doesn't go on today, I'll tell you that.

21        MR. WILCOX:  I understand, Your Honor.  At least

22   these courts have found that it does not protect it, and it's

23   not deliberative.

24        And I'd also say, *Vanda* was seeking those types of

25   documents for at least a change in a label for a drug.  And in

1    the years since *Vanda*, there's been no evidence that I've seen

2    of the sky falling in kind of the ways that you're suggesting.

3              THE COURT:  I don't think the sky has to fall.

4              MR. WILCOX:  I understand.  And I didn't mean to

5    suggest that the standard was, would the sky fall.  But I think

6    your parade of horribles would be the sky falling.

7              THE COURT:  Right.

8              MR. WILCOX:  But what I would say is that's a good

9    reason to avoid those kinds of issues, to decide this case

10   based on harm.  We think that harm alone is reason enough to

11   disclose these documents.

12             If you don't agree with our harm arguments or our

13   predecisional arguments or our deliberative arguments, then I

14   think we're down to segregability.  I do think in camera review

15   would be appropriate just as this Court did in the *100Reporters*

16   case.

17             And the government is exactly right.  Normally

18   there's a presumption that when agency officials write in that

19   they've done this line-by-line analysis and they have found

20   whether there is -- they've tried to figure out if it can be

21   intertwined or not intertwined, that comes with a presumption

22   that that's correct.

23             But that presumption can be overcome, as cases in

24   this district like *Centers for Biological Diversity* and *Centers*

25   *for Public Integrity* that we cite in our brief or the *Judicial*

1    *Watch* case that we cite in our brief.  When the other party

2    comes forward with evidence that calls those into question --

3    and we've done that here through the TPLs that we've submitted,

4    you know, the toxicology TPL for Juul specifically -- which is

5    Exhibit 3 to our motion -- and the other TPLs for other

6    manufacturers that are publicly available at Exhibits 20 to 22.

7    If you look at those, there is certainly, at the very minimum,

8    segregable information in those documents.

9            For example, the cover of the documents just tells

10   you, who is the applicant, what type of product are they

11   applying for; generally tells you what are the serial numbers

12   for the applications.  And then they --

13           THE COURT:  Do you want the agency to produce that to

14   you?

15           MR. WILCOX:  I mean, it would have been informative

16   here to know that the second TPL had a different -- had a

17   change to Dr. Holman's signature block from a typical TPL.

18   That would have been valuable information.

19           THE COURT:  I actually have a question.  How do you

20   know that?  How do you know what the signature block looks

21   like?  That document hasn't been disclosed.  Was it described

22   in one of the declarations or somewhere?

23           MR. WILCOX:  Yes, it was described -- I'm sorry.

24   Give me a second, and I'll remember.  It was either the second

25   German declaration or the second Mital declaration where they

1    describe here's how the signature block was changed.

2              It didn't have the normal signature block that,

3    typically, goes with Dr. Holman's signature and, instead, we

4    changed it for this document.

5              THE COURT:  No.  I know you know that.  Did you know

6    that it was signed by him because that was in the Vaughn Index

7    or --

8              MR. WILCOX:  At first we just surmised that from the

9    Vaughn Index because he was listed as an author.  And from what

10   we knew from all the other TPLs we've seen, that's the

11   typical -- he signs them, so we assumed he signed this one.

12             They've now in their declarations acknowledged that

13   Dr. Holman signed it.  So we know that he signed the second TPL

14   memo, just like he signed the first one in the MDO.

15             THE COURT:  Okay.

16             MR. WILCOX:  So we know that that's there.  If you

17   look at pages 7 to 8, they describe the background of here's

18   the application, here's what it was.

19             And we also know when you look at, like, the example

20   we have in our brief that we block quote, there's discussion of

21   just routine -- here's what Juul submitted in its application,

22   or here's the comparative cigarette that they used, which we

23   know is in every TPL because all the publicly available ones

24   have the same information.

25             So there's no revelation of the deliberative process

```
1    there.  We're not saying that's all we want, obviously, going

2    to your question of do you want them to produce to you the

3    cover page.  We do want them to produce more as well.

4         The point is, when we show some low-hanging fruit of

5    where there is information that can be segregated, then that

6    shows there's some additional work to do.  Both the agency

7    needs to come forward and offer a more concrete explanation and

8    a more specific one rather than just a blanket explanation if

9    it wants to try to keep that information confidential, and I

10   think that's exactly an appropriate circumstance for in camera

11   review, for the Court itself to look at those documents, see

12   what the agency says can and can't be disentangled and then

13   make a decision about whether that is appropriate or not.

14        So our ultimate position is we should get everything,

15   particularly based on the harm factor.  But, at a minimum, I

16   think that there needs to be further segregability analysis.

17        One final point on the signature.  I don't want to

18   spend a lot of time talking about the signature.  But you asked

19   about the delegation and why you can just partially rescind the

20   delegation.

21        To answer that, it's because the delegation didn't

22   come from Ms. Mital or from the center director.  The

23   delegation came from the commissioner of the Food & Drug

24   Administration.  So Ms. Mital didn't have the power to,

25   essentially, rescind that delegation.
```

1          THE COURT:  But --

2          MR. WILCOX:  I'm not --

3          THE COURT:  If she was operating under a delegation

4    from the secretary or from the commissioner, Ms. Mital was,

5    then I don't know why Ms. Mital couldn't use that delegated

6    authority to -- I want to avoid the language of rescinding

7    because I don't think that's necessarily right -- to say I'm

8    going to keep this portion.  I'm going to do this.

9          We have two agency officials who are vested with the

10   authority; one is senior to the other person.  I just would

11   think it's common practice that the more senior one at times

12   says I'm going to do this.  Otherwise, what do they do?  They

13   arm wrestle over it?

14         MR. WILCOX:  I don't want to belabor the point, Your

15   Honor.  But as far as I know, while Ms. Mital had some

16   delegated authority from the commissioner, she didn't have

17   delegated authority to change who could or couldn't sign off

18   and issue the final decision on marketing --

19         THE COURT:  She was the acting director of the Center

20   for Tobacco Products, right?

21         MR. WILCOX:  She was.  But even the center director

22   doesn't have the power to change who can have that delegated

23   authority -- as far as I know, who can have that delegated

24   authority.

25         As I said, I don't want to belabor the point.  I

1    don't think it's where your decision is going to hinge in this

2    case.  But it came up, so I wanted to answer that.

3              THE COURT:  Fair enough.  Fair enough.  Let me give

4    you -- well, let me ask the court reporter, if I give Ms.

5    Konkoly five minutes for rebuttal, is that okay, or would you

6    rather take a break?  I know you've been going for an hour and

7    a half.

8              THE COURT REPORTER:  That's fine.

9              THE COURT:  Okay.  Five minutes.

10             MR. WILCOX:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             MS. KONKOLY:  Thank you, Your Honor.  I understand I

13   have five minutes, and I will keep it brief.  Are there any

14   particular questions before I jump in?

15             THE COURT:  I don't think so.

16             MS. KONKOLY:  Okay.  I will focus on the harm

17   arguments at least first here.  I would note, first, that

18   there -- as Your Honor, I believe, noted, there's no

19   evidentiary requirement in the FOIA Improvement Act.  It is

20   simply a requirement that the agency provide a plausible

21   articulation of the harm that would follow as a matter of

22   common sense and the circumstances of the case.

23             There was also a suggestion that the agency could

24   counteract the harm by making proactive efforts on its website

25   to publish; and, certainly, that's not the standard either.

1    The whole point of the privilege is that the agency shouldn't

2    have to contend with the harm in the first place.

3              You also asked me when I was up here last where in

4    the record and in our briefing we tied the confusion harm that

5    we articulated specifically to an interest protected by the

6    privilege, and I'll quote here from *Coastal States*.  In part it

7    notes that the deliberative process privilege serves to protect

8    against confusing the issues and misleading the public by

9    dissemination of documents suggesting reasons and rationales

10   for a course of action which were not, in fact, the ultimate

11   reasons for the agency's decisions.  And then I'll --

12             THE COURT:  Is that from the circuit or the district

13   court?

14             MS. KONKOLY:  That is a D.C. Circuit court case,

15   *Coastal States*.  It's one of the seminal deliberative process

16   cases.

17             THE COURT:  Okay.

18             MS. KONKOLY:  And then on the heels of that, I'll

19   quote also directly from the Mital declaration.  It is

20   paragraph 24.  Again, where she explains that, because the

21   records here -- however, because FDA typically releases TPL

22   review memos and discipline review memos that do provide the

23   basis for its decisions, because the records at issue here did

24   not serve that purpose but otherwise appear very similar to the

25   types of records FDA typically releases in such circumstances,

1   these records are very likely to be misconstrued outside of the

2   agency.

3              Then again, we would emphasize that Juul's statements

4   about its intentions for what it plans to do with these

5   documents underscores that harm as well.  It's something the

6   Court can certainly take notice of that is on the record here.

7              On the separate chilling harm, with respect to the

8   withheld discipline review memos, again, Juul's counsel was

9   emphasizing that they're the exact same documents as the ones

10  that were released that were considered in the toxicology TPL

11  that was adopted that did form the basis of the agency's final

12  decision.

13             He also compared some scenarios where the agency

14  issues an MDO, and after the MDO is issued, has put the

15  decision back into further supervisory review and notes that

16  the agency has been able to be professional and do its job and

17  reconsider what needs to be reconsidered.

18             The distinction with the withheld documents and the

19  documents in those two other scenarios is that here these

20  documents never made their way into any final agency decision.

21  Where the agency has issued a final agency decision and relied

22  on certain rationales and assessments along the way, when it

23  takes the decision back for further reconsideration, it's a

24  very well-established canon of administrative law that the

25  agency has an obligation to explain itself and the changes that

1    it's made from its preliminary assessments.

2          Where there is no final decision, though, that's not

3    an obligation that the agency has as a matter of law.  The cat

4    is not yet out of the bag.  The harm is that Juul gets a peek

5    behind incomplete deliberations that just have not been made

6    the agency's final assessment yet.

7          So there isn't the same legal requirement but,

8    essentially, that legal requirement would be imputed into a set

9    of documents that shouldn't have that requirement attached to

10   them because they are just midstream at the moment.

11          Does that make sense?

12          THE COURT:  It does.

13          MS. KONKOLY:  Okay.  And then, similarly, that

14   applies to the TPL memorandum as well because it was not

15   adopted.

16          And then I think, lastly, I would touch briefly on

17   the discussion on the *Wall Street Journal* article.  We do take

18   the position that that is completely irrelevant to the issues

19   before the Court here.  The decision was made when it was

20   signed.  It's in the record.  There is a date and time stamp on

21   it.

22          The standard that Juul seems to be proposing is when

23   the decision-maker makes a decision subjectively inside his

24   head, but that's rather absurd and certainly a very unworkable

25   standard.  A bill becomes law when the President signs it.  He

1    may have decided in advance to sign it, but it is not executed,

2    it has not made the decision, and the document does not become

3    legally operative until it's signed.

4          So the decision is measured from the date of the

5    signature on it, which is in the record.  You know, anything

6    disclosed through an unnamed source in the *Wall Street Journal*

7    has no relevance to that.

8          THE COURT:  What I'm pausing on over here is whether

9    the argument that Mr. Wilcox is making invites discovery in

10   every case of this nature and that it may well be, for all we

11   know, for all I know at least, that the agency did make its

12   decision a week earlier, and then they had a meeting and

13   everyone got together and said, yes, this is our decision, this

14   is what we're going to do.

15         And that Dr. Holman was -- said that's great, but I

16   got -- can't sign it right now.  Someone run a copy for me, I'm

17   running off on vacation; I'll be back on Monday, and I'll sign

18   it when I get back.

19         I'm struggling with the notion of whether you

20   would -- I mean, perhaps maybe the answer is that the agency

21   just has to tell me the decision wasn't made until that day,

22   until the date it was signed, in their declaration at least.

23   But if they don't say that, is there -- am I left with a

24   material issue, a fact that is, potentially, in dispute?

25         MS. KONKOLY:  I don't think so, Your Honor.  I don't

1       think a decision is made until the document is signed.

2              You can imagine any variety, again, of agency

3       contacts where someone needs to make a decision.  The decision

4       isn't the decision until it's finalized.

5              To put it into a judicial context, a judge may have

6       an inkling of the decision that he intends to make coming out

7       of an argument, may sit down to write the opinion and may

8       change his or her mind in the course of doing that.  The

9       decision becomes final, that the legal effect is given to it

10      with the signature, when it is signed.

11             So the date of the decision is the date of the MDO

12      when it was issued.  And trying to trace it back to some

13      subjective precise moment in a particular decision-maker's mind

14      would be completely -- you can just -- it would be unsuitable

15      for discovery, and I don't think something that could

16      ultimately be discovered, setting aside the gigantic mess that

17      would make in cases across the spectrum of the administrative

18      state.

19             THE COURT:  What about the flip side of the factual

20      question here about when the memo was actually prepared.  Is

21      there any evidence on that, or is that something that the

22      agency could speak to as to whether, in fact, the -- in any

23      event, I don't have to reach this issue because the memo was

24      actually written before?

25             MS. KONKOLY:  When it was drafted?

1        THE COURT:  Yes.

2        MS. KONKOLY:  There isn't any evidence in the record

3    on that.  I don't have any -- I assume it was not done in one

4    day.

5        The Vaughn does disclose that Dr. Holman and

6    Dr. Lindsey were the authors and that the date of the document

7    is June 23rd, 2022.  But it doesn't have information about the

8    date it was -- when someone opened up a blank Word document and

9    started drafting it.

10        THE COURT:  Okay.  What about the question of why it

11    was prepared or finalized given the fact that a decision had

12    been made not to rely on it or to rely just on the toxicology

13    TPL?

14        I guess, is it a fair inference for me to draw that

15    it was prepared in case further analysis and consideration of

16    the issue was necessary?

17        MS. KONKOLY:  I think that's a fair inference, Your

18    Honor.  Certainly, the Office of Science had -- the first

19    discipline review memos were done in 2020.  There had been a

20    significant investment of time and resources on the part of the

21    agency to prepare the underlying discipline review memos, and

22    that work had been done.

23        And so the Office of Science determined to put its

24    separate analysis inside that document.  Dr. -- I don't think

25    the subjective reasons of the particular employee who wasn't

1   acting with his delegated authority in signing that document in

2   the first place are relevant to the analysis here, but in any

3   event, Dr. Holman is no longer with the FDA.  I understand he

4   works for Philip Morris these days.

5          So the -- insofar as the question of why he decided

6   to sign it and indicate his personal approval with the analysis

7   that a staff scientist had done, that is not a question that is

8   either relevant or answerable.  I don't think the Court needs

9   an answer to that to decide things.

10         I will note that the MDO --

11         THE COURT:  Well, the reason I'm raising the question

12   is whether it continues to this day to be a deliberative

13   document.  And that if it was prepared -- as Mr. Wilcox said,

14   you need to figure out what decision is the relevant decision

15   and -- for deciding whether something is deliberative.

16         And if it was prepared because -- these reviews are

17   ongoing matters and the agency always is open to further

18   persuasion and further consideration in its research and work

19   that's been done, and it's important for the agency to have,

20   not because of the decision it was making on June 22nd, was

21   it -- whatever the date was -- but because of some future

22   decision that it might make, that may weigh in favor that it

23   continues to be deliberative.

24         If it was targeted just to that particular event,

25   then there's just a further question I have to wrestle with, if

1     you follow.

2             MS. KONKOLY:  I do follow, Your Honor.  I don't have

3     anything in the record to point you to that speaks to that

4     question.

5             THE COURT:  Okay.

6             MS. KONKOLY:  I was going to point you to the MDO

7     which does explain that, in general, this -- the agency decided

8     to concur -- that OCD concurred with OS's proposal to bifurcate

9     this and decide the application strictly on the dispositive

10    toxicological deficiencies, in part, to obviate the need for

11    the time and the additional work that would be needed to

12    finalize the agency's position on all of the disciplines

13    addressed in the additional disciplines memo.

14            So that is expressly stated in the MDO as the reason

15    for that piece, which is a little bit distinct, I think, from

16    what you were asking, but related.

17            THE COURT:  All right.  Anything else you want to add

18    before we adjourn?

19            MS. KONKOLY:  No, Your Honor.

20            THE COURT:  So I think it would be helpful for me to

21    receive the in camera copies of the withheld documents so I can

22    review them both with respect to segregability -- because I

23    think the plaintiffs raised a fair issue with respect to

24    segregability, at least at the margin.  And also, I think it

25    will help me in determining that the documents are truly

1    deliberative and not simply reporting scientific fact in a way

2    that doesn't involve a selection that reveals internal

3    deliberations.

4            Also, if you do want to file a supplemental

5    declaration that addresses the question of public confusion or

6    any of the, sort of, related issues or other issues that I've

7    raised today, you're welcome to do that.  My question for you

8    is just timing for both of those things.

9            MS. KONKOLY:  Could we have three weeks?

10           THE COURT:  Any objection to that?

11           MR. WILCOX:  Three weeks seems to be amenable, Your

12   Honor.

13           THE COURT:  Okay.  You're getting into the holiday

14   season here, but that's fine with me.  So just pick a day.

15   Today is the 1st.  You want until the 22nd of December?

16           MS. KONKOLY:  The 22nd would be great, Your Honor.

17           THE COURT:  Okay.  I'll give you until the 22nd of

18   December to do those two things.  Well, this was very

19   enlightening for me.  Thank you.  It was a very helpful

20   argument.

21           MS. KONKOLY:  Thank you, Your Honor.

22           THE COURT:  Have a nice weekend everyone.

23           MS. KONKOLY:  You, too.

24           (The hearing adjourned at 3:20 p.m.)

25

```
1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, TAMARA M. SEFRANEK, do hereby certify that the

4      above and foregoing constitutes a true and accurate transcript

5      of my stenographic notes and is a full, true and complete

6      transcript of the proceedings to the best of my ability.

7              Dated this 8th day of December, 2023.

8

9                       /s/ Tamara M. Sefranek_____
                        Tamara M. Sefranek, RMR, CRR, CRC
10                      Official Court Reporter
                        Room 6714
11                      333 Constitution Avenue, N.W.
                        Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## /

**/s** [1] - 73:9

## 1

**1** [2] - 1:6, 27:19
**100** [1] - 33:22
**100Reporters** [1] -
58:15
**1100** [1] - 1:17
**1240** [3] - 30:17,
30:21, 30:22
**1301** [1] - 1:14
**16-2** [1] - 18:12
**1:22-cv-2853** [1] - 1:3
**1:40** [1] - 1:7
**1st** [1] - 72:15

## 2

**2** [1] - 27:3
**20** [3] - 43:22, 54:15,
59:6
**20001** [2] - 1:23, 73:11
**20004** [1] - 1:14
**20005** [1] - 1:18
**202-354-3246** [1] -
1:24
**2020** [1] - 69:19
**2021** [1] - 20:19
**2022** [2] - 3:21, 69:7
**2023** [2] - 1:6, 73:7
**22** [2] - 54:15, 59:6
**22-2853** [1] - 2:2
**22nd** [4] - 70:20,
72:15, 72:16, 72:17
**23rd** [7] - 3:20, 53:2,
53:22, 53:24, 54:4,
54:5, 69:7
**24** [4] - 18:11, 18:14,
48:19, 64:20
**25** [1] - 48:19

## 3

**3** [2] - 32:15, 59:5
**333** [2] - 1:23, 73:11
**357** [1] - 32:15
**358** [1] - 32:15
**3:20** [1] - 72:24

## 4

**4** [1] - 34:15

## 5

**5** [2] - 31:3, 32:8
**552** [1] - 32:8

## 6

**6** [1] - 16:6
**662** [2] - 30:17, 30:22
**6714** [2] - 1:22, 73:10
**6th** [1] - 56:9

## 7

**7** [2] - 22:14, 60:17
**7th** [1] - 73:7

## 8

**8** [1] - 60:17

## 9

**9** [1] - 22:14

## A

**abandoned** [1] - 46:25
**ability** [1] - 73:6
**able** [4] - 36:11, 41:4,
43:7, 65:16
**absurd** [1] - 66:24
**accept** [1] - 12:13
**accepted** [1] - 40:13
**accepting** [1] - 51:23
**accord** [1] - 45:18
**accurate** [4] - 10:25,
49:22, 50:19, 73:4
**acknowledged** [1] -
60:12
**Act** [3] - 31:16, 56:1,
63:19
**acting** [4] - 27:12,
27:14, 62:19, 70:1
**Action** [1] - 1:3
**action** [3] - 20:23,
20:24, 64:10
**active** [1] - 14:22
**actively** [1] - 15:6
**actual** [5] - 3:4, 35:20,
36:11, 37:20, 56:24
**add** [3] - 19:21, 34:6,
71:17
**additional** [19] - 4:14,
4:19, 4:21, 5:11,
10:13, 12:8, 12:15,
14:15, 14:24, 15:16,
26:15, 27:21, 40:1,
40:16, 47:14, 47:25,
61:6, 71:11, 71:13
**address** [5] - 8:4,
15:8, 15:23, 24:1,
26:13
**addressed** [2] - 15:11,
71:13

**addresses** [2] - 34:16,
72:5
**addressing** [1] - 34:19
**adds** [1] - 52:24
**adjourn** [1] - 71:18
**adjourned** [1] - 72:24
**ADMINISTRATION**[1]
- 1:6
**Administration** [7] -
2:3, 2:12, 27:20,
56:10, 56:14, 56:15,
61:24
**administrative** [9] -
38:7, 38:21, 39:2,
39:4, 39:11, 42:6,
46:14, 65:24, 68:17
**adopt** [1] - 3:17
**adopted** [17] - 3:4,
5:13, 5:14, 5:18,
5:19, 5:21, 6:18,
6:19, 9:25, 10:5,
13:23, 15:18, 15:19,
27:16, 30:7, 65:11,
66:15
**adopting** [2] - 13:2,
40:10
**adoption** [4] - 3:18,
5:16, 14:9, 18:22
**adults** [1] - 18:16
**advance** [1] - 67:1
**adverse** [1] - 22:5
**adversely** [1] - 45:15
**affect** [10] - 10:17,
14:20, 16:19, 17:2,
21:8, 21:9, 33:24,
34:5, 36:17, 46:9
**affected** [1] - 46:4
**aforementioned** [1] -
6:14
**afternoon** [5] - 2:6,
2:9, 2:10, 2:20, 52:9
**agencies** [6] - 9:20,
35:25, 36:3, 39:7,
53:9, 57:16
**agency** [95] - 4:23,
5:17, 6:12, 6:19,
6:23, 7:4, 8:22, 9:11,
10:1, 10:2, 10:5,
10:8, 10:12, 17:15,
17:18, 17:20, 20:8,
20:14, 20:21, 21:6,
22:4, 23:3, 23:4,
23:13, 24:21, 25:13,
27:10, 27:22, 28:17,
29:23, 32:9, 32:22,
33:18, 35:1, 35:20,
36:10, 36:17, 37:19,
37:20, 37:23, 38:2,
38:6, 38:11, 38:16,
38:22, 38:24, 39:3,

39:21, 40:7, 40:8,
40:14, 41:8, 41:15,
41:22, 42:14, 43:1,
43:22, 44:9, 44:22,
45:3, 45:4, 46:21,
46:24, 49:19, 50:13,
51:4, 51:10, 51:25,
55:10, 56:23, 57:4,
58:18, 59:13, 61:6,
61:12, 62:9, 63:20,
63:23, 64:1, 65:2,
65:13, 65:16, 65:20,
65:21, 65:25, 66:3,
67:11, 67:20, 68:2,
68:22, 69:21, 70:17,
70:19, 71:7
**agency's** [19] - 15:22,
19:13, 21:1, 22:18,
24:6, 24:10, 28:24,
33:8, 35:2, 36:17,
44:16, 45:6, 45:12,
46:20, 55:3, 64:11,
65:11, 66:6, 71:12
**aggregate** [1] - 3:11
**agree** [12] - 7:7, 10:21,
17:7, 28:22, 44:4,
45:20, 49:5, 53:17,
53:20, 53:22, 58:12
**agreed** [3] - 5:7,
13:19, 20:20
**agreement** [1] - 41:20
**agrees** [1] - 7:4
**ahead** [6] - 12:12,
30:4, 32:6, 33:16,
34:11, 48:7
**allow** [1] - 56:17
**almost** [1] - 50:24
**alone** [1] - 58:10
**amenable** [1] - 72:11
**analogy** [2] - 21:19,
22:6
**analyses** [3] - 33:3,
42:21, 56:13
**analysis** [24] - 6:18,
7:5, 12:21, 14:14,
21:16, 24:17, 24:22,
39:18, 47:19, 47:20,
52:22, 53:17, 55:16,
56:2, 56:18, 56:22,
57:11, 57:19, 58:19,
61:16, 69:15, 69:24,
70:2, 70:6
**analyzed** [1] - 45:14
**ANDA** [1] - 57:3
**announced** [4] -
49:15, 49:18, 49:19,
51:24
**answer** [4] - 61:21,
63:2, 67:20, 70:9
**answerable** [1] - 70:8

**ANTONIA** [1] - 1:16
**Antonia** [1] - 2:10
**APA** [1] - 38:20
**apologize** [1] - 50:2
**appeal** [1] - 42:6
**Appeals** [1] - 38:8
**appeals** [1] - 39:2
**appear** [1] - 64:24
**applicability** [1] -
23:25
**applicant** [2] - 36:10,
59:10
**application** [19] - 4:5,
4:6, 4:8, 4:17, 4:20,
12:10, 12:16, 12:17,
25:4, 25:5, 25:12,
36:9, 36:11, 57:3,
57:5, 60:18, 60:21,
71:9
**applications** [6] -
2:24, 4:25, 5:4, 29:3,
57:17, 59:12
**applies** [4] - 14:14,
31:3, 48:3, 66:14
**apply** [4] - 12:7, 40:24,
47:14, 47:24
**applying** [2] - 21:22,
59:11
**appreciate** [5] - 13:24,
22:8, 23:18, 35:21,
48:4
**approach** [2] - 2:4,
46:25
**appropriate** [7] - 6:15,
18:18, 44:7, 45:25,
58:15, 61:10, 61:13
**approval** [6] - 13:1,
18:19, 53:16, 54:24,
54:25, 70:6
**approve** [3] - 19:1,
56:16, 57:17
**approved** [2] - 21:21,
22:3
**April** [2] - 19:4, 25:19
**area** [2] - 17:8, 17:11
**arguing** [1] - 55:5
**argument** [30] - 6:1,
10:16, 10:24, 11:4,
11:15, 11:16, 11:17,
11:20, 14:11, 14:12,
17:6, 26:17, 27:11,
29:5, 34:15, 38:18,
38:19, 38:23, 40:15,
42:13, 42:14, 47:6,
49:13, 51:25, 53:22,
55:5, 55:6, 67:9,
68:7, 72:20
**arguments** [10] - 24:1,
26:13, 31:20, 32:2,
34:16, 51:20, 58:12,

75

58:13, 63:17
**arm** [1] - 62:13
**article** [4] - 39:6, 50:4, 53:4, 66:17
**articulate** [5] - 8:9, 17:25, 40:22, 41:10, 50:16
**articulated** [7] - 9:19, 14:19, 20:14, 20:21, 23:16, 50:17, 64:5
**articulating** [1] - 28:23, 37:17
**articulation** [3] - 8:15, 18:10, 63:21
**aside** [5] - 50:7, 50:25, 51:2, 52:2, 68:16
**asserting** [2] - 24:19, 48:3
**assertion** [2] - 21:17, 48:1
**assess** [2] - 24:13, 26:2
**assessed** [6] - 3:13, 4:4, 4:8, 4:13, 4:15, 15:18
**assesses** [1] - 3:10
**assessment** [7] - 2:24, 4:22, 18:25, 20:20, 20:22, 30:13, 66:6
**assessments** [4] - 5:10, 18:3, 65:22, 66:1
**assigned** [2] - 25:10, 26:24
**assistant** [1] - 28:7
**assume** [5] - 8:19, 52:7, 54:6, 54:10, 69:3
**assumed** [1] - 60:11
**attached** [2] - 19:8, 66:9
**attempted** [1] - 41:16
**attempting** [1] - 48:1
**attested** [1] - 24:18
**attorney** [1] - 28:7
**Attorney** [4] - 28:9, 28:10, 28:11, 28:14
**author** [3] - 14:18, 47:11, 60:9
**authored** [5] - 4:10, 4:14, 27:8, 47:13, 48:10
**authoring** [2] - 8:16, 12:4
**authorities** [3] - 17:22, 28:18, 29:13
**Authority** [1] - 30:19
**authority** [23] - 3:24, 3:25, 5:4, 13:7, 13:14, 13:22, 26:18,

26:25, 27:13, 27:25, 28:4, 28:13, 29:2, 29:20, 29:24, 30:2, 62:6, 62:10, 62:16, 62:17, 62:23, 62:24, 70:1
**authorized** [1] - 29:6
**authors** [4] - 12:3, 14:16, 48:13, 69:6
**availability** [1] - 39:6
**available** [14] - 9:15, 35:2, 38:4, 38:8, 38:21, 39:25, 40:6, 40:24, 41:2, 41:3, 44:10, 44:20, 59:6, 60:23
**Avenue** [3] - 1:14, 1:23, 73:11
**avoid** [3] - 33:4, 58:9, 62:6
**aware** [4] - 7:9, 15:1, 28:3, 40:10

---

## B

**back-and-forth** [1] - 57:8
**background** [2] - 49:1, 60:17
**bad** [1] - 43:15
**bag** [1] - 66:4
**balancing** [2] - 18:21, 56:24
**bark** [1] - 46:16
**barrage** [1] - 57:16
**based** [8] - 12:10, 17:15, 17:18, 31:14, 47:18, 55:10, 58:10, 61:15
**basic** [1] - 2:20
**basis** [8] - 4:3, 24:20, 25:22, 46:5, 47:10, 47:21, 64:23, 65:11
**battle** [1] - 38:16
**bears** [1] - 5:22
**became** [3] - 10:11, 13:15, 50:3
**become** [3] - 17:19, 18:23, 67:2
**becomes** [2] - 66:25, 68:9
**BEFORE** [1] - 1:8
**beforehand** [1] - 54:7
**begin** [1] - 2:20
**behalf** [3] - 2:7, 2:11, 28:10
**behind** [2] - 10:14, 66:5
**belabor** [3] - 51:19, 62:14, 62:25

**bench** [1] - 36:1
**benefit** [2] - 18:15, 18:21
**benefits** [1] - 18:23
**Berman** [2] - 2:13, 41:19
**BERMAN** [1] - 1:16
**best** [2] - 9:16, 73:6
**better** [1] - 30:3
**between** [1] - 44:23
**beyond** [3] - 4:21, 10:16, 17:25
**bifurcate** [2] - 12:20, 71:8
**big** [3] - 25:5, 33:11, 33:25
**bigger** [1] - 57:15
**bill** [1] - 66:25
**bin** [1] - 35:7
**binding** [1] - 11:25
**Biological** [1] - 58:24
**bit** [6] - 19:19, 20:9, 33:16, 34:11, 40:19, 71:15
**blank** [1] - 69:8
**blanket** [1] - 61:8
**block** [7] - 25:5, 33:11, 59:17, 59:20, 60:1, 60:2, 60:20
**body** [1] - 44:8
**bold** [1] - 16:24
**book** [1] - 39:5
**borrow** [1] - 43:8
**bottom** [5] - 11:20, 14:11, 42:14, 46:25, 47:24
**bottom-up** [5] - 11:20, 14:11, 42:14, 46:25, 47:24
**break** [1] - 63:6
**breaks** [1] - 20:9
**brief** [13] - 19:17, 20:18, 22:11, 32:14, 35:18, 38:6, 54:15, 54:23, 55:23, 58:25, 59:1, 60:20, 63:13
**briefing** [1] - 64:4
**briefly** [4] - 22:22, 30:12, 49:11, 66:16
**briefs** [1] - 26:23
**bring** [1] - 31:18
**broken** [1] - 19:19
**brought** [1] - 11:3
**burden** [3] - 5:17, 5:22, 21:2
**bureaucrat** [1] - 43:8

---

## C

**cabinet** [1] - 29:14

**camera** [6] - 25:1, 25:16, 25:21, 58:14, 61:10, 71:21
**candid** [1] - 35:20
**candidly** [1] - 40:13
**canon** [1] - 65:24
**capacity** [1] - 27:12
**caption** [1] - 34:1
**care** [1] - 32:22
**carries** [1] - 5:17
**Case** [1] - 2:2
**case** [44] - 2:21, 3:7, 6:9, 7:21, 11:9, 16:21, 17:11, 20:12, 20:18, 26:5, 28:19, 36:2, 39:16, 39:17, 40:10, 40:25, 41:15, 41:21, 42:7, 42:8, 42:9, 42:15, 46:11, 46:15, 51:20, 54:22, 54:23, 54:25, 55:23, 55:24, 56:6, 56:8, 56:9, 56:10, 56:12, 58:9, 58:16, 59:1, 63:2, 63:22, 64:14, 67:10, 69:15
**cases** [20] - 17:8, 21:4, 38:21, 38:22, 39:1, 41:14, 41:20, 41:23, 42:4, 45:2, 45:19, 46:6, 53:8, 54:22, 56:14, 56:15, 56:20, 58:23, 64:16, 68:17
**cat** [1] - 66:3
**cautionary** [1] - 34:6
**cautious** [1] - 33:6
**center** [2] - 61:22, 62:21
**Center** [1] - 62:19
**Centers** [2] - 58:24
**certain** [3] - 24:21, 34:2, 65:22
**certainly** [20] - 15:14, 16:19, 19:11, 20:10, 22:11, 23:12, 23:18, 26:2, 26:12, 29:1, 29:21, 31:5, 40:15, 48:18, 54:3, 59:7, 63:25, 65:6, 66:24, 69:18
**CERTIFICATE** [1] - 73:1
**certify** [1] - 73:3
**challenges** [1] - 38:6
**chance** [1] - 31:22
**change** [8] - 10:7, 10:8, 33:8, 57:25, 59:17, 62:17, 62:22, 68:8
**changed** [2] - 60:1,

60:4
**changes** [3] - 52:24, 53:7, 65:25
**characterize** [1] - 3:3
**chill** [8] - 14:21, 33:9, 33:13, 36:17, 39:21, 41:25, 42:16, 52:14
**chilled** [3] - 42:6, 42:23, 52:4
**chilling** [22] - 7:18, 7:20, 8:6, 8:11, 8:15, 9:19, 37:11, 37:19, 37:20, 37:22, 38:3, 38:13, 38:15, 40:6, 40:9, 41:6, 42:13, 42:17, 44:10, 44:13, 44:18, 65:7
**chooses** [1] - 4:1
**choosing** [1] - 25:7
**chromographic** [1] - 57:11
**chronology** [1] - 49:14
**cigarette** [2] - 18:5, 60:22
**circuit** [1] - 64:12
**Circuit** [9] - 21:11, 30:17, 31:19, 32:13, 39:16, 39:17, 41:7, 56:9, 64:14
**circumstance** [2] - 45:24, 61:10
**circumstances** [4] - 6:6, 49:7, 63:22, 64:25
**cite** [7] - 32:14, 38:5, 40:8, 54:22, 55:23, 58:25, 59:1
**cited** [2] - 20:18, 30:18
**cites** [1] - 56:22
**civil** [1] - 2:2
**Civil** [1] - 1:3
**clarification** [6] - 8:8, 13:9, 14:12, 28:23, 48:5, 48:8
**clarifies** [1] - 33:14
**clarify** [2] - 8:25, 48:1
**clarity** [1] - 22:23
**clear** [9] - 9:18, 24:4, 24:19, 31:7, 34:22, 35:12, 35:14, 36:9, 39:10
**clearest** [1] - 18:10
**clearly** [4] - 13:18, 27:11, 30:7, 47:9
**client** [1] - 46:19
**client's** [1] - 44:15
**closing** [1] - 30:11
**Coastal** [1] - 64:6, 64:15

**colleague** [1] - 2:8
**color** [1] - 43:20
**COLUMBIA** [1] - 1:1
**combustible** [1] -
18:24
**coming** [3] - 23:8,
55:10, 68:6
**comment** [4] - 27:17,
27:23, 28:17, 28:19
**commissioner** [5] -
27:20, 27:24, 61:23,
62:4, 62:16
**Committee** [4] -
32:14, 38:15, 41:9
**common** [8] - 42:22,
42:23, 42:25, 43:13,
44:1, 44:6, 62:11,
63:22
**commonsense** [2] -
20:25, 44:5
**company** [3] - 21:22,
35:5, 35:11
**comparative** [1] -
60:22
**compare** [1] - 27:5
**compared** [2] - 18:16,
65:13
**comparisons** [1] -
24:16
**compelling** [1] - 43:16
**competing** [1] - 45:24
**complete** [1] - 73:5
**completely** [2] -
66:18, 68:14
**complied** [1] - 31:15
**comply** [1] - 29:22
**concede** [1] - 55:4
**concern** [6] - 34:19,
37:14, 40:9, 40:18,
40:22, 40:23
**concerned** [3] - 25:15,
34:8, 34:21
**concerns** [4] - 35:20,
36:12, 37:23, 55:20
**concessions** [1] -
22:20
**conclusion** [2] -
18:15, 19:15
**conclusions** [4] - 5:5,
17:1, 40:5, 43:4
**concrete** [6] - 33:8,
38:12, 41:5, 41:7,
41:17, 61:7
**concur** [5] - 4:24,
12:17, 48:12, 48:14,
71:8
**concurred** [2] - 12:22,
71:8
**concurrence** [4] -
5:12, 13:1, 13:21,
14:8
**concurrent** [2] - 27:1,
27:10
**conducting** [2] - 8:17,
9:21
**confess** [1] - 14:1
**confidential** [3] - 12:6,
47:13, 61:9
**confidentiality** [2] -
12:19, 14:17
**confirm** [3] - 9:5, 25:1,
25:17
**conflicting** [1] - 45:22,
46:1
**confused** [2] - 17:18,
32:25
**confusing** [1] - 64:8
**confusion** [3] - 7:16,
8:4, 15:8, 15:22,
16:14, 16:18, 17:13,
19:2, 19:16, 19:20,
20:2, 20:4, 20:13,
20:15, 20:24, 21:1,
21:9, 21:16, 21:17,
21:24, 22:10, 22:20,
32:1, 32:16, 33:14,
34:17, 34:19, 34:21,
36:23, 37:8, 40:19,
64:4, 72:5
**confusions** [1] - 17:25
**Connolly** [1] - 30:17
**consider** [4] - 9:15,
9:16, 38:23, 57:17
**consideration** [4] -
15:2, 50:13, 69:15,
70:18
**considered** [8] - 6:13,
6:20, 9:25, 10:4,
10:11, 17:16, 23:15,
65:10
**considering** [2] -
18:22, 35:24
**consistent** [2] - 4:18,
17:10
**constantly** [1] - 57:16
**constitutes** [1] - 73:4
**Constitution** [2] -
1:23, 73:11
**consuming** [1] - 18:5
**contacts** [1] - 68:3
**contained** [1] - 4:16
**contend** [1] - 64:2
**contending** [1] - 27:7
**context** [5] - 2:22,
19:7, 22:19, 24:11,
68:5
**continues** [2] - 70:12,
70:23
**contravene** [1] - 5:21
**Control** [1] - 31:15
**controversial** [1] -
21:5
**conversation** [1] -
33:24
**conversations** [1] -
33:10
**convince** [1] - 36:14
**convinced** [1] - 19:20
**Cooper** [2] - 21:23,
34:16
**Cooper's** [1] - 6:9
**copies** [1] - 71:21
**copy** [1] - 67:16
**core** [1] - 11:14
**correct** [6] - 8:19,
12:23, 33:22, 34:13,
51:11, 58:22
**counsel** [6] - 2:4, 2:5,
15:4, 28:2, 37:14,
65:8
**Counsel** [1] - 28:8
**counteract** [1] - 63:24
**couple** [5] - 32:1,
34:14, 42:2, 54:14,
57:6
**course** [5] - 8:5, 10:8,
29:21, 64:10, 68:8
**court** [6] - 20:19,
20:20, 56:6, 63:4,
64:13, 64:14
**COURT** [119] - 1:1,
2:9, 2:15, 3:6, 5:22,
5:25, 6:4, 7:12, 7:15,
7:19, 7:22, 8:5, 8:7,
8:13, 8:19, 9:4, 9:8,
10:15, 11:3, 11:21,
12:1, 12:22, 12:25,
13:11, 13:24, 14:3,
14:23, 15:7, 15:10,
15:25, 18:7, 18:13,
19:18, 20:11, 21:3,
22:8, 22:24, 23:3,
23:20, 23:24, 24:24,
26:4, 26:16, 27:16,
28:1, 29:4, 29:9,
30:10, 30:21, 31:21,
31:24, 32:4, 32:20,
33:16, 34:13, 35:4,
35:15, 36:24, 37:12,
38:18, 39:14, 40:17,
41:1, 41:12, 42:19,
44:25, 45:10, 46:1,
46:23, 47:3, 47:5,
47:16, 47:22, 48:4,
48:7, 49:10, 49:12,
49:17, 50:7, 50:19,
50:23, 51:22, 52:19,
53:12, 54:9, 54:20,
55:14, 56:6, 56:25,
58:3, 58:7, 59:13,
59:19, 60:5, 60:15,
62:1, 62:3, 62:19,
63:3, 63:8, 63:9,
63:11, 63:15, 64:12,
64:17, 66:12, 67:8,
68:19, 69:1, 69:10,
70:11, 71:5, 71:17,
71:20, 72:10, 72:13,
72:17, 72:22, 73:1
**Court** [25] - 1:21, 1:22,
11:23, 11:25, 12:2,
12:6, 14:14, 23:17,
25:1, 25:16, 25:21,
31:9, 37:17, 38:8,
42:20, 42:22, 44:23,
45:4, 56:4, 58:15,
61:11, 65:6, 66:19,
70:8, 73:10
**Court's** [3] - 11:7,
26:1, 30:13
**Courthouse** [1] - 1:22
**COURTROOM** [1] -
2:2
**courts** [3] - 44:3,
56:19, 57:22
**cover** [3] - 35:6, 59:9,
61:3
**CRC** [2] - 1:21, 73:9
**creates** [1] - 51:10
**cross** [1] - 2:16
**cross-motions** [1] -
2:16
**crossing** [1] - 21:10
**CRR** [2] - 1:21, 73:9
**crucial** [1] - 2:21
**CTD** [1] - 13:12
**CTP** [2] - 3:23, 3:25
**current** [2] - 45:6,
45:12
**curtain** [1] - 10:14

**D**

**D.C** [10] - 1:6, 21:11,
30:17, 31:19, 32:13,
39:16, 39:17, 41:7,
64:14, 73:11
**data** [1] - 45:13
**date** [11] - 52:11,
52:13, 53:3, 66:20,
67:4, 67:22, 68:11,
69:6, 69:8, 70:21
**dated** [2] - 53:24, 54:5
**Dated** [1] - 73:7
**Davis** [2] - 54:23, 56:9
**days** [1] - 70:4
**DC** [3] - 1:14, 1:18,
1:23
**deal** [1] - 38:20
**dealing** [2] - 21:6,
43:2
**decades** [1] - 44:3
**December** [4] - 1:6,
72:15, 72:18, 73:7
**decide** [9] - 25:22,
26:10, 33:17, 36:8,
49:2, 51:15, 58:9,
70:9, 71:9
**decided** [8] - 17:16,
28:15, 31:19, 52:15,
56:6, 67:1, 70:5,
71:7
**decides** [1] - 23:14
**deciding** [1] - 70:15
**decision** [91] - 3:12,
6:9, 10:1, 10:6,
10:12, 10:17, 11:4,
11:6, 11:13, 11:24,
12:20, 13:6, 13:7,
13:8, 14:21, 14:22,
17:19, 24:6, 24:11,
25:25, 27:9, 29:12,
30:4, 30:17, 30:19,
31:8, 32:14, 32:18,
33:12, 34:15, 38:16,
40:7, 41:9, 43:5,
43:11, 43:20, 44:6,
47:11, 47:21, 48:11,
49:15, 50:3, 50:15,
50:16, 50:25, 51:7,
51:11, 51:13, 51:24,
52:1, 52:18, 52:23,
53:9, 53:10, 53:16,
56:16, 61:13, 62:18,
63:1, 65:12, 65:15,
65:20, 65:21, 65:23,
66:2, 66:19, 66:23,
67:2, 67:4, 67:12,
67:13, 67:21, 68:1,
68:3, 68:4, 68:6,
68:9, 68:11, 68:13,
69:11, 70:14, 70:20,
70:22
**decision-maker** [7] -
3:12, 11:12, 11:13, 13:7,
14:21, 29:12, 43:5,
66:23
**decision-maker's** [1] -
68:13
**decision-making** [4] -
10:17, 13:6, 24:6,
24:11
**decisional** [8] - 2:22,
3:5, 3:8, 3:20, 26:20,
38:9, 52:22
**decisions** [6] - 5:18,
14:18, 18:4, 46:8,
64:11, 64:23
**declaration** [14] -
6:12, 8:10, 18:11,

20:9, 23:19, 24:12, 24:18, 27:4, 38:2, 59:25, 64:19, 67:22, 72:5
**declarations** [9] - 8:9, 18:7, 19:22, 25:23, 25:24, 40:16, 40:18, 59:22, 60:12
**deemed** [1] - 56:19
**deeply** [1] - 32:22
**Defendant** [2] - 1:7, 1:16
**deficiencies** [9] - 4:4, 4:7, 4:13, 5:8, 12:11, 12:14, 31:15, 47:18, 71:10
**definition** [1] - 50:24
**delegated** [12] - 13:22, 26:18, 26:25, 27:13, 27:25, 29:14, 62:5, 62:16, 62:17, 62:22, 62:23, 70:1
**delegation** [17] - 27:1, 27:3, 27:10, 27:16, 27:18, 27:19, 28:4, 28:9, 29:1, 29:10, 30:1, 61:19, 61:20, 61:21, 61:23, 61:25, 62:3
**delegations** [2] - 27:19, 27:21
**delegee** [1] - 28:21
**deliberation** [1] - 11:12
**deliberations** [30] - 10:14, 11:7, 11:11, 20:5, 21:8, 21:9, 25:9, 33:9, 34:5, 34:22, 35:19, 36:18, 37:21, 38:13, 39:1, 39:22, 40:11, 41:8, 41:25, 42:16, 42:18, 42:24, 44:21, 44:22, 45:7, 45:13, 46:4, 46:20, 66:5, 72:3
**deliberative** [38] - 3:15, 4:24, 7:24, 15:13, 16:9, 17:5, 17:13, 17:24, 19:12, 23:13, 24:4, 30:14, 32:12, 32:18, 35:23, 36:13, 37:9, 38:24, 41:24, 42:4, 54:18, 54:21, 55:2, 55:15, 55:18, 55:21, 56:16, 56:20, 57:15, 57:23, 58:13, 60:25, 64:7, 64:15, 70:12, 70:15, 70:23, 72:1
**demonstrate** [1] - 5:17

**denial** [5] - 3:1, 35:3, 38:7, 38:10, 50:17
**denied** [2] - 4:20, 4:25
**deny** [2] - 4:2, 12:10
**Department** [4] - 1:17, 2:11, 2:14, 28:8
**DEPUTY** [1] - 2:2
**describe** [2] - 60:1, 60:17
**described** [3] - 23:6, 59:21, 59:23
**detail** [3] - 4:12, 24:13, 26:22
**determination** [2] - 20:3, 26:1
**determined** [3] - 3:22, 4:2, 69:23
**determining** [1] - 71:25
**developing** [1] - 17:8
**development** [1] - 16:2
**DHS** [1] - 20:20
**difference** [1] - 40:2
**different** [8] - 27:12, 28:16, 43:3, 43:11, 48:21, 48:24, 57:2, 59:16
**differently** [2] - 26:8, 33:4
**DIHS** [1] - 27:3
**dinky** [1] - 40:1
**direct** [1] - 26:9
**direction** [1] - 48:21
**directly** [3] - 7:24, 36:21, 64:19
**director** [4] - 27:2, 61:22, 62:19, 62:21
**disagree** [5] - 7:7, 10:18, 42:1, 43:16, 48:21
**disagreement** [3] - 6:5, 6:25, 10:23
**disagrees** [1] - 11:24
**discipline** [16] - 6:8, 6:17, 6:21, 7:2, 8:16, 8:21, 10:4, 14:5, 14:11, 15:17, 48:2, 55:9, 64:22, 65:8, 69:19, 69:21
**disciplined** [2] - 3:10, 14:16
**disciplines** [15] - 4:15, 4:19, 5:10, 10:13, 12:8, 14:15, 15:16, 26:15, 45:14, 47:14, 47:25, 54:11, 71:12, 71:13
**disclaimer** [1] - 22:19
**disclose** [5] - 8:22,

9:10, 58:11, 69:5
**disclosed** [9] - 5:15, 41:25, 42:5, 45:5, 45:11, 46:3, 46:7, 59:21, 67:6
**disclosing** [2] - 10:12, 57:18
**disclosure** [11] - 7:14, 9:22, 14:20, 19:15, 20:15, 20:21, 21:7, 23:5, 32:10, 37:6, 38:25
**disclosures** [1] - 23:7
**discovered** [1] - 68:16
**discovery** [3] - 46:11, 67:9, 68:15
**discretion** [1] - 26:1
**discussion** [4] - 11:5, 33:14, 60:20, 66:17
**discussions** [1] - 34:5
**disentangled** [1] - 61:12
**disorders** [1] - 21:21
**disposal** [1] - 34:20
**dispositive** [8] - 4:4, 4:14, 5:9, 8:24, 12:11, 52:12, 71:9
**dispute** [2] - 44:23, 67:24
**dissemination** [1] - 64:9
**distinct** [1] - 71:15
**distinction** [1] - 65:18
**distinctions** [1] - 56:11
**distinguish** [1] - 11:19
**distinguishable** [1] - 14:6
**distinguishes** [1] - 10:3
**DISTRICT** [3] - 1:1, 1:1, 1:9
**District** [1] - 56:7
**district** [3] - 56:11, 58:24, 64:12
**Diversity** [1] - 58:24
**Division** [1] - 27:2
**Dobbs** [1] - 11:4
**docket** [1] - 30:20
**Docket** [1] - 18:11
**doctrine** [3] - 3:19, 5:16, 24:4
**document** [39] - 2:22, 3:5, 3:8, 3:20, 12:7, 16:24, 26:20, 27:15, 27:21, 35:8, 41:24, 47:11, 47:13, 47:20, 51:10, 52:17, 52:22, 53:3, 53:8, 53:14, 53:24, 54:2, 54:5,

54:11, 54:12, 55:6, 56:4, 59:21, 60:4, 67:2, 68:1, 69:6, 69:8, 69:24, 70:1, 70:13
**documents** [52] - 3:15, 5:19, 9:22, 10:3, 15:15, 19:5, 19:10, 19:12, 22:12, 22:16, 22:17, 24:2, 24:9, 24:18, 25:15, 26:6, 27:8, 30:15, 31:6, 36:13, 37:15, 37:16, 37:25, 38:9, 38:24, 39:11, 39:12, 39:15, 40:4, 40:24, 42:4, 44:20, 46:21, 48:3, 53:9, 54:9, 55:2, 57:25, 58:11, 59:8, 59:9, 61:11, 64:9, 65:5, 65:9, 65:18, 65:19, 65:20, 66:9, 71:21, 71:25
**dog** [1] - 46:16
**done** [16] - 15:14, 17:6, 23:20, 23:22, 28:19, 29:11, 42:10, 44:3, 58:19, 59:3, 69:3, 69:19, 69:22, 70:7, 70:19
**dotting** [1] - 21:11
**doubt** [1] - 42:9
**doubting** [1] - 26:6
**down** [18] - 6:23, 11:20, 14:19, 18:11, 20:9, 22:22, 34:21, 35:17, 35:23, 40:5, 40:9, 40:11, 40:22, 49:2, 49:8, 55:1, 58:14, 68:7
**down/bottom** [1] - 11:17
**dozen** [1] - 38:5
**dozens** [1] - 44:12
**Dr** [19] - 13:1, 13:21, 26:14, 26:24, 29:6, 29:21, 52:6, 52:8, 52:15, 53:5, 53:25, 59:17, 60:3, 60:13, 67:15, 69:5, 69:6, 69:24, 70:3
**draft** [1] - 16:20
**drafted** [2] - 3:16, 68:25
**drafting** [1] - 69:9
**draw** [9] - 24:16, 32:21, 44:14, 46:18, 46:19, 54:2, 54:3, 56:11, 69:14
**drawn** [1] - 17:9

**DRMs** [2] - 15:18, 24:13
**Drug** [5] - 2:3, 2:12, 27:20, 56:15, 61:23
**DRUG** [1] - 1:6
**drug** [10] - 21:21, 21:22, 21:24, 22:1, 54:24, 54:25, 56:8, 57:3, 57:25
**due** [1] - 47:14

## E

**e-cigarette** [1] - 18:5
**easier** [2] - 10:22, 36:19
**easily** [1] - 35:11
**edits** [3] - 54:1, 54:4, 54:8
**effect** [20] - 11:6, 11:13, 20:4, 22:15, 26:14, 37:11, 37:19, 37:20, 37:22, 38:3, 38:13, 38:15, 40:6, 40:9, 41:6, 42:13, 44:11, 44:13, 44:18, 68:9
**effects** [1] - 22:5
**efficient** [1] - 26:5
**efforts** [2] - 3:3, 63:24
**either** [5] - 2:25, 7:8, 59:24, 63:25, 70:8
**electronic** [1] - 18:5
**Ellis** [2] - 1:13, 2:7
**embarrass** [1] - 43:21
**embarrassing** [1] - 43:25
**emphasize** [4] - 17:8, 19:3, 31:12, 65:3
**emphasizing** [2] - 2:20, 65:9
**employee** [1] - 69:25
**Employees** [1] - 20:17
**encompassed** [1] - 10:1
**end** [1] - 31:2
**endangered** [2] - 55:25, 56:12
**Endangered** [1] - 56:1
**ENDS** [1] - 19:1
**engages** [1] - 39:18
**enlightening** [1] - 72:19
**enter** [1] - 26:11
**entire** [4] - 3:24, 4:5, 25:6, 57:1
**entirely** [2] - 35:25, 44:7
**entirety** [1] - 3:24
**entitled** [1] - 37:15

**Environmental** [1] - 20:17
**EPA** [4] - 39:16, 39:18, 39:24
**equally** [2] - 31:9, 40:24
**equivalent** [1] - 50:1
**especially** [2] - 10:13, 46:17
**essence** [1] - 26:17
**essentially** [4] - 18:20, 24:8, 61:25, 66:8
**established** [1] - 65:24
**event** [3] - 68:23, 70:3, 70:24
**events** [2] - 49:14, 51:11
**evidence** [19] - 5:20, 5:21, 24:15, 41:5, 41:7, 41:17, 42:21, 45:22, 45:24, 46:2, 46:5, 46:13, 46:14, 46:16, 48:18, 58:1, 59:2, 68:21, 69:2
**evident** [1] - 44:21
**evidentiary** [1] - 63:19
**evolve** [1] - 10:7
**exact** [6] - 25:18, 39:12, 39:15, 40:3, 40:4, 65:9
**exactly** [4] - 29:19, 39:10, 58:17, 61:10
**example** [12] - 10:18, 16:15, 25:3, 33:11, 34:23, 38:12, 40:8, 41:18, 42:5, 55:13, 59:9, 60:19
**examples** [8] - 38:5, 38:17, 42:4, 44:10, 44:12, 44:17, 44:19, 56:21
**exception** [1] - 25:20
**executed** [1] - 67:1
**executive** [4] - 29:14, 29:16, 42:20, 44:2
**exemption** [8] - 16:5, 18:9, 19:25, 21:14, 22:25, 23:6, 23:9, 32:11
**Exemption** [2] - 16:6, 31:3
**exercise** [1] - 3:25
**exercised** [1] - 13:21
**exercising** [1] - 27:12
**Exhibit** [3] - 27:3, 27:19, 59:5
**Exhibits** [3] - 48:18, 54:15, 59:6
**exist** [1] - 32:24

**existed** [1] - 54:7
**exists** [4] - 17:14, 40:25, 45:21
**expectation** [7] - 12:5, 12:18, 14:7, 14:17, 47:12, 49:4
**expected** [1] - 29:21
**experienced** [3] - 3:9, 10:20, 43:2
**explain** [7] - 10:8, 37:17, 40:23, 47:10, 48:6, 65:25, 71:7
**explains** [2] - 18:14, 64:20
**explanation** [2] - 61:7, 61:8
**expressed** [1] - 13:20
**expression** [1] - 6:24
**expressly** [2] - 5:9, 71:14
**extent** [4] - 6:8, 7:25, 10:6, 12:6

## F

**F.3d** [2] - 30:17, 30:22
**F.4th** [1] - 32:15
**fact** [15] - 10:2, 12:3, 12:6, 15:22, 21:20, 27:7, 30:8, 33:22, 47:13, 52:25, 64:10, 67:24, 68:22, 69:11, 72:1
**facto** [1] - 26:19
**factor** [2] - 52:2, 61:15
**facts** [8] - 22:10, 24:9, 24:10, 24:17, 24:20, 24:21, 24:23, 25:17
**factual** [7] - 24:1, 24:4, 44:23, 44:25, 45:22, 56:4, 68:19
**fair** [9] - 11:1, 46:1, 49:17, 51:3, 63:3, 69:14, 69:17, 71:23
**fairly** [2] - 37:9, 54:13
**faith** [5] - 25:13, 26:7, 45:3, 45:19, 45:21
**fall** [4] - 8:25, 9:20, 58:3, 58:5
**falling** [2] - 58:2, 58:6
**familiar** [1] - 11:9
**far** [4] - 9:7, 25:14, 62:15, 62:23
**favor** [5] - 44:15, 44:16, 46:18, 54:4, 70:22
**FDA** [47] - 2:14, 2:17, 5:22, 6:6, 7:2, 11:24, 15:24, 16:16, 17:17, 18:14, 18:20, 18:25,

19:21, 20:3, 21:6, 22:4, 24:24, 26:21, 27:21, 32:21, 34:11, 34:14, 34:20, 35:7, 35:9, 37:1, 37:14, 38:9, 43:1, 43:18, 43:19, 46:8, 48:16, 49:25, 50:3, 50:8, 50:12, 50:15, 52:18, 53:6, 54:24, 57:3, 57:4, 57:10, 64:21, 64:25, 70:3
**FDA's** [11] - 2:24, 5:21, 17:21, 18:3, 19:12, 21:16, 31:13, 32:2, 32:18, 32:25, 49:15
**felt** [1] - 43:19
**few** [3] - 15:12, 22:16, 22:23
**field** [1] - 43:23
**figure** [2] - 58:20, 70:14
**file** [1] - 72:4
**filed** [3] - 2:17, 36:9, 36:10
**filing** [2] - 35:5, 57:9
**filings** [2] - 19:5, 30:20
**filling** [1] - 21:4
**final** [39] - 4:22, 5:6, 5:19, 10:1, 10:12, 13:6, 13:7, 13:8, 13:16, 15:15, 15:22, 17:1, 17:19, 18:3, 19:13, 22:12, 22:16, 22:18, 23:14, 26:20, 27:9, 30:4, 33:12, 35:1, 35:2, 35:9, 36:22, 49:15, 53:3, 53:16, 61:17, 62:18, 65:11, 65:20, 65:21, 66:2, 66:6, 68:9
**finalize** [1] - 71:12
**finalized** [2] - 68:4, 69:11
**finally** [1] - 22:25
**findings** [4] - 13:14, 13:15, 17:19, 19:12
**fine** [3] - 7:8, 63:8, 72:14
**first** [21] - 2:17, 4:10, 7:16, 7:20, 8:8, 8:10, 18:11, 24:12, 27:4, 27:8, 27:15, 30:14, 42:20, 50:24, 60:8, 60:14, 63:17, 64:2, 69:18, 70:2
**first-line** [1] - 27:15
**fit** [1] - 50:6

**fits** [1] - 51:18
**five** [3] - 63:5, 63:9, 63:13
**flip** [2] - 45:2, 68:19
**flow** [2] - 20:14, 20:25
**focus** [2] - 37:22, 40:17, 63:16
**focused** [1] - 9:12
**focusing** [1] - 8:22
**FOIA** [18] - 6:14, 19:7, 25:20, 31:8, 31:13, 34:24, 37:5, 37:13, 38:1, 39:20, 40:10, 41:14, 41:15, 45:2, 45:19, 46:11, 57:9, 63:19
**follow** [5] - 7:13, 9:21, 63:21, 71:1, 71:2
**followed** [2] - 3:22, 15:24
**following** [6] - 16:25, 25:5, 36:2, 42:24, 55:19
**Fontem** [1] - 30:19
**FOOD** [1] - 1:6
**food** [1] - 2:3
**Food** [4] - 2:12, 27:20, 56:15, 61:23
**FOR** [1] - 1:1
**foregoing** [1] - 73:4
**foresee** [1] - 32:10
**foreseeable** [19] - 5:23, 6:1, 6:4, 7:25, 15:25, 16:4, 16:6, 17:4, 18:8, 19:24, 21:13, 23:21, 38:25, 39:22, 41:20, 41:22, 41:23, 45:6, 45:12
**foresees** [1] - 23:5
**form** [3] - 20:15, 28:6, 65:11
**formal** [1] - 29:1
**formally** [2] - 29:11, 30:1
**former** [1] - 46:8
**forth** [4] - 4:11, 24:2, 47:19, 57:8
**forward** [5] - 9:17, 38:12, 46:13, 59:2, 61:7
**four** [2] - 4:3, 4:12
**framed** [1] - 9:8
**frank** [2] - 33:10, 33:14
**frankly** [3] - 43:6, 49:22, 52:7
**free** [4] - 19:9, 35:25, 36:3, 36:5
**front** [3] - 22:24, 25:23, 42:22

**fruit** [1] - 61:4
**full** [2] - 12:10, 73:5
**fundamentally** [1] - 57:2
**furtherance** [1] - 4:9
**future** [9] - 16:20, 40:11, 42:7, 42:16, 42:17, 45:7, 45:13, 51:4, 70:21

## G

**game** [1] - 33:16
**general** [3] - 28:7, 32:16, 71:7
**General** [4] - 28:9, 28:10, 28:11, 28:14
**generally** [5] - 25:20, 25:21, 40:21, 55:1, 59:11
**German** [5] - 6:11, 24:12, 24:18, 59:25
**gigantic** [1] - 68:16
**given** [4] - 38:17, 49:1, 68:9, 69:11
**gobbledygook** [1] - 57:12
**government** [3] - 29:22, 56:21, 58:17
**government's** [1] - 54:4
**grant** [2] - 44:15, 48:24
**granted** [2] - 2:25, 44:17
**great** [3] - 38:20, 67:15, 72:16
**Greenpeace** [2] - 54:22, 55:23
**grownup** [1] - 7:6
**guardrails** [1] - 22:6
**guess** [7] - 6:8, 13:3, 42:6, 53:1, 53:12, 53:15, 69:14
**guessing** [1] - 46:3

## H

**half** [1] - 63:7
**handle** [2] - 26:5, 48:22
**handled** [1] - 41:19
**hanging** [1] - 61:4
**harassment** [1] - 16:8
**hard** [3] - 25:7, 55:5, 57:14
**harder** [1] - 36:20
**harm** [60] - 5:23, 6:1, 6:3, 6:4, 7:25, 8:6, 8:9, 8:11, 9:19, 9:21,

14:19, 15:8, 15:9,
15:25, 16:4, 16:6,
16:7, 17:4, 17:17,
17:23, 18:8, 19:24,
20:13, 20:14, 21:13,
22:20, 23:5, 23:10,
23:21, 23:23, 31:1,
32:11, 32:18, 37:8,
38:25, 39:22, 41:20,
41:22, 41:23, 44:20,
46:20, 51:20, 51:21,
52:14, 55:7, 58:10,
58:12, 61:15, 63:16,
63:21, 63:24, 64:2,
64:4, 65:5, 65:7,
66:4
**harms** [1] - 7:11,
20:25
**hazards** [1] - 20:23
**head** [3] - 7:1, 41:20,
66:24
**health** [9] - 18:1,
18:19, 18:22, 21:6,
21:8, 21:18, 32:22,
32:23, 33:1
**Health** [1] - 27:3
**hear** [1] - 36:7
**heard** [2] - 41:21, 42:8
**HEARING** [2] - 1:4,
1:8
**hearing** [1] - 72:24
**heels** [1] - 64:18
**held** [2] - 22:21, 27:10
**HELD** [1] - 1:8
**help** [3] - 6:2, 36:14,
71:25
**helpful** [4] - 26:11,
36:4, 71:20, 72:19
**hereby** [1] - 73:3
**herself** [1] - 28:15
**HHS** [1] - 27:19
**hinge** [1] - 63:1
**history** [1] - 19:23
**hit** [1] - 15:13
**hold** [1] - 48:23
**holds** [2] - 26:18,
26:25
**holiday** [1] - 72:13
**holistic** [1] - 49:7
**Holman** [13] - 13:1,
13:21, 29:6, 29:21,
52:6, 52:8, 52:15,
53:5, 53:25, 60:13,
67:15, 69:5, 70:3
**Holman's** [3] - 26:14,
59:17, 60:3
**honest** [2] - 33:10,
33:13
**Honor** [45] - 2:6, 2:10,
2:19, 7:10, 9:2, 11:2,

13:9, 14:10, 14:25,
17:7, 17:12, 19:2,
20:6, 22:22, 23:11,
24:3, 25:18, 28:22,
30:11, 31:25, 32:2,
35:13, 36:22, 40:3,
42:11, 44:7, 46:11,
47:8, 47:9, 48:6,
51:10, 53:23, 54:13,
57:21, 62:15, 63:10,
63:12, 63:18, 67:25,
69:18, 71:2, 71:19,
72:12, 72:16, 72:21
**HONORABLE** [1] - 1:9
**horribles** [1] - 58:6
**hour** [1] - 63:6
**huge** [1] - 39:16
**hundreds** [1] - 41:19

### I

**I's** [1] - 21:11
**identified** [6] - 4:3,
4:20, 4:21, 5:8, 7:10,
47:18
**identity** [1] - 31:5
**imagine** [9] - 16:15,
17:23, 33:20, 34:4,
35:11, 43:6, 43:21,
57:1, 68:2
**immediately** [1] - 37:1
**impacted** [1] - 45:15
**impede** [1] - 41:8
**important** [3] - 24:10,
37:18, 70:19
**impression** [1] - 50:2
**improper** [1] - 43:9
**Improvement** [1] -
63:19
**imputed** [1] - 66:8
**IN** [1] - 1:1
**Inc** [1] - 2:3
**INC** [1] - 1:3
**inclination** [1] - 36:2
**inclined** [1] - 10:21
**include** [1] - 34:24
**included** [1] - 21:20
**includes** [1] - 8:20
**including** [1] - 38:8
**inclusion** [1] - 24:9
**incomplete** [1] - 66:5
**Index** [6] - 18:8, 19:22,
53:3, 53:23, 60:6,
60:9
**indicate** [2] - 46:2,
70:6
**indicated** [2] - 13:6,
19:11
**indicating** [1] - 32:5
**individual** [1] - 27:6

**Individual** [1] - 27:2
**inextricably** [1] -
24:22
**inference** [4] - 46:19,
51:3, 69:14, 69:17
**inferences** [4] - 44:15,
46:18, 54:3
**inform** [1] - 29:2
**informally** [1] - 29:11
**information** [17] -
4:16, 15:2, 23:4,
30:25, 31:2, 35:19,
39:7, 45:13, 46:3,
46:7, 51:3, 59:8,
59:18, 60:24, 61:5,
61:9, 69:7
**informative** [1] - 59:15
**informed** [2] - 5:4,
13:13
**initial** [2] - 18:2, 27:9
**inkling** [1] - 68:6
**inside** [2] - 66:23,
69:24
**insist** [1] - 22:17
**insofar** [5] - 12:2,
17:11, 17:23, 24:20,
70:5
**inspection** [1] - 25:1
**instances** [1] - 48:19
**instead** [2] - 11:17,
60:3
**insubordinate** [1] -
30:3
**Integrity** [1] - 58:25
**intend** [1] - 22:11
**intends** [2] - 19:5,
68:6
**intention** [1] - 19:11
**intentions** [1] - 65:4
**interest** [8] - 17:21,
23:5, 23:12, 31:10,
32:11, 35:12, 35:15,
64:5
**interested** [1] - 21:25
**interests** [1] - 21:14
**internal** [16] - 21:7,
25:8, 28:17, 33:2,
36:12, 38:24, 39:1,
39:19, 39:20, 39:21,
41:24, 41:25, 42:4,
42:24, 57:18, 72:2
**internally** [2] - 34:7,
34:8
**intertwined** [3] -
24:22, 58:21
**intertwining** [1] - 25:2
**interviewed** [1] - 46:8
**interwoven** [2] -
24:16, 24:23
**investment** [1] - 69:20

**invites** [1] - 67:9
**invocation** [1] - 29:24
**invoked** [2] - 5:3,
29:20
**invoking** [2] - 13:13,
29:2
**involve** [1] - 72:2
**involved** [2] - 20:19,
54:23
**involving** [1] - 45:16
**ipso** [1] - 26:19
**irrelevant** [1] - 66:18
**isotope** [1] - 57:11
**issuance** [2] - 3:21,
31:14
**issue** [30] - 2:23, 6:2,
16:5, 20:1, 20:2,
24:2, 24:9, 24:11,
24:25, 25:22, 28:9,
28:14, 30:4, 32:2,
37:2, 38:23, 39:13,
40:20, 43:9, 44:25,
45:5, 45:11, 49:5,
51:23, 62:18, 64:23,
67:24, 68:23, 69:16,
71:23
**issued** [8] - 5:12, 10:2,
10:5, 20:20, 50:18,
65:14, 65:21, 68:12
**issues** [10] - 31:18,
32:24, 33:1, 33:3,
58:9, 64:8, 65:14,
66:18, 72:6
**itself** [12] - 3:5, 4:22,
16:12, 17:24, 19:3,
20:16, 21:13, 24:5,
24:7, 37:14, 61:11,
65:25

### J

**JASON** [1] - 1:13
**Jason** [1] - 2:6
**jet** [1] - 21:22
**job** [2] - 36:19, 65:16
**jobs** [1] - 39:7
**joined** [1] - 2:8
**joint** [1] - 47:15
**Joseph** [1] - 2:8
**Journal** [10] - 49:16,
49:18, 49:20, 49:23,
50:2, 50:4, 51:25,
53:4, 66:17, 67:6
**Judge** [5] - 6:8, 21:23,
34:16
**JUDGE** [2] - 1:9, 1:9
**judge** [2] - 35:25, 68:5
**judged** [2] - 17:15,
23:14
**judges** [1] - 21:4

**judging** [1] - 17:18
**judgment** [11] - 2:16,
9:16, 23:14, 31:4,
44:14, 44:16, 44:17,
44:24, 45:1, 45:25,
55:3
**Judicial** [1] - 58:25
**judicial** [2] - 19:6, 68:5
**jump** [1] - 63:14
**June** [5] - 3:20, 53:24,
54:5, 69:7, 70:20
**Justice** [4] - 1:17,
2:11, 2:14, 28:8
**Juul** [21] - 2:2, 2:7,
5:17, 6:1, 10:13,
15:1, 19:3, 24:14,
25:4, 25:5, 25:11,
27:7, 31:5, 31:17,
35:4, 35:10, 35:12,
59:4, 60:21, 66:4,
66:22
**JUUL** [1] - 1:3
**Juul's** [10] - 4:2,
22:10, 24:1, 26:13,
28:2, 30:14, 30:18,
35:15, 65:3, 65:8

### K

**keep** [5] - 23:8, 36:5,
61:9, 62:8, 63:13
**keeping** [2] - 28:21,
37:6
**key** [3] - 12:3, 37:22,
47:10
**kind** [5] - 20:24, 21:1,
25:7, 31:10, 58:2
**kinds** [1] - 58:9
**Kirkland** [1] - 2:7
**kirkland** [1] - 1:13
**knowing** [1] - 49:1
**known** [2] - 22:5, 50:4
**KONKOLY** [69] - 1:16,
2:10, 2:19, 3:7, 5:24,
6:3, 7:10, 7:13, 7:16,
7:21, 8:3, 8:6, 8:8,
8:14, 9:2, 9:5, 9:18,
11:1, 11:19, 11:22,
12:2, 12:24, 13:9,
13:12, 14:1, 14:10,
14:25, 15:8, 15:11,
17:7, 18:10, 18:14,
20:6, 20:12, 21:15,
22:9, 23:1, 23:11,
23:22, 24:3, 25:18,
26:12, 26:17, 27:18,
28:22, 29:8, 29:19,
30:11, 30:22, 31:23,
47:8, 47:17, 47:23,
63:12, 63:16, 64:14,

64:18, 66:13, 67:25, 68:25, 69:2, 69:17, 71:2, 71:6, 71:19, 72:9, 72:16, 72:21, 72:23
**Konkoly** [3] - 2:11, 47:5, 63:5

## L

**label** [1] - 57:25
**Labs** [2] - 2:2, 2:7
**LABS** [1] - 1:3
**lack** [1] - 30:3
**lag** [1] - 21:23
**language** [5] - 19:23, 21:12, 22:24, 34:6, 62:6
**large** [1] - 15:2
**largely** [1] - 46:24
**last** [3] - 19:4, 22:9, 64:3
**lastly** [2] - 31:12, 66:16
**law** [9] - 16:1, 17:8, 17:11, 23:7, 28:10, 39:6, 65:24, 66:3, 66:25
**lead** [1] - 2:18
**leaked** [1] - 11:5
**leaking** [1] - 11:6
**least** [16] - 8:2, 11:12, 15:11, 16:10, 34:7, 40:16, 44:14, 44:21, 44:22, 55:22, 57:21, 57:25, 63:17, 67:11, 67:22, 71:24
**led** [1] - 9:25
**left** [1] - 67:23
**legal** [4] - 30:2, 66:7, 66:8, 68:9
**Legal** [1] - 28:8
**legally** [1] - 67:3
**lengthy** [2] - 54:10, 54:13
**letter** [3] - 34:24, 35:6, 37:3
**letters** [1] - 33:12
**level** [1] - 9:20
**licensed** [1] - 22:1
**licensing** [1] - 57:5
**likelihood** [1] - 15:21
**likely** [2] - 12:19, 65:1
**limited** [1] - 11:22
**Lindsey** [2] - 26:24, 69:6
**line** [5] - 19:14, 27:15, 54:21, 58:19
**line-by-line** [1] - 58:19
**link** [1] - 32:21

**listed** [4] - 27:5, 55:24, 55:25, 60:9
**litigation** [1] - 38:20
**live** [1] - 41:2
**LLP** [1] - 1:13
**logic** [1] - 38:23
**look** [16] - 7:6, 15:17, 15:18, 25:7, 26:8, 35:2, 38:1, 39:3, 43:15, 53:8, 55:2, 56:2, 59:7, 60:17, 60:19, 61:11
**looking** [2] - 17:12, 40:2
**looks** [3] - 52:16, 54:10, 59:20
**loses** [1] - 3:19
**lost** [1] - 14:1
**love** [1] - 43:7
**low** [1] - 61:4
**low-hanging** [1] - 61:4

## M

**maintaining** [1] - 47:1
**major** [1] - 33:2
**maker** [7] - 3:12, 11:13, 13:7, 14:21, 29:12, 43:5, 66:23
**maker's** [1] - 68:13
**man** [1] - 31:9
**manufacturer's** [1] - 48:24
**manufacturers** [1] - 59:6
**MARCIA** [1] - 1:16
**Marcia** [1] - 2:13
**margin** [3] - 10:18, 10:19, 71:24
**market** [1] - 56:17
**marketing** [7] - 2:25, 35:3, 38:7, 38:9, 50:17, 62:18
**material** [7] - 24:2, 24:5, 34:23, 36:18, 38:4, 44:9, 67:24
**matter** [16] - 4:7, 23:14, 25:6, 26:5, 26:24, 27:24, 28:16, 29:21, 30:1, 30:8, 30:24, 45:5, 45:11, 50:11, 63:21, 66:3
**matters** [2] - 57:18, 70:17
**MDO** [26] - 3:1, 3:7, 3:16, 3:21, 4:18, 5:12, 13:22, 29:7, 29:8, 30:7, 31:14, 37:24, 45:16, 50:24, 51:11, 51:13, 51:24,

52:18, 60:14, 65:14, 68:11, 70:10, 71:6, 71:14
**mean** [9] - 25:3, 34:2, 37:13, 46:10, 53:19, 57:20, 58:4, 59:15, 67:20
**meaning** [1] - 4:5
**means** [2] - 38:23, 52:20
**measured** [1] - 67:4
**measures** [1] - 37:7
**meet** [1] - 21:1
**meeting** [1] - 67:12
**meets** [1] - 56:24
**member** [1] - 21:25
**members** [2] - 18:2, 20:22
**memo** [25] - 3:4, 3:17, 5:11, 6:20, 6:21, 7:3, 12:15, 13:18, 47:1, 48:9, 48:10, 49:9, 49:16, 50:5, 50:16, 50:21, 50:23, 52:3, 52:4, 52:16, 55:4, 60:14, 68:20, 68:23, 71:13
**memorandum** [2] - 5:2, 66:14
**memorandums** [3] - 5:3, 12:21, 13:18
**memorialize** [2] - 51:5, 51:12
**memos** [30] - 3:11, 3:14, 4:10, 6:8, 6:13, 6:14, 6:17, 6:18, 6:22, 6:23, 8:16, 8:21, 10:4, 10:10, 12:4, 12:5, 14:5, 14:11, 14:16, 15:17, 39:19, 39:20, 40:1, 48:2, 55:8, 64:22, 65:8, 69:19, 69:21
**menthol** [4] - 18:17, 48:22, 48:23, 48:24
**merits** [1] - 31:18
**mess** [1] - 68:16
**MGO** [3] - 2:25, 3:8, 3:17
**midstream** [1] - 66:10
**might** [23] - 7:21, 9:15, 10:20, 16:6, 16:16, 16:18, 16:19, 16:20, 16:22, 16:24, 31:1, 31:10, 33:5, 33:19, 33:20, 34:8, 34:9, 41:1, 43:4, 50:12, 51:1, 54:16, 70:22
**million** [2] - 39:17, 39:24

**mind** [3] - 11:3, 68:8, 68:13
**minimum** [2] - 59:7, 61:15
**minutes** [3] - 63:5, 63:9, 63:13
**misconstrued** [1] - 65:1
**misleading** [1] - 64:8
**misled** [2] - 32:17, 33:5
**missed** [1] - 43:24
**missing** [3] - 32:5, 32:7, 32:21
**misunderstood** [1] - 47:4
**mital** [5] - 48:13, 61:22, 61:24, 62:4, 62:15
**Mital** [8] - 8:10, 18:11, 27:4, 27:19, 48:11, 59:25, 62:5, 64:19
**mode** [2] - 43:12, 43:13
**modified** [2] - 53:9, 53:10
**molecular** [3] - 55:17, 55:18, 55:19
**molecule** [2] - 55:17, 55:18
**moment** [4] - 9:11, 9:23, 66:10, 68:13
**Monday** [1] - 67:17
**morning** [1] - 54:7
**Morris** [1] - 70:4
**MOSS** [1] - 1:9
**most** [4] - 7:23, 13:17, 26:5, 30:19
**motion** [2] - 2:18, 59:5
**MOTION** [2] - 1:4, 1:8
**motions** [1] - 2:16
**MR** [48] - 2:6, 31:25, 32:7, 33:7, 34:10, 34:14, 35:12, 36:21, 36:25, 37:13, 39:9, 40:3, 40:21, 41:4, 42:11, 44:4, 45:9, 45:20, 46:10, 46:24, 47:4, 48:6, 48:8, 49:11, 49:13, 49:25, 50:14, 50:20, 51:9, 52:13, 53:1, 53:21, 54:13, 54:21, 55:22, 56:7, 57:21, 58:4, 58:8, 59:15, 59:23, 60:8, 60:16, 62:2, 62:14, 62:21, 63:10, 72:11
**MS** [68] - 2:10, 2:19, 3:7, 5:24, 6:3, 7:10,

7:13, 7:16, 7:21, 8:3, 8:6, 8:8, 8:14, 9:2, 9:5, 9:18, 11:1, 11:19, 11:22, 12:2, 12:24, 13:9, 13:12, 14:1, 14:10, 14:25, 15:8, 15:11, 17:7, 18:10, 18:14, 20:6, 20:12, 21:15, 22:9, 23:1, 23:11, 23:22, 24:3, 25:18, 26:12, 26:17, 27:18, 28:22, 29:8, 29:19, 30:11, 30:22, 31:23, 47:8, 47:17, 47:23, 63:12, 63:16, 64:14, 64:18, 66:13, 67:25, 68:25, 69:2, 69:17, 71:2, 71:6, 71:19, 72:9, 72:16, 72:21, 72:23
**multiple** [1] - 16:13
**must** [1] - 22:17

## N

**N.W** [1] - 73:11
**name** [1] - 2:5
**narrow** [1] - 14:12
**narrowing** [1] - 48:1
**national** [1] - 20:19
**nature** [9] - 3:15, 12:9, 24:6, 24:22, 42:2, 47:15, 47:23, 54:11, 67:10
**necessarily** [8] - 3:14, 9:6, 13:1, 17:10, 22:17, 34:7, 49:4, 62:7
**necessary** [1] - 69:16
**need** [9] - 12:14, 16:11, 21:25, 41:10, 42:15, 44:23, 51:2, 70:14, 71:10
**needed** [1] - 71:11
**needs** [8] - 17:9, 18:25, 37:19, 61:7, 61:16, 65:17, 68:3, 70:8
**net** [3] - 18:20, 18:21
**never** [6] - 10:10, 41:15, 41:21, 42:7, 65:20
**new** [5] - 15:2, 16:1, 17:22, 21:22, 57:3
**next** [1] - 56:23
**nexus** [4] - 17:9, 17:12, 23:9, 32:9
**nice** [1] - 72:22
**Nixon** [2] - 42:19, 44:7
**nondeliberative** [1] -

55:6
**none** [2] - 9:25, 15:15
**nonetheless** [1] - 56:18
**nonfinal** [1] - 20:22
**nonusers** [1] - 18:22
**normal** [1] - 60:2
**normally** [3] - 42:12, 45:9, 58:17
**note** [9] - 5:16, 11:9, 11:24, 19:17, 21:15, 26:22, 29:25, 63:17, 70:10
**noted** [6] - 5:3, 8:19, 21:17, 21:23, 22:3, 63:18
**notes** [4] - 57:10, 64:7, 65:15, 73:5
**nothing** [2] - 4:5, 41:3
**notice** [5] - 27:16, 27:23, 28:16, 28:19, 65:6
**Notice** [1] - 30:18
**noticed** [1] - 3:6
**noticing** [1] - 6:11
**notion** [2] - 23:9, 67:19
**notwithstanding** [1] - 22:18
**number** [7] - 3:3, 19:3, 21:17, 22:6, 27:22, 31:17, 37:22
**numbers** [1] - 59:11
**NW** [3] - 1:14, 1:17, 1:23

## O

**objection** [2] - 24:24, 72:10
**obligation** [3] - 10:8, 65:25, 66:3
**obtain** [2] - 22:1
**obviate** [1] - 71:10
**obviously** [4] - 19:7, 44:17, 56:12, 61:1
**occurring** [1] - 46:20
**occurs** [2] - 6:25, 25:21
**OCD** [16] - 3:23, 4:2, 5:2, 5:3, 5:12, 12:17, 12:22, 13:5, 13:18, 26:18, 29:2, 29:19, 30:4, 48:19, 71:8
**OF** [3] - 1:1, 1:8, 73:1
**offer** [4] - 41:5, 41:16, 46:10, 61:7
**offered** [1] - 45:22
**Office** [9] - 3:10, 3:22, 4:10, 13:15, 28:8,

44:9, 48:20, 69:18, 69:23
**office** [3] - 3:23, 27:5, 27:6
**Official** [2] - 1:22, 73:10
**official** [2] - 29:15, 43:19
**OFFICIAL** [1] - 73:1
**officials** [5] - 16:16, 27:22, 43:2, 58:18, 62:9
**often** [2] - 3:4, 6:6
**once** [1] - 10:5
**one** [46] - 5:14, 5:15, 7:17, 7:20, 7:23, 8:23, 11:22, 12:7, 13:19, 16:1, 16:22, 16:23, 20:12, 26:22, 28:21, 28:23, 29:6, 29:17, 29:18, 34:14, 36:22, 37:22, 39:5, 43:4, 43:6, 43:11, 48:11, 48:13, 48:14, 49:5, 50:17, 51:22, 53:11, 54:3, 54:10, 56:7, 59:22, 60:11, 60:14, 61:8, 61:17, 62:10, 62:11, 64:15, 69:3
**ones** [3] - 54:15, 60:23, 65:9
**ongoing** [26] - 8:11, 8:17, 9:1, 9:7, 11:11, 11:12, 14:21, 15:3, 15:6, 35:18, 37:23, 38:3, 40:11, 42:16, 42:18, 44:8, 44:21, 46:22, 50:8, 50:9, 50:12, 50:21, 51:15, 51:17, 70:17
**open** [2] - 16:10, 70:17
**opened** [1] - 69:8
**operate** [1] - 24:13
**operating** [1] - 62:3
**operative** [1] - 67:3
**opinion** [2] - 28:14, 68:7
**opinions** [1] - 28:9
**opportunity** [5] - 8:3, 20:10, 23:18, 33:18, 46:11
**options** [1] - 49:3
**order** [12] - 2:25, 3:1, 7:19, 12:15, 19:1, 26:11, 29:14, 29:16, 35:3, 38:7, 38:10, 50:18
**orders** [1] - 19:8

**OS** [11] - 4:2, 4:9, 5:2, 5:5, 5:7, 5:12, 13:12, 13:13, 13:17, 29:1, 47:17
**OS's** [1] - 71:8
**otherwise** [4] - 16:11, 51:6, 62:12, 64:24
**ought** [1] - 34:1
**ourselves** [1] - 34:11
**outright** [1] - 22:15
**outside** [1] - 65:1
**outweigh** [1] - 4:6
**overcome** [1] - 58:23
**overruled** [2] - 43:8, 48:19
**overt** [1] - 22:21

## P

**P.M** [1] - 1:7
**p.m** [1] - 72:24
**page** [2] - 34:15, 61:3
**pages** [5] - 22:14, 22:16, 39:17, 39:24, 60:17
**paper** [1] - 16:17
**papers** [1] - 25:25
**parade** [1] - 58:6
**paragraph** [3] - 18:11, 18:13, 64:20
**Parke** [2] - 54:23, 56:9
**Parke-Davis** [2] - 54:23, 56:9
**part** [11] - 4:23, 9:24, 15:12, 17:19, 32:8, 34:24, 37:24, 50:21, 64:6, 69:20, 71:10
**partially** [2] - 28:6, 61:19
**particular** [10] - 6:5, 9:11, 16:5, 23:25, 26:22, 31:5, 63:14, 68:13, 69:25, 70:24
**particularly** [3] - 21:5, 43:1, 61:15
**parties** [2] - 6:5, 44:23
**party** [1] - 59:1
**pass** [1] - 27:11
**pattern** [2] - 12:6, 47:14
**pause** [1] - 29:15
**pausing** [1] - 67:8
**peek** [2] - 10:14, 66:4
**Pennsylvania** [1] - 1:14
**people** [7] - 26:8, 32:23, 32:25, 42:1, 42:23, 43:13, 43:14
**people's** [1] - 16:7
**percent** [1] - 33:22

**perhaps** [8] - 15:4, 16:13, 19:18, 24:25, 30:3, 38:18, 49:17, 67:20
**period** [1] - 42:18
**person** [6] - 13:21, 34:7, 43:21, 43:23, 43:25, 62:10
**personal** [2] - 31:10, 70:6
**personnel** [2] - 8:16, 9:19
**persuaded** [1] - 16:11
**persuasion** [1] - 70:18
**persuasive** [4] - 11:24, 12:7, 14:14, 32:3
**Ph.D** [2] - 43:10, 43:11
**Pharmaceuticals** [1] - 6:9
**pharmacological** [1] - 55:13
**Philip** [1] - 70:4
**phrasing** [1] - 6:7
**physician** [1] - 22:1
**pick** [2] - 33:25, 72:14
**picking** [1] - 25:6
**piece** [2] - 32:5, 32:7, 71:15
**place** [3] - 27:8, 64:2, 70:2
**Plaintiff** [2] - 1:4, 1:13
**plaintiff** [1] - 3:3
**plaintiff's** [2] - 2:5, 15:4, 45:16
**plaintiffs** [1] - 71:23
**plans** [2] - 30:25, 65:4
**plausible** [1] - 63:20
**PMT** [1] - 3:12
**PMTAs** [1] - 4:3
**podium** [1] - 2:4
**point** [31] - 2:21, 6:10, 8:8, 8:23, 11:14, 14:12, 20:12, 22:7, 22:9, 28:23, 29:9, 31:12, 32:13, 34:18, 35:17, 36:22, 36:25, 39:1, 39:5, 41:17, 51:19, 52:8, 53:12, 55:16, 61:4, 61:17, 62:14, 62:25, 64:1, 71:3, 71:6
**points** [2] - 30:13, 34:14
**policymaking** [1] - 55:3
**portion** [3] - 29:10, 29:18, 62:8
**posed** [1] - 18:16
**position** [12] - 5:18,

9:5, 14:13, 14:15, 15:15, 23:16, 28:24, 28:25, 33:1, 61:14, 66:18, 71:12
**possible** [3] - 15:12, 16:25, 33:4
**post** [2] - 35:7, 41:20
**post-foreseeable** [1] - 41:20
**posted** [1] - 35:10
**potential** [2] - 18:15, 20:23
**potentially** [7] - 9:3, 9:6, 9:13, 11:12, 18:2, 32:17, 67:24
**power** [2] - 61:24, 62:22
**practical** [1] - 29:20
**practice** [1] - 62:11
**precedent** [2] - 19:23, 21:12
**precise** [2] - 13:10, 68:13
**predecisional** [13] - 3:15, 5:14, 36:13, 49:11, 49:13, 50:6, 52:15, 52:17, 53:10, 53:18, 53:19, 55:7, 58:13
**predominant** [2] - 8:1, 37:6
**predominantly** [1] - 7:23
**preemptively** [1] - 26:13
**preexisting** [1] - 39:4
**preliminary** [11] - 16:24, 17:18, 33:2, 33:13, 33:21, 33:23, 34:3, 34:25, 36:6, 66:1
**premarket** [1] - 2:24
**premature** [1] - 20:21
**prepare** [2] - 7:9, 69:21
**prepared** [6] - 52:3, 68:20, 69:11, 69:15, 70:13, 70:16
**preparing** [2] - 7:2, 52:4
**prescription** [1] - 22:1
**present** [2] - 19:11, 22:12
**presented** [3] - 48:11, 48:15, 48:18
**presenting** [1] - 49:3
**presently** [1] - 8:17
**President** [3] - 29:15, 44:9, 66:25
**presidential** [1] -

29:13

**press** [2] - 37:2, 50:1

**presumably** [1] - 54:11

**presumption** [8] - 45:3, 45:18, 45:20, 45:21, 45:23, 58:18, 58:21, 58:23

**pretty** [4] - 34:2, 51:25, 52:16, 54:12

**prevented** [1] - 39:7

**previously** [1] - 22:3

**primary** [1] - 49:13

**principally** [1] - 35:16

**principle** [2] - 17:15, 28:3

**prioritization** [2] - 24:10, 24:21

**privacy** [1] - 16:7

**privilege** [27] - 3:19, 4:24, 7:24, 8:1, 15:14, 16:5, 16:10, 16:12, 17:5, 17:14, 17:24, 20:16, 23:13, 23:25, 24:4, 24:5, 30:14, 32:13, 32:19, 42:20, 44:2, 55:15, 55:24, 56:20, 64:1, 64:6, 64:7

**privileges** [1] - 44:2

**proactive** [1] - 63:24

**problem** [6] - 25:14, 33:2, 35:22, 45:9, 53:23, 57:15

**proceeding** [4] - 44:24, 50:8, 50:10, 50:12

**proceedings** [3] - 15:5, 38:6, 73:6

**process** [32] - 2:23, 3:21, 4:24, 9:25, 10:17, 14:21, 14:24, 15:13, 15:24, 16:9, 17:5, 17:13, 17:24, 23:13, 24:4, 24:7, 24:11, 30:14, 32:13, 32:19, 32:22, 35:23, 37:10, 45:16, 55:15, 56:20, 57:1, 57:16, 57:19, 60:25, 64:7, 64:15

**produce** [3] - 59:13, 61:2, 61:3

**product** [7] - 19:1, 35:8, 48:25, 55:12, 56:16, 56:17, 59:10

**products** [4] - 18:6, 18:17, 48:22, 48:23

**Products** [1] - 62:20

**professional** [1] -

65:16

**prohibited** [1] - 23:7

**promptly** [2] - 35:5, 37:18

**pronouncements** [1] - 18:4

**proof** [1] - 37:21

**properly** [1] - 39:8

**prophylactic** [1] - 37:7

**proposal** [10] - 4:9, 4:12, 12:9, 12:13, 12:19, 13:17, 13:20, 47:15, 71:8

**propose** [3] - 3:23, 4:2, 12:12

**proposed** [5] - 3:17, 5:5, 13:14, 47:17, 47:20

**proposing** [1] - 66:22

**protect** [2] - 57:22, 64:7

**protected** [12] - 3:19, 4:23, 23:6, 23:12, 24:5, 32:11, 55:15, 56:5, 56:19, 56:21, 64:5

**protective** [1] - 19:8

**prototypical** [1] - 31:9

**proves** [1] - 38:18

**provide** [3] - 33:17, 63:20, 64:22

**provided** [1] - 5:12

**provision** [1] - 21:13

**PTMA** [1] - 4:1

**public** [48] - 7:4, 7:16, 10:20, 10:21, 11:5, 14:8, 14:23, 15:21, 16:18, 17:13, 17:17, 17:21, 18:1, 18:2, 18:19, 18:21, 19:15, 19:20, 20:13, 20:15, 20:23, 20:24, 21:6, 21:8, 21:16, 21:17, 21:18, 21:23, 21:25, 22:10, 22:20, 23:10, 32:17, 32:22, 32:23, 33:1, 33:3, 33:5, 33:15, 34:22, 37:25, 39:25, 40:19, 43:15, 52:5, 54:16, 64:8, 72:5

**Public** [2] - 20:17, 58:25

**publicly** [10] - 11:11, 35:2, 38:4, 41:2, 44:10, 44:20, 49:15, 59:6, 60:23

**publish** [1] - 63:25

**purely** [1] - 24:1

**purpose** [4] - 16:4,

37:5, 37:6, 64:24

**purposes** [10] - 2:21, 7:24, 7:25, 16:12, 17:5, 17:14, 18:8, 19:24, 51:13, 55:25

**pursuant** [1] - 3:18

**push** [1] - 44:3

**put** [11] - 5:2, 16:16, 16:24, 20:6, 49:8, 50:1, 50:7, 50:25, 65:14, 68:5, 69:23

**puts** [1] - 3:11

**putting** [2] - 51:2, 52:2

## Q

**questioning** [1] - 25:13

**questions** [2] - 30:12, 63:14

**quickly** [1] - 30:16

**quit** [1] - 18:24

**quite** [6] - 17:21, 22:21, 40:19, 51:18, 52:7, 52:24

**quote** [8] - 25:5, 30:16, 30:23, 31:2, 31:4, 60:20, 64:6, 64:19

**quotes** [1] - 22:14

## R

**raised** [3] - 37:24, 71:23, 72:7

**raises** [1] - 55:20

**raising** [2] - 21:10, 70:11

**RANDOLPH** [1] - 1:9

**rather** [7] - 13:8, 23:10, 41:12, 49:5, 61:8, 63:6, 66:24

**rationale** [6] - 8:1, 20:7, 35:16, 47:24, 48:3, 48:9

**rationales** [2] - 64:9, 65:22

**re** [1] - 38:11

**re-review** [1] - 38:11

**reach** [7] - 5:9, 12:14, 12:24, 43:3, 43:19, 44:6, 68:23

**reached** [3] - 17:1, 18:15, 46:7

**reactions** [1] - 36:3

**read** [6] - 6:20, 13:19, 45:8, 49:6, 52:16

**readily** [1] - 25:17

**reading** [1] - 11:4

**reads** [1] - 45:10

**ready** [1] - 36:6

**really** [13] - 7:23, 20:1, 21:10, 26:4, 34:1, 34:4, 35:22, 36:6, 37:10, 37:14, 38:24, 43:21

**realm** [1] - 21:18

**reason** [14] - 9:8, 11:8, 11:9, 16:5, 23:8, 28:1, 37:16, 42:12, 43:16, 43:20, 58:9, 58:10, 70:11, 71:14

**reasonable** [7] - 12:18, 19:15, 46:18, 46:19, 47:12, 49:4, 54:6

**reasonably** [4] - 23:5, 32:10, 45:6, 45:12

**reasoning** [6] - 3:17, 6:18, 12:3, 13:3, 13:23, 44:5

**reasons** [9] - 4:21, 6:22, 15:11, 30:15, 31:6, 32:17, 64:9, 64:11, 69:25

**rebuttal** [1] - 63:5

**receive** [1] - 71:21

**receives** [1] - 35:5

**recent** [1] - 30:20

**recognize** [2] - 25:25, 45:2

**recognized** [1] - 42:20

**recognizing** [1] - 44:2

**recollection** [1] - 16:3

**recommendation** [6] - 3:12, 4:25, 7:5, 12:23, 48:12, 56:3

**recommendations** [6] - 11:11, 22:13, 27:9, 27:15, 48:15, 48:20

**recommended** [1] - 4:19

**reconsider** [2] - 40:12, 65:17

**reconsideration** [1] - 65:23

**reconsidered** [1] - 65:17

**reconsiders** [1] - 40:7

**record** [25] - 2:5, 5:1, 5:20, 12:9, 19:19, 20:3, 20:7, 23:17, 25:22, 30:6, 35:14, 38:7, 38:21, 39:2, 39:4, 39:16, 44:13, 54:14, 64:4, 65:6, 66:20, 67:5, 69:2, 71:3

**records** [10] - 24:25, 39:11, 39:12, 45:5,

45:11, 46:15, 64:21, 64:23, 64:25, 65:1

**redactions** [1] - 6:15

**redelegating** [1] - 27:24

**reference** [1] - 52:18

**referred** [1] - 42:13

**referring** [1] - 32:9

**refinement** [1] - 13:24

**reflect** [2] - 35:1, 43:4

**reflected** [2] - 5:1, 12:8

**regard** [1] - 31:4

**regarding** [5] - 26:14, 28:10, 30:19, 45:7, 45:13

**regardless** [1] - 44:5

**regime** [1] - 39:14

**regulatory** [4] - 2:23, 17:22, 39:14, 57:1

**reject** [1] - 21:16

**relate** [2] - 50:15, 50:16

**related** [5] - 16:12, 21:14, 32:18, 71:16, 72:6

**relates** [1] - 16:4

**relating** [2] - 25:10, 28:18

**relatively** [1] - 16:1

**release** [6] - 6:22, 6:23, 7:8, 19:8, 37:2, 50:1

**released** [9] - 4:11, 6:12, 6:17, 6:19, 15:20, 16:17, 16:23, 65:10

**releases** [4] - 6:6, 6:7, 64:21, 64:25

**relevance** [2] - 31:13, 67:7

**relevant** [7] - 25:6, 30:13, 52:2, 54:16, 70:2, 70:8, 70:14

**relied** [4] - 6:13, 22:5, 42:22, 65:21

**reluctant** [2] - 16:16, 43:3

**rely** [5] - 7:22, 44:6, 51:7, 69:12

**relying** [1] - 42:14

**remain** [2] - 12:5, 47:12

**remainder** [1] - 4:6

**remaining** [1] - 5:10

**remands** [2] - 38:22, 39:17

**remember** [1] - 59:24

**reply** [4] - 19:17, 20:18, 22:11, 31:22

**report** [1] - 15:1
**reporter** [1] - 63:4
**Reporter** [3] - 1:21,
1:22, 73:10
**REPORTER** [2] - 63:8,
73:1
**Reporters** [4] - 32:14,
38:15, 41:9
**reporting** [1] - 72:1
**represent** [1] - 22:17
**representation** [1] -
45:4
**representations** [3] -
19:4, 19:14, 53:5
**representative** [1] -
29:22
**represented** [1] - 45:4
**request** [4] - 34:24,
38:1, 39:20, 51:16
**requester** [3] - 30:24,
30:25, 31:1
**requester's** [1] - 31:5
**requests** [2] - 6:14,
57:10
**require** [1] - 28:5
**required** [2] - 9:10,
42:10
**requirement** [7] -
15:25, 19:24, 63:19,
63:20, 66:7, 66:8,
66:9
**requires** [3] - 18:20,
32:8, 41:7
**rescind** [4] - 28:5,
28:6, 61:19, 61:25
**rescinded** [1] - 38:9
**rescinding** [1] - 62:6
**rescission** [1] - 29:1
**research** [1] - 70:18
**resolve** [2] - 12:15,
44:24
**resolved** [1] - 47:18
**resources** [1] - 69:20
**respect** [23] - 5:16,
5:22, 6:1, 11:16,
13:2, 14:4, 14:5,
14:10, 14:24, 16:2,
16:6, 16:9, 16:14,
17:12, 19:18, 24:1,
31:8, 33:1, 35:23,
47:6, 65:7, 71:22,
71:23
**respected** [1] - 10:19
**respond** [3] - 35:20,
36:11, 36:21
**responding** [1] -
34:11
**response** [2] - 6:14,
30:18
**responses** [1] - 32:1

**responsibilities** [1] -
28:18
**Responsibility** [1] -
20:18
**rest** [2] - 4:7, 47:19
**restatement** [1] -
18:18
**result** [2] - 20:22,
38:22
**results** [1] - 34:2
**retain** [1] - 28:15
**retaining** [1] - 13:6
**revealing** [1] - 25:8
**reveals** [1] - 72:2
**revelation** [1] - 60:25
**revelatory** [1] - 24:9
**review** [61] - 3:4, 3:11,
6:8, 6:14, 6:17, 6:20,
6:21, 7:3, 8:11, 8:16,
8:18, 8:20, 8:21, 9:1,
9:7, 9:21, 10:4, 10:6,
10:9, 12:4, 13:8,
13:14, 14:5, 14:11,
14:16, 14:24, 15:3,
15:6, 15:17, 25:10,
25:16, 25:21, 37:23,
38:3, 38:10, 38:11,
39:6, 39:24, 45:15,
46:22, 47:1, 48:2,
48:9, 49:9, 49:16,
50:5, 50:16, 50:21,
51:15, 51:17, 55:8,
58:14, 61:11, 64:22,
65:8, 65:15, 69:19,
69:21, 71:22
**reviewed** [8] - 5:7,
6:13, 52:9, 52:10,
52:21, 53:14, 53:17,
53:20
**reviewer** [5] - 13:3,
52:7, 52:12, 52:13,
56:23
**reviewers** [2] - 48:15,
48:17
**reviews** [2] - 55:9,
70:16
**revoked** [1] - 30:2
**risk** [3] - 18:16, 20:20,
33:4
**risks** [2] - 18:22, 20:22
**RMR** [2] - 1:21, 73:9
**role** [2] - 19:21, 27:14
**roll** [1] - 35:6
**Room** [2] - 1:22, 73:10
**routine** [1] - 60:21
**routinely** [1] - 40:6
**rule** [2] - 25:21, 28:5
**rulemaking** [3] -
27:17, 28:5, 28:19
**rules** [1] - 28:18

**run** [1] - 67:16
**running** [2] - 24:17,
67:17

## S

**safe** [1] - 21:24
**safeguard** [1] - 22:2
**safeguards** [1] - 21:18
**safety** [1] - 18:5
**SAI** [1] - 56:10
**sample** [1] - 24:25
**satisfy** [1] - 39:22
**scenarios** [2] - 65:13,
65:19
**Schroeder** [1] - 2:8
**science** [3] - 25:10,
56:2, 57:13
**Science** [7] - 3:10,
3:22, 4:10, 13:15,
48:20, 69:18, 69:23
**Sciences** [1] - 27:3
**scientific** [15] - 9:16,
38:10, 40:4, 46:22,
50:21, 51:15, 51:17,
55:1, 55:8, 55:10,
55:11, 56:1, 56:18,
56:22, 72:1
**scientist** [12] - 3:9,
7:2, 7:6, 10:20,
26:24, 33:21, 43:8,
43:18, 43:22, 46:9,
57:10, 70:7
**scientists** [9] - 8:15,
16:16, 22:13, 43:2,
45:14, 54:25, 55:9,
57:7, 57:19
**scope** [5] - 8:20, 9:1,
9:14, 10:11, 50:9
**SDNY** [1] - 56:8
**season** [1] - 72:14
**second** [21] - 6:11,
7:17, 12:23, 14:4,
23:2, 29:15, 35:16,
47:1, 47:6, 48:9,
49:9, 49:16, 50:16,
50:20, 50:23, 55:4,
59:16, 59:24, 59:25,
60:13
**secret** [1] - 37:7
**secretary** [1] - 62:4
**section** [2] - 23:4,
25:6
**Sections** [1] - 27:4
**Security** [2] - 56:10,
56:13
**see** [8] - 18:2, 19:13,
26:2, 27:5, 35:1,
41:19, 47:16, 61:11
**seeking** [3] - 5:18,

30:15, 57:24
**seeks** [1] - 30:24
**seem** [1] - 42:25
**Sefranek** [3] - 1:21,
73:9, 73:9
**SEFRANEK** [1] - 73:3
**segregability** [6] -
54:17, 54:19, 58:14,
61:16, 71:22, 71:24
**segregable** [2] - 26:9,
59:8
**segregated** [1] - 61:5
**selection** [6] - 24:8,
24:17, 24:20, 24:23,
25:2, 72:2
**seminal** [1] - 64:15
**senior** [4] - 43:2,
43:18, 62:10, 62:11
**sense** [10] - 11:22,
42:22, 42:23, 42:25,
43:13, 44:1, 44:6,
49:6, 63:22, 66:11
**sensitive** [1] - 42:1
**sent** [1] - 5:2
**sentences** [1] - 42:2
**separate** [3] - 47:19,
65:7, 69:24
**separated** [1] - 25:17
**separately** [1] - 4:14
**sequence** [1] - 51:10
**sequencing** [1] - 50:6
**serial** [1] - 59:11
**series** [1] - 57:9
**seriously** [1] - 37:8
**serve** [1] - 64:24
**serves** [1] - 64:7
**set** [5] - 8:10, 24:2,
29:3, 47:19, 66:8
**sets** [1] - 4:11
**setting** [1] - 68:16
**shall** [1] - 23:3
**shape** [1] - 28:6
**share** [1] - 36:6
**short** [1] - 23:19
**show** [4] - 33:9, 37:19,
44:18, 61:4
**showing** [1] - 11:10
**shows** [5] - 24:20,
30:6, 30:7, 43:9,
61:6
**sic** [1] - 28:21
**side** [5] - 22:5, 45:2,
45:22, 47:20, 68:19
**sign** [8] - 13:22, 29:7,
52:8, 62:17, 67:1,
67:16, 67:17, 70:6
**signature** [14] - 26:14,
26:19, 27:6, 52:20,
53:13, 59:17, 59:20,
60:1, 60:2, 60:3,

61:17, 61:18, 67:5,
68:10
**signed** [26] - 13:1,
13:3, 29:6, 30:7,
50:5, 51:11, 52:6,
52:7, 52:11, 52:13,
52:17, 52:25, 53:6,
53:14, 53:22, 53:24,
60:6, 60:11, 60:13,
60:14, 66:20, 67:3,
67:22, 68:1, 68:10
**significance** [1] -
53:13
**significant** [1] - 69:20
**signing** [1] - 70:1
**signs** [3] - 52:9, 60:11,
66:25
**similar** [2] - 56:11,
64:24
**similarly** [1] - 66:13
**simply** [12] - 5:20,
10:21, 21:18, 22:13,
27:10, 27:24, 28:20,
46:6, 52:20, 54:8,
63:20, 72:1
**single** [9] - 38:12,
40:8, 40:10, 41:15,
41:21, 42:7, 42:8,
42:9
**sit** [1] - 68:7
**sitting** [1] - 55:1
**sky** [4] - 58:2, 58:3,
58:5, 58:6
**sleep** [1] - 21:21
**slight** [2] - 10:22, 13:9
**small** [1] - 43:24
**smell** [1] - 27:11
**smoking** [1] - 18:25
**solely** [1] - 31:14
**someone** [5] - 39:19,
53:13, 67:16, 68:3,
69:8
**sometimes** [2] - 7:7
**somewhat** [1] - 16:21
**somewhere** [1] -
59:22
**sorry** [7] - 13:12, 14:1,
45:7, 47:8, 52:19,
55:25, 59:23
**sort** [4] - 6:24, 20:25,
55:14, 72:6
**sound** [2] - 52:21,
53:22
**sounded** [1] - 11:9
**sounding** [1] - 19:19
**sounds** [1] - 46:25
**source** [1] - 67:6
**space** [2] - 17:22, 18:1
**speaks** [1] - 71:3
**Species** [1] - 56:1

**species** [2] - 56:3, 56:13
**specific** [4] - 2:23, 22:6, 33:8, 61:8
**specifically** [6] - 5:1, 8:10, 22:5, 50:15, 59:4, 64:5
**specificity** [2] - 20:8, 23:18
**spectrum** [1] - 68:17
**speculating** [1] - 33:18
**spend** [1] - 61:18
**spitting** [1] - 11:16
**squarely** [1] - 34:18
**staff** [3] - 3:9, 22:13, 70:7
**stage** [2] - 51:8, 57:18
**stamp** [1] - 66:20
**stand** [1] - 31:9
**standard** [10] - 18:19, 25:20, 38:14, 41:12, 45:1, 48:23, 58:5, 63:25, 66:22, 66:25
**standards** [1] - 31:15
**stands** [2] - 17:15, 29:9
**start** [4] - 8:6, 31:25, 32:7, 54:7
**started** [1] - 69:9
**starting** [2] - 2:5, 3:2
**state** [3] - 2:4, 47:8, 68:18
**statement** [1] - 14:23
**statements** [2] - 22:10, 65:3
**STATES** [2] - 1:1, 1:9
**States** [5] - 1:22, 42:19, 44:8, 64:6, 64:15
**status** [1] - 3:19
**statute** [2] - 49:7, 56:24
**stay** [1] - 56:17
**stayed** [1] - 15:5
**stenographic** [1] - 73:5
**step** [7] - 10:16, 19:21, 21:5, 32:21, 35:22, 56:23, 57:19
**Sterling** [1] - 54:24, 56:8
**still** [8] - 15:5, 15:6, 16:1, 29:9, 30:2, 33:24, 35:24, 41:4
**story** [2] - 49:20, 49:23
**straight** [1] - 19:14
**strategic** [1] - 20:19
**Street** [1] - 1:17,

49:16, 49:18, 49:20, 49:23, 50:1, 50:4, 51:24, 53:4, 66:17, 67:6
**street** [1] - 31:10
**strengths** [3] - 24:14, 55:12, 55:13
**strictly** [2] - 20:16, 71:9
**strings** [1] - 19:8
**strong** [1] - 15:14
**strongest** [1] - 51:20
**structure** [1] - 47:23
**struggling** [3] - 20:1, 53:15, 67:19
**studies** [1] - 42:21
**study** [1] - 24:14
**subject** [5] - 15:9, 16:7, 19:2, 42:17, 50:12
**subjective** [2] - 68:13, 69:25
**subjectively** [1] - 66:23
**subjects** [1] - 15:23
**submission** [1] - 36:8
**submit** [5] - 20:8, 23:19, 26:3, 40:16, 57:6
**submits** [3] - 39:20, 57:2, 57:4
**submitted** [6] - 15:1, 24:14, 24:15, 34:25, 59:3, 60:21
**submitting** [2] - 24:25, 25:15
**subordinates'** [1] - 40:13
**subsection** [1] - 23:6
**substantial** [2] - 15:21, 19:23
**subtlety** [1] - 29:5
**suffer** [1] - 31:1
**suffice** [3] - 4:6, 21:1, 25:24
**sufficient** [1] - 28:13
**suggest** [2] - 49:25, 58:5
**suggested** [1] - 37:3
**suggesting** [4] - 35:13, 46:12, 58:2, 64:9
**suggestion** [1] - 63:23
**suggests** [1] - 38:19
**suit** [1] - 31:13
**summary** [8] - 2:16, 11:1, 44:14, 44:15, 44:17, 44:24, 45:1, 45:24
**supervisor** [4] - 10:18,

34:9, 49:2, 49:4
**supervisors** [2] - 29:23, 40:12
**supervisory** [12] - 3:24, 3:25, 5:4, 8:11, 8:17, 9:21, 10:6, 13:13, 29:2, 29:20, 45:15, 65:15
**Supplemental** [1] - 30:18
**supplemental** [3] - 20:9, 23:19, 72:4
**suppose** [1] - 17:3
**supposed** [3] - 29:17, 44:14, 46:17
**Supreme** [2] - 11:7, 42:19
**surmised** [1] - 60:8
**sustain** [1] - 18:24
**swath** [1] - 15:2
**sweep** [1] - 9:7
**sweeps** [1] - 14:20

---

# T

**T's** [1] - 21:11
**talks** [2] - 21:13, 35:8
**Tamara** [3] - 1:21, 73:9, 73:9
**TAMARA** [1] - 73:3
**tangential** [1] - 37:9
**targeted** [1] - 70:24
**TCA** [1] - 18:19
**technical** [2] - 30:1, 57:17
**technically** [1] - 30:2
**telephone** [1] - 33:25
**temporal** [1] - 50:5
**tend** [1] - 56:22
**tentative** [1] - 16:25
**terribly** [2] - 21:5, 43:4
**test** [3] - 18:21, 24:8, 27:11
**Thanhauser** [1] - 2:14
**THE** [121] - 1:1, 1:1, 1:9, 2:2, 2:9, 2:15, 3:6, 5:22, 5:25, 6:4, 7:12, 7:15, 7:19, 7:22, 8:5, 8:7, 8:13, 8:19, 9:4, 9:8, 10:15, 11:3, 11:21, 12:1, 12:22, 12:25, 13:11, 13:24, 14:3, 14:23, 15:7, 15:10, 15:25, 18:7, 18:13, 19:18, 20:11, 21:3, 22:8, 22:24, 23:3, 23:20, 23:24, 24:24, 26:4, 26:16, 27:16, 28:1, 29:4, 29:9, 30:10,

30:21, 31:21, 31:24, 32:4, 32:20, 33:16, 34:13, 35:4, 35:15, 36:24, 37:12, 38:18, 39:14, 40:17, 41:1, 41:12, 42:19, 44:25, 45:10, 46:1, 46:23, 47:3, 47:5, 47:16, 47:22, 48:4, 48:7, 49:10, 49:12, 49:17, 50:7, 50:19, 50:23, 51:22, 52:19, 53:12, 54:9, 54:20, 55:14, 56:6, 56:25, 58:3, 58:7, 59:13, 59:19, 60:5, 60:15, 62:1, 62:3, 62:19, 63:3, 63:8, 63:9, 63:11, 63:15, 64:12, 64:17, 66:12, 67:8, 68:19, 69:1, 69:10, 70:11, 71:5, 71:17, 71:20, 72:10, 72:13, 72:17, 72:22
**theirs** [1] - 36:20
**themselves** [2] - 3:14, 18:4
**theory** [1] - 40:11
**therefore** [4] - 13:7, 16:18, 36:12, 48:23
**they've** [3] - 58:19, 58:20, 60:12
**thinking** [7] - 9:11, 10:7, 10:9, 17:4, 26:4, 35:24, 37:8
**thoughts** [1] - 36:7
**threats** [1] - 20:23
**three** [4] - 6:22, 42:3, 72:9, 72:11
**throughout** [1] - 16:24
**throw** [2] - 37:4, 51:6
**throwing** [1] - 36:25
**thumbs** [2] - 49:2
**thumbs-down** [1] - 49:2
**thumbs-up** [1] - 49:2
**tie** [2] - 16:13, 32:12
**tied** [2] - 17:4, 20:16, 64:4
**ties** [4] - 17:23, 18:8, 19:24, 32:18
**timing** [5] - 14:24, 49:14, 50:11, 51:23, 72:8
**Tobacco** [2] - 31:15, 62:20
**tobacco** [4] - 2:24, 17:22, 18:16, 18:23, 18:24
**today** [8] - 2:8, 6:2,

8:22, 42:14, 52:15, 57:20, 72:7, 72:15
**together** [2] - 3:11, 67:13
**tomorrow** [1] - 52:8
**tools** [1] - 34:20
**top** [12] - 11:17, 11:20, 14:19, 35:17, 35:23, 40:5, 40:9, 40:11, 40:22, 43:22, 47:6, 49:8
**top-down** [9] - 11:20, 14:19, 35:17, 35:23, 40:5, 40:9, 40:11, 40:22, 49:8
**top-down/bottom-up** [1] - 11:17
**top-up** [1] - 47:6
**Topic** [1] - 25:11
**topic** [3] - 25:12, 28:14, 42:1
**toss** [1] - 35:6
**touch** [3] - 22:22, 30:12, 66:16
**tough** [1] - 38:16
**toxicological** [17] - 4:3, 4:7, 4:13, 4:18, 4:22, 5:7, 5:8, 5:13, 12:11, 12:14, 13:19, 13:23, 30:8, 31:14, 37:23, 55:12, 71:10
**toxicology** [10] - 4:11, 10:4, 40:25, 45:15, 47:18, 49:5, 54:10, 59:4, 65:10, 69:12
**TPL** [62] - 3:4, 3:9, 3:14, 3:17, 3:18, 4:9, 4:10, 4:11, 4:15, 4:18, 4:19, 4:20, 4:22, 5:2, 5:7, 5:11, 5:13, 6:14, 6:20, 9:24, 10:5, 10:13, 12:8, 12:23, 13:22, 13:23, 14:4, 14:15, 15:16, 16:20, 26:15, 26:24, 27:7, 27:12, 27:14, 30:8, 40:25, 46:15, 47:1, 47:6, 47:14, 47:19, 47:25, 48:9, 48:13, 49:9, 49:16, 50:5, 50:16, 50:20, 50:23, 55:4, 59:4, 59:16, 59:17, 60:13, 60:23, 64:21, 65:10, 66:14, 69:13
**TPLs** [8] - 5:14, 8:21, 15:17, 15:19, 16:22, 59:3, 59:5, 60:10
**trace** [1] - 68:12
**track** [1] - 14:1

transcript [2] - 73:4, 73:6
TRANSCRIPT [1] - 1:8
Transportation [1] - 56:10
trash [3] - 37:1, 37:4, 51:7
treat [1] - 21:22
tribunals [1] - 19:6
tried [2] - 31:18, 58:20
TRMs [1] - 10:12
true [2] - 73:4, 73:5
truly [1] - 71:25
try [1] - 61:9
trying [6] - 7:1, 22:19, 47:10, 49:25, 57:17, 68:12
TSA [1] - 56:12
turn [3] - 22:16, 23:24, 37:11
turned [1] - 36:18
turns [2] - 26:20, 34:23
two [12] - 4:10, 7:10, 12:20, 12:21, 16:22, 27:19, 30:12, 41:11, 56:14, 62:9, 65:19, 72:18
type [10] - 20:4, 25:2, 25:12, 39:12, 40:4, 40:6, 44:6, 46:13, 55:14, 59:10
types [2] - 57:24, 64:25
typical [4] - 41:23, 42:12, 59:17, 60:11
typically [8] - 3:16, 6:17, 28:19, 43:14, 45:19, 60:3, 64:21, 64:25

## U

U.S [2] - 1:17, 2:11
U.S.C [1] - 32:8
ultimate [6] - 18:25, 50:3, 56:3, 56:15, 61:14, 64:10
ultimately [5] - 7:4, 31:19, 48:16, 56:1, 68:16
uncertain [1] - 33:24
under [9] - 3:19, 6:6, 16:1, 23:4, 25:20, 26:25, 56:24, 57:16, 62:3
underlying [10] - 3:4, 3:10, 3:18, 9:22, 15:13, 38:8, 55:8, 56:2, 56:18, 69:21

underscores [1] - 65:5
understood [1] - 10:24
underway [1] - 45:16
unfinished [1] - 10:14
UNITED [2] - 1:1, 1:9
United [3] - 1:22, 42:19, 44:8
unless [3] - 14:8, 30:11, 45:21
unnamed [1] - 67:6
unpersuasive [1] - 34:17
unsuitable [1] - 68:14
unsure [1] - 34:9
unusual [1] - 16:22
unworkable [1] - 66:24
up [19] - 5:3, 10:1, 11:17, 11:20, 13:18, 14:11, 28:11, 29:16, 33:25, 35:6, 42:12, 42:14, 46:25, 47:6, 47:24, 49:2, 63:2, 64:3, 69:8
uphill [1] - 38:16
upshot [1] - 31:3
user [1] - 18:23
users [1] - 18:24
uses [1] - 22:4
usual [1] - 45:18

## V

vacation [1] - 67:17
valuable [1] - 59:18
value [1] - 51:4
Vanda [19] - 6:9, 11:19, 11:20, 11:23, 12:7, 14:7, 14:11, 14:13, 21:15, 21:16, 21:20, 22:7, 34:15, 34:18, 47:11, 48:15, 57:24, 58:1
variety [1] - 68:2
various [2] - 45:14, 56:13
Vaughn [7] - 18:8, 19:22, 53:3, 53:23, 60:6, 60:9, 69:5
verbatim [1] - 30:23
version [1] - 5:25
vested [1] - 62:9
via [1] - 38:1
view [11] - 10:19, 12:23, 16:25, 17:1, 22:18, 33:21, 33:22, 33:23, 35:9, 51:23, 55:20
views [6] - 15:22,

32:23, 33:13, 34:25, 35:1, 35:2
virtue [1] - 15:23
vs [1] - 1:5

## W

walk [1] - 22:19
Wall [10] - 49:16, 49:18, 49:20, 49:23, 50:1, 50:4, 51:24, 53:4, 66:17, 67:6
wants [2] - 40:14, 61:9
warranted [1] - 20:24
Washington [6] - 1:6, 1:14, 1:18, 1:23, 56:8, 73:11
Watch [1] - 59:1
water [1] - 34:21
ways [3] - 16:13, 34:10, 58:2
weaknesses [3] - 24:14, 55:12, 55:13
website [2] - 35:7, 63:24
week [1] - 67:12
weekend [1] - 72:22
weeks [3] - 51:16, 72:9, 72:11
weigh [3] - 3:25, 5:5, 70:22
weighed [1] - 18:23
weight [3] - 55:17, 55:18, 55:19
welcome [2] - 20:10, 72:7
well-established [1] - 65:24
well-respected [1] - 10:19
Western [1] - 56:7
whole [3] - 8:23, 40:18, 64:1
WILCOX [49] - 1:13, 2:6, 31:25, 32:7, 33:7, 34:10, 34:14, 35:12, 36:21, 36:25, 37:13, 39:9, 40:3, 40:21, 41:4, 42:11, 44:4, 45:9, 45:20, 46:10, 46:24, 47:4, 48:6, 48:8, 49:11, 49:13, 49:25, 50:14, 50:20, 51:9, 52:13, 53:1, 53:21, 54:13, 54:21, 55:22, 56:7, 57:21, 58:4, 58:8, 59:15, 59:23, 60:8, 60:16, 62:2, 62:14, 62:21, 63:10, 72:11

Wilcox [4] - 2:7, 31:24, 67:9, 70:13
Williams [1] - 30:16
willing [2] - 38:2, 40:12
win [1] - 51:20
wisely [1] - 7:22
withheld [7] - 9:23, 10:10, 10:12, 15:15, 65:8, 65:18, 71:21
withhold [2] - 23:4, 32:10
wonderful [1] - 35:8
word [5] - 9:13, 9:14, 19:13, 30:3, 54:18
Word [1] - 69:8
words [4] - 2:24, 8:14, 43:8, 47:11
works [2] - 49:8, 70:4
world [5] - 16:15, 33:20, 34:4, 39:4, 39:15
wrestle [2] - 62:13, 70:25
write [4] - 16:19, 33:3, 58:18, 68:7
writing [4] - 33:13, 34:7, 52:4, 54:7
written [4] - 39:5, 39:19, 53:19, 68:24
wrote [1] - 53:13

## Y

years [4] - 41:11, 43:22, 57:6, 58:1
yourself [2] - 7:3, 7:5
youth [1] - 18:16